IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT BOUTO, | ) |
| | ) Case No. 19-cv-2441 |
| Plaintiff, | ) |
| | ) |
| v. | ) District Judge John F. Kness |
| | ) |
| GUEVARA, et al., | ) Magistrate Judge Susan E. Cox |
| | ) |
| | ) |
| Defendants. | ) |
| | ) JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF COMPLAINT
REGISTER AND HOMICIDE FILES REQUIRED TO SUPPORT HIS *MONELL* CLAIM**

## PROPOSED BRIEFING SCHEDULE

Pursuant to Judge Kness's updated Motions Policy, the parties propose this agreed briefing schedule: 21 days for Defendants' response, and 10 days for Plaintiff's reply.

## INTRODUCTION

In this Section 1983 lawsuit, Plaintiff Robert Bouto alleges that notorious former Chicago Police Detective Reynaldo Guevara and other police and prosecutor defendants caused his 23-year wrongful imprisonment for a murder he did not commit. Mr. Bouto is one of dozens of men framed by Guevara, many of whom have likewise had their convictions overturned. Dkt. 1 ¶¶ 130-136. Additionally, Plaintiff brings a *Monell* claim against the City, alleging this wrongful conviction was caused by the deficient policies and customs of the Chicago Police Department.

In Plaintiff's First Set of Requests for Production, Ex. A, he sought documents required to prove his *Monell* claim, including: (1) Complaint Register ("CR") files documenting allegations of misconduct by Chicago police officers (RFP no. 55); and (2) files for other homicides investigated by Chicago police (RFP no. 53). Plaintiff has already significantly narrowed the scope of these requests, both in geography (narrowing Department-wide requests to cover only Area Five) and timeframe (20 years to 7 years). *Compare* Ex. A at RFP nos. 53, 55 with Ex. B (2020.02.11 Letter to City). Plaintiff has offered to narrow the timeframe even further if the City will stipulate to the statistical representativeness of this sub-set. *See* Ex. B. The City has refused this compromise; the parties are at impasse. *See* Ex. C, Rule 37.2 Cert; Exs. B, D-H.

Plaintiff thus moves this Court to compel production of the following documents:

I. Complaint Register ("CR") files for all Chicago police detectives present at Area Five from 1987-1993.
II. Complete files for all homicide investigations conducted by Chicago police detectives at Area Five for homicides taking place between 1987-1993.

The *Monell* discovery at issue here has been litigated in numerous cases alleging similar misconduct by Defendant Guevara and others, including *Reyes & Solache v. Guevara*, Nos. 18 C 1028 & 18 C 2312 (N.D. Ill.), where Judge Harjani ordered the City to produce all Area Five homicide investigative files and detective CR files from 1995-1998, Ex. I (*Reyes*, Dkt. 224), and

1

*Sierra v. Guevara*, No. 18 C 3029 (N.D. Ill.), where Judge Weisman ordered the City to produce the same for the period 1991-1995, Ex. J (*Sierra*, Dkt. 154). And in a case alleging similar misconduct in Area Four, Judge Harjani ordered production of CRs and homicide files from 1987-1991. Ex. K (*Prince v. Kato*, No. 18 C 2952 (N.D. Ill.), Dkt. 205). As in *Reyes*, *Solache*, *Sierra,* and *Prince,* this case presents compelling grounds for robust *Monell* discovery. The homicide files which Plaintiff seeks are independently relevant to each of his *Monell* theories. And the requested CR files are required to demonstrate the City's notice of investigative misconduct, and its failure to train, supervise, and discipline its officers.

Having no basis to seek dismissal of Plaintiff's meritorious *Monell* claims, and after losing a motion to bifurcate and stay *Monell* discovery, Dkt. 105, the City has no proper basis to resist this narrowly-tailored and centrally-relevant *Monell* discovery. The City's claim that homicide files are irrelevant to Plaintiff's *Monell* theories was soundly rejected in *Solache, Reyes*, *Sierra*, and *Prince*. Indeed, two federal juries have recently found, based on precisely such evidence, that the City's policies caused constitutional violations resulting in wrongful convictions. *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. Chicago*, No. 10 C 1168 (N.D. Ill.). And while the City concedes that CR files are relevant, it argues it should only have to produce CR files over a narrow four-year period while simultaneously refusing to stipulate that this period is representative of its policies and customs. The City should not be permitted to withhold sufficient CR files for Plaintiff to prove his *Monell* claim, then leverage that denial to argue at trial that the number of CR files reviewed is insufficient.

