## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT BOUTO, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 19-cv-2441** |
| | ) | |
| v. | ) | **Judge John F. Kness** |
| | ) | **Magistrate Judge Susan E. Cox** |
| CHICAGO POLICE OFFICERS | ) | |
| REYNALDO GUEVARA, JOANN | ) | |
| HALVORSEN as SPECIAL | ) | |
| REPRESENTATIVE for ERNEST | ) | JURY TRIAL DEMANDED |
| HALVORSEN, EDWARD MINGEY, | ) | |
| KENNETH PANG, ALAN PERGANDE, | ) | |
| RICHARD MAHER, L. MARRON, AND | ) | |
| UNKNOWN OFFICERS; KEVIN | ) | |
| HUGHES; CITY OF CHICAGO; and | ) | |
| COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Robert Bouto, by his attorneys, Loevy & Loevy, complains of Defendant Chicago Police Department Officers Reynaldo Guevara, JoAnn Halvorsen as Special Representative for Ernest Halvorsen, Edward Mingey, Kenneth Pang, Alan Pergande, Richard Maher, L. Marron, and Unknown Officers; Former Assistant State's Attorney Kevin Hughes; City of Chicago; and Cook County, as follows:

## INTRODUCTION

1.     Plaintiff Robert Bouto was wrongfully convicted of the tragic 1993 shooting death of Salvador Ruvalcaba. Plaintiff was convicted solely because Defendants framed Bouto for the murder.

2.     Mr. Bouto had nothing to do with the murder; as two independent alibi

witnesses have maintained with absolute certainty for over two decades, Mr. Bouto, then just 17 years old, was with them at the time of the shooting.

3.      The City of Chicago conducted its own investigation into Mr. Bouto's case and concluded that Mr. Bouto is innocent.

4.      This was a classic set-up by the now-notorious Chicago Police Detective Defendant Reynaldo Guevara and his cohorts, who specialized in framing young men to close unsolved cases and did so time and time again over the course of two decades working for the Chicago Police Department.

5.      To secure Mr. Bouto's wrongful conviction, Defendant Guevara and other Defendants coerced, manipulated, and instructed eyewitnesses—most of whom were teenagers—to identify Mr. Bouto as the shooter, even though they witnessed a chaotic scene and were too far from the shooter to reliably identify anyone.  The two eyewitnesses who identified Mr. Bouto at trial have since recanted their testimony, alleging that Guevara improperly influenced their identifications and that they did not even see the perpetrator's face.

6.      For his part, Defendant Guevara has universally taken the Fifth about his activities as a Chicago police officer in the face of over 100 incidents of his misconduct, asserting his right to silence on grounds that truthful responses would subject him to criminal liability.

7.      Due to Defendants' foul play, Plaintiff was wrongfully convicted of Ruvalcaba's 1993 shooting death and spent 23 years in prison as an innocent man.

8.     In 2018, Plaintiff was finally vindicated: the Circuit Court of Cook County vacated his conviction and the charges against him were dismissed. Mr. Bouto received a Certificate of Innocence on May 27, 2019.

9.      He now brings this action to redress the devastating injuries that Defendants have caused him.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claim for indemnification pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

13.     Plaintiff Robert Bouto is a resident of Cook County, Illinois, who spent approximately 23 years in prison for a crime he did not commit.

14.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendant Officers.  The City of Chicago is liable for the acts of the Defendant Officers while acting within the scope of their employment for the City.

3

15.     At all times relevant hereto, Defendants Reynaldo Guevara, Edward Mingey, Kenneth Pang, Alan Pergande, Richard Maher, L. Marron, and other unknown law enforcement officers, as well as deceased officer Ernest Halvorsen, (collectively, the "Defendant Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.[1]

16.     JoAnn Halvorsen, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

17.     Defendant Edward Mingey, at all relevant times, supervised the Police Officer Defendants. He facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

18.     At all relevant times, Kevin Hughes was an Assistant Cook County State's Attorneys. Hughes conspired with the Defendant Officers, prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in an investigatory capacity, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for Salvador Ruvalcaba's murder.

19.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office.  Defendant

---

[1] The collective "Defendants" also includes Mr. Halvorsen.

Cook County was at all relevant times the employer of Defendant Hughes and is a necessary party to this lawsuit.

## FACTS

### The Crime

20.     At approximately 3:05 pm on May 14, 1993, an unknown person fatally shot Salvador Ruvalcaba.

21.     The tragic murder occurred near Roosevelt High School in Chicago, right after school let out for the day.

22.     At the time of his death, Ruvalcaba had been walking with several members of the Spanish Cobra street gang.

23.     After striking the victim with multiple bullets, the perpetrator fled the scene.

24.     Investigators later recovered cartridge casings from a grassy area about 245 feet away from the victim's body.

25.     Mr. Bouto had nothing to do with the crime. At the time of the shooting, Mr. Bouto was a few blocks away in an alley embracing his high school girlfriend, Tania Astefan.

26.     For decades, Tania Astefan has consistently maintained that Mr. Bouto was with her at the time of the shooting.

27.     Also for decades, Ms. Astefan's friend, Helen Kandah, has consistently maintained that Mr. Bouto was kissing Ms. Astefan at the time of the shooting.

28.     After the shooting, police officers interviewed numerous witnesses, including Carl Richmond, Rey Lozada, and other Spanish Cobra gang members who were with Ruvalcaba when he was shot, as well as several neighborhood witnesses, including Margaret and Michael Fleming.

29.     Richmond and the other Spanish Cobras who witnessed Ruvalcaba's death described the shooter to police at the scene as a 16- to 17-year-old Hispanic male member of the rival P.R. Stones gang with a ponytail, 5' 7" tall, 140 pounds, and wearing a blue hoodie, long black shorts, and white shoes.