Importantly, the production at issue here will not be burdensome given the substantial overlap between productions in this case and those in other pending Guevara cases that involve similar *Monell* theories. Of the 7 years of homicide files sought in this motion, the City has

2

already been ordered to produce 3 years' worth (dated 1991-1993) in *Sierra*. *See* Ex. J. On top of that, 138 of the Area Five homicide files from 1985-1991 were already produced in the *Rivera* case, overlapping substantially with Plaintiff's request here. *See* Ex. I at 19, n.10. All of the CRs that Plaintiff seeks have likewise already been compelled in other wrongful conviction and FOIA cases against the City. *See, e.g.*, Ex. J (compelling production of Area Five CR files from 1991-1995); Ex. L, *Green v. Chicago Police Dep't*, No. 15 CH 17646 (Cook Cty., Ill. Chancery Ct., Jan. 10, 2020) (ordering production of all CR files, citywide, from 1967-2015). The production will likely also be required in other Guevara cases alleging similar *Monell* claims, where *Monell* bifurcation has been or may be denied. *See, e.g.*, *Maysonet v. Guevara*, No. 18 C 2342 (N.D. Ill.); *Rodriguez v. Guevara*, No. 18 C7951 (N.D. Ill.); *Gomez v. Guevara*, 18 C 3335 (N.D. Ill).

Plaintiff therefore respectfully moves for an order compelling the City to produce complete Area Five homicide files from 1987-1993 and CR files for all Area Five detectives present at Area Five in that same timeframe.

## RELEVANT BACKGROUND

Plaintiff's *Monell* claims concern misconduct by one of the most notorious police officers in Chicago history. The City has repeatedly been ordered in analogous cases to produce the relevant evidence at issue here. The same *Monell* claims are currently being litigated in a large number of related cases. And the City has been found liable already on similar *Monell* claims.

### A. Plaintiff's Allegations

Plaintiff alleges he was wrongly convicted of the 1993 murder of Salvador Ruvalcaba due to investigative misconduct by Guevara and his Area Five colleagues. Dkt. 1 ¶¶ 1-9. His conviction rested on eyewitness identifications which were fabricated and manipulated by Defendants, including those of Carl Richmond and Rey Lozada, *id.* ¶¶ 25-52, and on

3

"confessions" fabricated by Defendants and falsely attributed to Plaintiff by incentivized jailhouse accusers Francisco Vicente and Edwin Maldonado, *id.* ¶¶ 59-85. Plaintiff alleges that Defendants fabricated other evidence (including false police reports) and suppressed exculpatory evidence that would have proven his innocence and impeached the state's witnesses, including Guevara. *Id.* ¶¶ 51-58. Guevara has asserted his Fifth Amendment rights in response to all questions about the Ruvalcaba murder investigation and the prosecution of Mr. Bouto. *Id.* ¶ 134.

Discovery is in its infancy and no depositions have taken place, but Plaintiff has already amassed compelling evidence to support his claims, including sworn statements by Richmond and Lozada that they were pressured to falsely implicate Mr. Bouto through coercion and suggestive identification procedures, Ex. M (Richmond Tr.) at Bouto 7527-28, 7536-39; Ex. N (Lozada Aff.), and Vicente's testimony describing how Defendants Guevara and Halvorsen abused and threatened him, and fed him facts of murders to implicate Mr. Bouto (plus four men in other cases), Ex. O (Vicente Tr.) at 26-34, 47-48, 71-72, 89-93, 107-108, 190-191, 209-211.

Consistent with these allegations and based on evidence already developed, Plaintiff asserts *Monell* claims alleging that his constitutional violations and his wrongful conviction were caused by the City's policies and customs. These policies and customs: (1) allowed for eyewitness and identification procedure manipulation; (2) caused evidence fabrication; (3) caused routine evidence suppression, including burying documents in clandestine street files; and (4) left officers without adequate training, supervision, and discipline. Dkt. 1 ¶¶ 130-154.