30.     Similarly, the neighborhood witnesses described the offender as a 16-year-old Hispanic male with a ponytail, 5' 5" tall, 120 pounds, and wearing a black t-shirt, 3/4-length baggy pants, and white high-top shoes. The shooter was further described as "clean shaven."

31.     When initially questioned by the police, no witness was able to identify the shooter by name.

32.     Although Richmond, Lozada, and other witnesses were acquainted with Mr. Bouto, none of them initially identified him as the shooter.

33.     Officers began searching the area for potential suspects.

34.     The area of the murder and surrounding blocks was a densely populated urban area that included not only a large city high school but also many businesses and residences.

35.     In the hour after the Ruvalcaba shooting, the blocks surrounding the murder scene were populated by numerous pedestrians, including students leaving

6

Roosevelt High School, persons frequenting nearby businesses, residents of the surrounding homes, and other passersby.

## Defendants Taint Eyewitness Identifications
## Through a Suggestive "Show-Up"

36.     Some time later, Defendant Officers including Alan Pergande and Kenneth Pang detained Mr. Bouto about four blocks from the scene.

37.     Defendants ordered Mr. Bouto into their police car.

38.     Defendants including Pang and Pergande arrested Mr. Bouto.

39.     Defendants Pang and Pergande drove Bouto and some other boys to the crime scene.

40.     According to Pergande, Defendants took Mr. Bouto into custody because Mr. Bouto matched the description of the perpetrator.

41.     Yet other than wearing a blue hooded shirt and dark ¾-length shorts, Mr. Bouto did not otherwise match the shooter's description.

42.     Mr. Bouto had no ponytail on May 14, 1993.

43.     At 5'10", Mr. Bouto was significantly taller than the shooter.

44.     Mr. Bouto did not have on white high-top shoes.

45.     Mr. Bouto's shorts were neither "black" nor "baggy."

46.     Mr. Bouto was not "clean shaven."

47.     Rather, Mr. Bouto had a prominent mustache, a "soul patch" above his upper lip, and dark stubble on his chin and neck.

48.     Blue hooded shirts were common attire in the neighborhood at the time.

49.     Dark ¾-length shorts were common attire in the neighborhood at the time.

50.     Moreover, as confirmed by the lengthy distance between the shell casings and Ruvalcaba's body, many of the eyewitnesses, such as Lozada and Richmond, were much too far away from the shooter to reliably identify him.

51.     Nonetheless, Defendants used suggestive and coercive methods to manipulate the eyewitnesses to identify Mr. Bouto as the shooter.

52.     First, at the scene, Defendants intentionally performed a "show-up" to manufacture evidence to continue to hold Mr. Bouto.

53.     Defendants presented a handcuffed Mr. Bouto, and the other boys detained with him, to some of the eyewitnesses at the scene for identification as the perpetrator.

54.     Defendant Pergande conducted and/or participated in the show-up.

55.     Defendant Pang conducted and/or participated in the show-up.

56.     Defendant Guevara conducted and/or participated in the show-up.

57.     Detective Halvorsen conducted and/or participated in the show-up.

58.     As Defendants were well aware, the show-up was improper and impermissibly suggestive, because it strongly indicated to the witnesses that the Defendants had captured the perpetrator and brought him to the scene; indeed, the Defendants expressly advised the witnesses that the show-up contained the "murderer" and that the "offender was in custody," or words to that effect. Some of

the witnesses were even falsely advised during the show-up by Defendant Guevara and others that Mr. Bouto was the shooter.

59. In addition, Mr. Bouto was the only participant in the show-up who bore any resemblance whatsoever to descriptions of the perpetrator.

60. Using this suggestive and improper procedure, Defendants including Pergande, Pang, and Guevara fabricated identifications by Lozada and Richmond (then just 15 and 19 years old, respectively) of 17-year-old Mr. Bouto as the gunman.

61. After fabricating and tainting these eyewitnesses' identifications, Defendants Guevara, Pergande, and Mr. Halvorsen prepared false, misleading, and incomplete police reports, in which they intentionally declined to document the procedure used during the show-up, the actions taken that influenced the witnesses' identifications, the clothing and physical characteristics of the participants in the show-up other than Mr. Bouto, and the full and complete responses of all witnesses who viewed the show-up.

62. The Defendants also purposefully declined to photograph the other participants in the show-up, or to arrange for such photographs to be taken by others, so that such photographic evidence would be kept from Mr. Bouto's defense.

63. Defendants Guevara and Pergande, and Mr. Halvorsen deliberately took these actions to ensure that Mr. Bouto would not have this exculpatory information for use in his defense, and they withheld it from Mr. Bouto's defense.

64.     Defendant Mingey, who was working that day as a watch commander, approved of and condoned the show-up procedure despite knowing of its impermissibly suggestive nature.

### Defendants Further Taint Eyewitness Identifications through a Suggestive Line-up

65.     Subsequently, Mr. Bouto was transported to the police station, where Defendants including Guevara placed him in a line-up and engaged in additional misconduct to manipulate the eyewitnesses to identify him.

66.     Prior to the line-up, Detective Guevara showed Mr. Bouto to many of the witnesses and instructed them that he was the shooter and that they should select him.

67.     Also prior to the line-up, Detectives Guevara and Halvorsen allowed the witnesses to view photographs of Mr. Bouto at Area 5 detective headquarters.

68.     Defendants further put their thumb on the scale by constructing the line-up to suggest Mr. Bouto as the only possible selection that remotely matched the eyewitnesses' descriptions.

69.     As one example, Mr. Bouto was the only person in the line-up wearing a dark top and ¾ length shorts; most of the other participants wore clothing that, as with the show-up, bore no resemblance whatsoever to descriptions of the perpetrator.

70.     As a result of the Defendants' misconduct, Richmond and Lozada viewed the line-up and repeated their identification of Mr. Bouto as the shooter.