**B.      Proof of the City's Policies and Customs in Other Cases**

Plaintiff's *Monell* theories have been tested in other cases in this District. In at least six recent lawsuits, the City has staunchly resisted yet eventually been ordered to produce homicide files like those Plaintiff seeks here, after courts determined that they were centrally relevant to

4

the same City policies and customs.[1] In two of those cases, federal juries found, based on the City's homicide files, that the City's policies and customs caused the violation of citizens' constitutional rights, and the City's post-trial motions have been denied. *Rivera*, Dkts. 678, 782; *Fields*, Dkts. 1175, 1227. Specifically, in *Rivera* and *Fields*, the homicide files were used to show that the City's policies and customs on investigative file keeping and the production of homicide files to the criminal justice system caused routine evidence suppression, violating the plaintiffs' constitutional rights. And in *Rivera*, the homicide files were used to show that the City's policies and customs regarding identification procedures caused constitutional violations.[2]

Numerous courts in this District have likewise recognized that CR files—the City's only documentation of complaints against its officers, and its response—are relevant to show notice to the City of police misconduct and to prove that the City did not properly train, supervise, and discipline. CR file production has been ordered in *Prince*, Ex. K at 11-12, *Sierra*, Ex. J at 3-4; *Reyes* and *Solache*, Ex. I at 21-24, as well as *Hood v. Chicago*, No. 16 C 1970 (N.D. Ill.), and *Washington v. Chicago*, No. 16 C 1893 (N.D. Ill.). These cases show that Plaintiff's *Monell* theories have merit, and that homicide and CR files are probative of such theories.

C.  *Monell* **Discovery Is Ongoing In Multiple Guevara Cases**

The *Monell* discovery Plaintiff seeks here also overlaps with ongoing *Monell* discovery in other Guevara cases. Guevara's long history of misconduct spans dozens of cases, Dkt. 1 ¶¶ 130-136, and many civil cases concerning Guevara's investigative misconduct and the City's policies and customs are currently pending, with *Monell* discovery presently moving forward in at least

---

[1] *Reyes & Solache*, Nos. 18 C 1028, 2312 (N.D. Ill.); *Sierra*, No. 18 C 3029 (N.D. Ill.); *Prince*, No. 18 C 2952 (N.D. Ill.); *Rivera*, No. 12 C 4428 (N.D. Ill.); *Fields*, No. 10 C 1168 (N.D. Ill.).
[2] The *Monell* theories in *Rivera* and *Fields*, and their supporting evidence, are explained in post-trial motion responses (Ex. P (*Rivera*, Dkt. 735) at 78-118; Ex. Q (*Fields*, Dkt. 1184) at 12-24), expert analyses of homicide files (Exs. R-T, Ex. U at 30-68 (*Rivera*); Ex. V, Ex. W at 6-39 (Fields)); and summary judgment briefs (Ex. X at 50-62). *See also Reyes*, Dkt. 195 at 5-7.

5

six of them, in which the City's bifurcation motions were denied.³ The cases all concern investigations between 1993 and 1998 and raise similar *Monell* theories. As a result, the City's burden of responding to *Monell* discovery will be shared among multiple, major civil suits.

### D. *Monell* Litigation in This Case

Against this backdrop, and based on Plaintiff's lawyers' experience proving the *Monell* claims at issue, Plaintiff issued requests for production to the City, seeking files relevant to his specific *Monell* theories for the relevant time period. Ex. A. The City moved to bifurcate and stay the *Monell* claims, Dkt. 83, which the Court denied, reasoning in part that "the burden of *Monell* production is lessened by the numerous similar cases that have required *Monell* discovery that is very likely to overlap with the *Monell* discovery in the instant matter," Dkt. 105 at 3.

Following the denial of bifurcation, Plaintiff conferred with the City and significantly narrowed the geographic scope of his requests for homicide and CR files, both in geography (Department-wide to Area Five only) and timeframe (20 years to 7). *Compare* Ex. A at RFP no. 53, 55 with Ex. B. Plaintiff has offered to narrow the timeframe even further if the City will stipulate to the statistical representativeness of the narrower sub-set. *See* Ex. B. The City has declined these compromise offers. Accordingly, Plaintiff seeks Area Five homicide files for homicides committed between 1987-1993 and CR files for officers present at Area Five during the same time period—the seven years leading to Plaintiff's arrest, prosecution, and conviction.

### DISCUSSION

**A.** ***Monell* Discovery Is Necessarily Broad, Given the Onerous Burden of Proof**

The federal notice pleading system contemplates that parties will have broad discovery to investigate facts and help define and clarify issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S.