71.     Defendants also tainted the identifications of neighborhood witnesses Margaret and Michael Fleming by similarly presenting them with a line-up that suggested Mr. Bouto as the only possible selection.

72.     Margaret and Michael Fleming had admitted that they did not view the offender's face.

73.     Margaret and Michael Fleming were asked to identify the shooter in the line-up based only on his clothing.

74.     Yet no one in the line-up other than Mr. Bouto was wearing ¾ length shorts and a dark shirt.

75.     The remaining participants in the line-up wore clothing that did not match the descriptions of the shooter's clothing.

76.     The clothing line-up was not a proper identification procedure.

77.     The clothing line-up suggested Mr. Bouto as the only possible selection.

78.     The clothing line-up was unfairly suggestive.

79.     Due to Defendants' misconduct, Margaret and Michael Fleming identified Mr. Bouto as the perpetrator based on his clothing.

80.     Guevara, Pergande, and/or Halvorsen prepared false, misleading, and incomplete police reports documenting the line-up that omitted material facts. For example, they purposefully omitted mention of the methods they used during the line-up, their actions to influence the identifications, and the full complete responses of all eyewitnesses who viewed the show-up to taint the identifications. Guevara,

11

Pergande, and/or Halvorsen authored the reports in this manner to withhold exculpatory evidence from Mr. Bouto's defense.

81.     Defendant Mingey was working as a watch commander on the day of the line-up in the Ruvalcaba homicide investigation.

82.     Defendant Mingey expressly approved and condoned the line-up procedure despite knowing of its impermissibly suggestive nature.

**Defendants Destroy and Suppress
Additional Exculpatory Evidence**

83.     Defendants also suppressed and destroyed additional exculpatory evidence that would have demonstrated Mr. Bouto's innocence, in order to frame him for the Ruvalcaba murder.

84.     For example, Defendants including Pergande, Pang, Guevara, and Halvorsen withheld and suppressed their contemporaneous documentation of exculpatory witness statements and other identification procedures conducted during the Ruvalcaba homicide investigation.

85.     During one meeting with Defendant Officers including Defendant Guevara and Defendant Pang, Mr. Bouto offered to retrieve alibi witness Tania Astefan's phone number from his pager.

86.     In response, one of the Defendants removed the battery from the pager, thus erasing its memory and, accordingly, Astefan's phone number.

87.     Defendants intentionally omitted mention of this occurrence in their police reports.

88.     Had the pager memory been maintained, Mr. Bouto could have put officers or prosecutors in touch with Ms. Astefan to confirm his alibi and would not have been charged with murder.

89.     Mr. Bouto also requested a gunshot residue test and a polygraph examination to prove his innocence and prevent the destruction of exculpatory evidence.

90.     Defendants could have arranged for a gunshot residue test had they wanted to.

91.     Defendants had to opportunity to request that a gunshot residue test be performed at the time of the Ruvalcaba homicide investigation.

92.     Defendants could have arranged for a polygraph examination had they wanted to.

93.     Polygraph examinations were readily available to Defendants at the time of the Ruvalcaba homicide investigation.

94.     Defendants declined to request a gunshot residue test or polygraph examination for Mr. Bouto.

95.     They did so even though those tests were easily available to them, in service of their goal of framing Mr. Bouto for the Ruvalcaba homicide.

96.     Defendants refused the tests in bad faith. They wanted to pin the Ruvalcaba homicide on Mr. Bouto even though they knew that he had not shot Ruvalcaba and thus did not, for example, have gunshot residue on his hands.

97. Defendants intentionally declined to document Mr. Bouto's requests for testing.

98. Had Defendants performed a gunshot residue test on Mr. Bouto, such a test would have provided powerful exculpatory information and Mr. Bouto would not have been charged and prosecuted for the Ruvalcaba homicide.

99. Had Defendants performed a gunshot residue test on Mr. Bouto, which came out negative, and had Mr. Bouto passed a polygraph examination that indicated that he was being truthful (and/or not exhibiting deception) as to his alibi and innocence of the crime, the prosecution would not have brought charges against Mr. Bouto.

100. In ways such as these, Defendants knowingly created a false and misleading record that omitted material facts, misrepresented material facts, fabricated evidence against Mr. Bouto, destroyed exculpatory evidence, and withheld exculpatory information from his defense.

**Defendants Fabricate a Purported Confession
to Heroin Addicts Francisco Vicente and Edwin Maldonado**

101. The "evidence" collected thus far was then presented to Assistant State's Attorney Sally Bray of the State's Attorney's Felony Review Unit.

102. Attorney Bray reviewed the evidence on or about the evening of May 14, 1993.

103. In the alternative, Attorney Bray reviewed the evidence on or about the morning of May 15, 1993.

14

104.     Felony Review Attorney Bray declined to approve charges against Plaintiff.

105.     Felony Review Attorney Bray deemed the evidence collected thus far insufficient for charges against Plaintiff.

106.     At that point, there was no probable cause to believe that Plaintiff had committed the crime.

107.     The eyewitness identifications were insufficient for a multitude of reasons, including but not limited to that they resulted from unduly suggestive procedures; were provided against Plaintiff by rival gang members; failed to explain why eyewitnesses such as Richmond, who knew Plaintiff, would have failed to identify him by name had they truly seen him murder Ruvalcaba; diverged greatly from the descriptions provided by the same eyewitnesses; and were fabricated. In addition, Plaintiff had alerted police to the existence of his alibi witness, Tania Astefan, but police had not yet spoken to her.

108.     Bray directed that Detectives Guevara and Halvorsen should locate Mr. Bouto's girlfriend and another individual known as "Mario" who had been identified by eyewitness Frank Escovar as having handed the gun to the perpetrator.

109.     Defendants declined to do as Bray had requested. -

110.     Defendants took no steps to try to locate Mr. Bouto's alibi witness, Ms. Astefan, in response to Ms. Bray's request.