---

³ In addition to this case, *see Sierra*, Dkt. 84, *Reyes & Solache*, Dkt. 174, *Gomez v. Guevara*, No. 18 C 3335 (N.D. Ill.), Dkt. 65, and *Rodriguez v. Guevara*, No. 18 C 7951 (N.D. Ill.), Dkt.51.

6

340, 351 (1978); *see also Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006). Accordingly, Fed. R. Civ. P. 26(b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Information is relevant if it "bears on" or "reasonably could lead to other matter that could bear on" any material facts or issue. *Oppenheimer*, 437 U.S. at 351. "The burden rests upon the objecting party to show why a particular discovery request is improper." *Parvati v. Oak Forest*, 2010 WL 2836739, at *1 (N.D. Ill. July 19, 2010). This Court has "extremely broad discretion in controlling discovery." *Jones v. Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013).

In determining the appropriate scope of discovery here, this Court must consider the stringent evidentiary requirements for Plaintiff to succeed on his *Monell* claims. To prevail, a plaintiff must gather evidence that a municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997); *Levy v. Marion Cty. Sheriff*, 940 F.3d 1002, 1010-13 (7th Cir. 2019). This evidentiary burden is especially heavy here, where Plaintiff must prove a widespread custom, over a sufficiently long time period, to establish liability. *See Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("[P]roof of isolated acts of misconduct will not suffice; a series of violations must be presented . . . ."); *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 780 (7th Cir. 2014) (three past suicides in a county jail was not sufficient evidence).

7

In light of this heavy burden, *Monell* discovery is routinely more complex than discovery against individuals. *See*, *e.g.*, *Elrod v. City of Chicago*, 2007 WL 3241352, at *5 (N.D. Ill. Nov. 1, 2007); *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 895 (N.D. Ill. 2000). Quite often, it requires production of many files and documents relevant to establishing widespread customs. For example, in *Awalt v. Marketti*, 2012 WL 6568242 (N.D. Ill. Dec. 17, 2012), the court compelled production of hundreds of inmate medical files (tens of thousands of pages) for a five-year period, reasoning that the plaintiff's *Monell* theory required her to "prove more than just one, or two, or even three instances of inadequate medical care." *Id.* at *6.[4] In *Padilla v. City of Chicago*, 2011 WL 3651273 (N.D. Ill. 2011), the court found it was clear error to refuse to order disclosure of five years' worth of misconduct reports across the whole police department. *Id.* at *4; *see also Santos v. Culver City*, 228 Fed. App'x 655, 660-61 (9th Cir. 2007) (reversing grant of summary judgment on *Monell* claim where the district judge denied five years of *Monell* discovery). These precedents convinced the courts in *Prince*, *Sierra*, *Reyes*, *Solache*, *Rivera*, and *Fields* to order production of hundreds of investigative files—from the City and third-parties—to litigate the *Monell* claims.[5] The production ordered in this case should take account of the fact that larger productions are routinely ordered in *Monell* cases, and that Bouto's request for documents is modest in light of the magnitude and importance of this litigation. *See Prince,* Ex. K at 3 ("Plaintiff bears a heavy burden in proving *Monell* claims" and "*Monell* discovery is

---

[4] Plaintiff's counsel's firm litigated *Awalt*, and thus has knowledge of the pages produced.
[5] Furthermore, the volume of documents in even a large *Monell* case like this one represents a tiny fraction of the volume of documents routinely produced in complex civil cases in this District. *See*, *e.g.*, *In re Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 2013 WL 1729682, at *1 (N.D. Ind. Apr. 18, 2013) (2.5 million documents); *Rawat v. Navistar Int'l Corp.*, 2011 WL 3876957, at *11-13 (N.D. Ill. Sept. 1, 2011) (1,170,932 pages); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006) (4 million pages).

8

inherently time-consuming and voluminous," so the Court should "not excessively limit discovery such that it affects Plaintiff's ability to prove his claim at trial.").