111.     Defendants took no steps to try to locate "Mario" in response to Ms. Bray's request.

112.    Defendants Guevara and Halvorsen did not document in any police report any actions taken after Ms. Bray's request, on May 14, 1993 or May 15, 1993, to locate Plaintiff's alibi witness (Ms. Astefan) or "Mario."

113.    Instead, Defendants manufactured additional evidence to facilitate the approval of charges against Bouto: a purported jailhouse confession by Mr. Bouto to heroin addict Francisco Vicente. According to this fictitious story, Bouto had spontaneously confessed to the murder to Vicente and another detainee and heroin addict, Edwin Maldonado, while the three strangers were detained in separate cells in a lockup.

114.    This was false. Mr. Bouto did not commit the murder.

115.    Mr. Bouto did not confess to the murder to Vicente and Maldonado.

116.    Indeed, the City itself has determined that Mr. Bouto is innocent and that Vicente's claim was a lie.

117.    When he met the Defendant Officers, Vicente was highly vulnerable to Defendants' manipulation.

118.    Vicente was suffering from heroin withdrawal.

119.    Vicente had been robbing people to feed his heroin addiction.

120.    Vicente had an extensive criminal history.

121.    Vicente was facing up to 100 years in prison on four felony robbery charges.

16

122. Guevara and Halvorsen met with Vicente and falsely told him that Mr. Bouto had committed the Ruvalcaba homicide. They then instructed Vicente to claim that Mr. Bouto had confessed the crime to him and Maldonado, while in the lockup.

123. To coerce Vicente to acquiesce to the scheme, Guevara and/or Halvorsen detained Vicente for hours, used force on him, threatened him, and promised him assistance with pending criminal charges.

124. So that Vicente's false narrative would appear more credible, Guevara and/or Halvorsen purposefully fed Vicente details of the Ruvalcaba homicide that they had already learned from eyewitnesses.

125. Defendants then knowingly dictated a false handwritten statement for Vicente to sign, which detailed the purported confession from Mr. Bouto.

126. Specifically, Guevara and/or Halvorsen arranged for and conspired with Defendant Assistant State's Attorney Hughes to record a false statement on Vicente's behalf.

127. Defendant Hughes did not interview Vicente, and record Vicente's account as provided to him by Vicente.

128. Rather, Defendant Hughes purposefully allowed Defendants Guevara and/or Halvorsen to dictate Vicente's statement and recorded Guevara and/or Halvorsen's account of Vicente's statement.

129. Defendant Hughes then documented that the contents of the statement had been provided to him by Vicente.

130. Defendant Hughes's documentation described in Paragraph 129 was false, as Defendant Hughes knew.

131. Defendant Hughes included this account to lend false credibility to Vicente's supposed inculpation of Bouto.

132. Defendant Hughes did so because, as he was well aware, probable cause did not exist to charge Plaintiff for the Ruvalcaba murder, and he was complicit with the Defendant Officers in wanting to frame Plaintiff for that murder.

133. In the alternative, Guevara and Halvorsen concealed their fabrication of the purported confession from Defendant Hughes.

134. Defendant Hughes then approved charges against Plaintiff—charges which had previously been rejected by Attorney Bray—based on the fabricated statement from Vicente.

135. Defendant Hughes approved charges even though Guevara and Halvorsen had not made any attempt to locate Plaintiff's girlfriend and alibi witness (Tania Astefan) or "Mario" since Felony Review Attorney Bray's request.

136. Defendant Hughes approved charges even though Guevara and Halvorsen had not documented any attempt to locate Plaintiff's girlfriend and alibi witness (Tania Astefan) or "Mario" since Felony Review Attorney Bray's request.

137. Defendant Hughes approved charges even though Guevara and Halvorsen had not informed Hughes of any attempt to locate Plaintiff's girlfriend and alibi witness (Tania Astefan) or "Mario" in response to Felony Review Attorney Bray's request.

138.    Guevara and Halvorsen documented in police reports the details of the fabricated account that Halvorsen and/or Guevara had knowingly fed to Vicente.

139.    Guevara and Halvorsen withheld documentation of their actions to coerce Vicente to acquiesce to the scheme, including their supplying him with details of the crime, to keep such exculpatory information from Mr. Bouto's defense.

140.    Guevara and Halvorsen documented in police reports that Vicente had informed Defendant Maher that Vicente had heard a murder confession in the lock-up.

141.    Guevara and/or Halvorsen documented in police reports that Halvorsen had first learned of Mr. Bouto's purported confession to Vicente from Defendant Maher.

142.    The documentation described in Paragraph 140 was false.

143.    The documentation described in Paragraph 141 was false.

144.    The false statements described in Paragraphs 140 and 141 were recorded to conceal Defendants' misconduct in fabricating Vicente's statement.

145.    Defendant Maher backed the false claim that Vicente had told him first that Bouto confessed.

146.    According to Defendants, Maher told Halvorsen of Vicente's statements inculpating Bouto at the time Halvorsen first arrived at work on May 15, 1993.

147.    This was false.

148. Without Defendant Maher's agreement to carry out the lie, the other Defendants would not have been emboldened to coerce Vicente to falsely implicate Mr. Bouto.

149. Defendant Maher also participated in fabricating Vicente's false inculpation of Bouto in the crime.

150. Pleading in the alternative, and upon information and belief, Guevara and/or Halvorsen instructed arresting officers Lupe Pena and Defendant L. Marron to falsely claim that Vicente told them first that Bouto confessed, and the arresting officers complied.

151. Without Pena and Marron's agreement to carry out the lie, the other Defendants would not have been emboldened to coerce Vicente to falsely implicate Mr. Bouto.

152. To further conceal their misconduct, Defendants coerced Edwin Maldonado to falsely claim to have heard the same purported confession from Mr. Bouto.