**B.     The Homicide Files Are Essential to Plaintiff's *Monell* Theories**

Area Five homicide files from 1987-1993 are unquestionably relevant to Plaintiff's *Monell* theories, contrary to the City's claims. Addressing similar *Monell* theories in *Reyes* and *Solache*, Judge Harjani "ha[d] no trouble concluding that the Area Five homicide files in question are relevant to [p]laintiffs' stated *Monell* claims," and set forth the numerous bases for that relevance, which track those asserted by Mr. Bouto here. Ex. I at 8. Likewise, in *Sierra*, Judge Weisman found that "plaintiff must have access to enough other homicide investigations to demonstrate that any violation of his constitutional rights was part of a larger practice," that Mr. Sierra "has explained a means by which the requested information . . . is sufficiently important for him to access and review," and the fact that he had "no other ready means of gathering this type of information and his *Monell* claim raises questions that are important not only to him but to the public-at-large also justifies the burden involved in the discovery requested." Ex. J at 2. *See also Prince*, Ex. K at 4-8. This Court should reach the same result.

**General Relevance of Homicide Files.** The City's homicide files represent perhaps the only documents the City possesses documenting Area Five homicide investigations during the relevant timeframe. The files reflect the police department's version of what occurred during the investigations. They are thus the linchpin of any theory about the City's widespread customs in homicide cases, and they are essential to assess any *Monell* theory regarding systematic defects in those investigations. If the City were permitted to decline to disclose these files, it would be difficult, if not impossible, for Plaintiff to prove *Monell* liability.

9

**Relevance to Eyewitness Identification Theories.** Area Five homicide files will reveal evidence that City policies and customs led to unduly suggestive identifications, and the suppression of identifications, violating due process. The files will likely indicate: (1) whether improper identification procedures were used during an investigation;[6] (2) whether eyewitness identifications are unreliable, implausible, or impossible;[7] and (3) whether identification procedures went undocumented or were documented improperly.[8] For example, the files will likely contain evidence of the use of improperly suggestive "show-ups," live line-ups and clothing identification procedures. They will demonstrate that the City failed to accurately document identification procedures, suppressing evidence that would have revealed unreliable eyewitnesses. *See* Ex. S at 17-18. And the homicide files will reveal facts showing that an eyewitness identification was the result of officer manipulation or suggestion. This may take the form—as it did in *Rivera* and *Fields*—of police reports and evidence revealing that a witness who later testified in the criminal proceedings could not have observed the crime or identified the perpetrator. It may also take the form of circumstantial indicia of unreliability—*e.g.*, a stranger identification, many months after, that is inconsistent with initial descriptions and based on suspect viewing opportunities—that reveal witness manipulation upon investigation.

All of these different theories are in play in Plaintiff's case. Mr. Bouto was placed in an improper, suggestive "show-up" procedure. Dkt. 1 ¶ 35. He was identified in suggestive line-ups, where eyewitnesses were told who to pick prior to viewing. *Id.* ¶ 36. The clothing line-ups

---

[6] Improper procedures include show-ups, clothing line-ups, live lineups or photo arrays in which the fillers look different than the suspect, as well as identification procedures that suggest who the suspect is (for example, where an eyewitness is told who the suspect is, or shown a single person or photo, prior to the procedure).
[7] In *Rivera* and *Fields*, homicide files revealed that certain witnesses who provided identifications could not have actually seen the perpetrator at all. *See Sierra*, Dkt. 138 at 10-11.
[8] In *Rivera*, the homicide files showed that CPD never documented identification procedures where someone other than the suspect was picked. See Ex. X at 59-62; Exs. S, T.

impermissibly suggested Mr. Bouto's clothing as the only possible selection. Dkt. 1 ¶ 45-50. And even before any depositions have been taken, sworn statements from Richmond and Lozada show they were pressured to falsely implicate Mr. Bouto through coercion and suggestive procedures. Ex. M at Bouto 7527-28, 7536-39; Ex. N. Plaintiff is also investigating whether a photograph of Mr. Bouto was impermissibly shown to witnesses prior to their identifications. There is also ample evidence in this case that eyewitnesses could not reliably see the face of the shooter, because his face was concealed by a hood and they were scrambling to avoid getting shot themselves. Dkt. 1 ¶ 48; Ex. N. The police reports documenting the identification procedures, moreover, are contradicted by Richmond and Lozada's sworn statements.

In short, the homicide files will show, as they did in *Rivera*, that the manipulation of eyewitness identification procedures and the misreporting of those procedures was the result of City policy and custom, and not an isolated event. Notably, manipulated identification procedures, and the failure to report the tactics used in identification procedures, are issues in numerous other Guevara cases.[9] And, as indicated above, Judges Harjani and Weisman deemed homicide files relevant to pursuing such a *Monell* theory. *Prince*, Ex. K at 4; *Sierra*, Ex. J at 1-2.