153. Maldonado was suffering from heroin withdrawal at the time he was detained at Grand and Central with Mr. Bouto and Vicente.

154. Defendants including Defendant Guevara provided Maldonado with the facts of the purported confession and coerced him to acquiesce using promises and threats undisclosed to Mr. Bouto's defense.

155. The supposed confession purportedly occurred while Vicente, Maldonado, and Bouto were detained separately in cells 7-2, 7-4, and 7-6 of the 25th District Lockup.

156. The lock-up was full at the time.

157. For Vicente's account to be true, Mr. Bouto would have had to make the implausible decision to yell a detailed confession at the top of his lungs, to complete strangers, in a full lockup populated by other detainees and monitored by guards.

158. Because of the location of the cells, Bouto and Vicente were at the time separated by as many as fifty feet.

159. Mr. Halvorsen himself admitted to City of Chicago investigators that "Vicente's statement was the deciding factor in charging Bouto," or words to that effect.

160. Yet Defendants knew Vicente's statement was false, and no probable cause existed to charge Mr. Bouto at this time, nor any time before it. Defendants had manufactured all of the evidence against Mr. Bouto, including the false eyewitness identifications and the statements of Vicente and Maldonado.

161. Vicente's account did not contain a single piece of corroborable information about the Ruvalcaba homicide that had not yet been reported to police.

162. Moreover, some of the additional details in Vicente's statement were verifiably false.

163. For example, Vicente's statement claimed that Vicente had learned from Bouto that the victim (Ruvalcaba) had cried, "I'm hit, I'm hit," upon having been shot.

21

164.   This was false; Ruvalcaba did not cry, "I'm hit, I'm hit," upon having been shot.

165.   Vicente's statement also claimed that he had learned from Bouto that an initial set of shots preceded a second round of shots that led to Ruvalcaba's death.

166.   This was false; eyewitnesses near to Ruvalcaba at the time of his death confirmed that there had not been an initial set of shots before the shots that led to Ruvalcaba's death.

167.   Nonetheless, the fabricated statement improperly obtained from Vicente by the Defendants, and purportedly corroborated by a fabricated statement by Maldonado, in addition to the fabricated eyewitness identifications, caused the approval of charges against Mr. Bouto, and resulted in his arrest and detention pre-trial.

168.   Maldonado and Vicente repeated their fabricated inculpation of Bouto in grand jury proceedings.

169.   The prosecution would not have initiated and continued the prosecution of Mr. Bouto without Vicente's false statement and Maldonado's supposed corroboration of Vicente's false statement.

170.   Vicente's and Maldonado's fabricated supposed inculpations of Mr. Bouto were used to deprive him of liberty.

171.   As a prosecutor, Defendant Hughes would not have acted on his own to falsely implicate Plaintiff in the murder case.  He knew he would need the help and

active involvement of the Defendant Officers to support the initiation of false charges against Plaintiff.

172.    Indeed, Defendant Hughes joined the conspiracy only because he knew that the Defendant Officers would be complicit in securing the false evidence to frame the accused.

173.    Defendant Hughes would not have filed false charges against Plaintiff without the Defendant Officers' willingness to fabricate evidence and their success in so doing, as well as their involvement and encouragement. Defendant Hughes would not have done the dirty work of coercing Vicente or creating wildly false police reports; but in light of the Defendant Officers' ready willingness to do both, Defendant Hughes was willing to play his part in the conspiracy.

174.    In other words, Defendant Hughes would never have approved charges against Plaintiff without having at least one police officer available to document and testify to the version of events surrounding Vicente's statement that led to the initiation of charges against Plaintiff. Defendant Hughes needed the Defendant Officers to write false reports and back up their fabricated charges against Plaintiff.

**Defendants "Solve" Another Murder**
**With a Purported Confession to Vicente**

175.    Remarkably, Guevara and Halvorsen went on to falsely claim that over a period of just weeks, Vicente obtained confessions from four other men in two additional unrelated murder cases.

23

176.    Defendants used Vicente to pin the unsolved February 1993 murder of Rodrigo Vargas on three innocent men: Jose Montanez, Armando Serrano, and George Pacheco.

177.    On June 2, 1993, Guevara and/or Halvorsen met with Vicente and coerced him to falsely claim that Montanez, Serrano, and Pacheco had confessed to having murdered Vargas.

178.    Guevara and Halvorsen concocted a story for Vicente of how the murder transpired and fed details to Vicente.  They used threats, abuse, and undisclosed promises to coerce Vicente to adopt it.

179.    Pursuant to the fabricated story, Vicente falsely claimed that on February 5, 1993, he had encountered Montanez, Serrano, and Pacheco and that the three disclosed that they had just committed a murder.

180.    This was entirely false: not only did the three men not confess to Vicente, but they were innocent and had nothing to do with the murder.

181.    The City of Chicago's own investigation concluded that Montanez, Serrano, and Pacheco were more likely than not innocent.

182.    Guevara and Halvorsen claimed that they first began investigating Montanez, Serrano, and Pacheco for the Vargas homicide only because they learned in June 1993 from Vicente of the purported confession; at this point in the investigation, no evidence of any kind had suggested Montanez, Serrano, and Pacheco as suspects to the Vargas homicide.

24

183.    Yet records indicate that Defendant Guevara had requested criminal history reports for Montanez, Serrano and Pacheco a week earlier, in late May, 1993.

184.    There was no legitimate basis to run criminal history reports for any of the three men at the time.

185.    For example, there was no suggestion that any of the three had committed a crime on or about that date or had had anything to do with the Vargas homicide.

186.    Undoubtedly, this information was requested to determine whether Defendants could plausibly frame the three for the Vargas murder to close that case.

187.    At no time during the entirety of Vicente's cooperation with Guevara and Halvorsen to implicate Mr. Bouto did Vicente mention knowing anything about any other murders, such as the Vargas homicide.