**Relevance to Fabrication Theories.** The homicide files are also probative of Plaintiff's *Monell* fabrication theories because they will likely contain documents that themselves are fabricated evidence. Homicide files standing alone can reveal fabricated police reports, such as when the "official" story told in typed police reports contradicts other documents in the file. For example, in *Rivera*, police reports suggested Mr. Rivera became a suspect only after the eyewitness picked his photo from a mugbook, but the homicide file contained a rap sheet

---

[9] *See, e.g.*, *Sierra, Solache, Reyes, Rodriguez, Gomez, Almodovar v. Guevara*, No. 18 C 2341 (N.D. Ill.), *Negron v. Guevara*, No. 18 C 2701 (N.D. Ill.), *Montanez v. Guevara*, No. 17 C 4560 (N.D. Ill.), and *Serrano v. Guevara*, No. 17 C 2869 (N.D. Ill.).

11

revealing that defendants had considered him a suspect days earlier. Fabrication is also apparent when documentation of witness statements in police reports is contradicted by other reports or officer notes. "Homicide investigative files could also contain evidence supporting allegations of coercion," such as the length of time a witness or suspect was in custody prior to giving a statement, the participants in the interrogation, and the resulting statements. *Reyes*, Ex. I at 8.

As additional examples: the homicide files produced in *Monell* discovery in *Rivera* litigation concerning the investigation and arrest of Demetrius Johnson contained a fabricated police report stating that a key eyewitness had never previously identified anyone but Johnson, when in fact the eyewitness had first identified a different suspect. Ex. Y (Johnson PC petition). Or consider the file in Rivera's case itself, where a report stated the crime victim had picked Rivera in a photo line-up conducted by Guevara, but other evidence revealed the victim was in a coma at the time. *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1032 (N.D. Ill. 2018). These are merely examples of ways in which past homicide file reviews have revealed fabricated evidence.

It is already apparent that similar evidence was fabricated in this case, including fabricated inculpatory statements by Vicente and Maldonado, which both have since recanted. For his part, Vicente has testified under oath about the manner in which Guevara and Halvorsen abused and threatened him and fed him facts of other murders to implicate Mr. Bouto (and four other men). Ex. O at 26-34, 47-48, 71-72, 89-93, 107-108, 190-191, 209-211. Defendants Guevara and Halvorsen fabricated police reports documenting the fabricated "confessions," and the supposed method by which they claimed to have learned of them. *Id.* at 47-53.

The manipulated identification theories discussed above also tie into fabrication of evidence. When a witness is told who to pick in a lineup, or is repeatedly shown that person's photo before viewing, police reports are typically created afterward that omit such information,

12

instead falsely stating the witness viewed the lineup and made a confident, unprompted identification. Such reports, too, are fabricated evidence. The homicide files will reveal these fabrications in Mr. Bouto's case were part of a pattern of fabrication endemic in Area Five.

**Relevance to Suppression Theories**. The homicide files are also relevant to Plaintiff's allegations that the City had an unconstitutional practice of suppressing evidence. This includes the suppression of investigative materials in clandestine files not provided to prosecutors and defense attorneys, and the widespread failure to preserve or document pertinent investigative information in the homicide files in the first place. Area Five homicide files are relevant to both theories. They can be examined by themselves to determine whether investigative information has been suppressed,[10] or compared with other files concerning the same investigation and prosecution to show what evidence was suppressed.[11] Such examination and comparison in *Rivera* and *Fields* revealed systemic evidence suppression. *See generally* Exs. R-X.

Plaintiff has alleged, and intends to prove, that exculpatory evidence was suppressed during his criminal case. Even in the beginning stages of discovery here, Plaintiff's investigation has uncovered withheld evidence of: (1) improper tactics during eyewitness identifications; (2) promises, threats, and coercion used on Vicente and Maldonado; (3) missing police reports documenting important developments; (4) an exculpatory 911 call; and (4) a photograph of Mr. Bouto that was impermissibly shown to witnesses before identification procedures. Mr. Bouto is entitled to the discovery to show that this suppression was a matter of City policy and custom.

---

[10] For example, the *Rivera* homicide file contained General Progress Reports (GPRs) on which detectives write notes, but the Investigative File Inventory (which tracks the materials in the investigative file) showed that multiple GPRs created on key dates and logged into the file had gone missing. Ex. P at 30.