188.    Guevara and/or Halvorsen claimed that they had first learned of Montanez's purported confession to Vicente from Defendant Mingey.

189.    This was a fabrication to conceal their misconduct; Guevara and Halvorsen had *not* learned of Vicente's inculpation of Montanez from Defendant Mingey.

190.    To bolster the credibility of the fabricated confession to Vicente, Chicago Police Department Officers including Guevara, Mingey, and Halvorsen falsely claimed that a confidential informant (Timothy Rankins) had separately told them that Montanez had admitted his involvement in the murder, and prepared a fictitious supplemental police report to that effect.

25

191.   In truth, Guevara, Mingey, Halvorsen, and others had fabricated Rankins' story, fed him details of the crime, and coerced him to adopt the story using force, threats, and promises undisclosed to the defendants in the Vargas criminal prosecution.

192.   Rankins did not know Montanez, Serrano, or Pacheco, and had never met them. Defendants Guevara, Halvorsen, and Mingey claimed that Rankins had first disclosed his inculpation of Montanez to Mingey when he was interviewed by Mingey.

193.   This was false, and the fabricated origin of the Rankins inculpation of Montanez was created to conceal Guevara and Halvorsen's misconduct.

194.   Defendants ensured that Rankins was housed along with Vicente in the special witness quarters to encourage his continued acquiescence. Defendants brought the two "witnesses" money and afforded them special privileges.

195.   Nevertheless, Rankins ultimately refused to falsely implicate Montanez and did not testify at his trial, and Vicente has since recanted his contention that Montanez, Serrano, and Pacheco confessed to him.

### Yet Another Man Supposedly Confesses to Vicente

196.   After coercing Vicente to frame Bouto, Montanez, Serrano, and Pacheco, Defendants returned to the Vicente well one final time and coerced him to "solve" a third unrelated murder, this time the horrific June 1993 murder of Monica Roman.

197.   At Defendants' behest, a few weeks after falsely accusing Plaintiff, Vicente falsely implicated a man named Geraldo Iglesias as Roman's killer.

26

198.    Guevara and Halvorsen returned to their old stand-by and had Vicente claim that, once again, the villain had just happened to confess to him, this time while Vicente and Iglesias were in a bullpen together, awaiting court.

199.    Guevara and Halvorsen again fed Vicente the details of the crime for the "confession" to make it convincing.

200.    Guevara and Halvorsen did not document that Vicente supposedly received a confession from Iglesias.

201.    Had Vicente actually reported to Guevara and Halvorsen that Iglesias had confessed, Guevara and Halvorsen would have documented that fact in a supplementary police report.

202.    Defendants knew that that "confession" was a complete fabrication, so they did not document Vicente's implication of Iglesias in a police report.

203.    Defendant Guevara also paid Vicente money and arranged to get him special privileges while he was incarcerated. While in jail, Vicente received perks like cigarettes, a radio, home-cooked meals, conjugal visits, and other things not generally available to inmates, to ensure his continued cooperation in the prosecutions of Mr. Bouto and the other men he had implicated.

204.    In exchange for his testimony on all three murder cases, Defendant Guevara promised Vicente that his four pending felony charges, for which he was facing up to 100 years in prison, would "work out fine."

27

205.    Vicente was placed in the State's Attorney's witness quarters where he spent the next three years, receiving a wide array of benefits in exchange for his cooperation in the three separate murder prosecutions.

206.    Vicente received a deal that gave him less than the minimum sentence for his crimes: he received 344 days of pre-trial custody credit to which he was not entitled, in effect knocking two years off the time he would have to serve in the penitentiary.

207.    This benefit was never disclosed to Plaintiff's defense.

### The Vicente Scheme Unravels

208.    All told, in a matter of weeks, Vicente claimed that five different men confessed to three murders – all reported by him after he was facing up to 100 years in prison on pending charges, and two of the "confessions" conveniently coming from strangers who supposedly confessed to Vicente after he was incarcerated on his own charges.

209.    In each case, Guevara, Mingey, and Halvorsen knew that Vicente's story was fabricated and that none of the men he accused had really confessed murder to him.

210.    The City has since determined that all three purported confessions to Vicente were fabricated.

211.    Vicente has since recanted, explaining that the confession evidence he provided in all three cases had been fabricated and alleging that he had been coerced by Guevara and Halvorsen.

212.     Rankins has likewise recanted his inculpation of Montanez, Serrano, and Pacheco, and also alleged coercion by personnel including Guevara and Halvorsen.

213.     Maldonado, too, has recanted the evidence that he provided against Bouto, alleging that Vicente and the Defendants had coerced him to provide it.

## Plaintiff's Trial

214.     At Plaintiff's criminal trial, the prosecution did not present any inculpatory evidence other than the evidence fabricated by Defendants.

215.     Rey Lozada and Carl Richmond presented their tainted identifications of Mr. Bouto as the shooter.

216.     Margaret and Michael Fleming presented their tainted identifications of Mr. Bouto as the shooter based on his clothing.

217.     Mr. Bouto was convicted and sentenced to forty-five years of imprisonment.

218.     Even after he was convicted, Mr. Bouto testified at his sentencing: "I truly am innocent."

219.     Without the Defendants' misconduct, Plaintiff would never have been charged with, prosecuted for, or convicted of Ruvalcaba's murder.

## Plaintiff's Exoneration

220.     The allegations of Defendant Guevara's abuses became so ubiquitous that the City of Chicago commissioned Sidley Austin to conduct an independent investigation into this case and others, to evaluate the credibility of the allegations.

29

221.    After a thorough examination of witnesses and evidence, on March 3, 2015, the investigation yielded a detailed, 44-page report, known as "the Lassar Report," so-named after its chief architect, former Assistant United States Attorney Scott Lassar.

222.    The Lassar Report concluded that Mr. Bouto had been wrongfully convicted, stating: "[W]e find it more likely than not that Bouto is innocent of the murder of Salvador Ruvalcaba."