[11] For example, in *Rivera*, the Investigative File Inventory documenting the missing GPRs was not handed over to prosecutors or defense attorneys, leaving them in the dark that key investigative information had not been provided. Ex. P at 29-30.

**Relevance to Training and Supervision Theories.** Homicide files are relevant evidence of a failure to train and supervise police officers. In *Fields* and *Rivera*, the homicide files on their face contained ample evidence that police officers routinely did not follow written City policies governing the maintenance and production of homicide files. Ex. Q at 16-24; Ex. P at 82-83.

**No Undue Burden**. Production of the homicide files is not burdensome.[12] Of the 7 years of homicide files sought in this motion, the City has already been ordered to produce 3 years of the files (dated 1991-1993) in the *Sierra* case. *See* Ex. J. On top of that, 138 of the Area Five homicide files from 1985-1991 were already produced in the *Rivera* litigation. *See* Ex. I at 19, n.10. And of the remaining homicide files that Plaintiff requests in this case, many will be relevant in multiple other Guevara cases in which bifurcation has been denied. *See supra* at 5-6.

**C.     The CR Files Are Relevant and Should Be Produced Over the Same Timeframe**

The City does not dispute that CR files are relevant to Plaintiff's *Monell* theories that the City failed to train, supervise, and discipline its employees.[13] CR files are, at minimum, probative of the City's failure to train and supervise, and its notice of patterns of misconduct. Rather, the parties' CR file dispute turns on the time duration. Plaintiff seeks CR files for detectives present at Area Five from 1987-1993. This is the minimum evidence required to prove his *Monell* claims. Plaintiff bears the burden of proving his *Monell* theories, and courts have repeatedly held that proving failure to train or supervise is a tall order. *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (municipality must have had notice of the problem); *see also*

---

[12] As this Court has already determined, "the burden of *Monell* production is lessened by the numerous similar cases that have required *Monell* discovery that is very likely to overlap with the *Monell* discovery in the instant matter." Dkt. 105 at 3.

[13] Nor could it. Many Courts have recognized that CR files—the City's sole mechanism of documenting complaints against police officers and the City's response to those complaints—are central to claims that the City failed to properly train and supervise. *Reyes*, Ex. I at 21-24 (collecting cases); *Hood v. Chicago*, No. 16 C 1970, Dkts. 172, 182, 189, 190, 191 (N.D. Ill.); *Washington v. Chicago*, No. 16 C 1893 (N.D. Ill.).

14

*Rivera v. Guevara*, 319 F.Supp.3d 1004, 1070 (N.D. Ill. May 11, 2018) (holding that the records of misconduct relating to Guevara were insufficient to show a failure to train or discipline).

The production of CR files should not be limited further, given that the City has categorically refused to stipulate that its more limited proposed timeframe is representative of its policies and customs, and intends to contest, on statistical grounds, the reliability of such a sub-set. The City wants to deny discovery *ex ante* and then argue that there is insufficient evidence *ex post*. As Judge Harjani put it in *Reyes*, "the City cannot have it both ways" by refusing to stipulate that it will not challenge the size of the very sample it offers to produce; "the failure of the City to agree to a stipulation is illuminating . . . In other words, its lack of willingness to stipulate diminishes the strength of its proposal." Ex. I, Dkt. 224 at 22.

Moreover, the City's objection on the basis of burden is unwarranted. First, the burden is not disproportionate, because Plaintiff is entitled to discover evidence required to meet his substantial burden of proof for *Monell* claims. Second, the CR file production sought here is largely duplicative of production in other civil rights and FOIA cases. *See supra.* at 3.

Plaintiff is prepared to review the entire set of relevant files and present evidence to the jury that the City failed to train and discipline officers. He does not want to have a battle of statistical experts who present evidence about the reliability of a narrower sub-set. The City cannot provide a justification for requiring such a battle through a discovery limitation.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Court order the City to produce Area Five homicide files for the years 1987 through 1993, and all CR files for detectives who worked at Area Five between 1987 and 1993, inclusive.

15

                                                      RESPECTFULLY SUBMITTED,

                                        By:    /s/ Sam Heppell
                                                  *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Sam Heppell
LOEVY & LOEVY
311 North Aberdeen
Chicago, Illinois 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

    I, Sam Heppell, an attorney, hereby certify that on May 27, 2020, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                                        By:    /s/ Sam Heppell
                                                  *One of Plaintiff's Attorneys*