223.    Lassar's statement that "we find it more likely than not that Bouto is innocent of the murder of Salvador Ruvalcaba" was made as an agent of the City of Chicago on a topic within the scope of his agency, made during the agency relationship with the City of Chicago.

224.    Sidley Austin also concluded that Jose Montanez, Armando Serrano, Robert Almodovar, Gabriel Solache, and Arturo Reyes—all men convicted of murder based on investigations conducted by Guevara—were wrongfully convicted.

225.    Plaintiff never stopped fighting to prove his innocence.

226.    On April 30, 2018, the Cook County Circuit Court vacated the 1996 judgment in his trial for Ruvalcaba's murder.

227.    On June 25, 2018, the charges against him were dismissed.

228.    Mr. Bouto received a Certificate of Innocence on March 27, 2019.

## Defendant Guevara's History of Framing Innocent Persons

229.    Defendant Guevara has framed literally dozens of other innocent men over the span of two decades—men who have all lodged independent accusations of similar misconduct against him.

230.    Defendant Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

231.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

232.    Given this extensive history, it is apparent that Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

233.    Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he coerced or manipulated eyewitnesses to the shooting to falsely identify Mr. Bouto; whether he coerced or manipulated Vicente and/or Maldonado to

falsely implicate Plaintiff; and whether he fed facts to Vicente and/or Maldonado to enable their false implication of Mr. Bouto.

234.   Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

235.   Plaintiff provides examples of Defendant Guevara's misconduct below in paragraphs 237 to 343.

236.   Bill Dorsch is a former Chicago police detective.

237.   While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him."  The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder.  Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted

32

that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

238. Defendant Guevara's activities have drawn the interest of federal law enforcement officers.

239. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara.

240. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way out of trouble."

241. According to the report, Guevara also took bribes to alter both positive and negative line-ups of murder suspects.

242. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

243. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez.

244. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

33

245.    In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted. Juan Johnson was later exonerated and brought suit against Defendant Guevara.

246.    A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

247.    In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

248.    In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

249.    In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder.

250.    Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial.

251.    Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

252.     In 1991, Defendant Guevara physically coerced sixteen-year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk.

253.     All of the false details of Velazquez's statement were provided by Guevara.

254.     In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a line-up.

255.     As a result, Efrain and Julio Sanchez falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

256.     In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.

257.     After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a line-up in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

258.     In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

35

259.    In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything.

260.    Figueroa identified Diaz but recanted his identification at trial.

261.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial.

262.    During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

263.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony.

264.    Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

265.    In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

266.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a line-up by unzipping his pants and propositioning her.

36

Rivera later told the prosecutor that she had falsely identified an individual in a line-up at Guevara's direction.

267.    The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the line-up.

268.    In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.

269.    Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story.

270.    Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty.

271.    The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

272.    In 1997, Defendant Guevara withheld physical evidence and failed to disclose to criminal defendant Ariel Gomez the exculpatory statements of witness Ruth Antonetty.

273.    Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd,

37

not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her."

274. As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

275. In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.

276. As a result, Rivera was convicted of murder.

277. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.

278. As a result, Rivera received a new trial.

279. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

280. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died.

281. At the time Defendant Guevara claimed that the victim's identification had been made, the victim was in a medically-induced coma and unresponsive to stimuli.

282. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses.

283. Judith Martinez then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

284. In 2011, the First District granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive line-up wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

285. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus.

286. Guevara called Turner a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch."

287. Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

288. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home.

289. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles.

290. Lloyd filed a complaint with the Office of Professional Standards the next day.

291.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed.

292.    Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards.

293.    Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police.

294.    The criminal court judge suppressed Hunt's confession.

295.    A jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

296.    In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police.

297.    Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair.

298.    As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

299.    In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz.

300.    Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

301.    In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head.

302.    Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

303.    Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head.

304.    After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

305.    In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation.

306.    Pena was taken to see a doctor where he complained about being beaten by the police.

307.    The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose.

308.    Family members corroborated Pena's claim that he had been beaten while in police custody.

41

309.    In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard.

310.    Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him.

311.    Two eyewitnesses confirmed that Guevara initiated the beating of Warren.

312.    In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS).

313.    OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

314.    In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda.

315.    Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

316.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements.

317.    Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

42

318.  In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation.

319.  While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Mr. Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

320.  In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present.

321.  The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

322.  In 1993, Defendant Guevara arrested fifteen-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

323.  In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz.

43

324.    Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

325.    In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement.

326.    When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.

327.    Duta complained to his father of being struck in the head and stomach by Guevara.

328.    In 1995, Defendant Guevara and Mr. Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney.

329.    During the course of the 11-hour interrogation, Guevara yelled at Flores, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime.

330.    Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

331.    In 1997, Defendant Guevara coerced a false confession from Voytek Dembski.

332.    Guevara beat Dembski while he was chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter.

333.    Dembski could not read the statement he eventually signed as it was written in English.

334.    In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him.

335.    Mejia never confessed and was finally released after being held in custody for three days.

336.    In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

337.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement.

338.    After two days of isolation and interrogation, Reyes provided a false statement.

339.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room.

340.    After 40 hours of interrogation, Solache gave a false statement so the beating would stop.

341.    Solache sustained permanent hearing loss to his left ear and sought medical treatment.

342.    To this day, the City of Chicago does not acknowledge that Guevara engaged in misconduct.

343.    To this day, the City of Chicago does not acknowledge that Guevara framed innocent people for crimes they did not commit.

344.    To this day, the City of Chicago does not acknowledge that Guevara fabricated statements and identifications using physical force and other improper forms of coercion.

345.    To this day, the City of Chicago works to cover up Guevara's misconduct.

### The City of Chicago's Policy and Practice of
### Prosecuting Innocent Persons in Violation of Due Process

346.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime. There are undoubtedly many more such cases that have not yet been discovered.

347.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) procuring false statements from detainees and "jailhouse snitches;" (2) concealment of exculpatory evidence; (3) manipulating witnesses to obtain false identifications; (4) manipulating witnesses to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of persons without regard to their actual guilt or innocence.

348.    At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to detainees to make false witness statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable "jailhouse snitches" who then adopted those false witness narratives as their own for the purpose of wrongly obtaining charges and convictions of innocent

47

persons. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a jailhouse witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

349.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, procured false testimony from detainee witnesses knowing full well that their testimony was false and would lead to the wrongful charging of Plaintiff. The tactics and inducements used to gain cooperation from these jailhouse witnesses were concealed from Plaintiff.

350.    At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

351.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

352. At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

353. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, manipulated, tricked, and improperly influenced the testimony of the eyewitnesses that implicated Mr. Bouto.

354. The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his or her misconduct in any of those cases.

355. Prior to and during 1993, the year in which Plaintiff was falsely charged with the Ruvalcaba murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

356.   As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

357.   As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

358.   Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. They engaged in such

misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

359. The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b. The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c. The risks associated with relying on testimony from "jailhouse snitches."

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

360. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

51

361. The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Guevara and Halvorsen, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

362. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

363. The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Devastating Injuries

364. During his twenty-three years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

365. Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer.

366.    As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

367.    In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

## COUNT I – 42 U.S.C. § 1983
## Due Process: Fabrication of Evidence

368.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

369.    As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating Vicente's and Rankins' testimonial inculpation of Plaintiff, as well as other evidence.

370.    In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false statements and testimony from individuals including Lozaro, Richmond, Michael and Margaret Fleming, Vicente, and Maldonado implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; used suggestive identification procedures to falsify evidence; obtained the charging and conviction of Plaintiff using that false evidence; and failed

53

to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

371.    Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

372.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

373.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

374.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below, in Count VII.

## COUNT II – 42 U.S.C. § 1983
## Due Process: *Brady* Violations

375.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

376.    As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the

54

manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

377.   In addition, in the manner described more fully above, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained Plaintiff's charging and conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

378.   The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

379.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

380.   As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

381.   The misconduct described in this Count by was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT III – 42 U.S.C. § 1983
## Due Process: Destruction of Evidence

382.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

383.    As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by deliberately, and in bad faith, causing the loss of and/or failing to preserve evidence that Plaintiff could have used to prove his innocence.

384.    The exculpatory value of that evidence was apparent to the Defendants. In the alternative, the evidence was potentially exculpatory, and the Defendants knew that.

385.    The Defendant Officers' misconduct resulted directly in the unjust criminal prosecution and conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

386.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, in bad faith, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

387.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT IV – 42 U.S.C. § 1983
## Deprivation of Liberty

388.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

389.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

390.    Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

391.    In so doing, Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

392.    As a result of Defendants' false allegations and fabricated evidence, Plaintiff was arrested and charged and remained incarcerated from that day continuing on through his trial and until his release on parole, after which he remained subject to restraints on his liberty until his eventual exoneration.

393.     As a result of the misconduct of Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

394.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

395.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

396.     Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

397.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

398.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

399. The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

400. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT VI – 42 U.S.C. § 1983
## Failure to Intervene

401. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

402. During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

403. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

404. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

405. The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII – 42 U.S.C. § 1983
## Municipal Liability

406.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

407.     As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

408.     This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

409.     The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who

withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

410.    The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

411.    Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

412.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VIII – State Law Claim
## Intentional Infliction of Emotional Distress

413.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

414.    In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

415.    The Defendants either intended that their conduct would cause severe

emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

416.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

417.    As a proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress.

### Count IX – State Law Claim
### Malicious Prosecution

418.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

419.    All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

420.    Defendants accused Plaintiff of murdering Salvadore Ruvalcaba, knowing that he was innocent of the crime.

421.    Defendants fabricated evidence, manipulated the eyewitnesses and withheld material exculpatory evidence.

422.    Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

423.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

424.    As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## Count X – State Law Claim
## Respondeat Superior

425.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

426.    In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

427.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

428.    In committing the acts alleged in the preceding paragraphs, Defendant Hughes was a member of, and agent of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment and under color of law.

429.    Defendant Cook County is liable as principal for all torts committed by its agents.

## COUNT XI – State Law Claim
## Civil Conspiracy

430.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint

as if fully set forth herein.

431.    As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

432.    In furtherance of the conspiracy, the Defendants each committed overt acts and were otherwise willing participants in joint activity.

433.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

434.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## Count XII – State Law Claim
### Indemnification

435.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

436.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

437.    The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

438.    The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

439.    Defendant Cook County was at all times material to this complaint the employer of Defendant Hughes and is therefore responsible for any judgment entered against Defendant Hughes and for any judgment entered against him during said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff Robert Bouto respectfully requests that this Court enter judgment in his favor and against Defendants Reynaldo Guevara, JoAnn Halvorsen as Special Representative for Ernest Halvorsen, Edward Mingey, Kenneth Pang, Alan Pergande, Richard Maher, L. Marron, and Unknown Officers; Kevin Hughes; City of Chicago; and Cook County, awarding compensatory damages, punitive damages, interest, costs, and attorneys' fees, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Robert Bouto hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

**ROBERT BOUTO**

By: s/ Ruth Brown
Attorney for Robert Bouto

Arthur Loevy
Jon Loevy
Russell Ainsworth
Debra Loevy

Ruth Brown
Sam Heppell
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Ruth Brown, an attorney, hereby certify that on July 10, 2020, I caused the

foregoing SECOND AMENDED COMPLAINT to be filed using the Court's CM/ECF system

which effected service on all counsel of record.


/s/ Ruth Brown
*One of Plaintiff's Attorneys*