**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BOUTO | ) | |
| Plaintiff, | ) | Case No. 19 CV 02441 |
| | ) | |
| vs. | ) | Hon. John F. Kness |
| | ) | Magistrate Susan E. Cox |
| CHICAGO POLICE OFFICERS, REYNALDO GUEVARA, et al. | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO FOR SUMMARY JUDGMENT**

Date: March 26, 2026

Respectfully submitted,

/s/ Kyle T. Christie________________________
KYLE T. CHRISTIE, Atty. No.
*of the Attorneys for Defendants*

James G. Sotos
Laura M. Ranum
Josh M Engquist
Jeffrey R. Kivetz
Kyle T. Christie
Kylie M. Dodd
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
kchristie@jsotoslaw.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND....................................................................................2

LEGAL STANDARD..............................................................................................8

ARGUMENT .........................................................................................................8

I. Bouto's Federal (County IV) & State (Count IX) Malicious Prosecution Claims Fail ....8

A. The untainted evidence established probable cause to prosecute Bouto .............8

B. Alternatively, Defendants are entitled to qualified immunity on Bouto's Federal Malicious prosecution claim (County IV) ........................................................11

a. Arguable probable cause entitles Movants to qualified immunity...............12

b. Defendants are also qualifiedly immune because this prosecution predated the Supreme Court's decision in *Thompson v. Clark* .......................................12

II. Bouto Lacks Evidence to Support His Fabrication Claims Against Movants (Count I).........................................................................................................14

A. No Movant fabricated the show-up or lineup identifications ............................15

1. Michael and Margaret Flemings' clothing identifications were neither false nor manufactured ...........................................................................15

2. Jacobo's and Escobar's identifications were not introduced at trial, nor is there evidence that their identifications were false or manufactured.......................................................................................15

3. No Movant manufactured Lozada's identifications or knew they were false16

4. Movants did not manufacture or know Richmond's identifications were false .........................................................................................................17

B. None of the allegedly fabricated police reports were used at Bouto's trial ........18

**TABLE OF CONTENTS**
**-CONTINUED-**


C. Vicente's or Maldonado's statements implicating Plaintiff were not used at trial ......20

D. Qualified immunity defeats fabrication theories predicted on Jacobo's and Escobar's identifications, reports, and Vicente's or Maldonado's statements ...21

III. Bouto's Suggestive Identification Claim Is Foreclosed as a Matter of Law Or, Alternatively, by Qualified Immunity (Count I)......22

IV. Summary Judgment is Warranted on Bouto's *Brady* Claims (Count II)......22

A. There is no evidence supporting the existence of additional GPRs......23

B. Evidence of the 911 call was not suppressed nor was it exculpatory......24

C. No Movant was involved in the purportedly withheld identification tactics and, regardless, this is not a viable *Brady* claim......25

D. The excessive force complaint was not suppressed nor material and, alternatively, Movants are entitled to qualified immunity......26

E. Because the culpability standard necessary to state a civil *Brady* claim remains in flux, Defendants are qualifiedly immune from *Brady* liability......27

V. Bouto's Destruction of Evidence Claim Fail (Count III)......29

A. There is no constitutional duty to perform a gunshot residue test or polygraph examination......29

B. Bouto's pager-erasure theory lacks competent evidence to establish destruction ......30

VI. No Involvement Entitles Mingey, Marron, and Maher to Summary Judgment ......33

VII. Judgment is Warranted on Bouto's Failure to Intervene Claim (Count VI)......33

VIII. Bouto's Federal (Count V) and State (Count XI) Conspiracy Claims Also Fail......35

A. Absence of underlying tort violations requires dismissal of conspiracy claims......35

**TABLE OF CONTENTS**
**-CONTINUED-**


B. There is no evidence to support Bouto's conspiracy claims ..............................35

C. §1983 conspiracy fails because there are no private actor defendants ..............36

D Defendants are qualifiedly immune from § 1983 conspiracy liability ..............36

IX. Summary Judgment Is Warranted on Bouto's IIED Claim (Count VIII) .......................37

X. Summary Judgment is Warranted on *Respondeat Superior* and Indemnification Claims. ..........................................................................................................37

CONCLUSION ..........................................................................................................37

**TABLE OF AUTHORITIES**
**-CONTINUED-**

**Cases:** **Page**


*Abbott v. Sangamon Cnty, Ill.*, 705 F.3d 706 (7th Cir. 2013) .......... 11

*Albright v. Oliver*, 510 U.S. 266, 270–71 (1994) .......... 12, 13

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .......... 8

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) .......... 15, 19, 21

*Arizona v. Youngblood*, 488 U.S. 51, 59 (1988) .......... 29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 35

*Aska v. Yingling*, at *13 (N.D. Ill. Jan. 23, 2026) .......... 28

*Baker v. Fermon*, 799 F. App'x 921, 924 (7th Cir. 2020) .......... 11

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) .......... 27, 30, 35

*Bianchi v. McQueen*, 818 F.3d 309, 323 (7th Cir. 2016) .......... 13

*Blackmon v. Jones,*132 F.4th 522 (7th Cir. 2025) .......... 22, 34

*Bolden v. City of Chicago,* No. 17 CV 417, 2019 WL3766104, at *9 (N.D. Ill. Aug. 9, 2019). .......... 24

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... *passim*

*Briscoe v. Lahue*, 460 U.S. 325 (1983) .......... 20

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) .......... 34, 35

*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) .......... 24

*Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017) .......... 25

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019) .......... 9, 14, 15, 17

*Cooney v. Casaday*, 746 F. Supp. 2d 973 (N.D. Ill. 2010) .......... 36, 37

*Evans v. Matson*, No. 20-C-476, 2022 WL 912031, at *4 (E.D. Wis. Mar. 29, 2022) .......... 12

*Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) .......... 36, 37

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) .......... 15, 19, 21, 33

**TABLE OF AUTHORITIES**
**-CONTINUED-**

**Cases:** **Page**

*Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ....................34

*Frias v. Hernandez*, 2024 WL 1252945, *8 (N.D. Tex. 2024) ....................13

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003) ....................27

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) ....................35

*Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651 (7th Cir. 2010) ....................8

*Goudy v. Cummings*, 922 F.3d 834, 838 ....................24

*Grayson v. City of Aurora*, 157 F. Supp. 3d. 725 (N.D. Ill. 2016) ....................16, 18, 36

*Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ....................17, 18, 21, 33

*Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023) ....................13

*Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ....................33

*Harrell v. Cook*, 169 F.3d 428, 433 (7th Cir. 1999) ....................32

*Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) ....................26

*Haynes v. Astrella*, No. 19-cv-2296, Dkt. 142, slip op. at 26 (C.D. Ill. Jan. 9, 2023) ....................9

*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) ....................23

*Hill v.*, No., 2014 WL 4922319, at *3. () ....................27

*Holloway v. City of Milwaukee*, 43 F.4th 760, 768 (7th Cir. 2022) ....................22

*Iglesias v. Guevara*, No. 19-cv-06508, 2025 WL 3171611 (N.D. Ill. Nov. 13, 2025) ....................15, 16, 22, 25

*Johnson*, 892 F.3d at 894 ....................23

*Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025) ....................22

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022) ....................20

**TABLE OF AUTHORITIES**
**-CONTINUED-**

**Cases:** **Page**

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012) ........................................................8

*Lee v. Harris*, 127 F.4th 666 (7th Cir. 2025) ........................................................8

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ........................................................ 21

*Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012) ........................................................36, 37

*Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006), ........................................................27

*Mims v. City of Chicago*, 155 F.4th 970 (7th Cir. 2025) ........................................................28

*Monell v. N.Y. City of Department of Social Services,* 436 U.S. 658 (1978) ...............................35

*Moore v. City of Dallas, Texas,* 2024 WL 913368, *3 (5th Cir. 2024) .......................................13

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ........................................................ *passim*

*Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006) ........................................................29

*Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022) ........................................................35

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir.2001)........................................................12, 13

*Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379 (4th Cir. 2014)...........................................28

*Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *31 (C.D. Ill. Sept. 20, 2021) ........................................................15, 16

*Parria v. Cvitanovich*, 2025 WL 2754743, *19 (E.D. La. 2025) .................................................13

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020)................................................... *passim*

*Pearson v. Callahan*, 555 U.S. 223 (2009)........................................................28

*People v. Follins*, 554 N.E.2d 345 (Ill. App. Ct. 1990) ........................................................12

*People v. Gard*, 632 N.E.2d 1026 (Ill. 1994)........................................................30

*People v. Jackson*, 182 N.E.3d 594 (Ill. 2021) ........................................................27

*People v. Robinson*, 701 N.E.2d 231 (Ill. App. Ct. 1998). ........................................................12

**TABLE OF AUTHORITIES**
**-CONTINUED-**

**Cases:** **Page**

*Purtell v. Mason*, 527 F.3d 615 (7th Cir. 2008)........................................................30, 37

*Reichle v. Howards*, 566 U.S. 658, 663 (2012)..................................................21, 26, 28

*Rice v. Burks*, 999 F.2d 1172 (7th Cir. 1993) ..........................................................................31

*Rose v. Collins*, 2022 WL 1251007, *1 (E.D.Ark 2022)..........................................13

*Saunders-El v. Rohde* 778 F.3d 556 (7th Cir. 2015).......................................................25

*Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648, 656 (7th Cir. 2024)).......................11

*Siegel v. Shell Oil Co*., 612 F.3d 932 (7th Cir. 2010) ......................................................8

*Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2008). ..........................................................35

*Spiegel v. Cortese*, 196 F.3d 717 (7th Cir. 1999), *as amended* (Jan. 7, 2000) ............................11

*Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) ..........................................................8

*Thompson v. Clark*, 596 U.S. 36 (2022) .........................................................................12, 13

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183..............................................35

*Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2014) .......................................................36, 37

*Turner v. Hirschbach Motor Lines*, 854 F.3d 926 (7th Cir. 2017) ......................................... 35-36

*United States v. Carpenter*, 342 F.3d 812 (7th Cir. 2003 ...............................................10, 12

*United States v. Johnston*, 876 F.2d 589 (7th Cir. 1989 ................................................11, 12

*United States v. Kimoto*, 588 F.3d 464 (7th Cir. 2009) ...............................................31, 32

*United States v. Ludwig*, 641 F.3d 1243 (10th Cir. 2011) ..................................................31

*United States v. Mancias*, 350 F.3d 800 (8th Cir. 2003) ....................................................9

*United States v. Timms*, 74 F. App'x 647 (7th Cir. 2003) ...............................................10, 12

*United States v. Walker*, 746 F.3d 300 (7th Cir. 2014)........................................................24

**TABLE OF AUTHORITIES**
**-CONTINUED-**

**Cases:** **Page**

*Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004) ....................28

*Wade v. Collier*, 783 F.3d 1081 (7th Cir. 2015) ....................11

*Wallace v. Kato*, 549 U.S. 384 (2007) ....................13

*Wilson v. Layne*, 526 U.S. 603 (1999) ....................28

*Williams v. Seniff*, 342 F.3d 774 (7th Cir. 2003) ....................36

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ....................33, 34

*Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021) ....................9, 33

*Youngblood v. Arizona*, 488 U.S. 51 (1988) ....................28, 30, 32

*Ziglar*, 582 U.S. at 154 ....................36

**Statutes:** **Page**

42 U.S.C. § 1983 .................... *passim*

Defendants Edward Mingey, JoAnn Halvorsen (as Special Representative for Ernest Halvorsen, deceased),[1] Kenneth Pang, Alan Pergande, Richard Maher, and Louis Marron, by and through their respective attorneys, and in support of their motion for summary judgment, state:

## INTRODUCTION

In May 1993, Salvador Ruvalcaba was shot in broad daylight in the presence of several witnesses, including a group of his friends. Witnesses on the scene provided police with a description of the shooter's appearance and clothing, the fact that the shooter was a member of the P.R. Stone street gang, and that the shooter fled northeast in the direction of P.R. Stone territory after the shooting. Police immediately proceeded to nearby P.R. Stone territory and located Plaintiff Roberto Bouto—a known P.R. Stone—matching the shooter's description. Bouto was subsequently identified at the scene by Ruvalcaba's friends, Carl Richmond, Rey Lozada, Jacobo Lozado, and Frank Escobar. Later that same night, a lineup was conducted at Area 5 and Bouto was again identified by Ruvalcaba's friends along with an additional two eyewitnesses, Margaret and Michael Flemings, who identified Bouto as wearing the same clothing as the shooter. Edwin Maldonado and Francisco Vicente then provided statements that Bouto made incriminating statements to them about the shooting while in lockup together. Bouto was charged, prosecuted, and convicted for Ruvalcaba's murder.

Bouto's conviction was based in part on eyewitness testimony from Carl Richmond, Rey Lozado, and Margaret and Michael Flemings. However, Frank Escobar and Jacobo Lozado died before trial and their identifications—which they never recanted—were not introduced at trial. Carl Richmond and Rey Lozado have both recanted their identifications, though neither have

[1] For ease of reference, we refer to Mr. Halvorsen rather than the special representative for the deceased defendant.

accused any of the Movants of coercing a false identification. Vicente and Maldonado now claim that their statements were fabricated, but those statements were not used to convict Bouto. In 2018, following a post-conviction petition, the Circuit Court of Cook County vacated Bouto's conviction for first-degree murder and the charges were dismissed.

Bouto now seizes on that vacatur to launch this federal civil-rights suit against the City of Chicago and former Chicago police detective Reynaldo Guevara, who are separately represented. Bouto also sues Movants here—former Chicago police detectives and officers Edward Mingey, Ernest Halvorsen, Alan Pergande, Kenneth Pang, and Louis Marron ("Movants")—for fabricating evidence in violation of due process (Count I), withholding exculpatory evidence (Count II), destroying evidence (Count III), federal malicious prosecution (Count IV), federal conspiracy (Count V), and federal failure to intervene (Count VI), along with state law claims of intentional infliction of emotional distress (IIED) (Count VIII), malicious prosecution (Count IX) and conspiracy (Count XI). (*See generally*, Dkt. 256, Third Amended Complaint ("TAC")). The essence of Bouto's claims against Movants is that they manipulated the many eyewitnesses who identified him; maliciously prosecuted him; and destroyed, withheld, and fabricated material evidence. As detailed below, Movants are entitled to summary judgment because there simply is no evidence that any Movant acted without probable cause or engaged in conduct that violated Bouto's due process rights and even if there were, several of Bouto's claims would be barred by the doctrine of qualified immunity.

## FACTUAL BACKGROUND

***The Ruvalcaba Murder and Initial Eyewitness Descriptions***

On the afternoon of May 14, 1993, fifteen-year-old Salvador Ruvalcaba was shot and killed at 3415 West Sunnyside near the mouth of the alley. **(SOF ¶ 6.)** At the time of the shooting, he

was with his friends Frank Escobar, brothers Rey and Jacobo Lozada, and Carl Richmond, who were members of the Spanish Cobras street gang. **(SOF ¶ 7.)**

The 17th District tactical unit officers Pergande, Pang, and King responded to the scene. **(SOF ¶ 14.)** Defendant Pergande spoke with Richmond, Rey, Jacobo, and Escobar and obtained information that the shooter was: (1) a P.R. Stone; (2) approximately 16 or 17 years old; (3) approximately five foot and seven inches, 140 pounds; (4) wearing a "blue hoody with long black shorts,"; and (5) had shaved hair on the sides with a small ponytail in the back. **(*Id.*)** Police also learned that the shooter fled eastbound, and that a separate witness advised that the offender was wearing a black T-shirt, black three-quarter length baggie pants, with white shoes, and black hair that was shaved on the sides with a ponytail on top. **(SOF ¶¶ 12–13, 15.)**

***Bouto is Identified by Eyewitnesses at the Scene and Interviewed***

Police were aware that Kimball Avenue acted as a dividing line between the Spanish Cobras' territory on the westside and the P.R. Stones' territory on the eastside. **(SOF ¶ 16.)** Pergande and Pang drove three to four blocks to an area that they knew to be frequented by members of the P.R. Stones. **(SOF ¶ 17.)** Upon arrival, Pergande observed 17-year-old Bouto, who Pergande believed fit the description provided by witnesses and who Pergande knew as a P.R. Stone. **(SOF ¶ 18–20.)** Pergande drove Bouto and other P.R. Stone members to the scene and performed a show-up identification. **(SOF ¶ 23.)**

During the show-up, Richmond identified Bouto as the shooter, but Plaintiff contends in this lawsuit that the identification was fabricated. **(SOF ¶ 24.)** Jacobo identified Bouto as wearing the same clothing as the shooter. **(SOF ¶ 26.)** Rey and Escobar both identified Bouto as the shooter; however, Rey now contends that he only identified Bouto because Richmond and Jacobo had identified him, though he did not disclose that to police. **(SOF ¶¶ 26–27.)** Pergande and Pang

transported Bouto to the 17th District. **(SOF ¶ 31.)** Defendant Halvorsen then arrived on scene, and he and Guevara spoke with witnesses Escobar, Jacobo, Richmond, and Rey. **(SOF ¶¶ 32, 36–37.)** They also spoke with Michael and Margaret Fleming, who lived in the neighborhood and witnessed the shooting. **(SOF ¶¶ 34–35.)**

Meanwhile, once at the 17th District, Bouto was interviewed by Pang and relayed that he was with his girlfriend Tania at the time of the shooting, and that Pang could try to contact her using the last number she paged him from. **(SOF ¶ 38.)** According to Bouto, Pang then removed the batteries from Bouto's pager, and Bouto "lost the number" from which Tania paged him. **(SOF ¶ 39–40.)** Pergande and Pang took Bouto to Area 5 and Pergande filled out the arrest report for Bouto. **(SOF ¶ 41.)** Neither Pang nor Pergande had any further involvement in the investigation. **(SOF ¶ 43–44.)**

***Bouto is Identified by All Witnesses in a Lineup at Area 5***

Once at Area 5, Bouto contends that certain witnesses viewed him prior to the physical lineup. First, Bouto contends that he was placed in the bathroom by Guevara who then escorted Richmond, Rey, Jacobo, and Escobar past the bathroom and asked if Bouto was the shooter, to which they all said yes. **(SOF ¶ 45.)** Second, while idling at Area 5, Rey, Jacobo, and Richmond allegedly looked through a folder containing several photographs sitting on a desk—including one of Bouto—which no officer gave them or had knowledge of, and Richmond and Jacobo discussed among themselves that Bouto was the shooter. **(SOF ¶ 49.)** Third**,** Guevara allegedly took Richmond to a separate location within Area 5 and showed him a Polaroid of Bouto. **(SOF ¶ 46.)** When Richmond told Guevara that he did not see the shooter's face, Guevara "in so many words" allegedly told Richmond "he could make [his] life very miserable if he didn't play ball" but that he would leave Richmond alone if Richmond pointed out Bouto. **(SOF ¶ 47.)**

At approximately 7:00 PM on the same night as the shooting, witnesses Carl Richmond, Frank Escobar, Rey Lozado, Jacobo Lozado, and Michael and Margaret Fleming each viewed an eight-person lineup that included Bouto. **(SOF ¶ 50.)** Bouto was identified at the lineup as the shooter by Richmond, Rey Lozado, and Escobar. **(SOF ¶ 57.)** Jacobo, Michael, and Margaret identified Bouto at the lineup "as the person wearing the same clothing as the shooter." **(*Id.*)** That same evening, police ran a criminal history check on Bouto that detailed arrests for mob action in March and April 1993, and unlawful use of a weapon—a firearm—in March 1993. **(SOF ¶¶ 63–64.)**

***Felony Review is Called Out and Approves Charges the Following Day***

Felony Review Assistant State's Attorney ("ASA") Kevin Hughes reported to Area 5 on the evening of May 14. **(SOF ¶ 65.)** ASA Hughes interviewed Bouto who stated that he was with his girlfriend, Tania, but Bouto was unable to provide Hughes with Tania's number because it was on his pager and the detectives removed the battery. **(SOF ¶ 70.)** Hughes concluded that "there was more than enough evidence" to approve charges but classified the investigation as a "continuing investigation until May 15," so detectives could interview Tania, and locate "Mario" who may have handed the gun to the shooter just prior to Ruvalcaba being shot. **(SOF ¶ 71.)** Bouto was held overnight in lockup. **(SOF ¶ 72.)**

Also in lockup was Francisco Vicente and Edwin Maldonado. **(SOF ¶ 75.)** The following day—on May 15, 1993—Defendant Maher was investigating armed robberies involving Vicente, removed Vicente from lock-up and brought him to an interview room. **(SOF ¶ 75.)** Maher was not assigned to or involved in the Ruvalcaba investigation. **(SOF ¶ 76.)** Vicente contends that he was then interviewed by Guevara and Halvorsen, and Vicente eventually agreed to say that Bouto confessed to him after Guevara allegedly abused and threatened him. **(SOF ¶ 78.)** Vicente

signed a statement written by ASA Hughes that stated that while Bouto and Vicente were conversing in Area 5 lock-up, Bouto confessed to Vicente that he shot Ruvalcaba. **(SOF ¶ 79.)** Vicente now contends that his statement is false. **(SOF ¶ 81.)** Later that evening, ASA Hughes approved charging Bouto for Ruvalcaba's murder. **(SOF ¶ 82.)** Bouto was subsequently indicted by a grand jury for first-degree murder. **(SOF ¶ 83.)** Both Frank Escobar and Jacobo Lozada died before trial and before providing sworn testimony in the case. **(SOF ¶ 84–85.)**

***Bouto's Criminal Proceedings and Conviction***

Prior to trial, Bouto moved to quash his arrest. **(SOF ¶ 86.)** In May 1995, the court held a hearing and denied Bouto's motion to quash, holding that "probable cause existed due to the facts and circumstances" known to Pergande. **(SOF ¶ 87.)** Bouto moved to suppress the identifications made by Richmond, Jacobo, Rey, and Escobar, which was also denied following a hearing. **(SOF ¶ 88–89.)**

During trial, the State introduced identifications from Rey Lozada, Carl Richmond, Michael Fleming and Margaret Fleming. **(SOF ¶¶ 94–98.)** The identifications of the now deceased Jacobo Lozado and Frank Escobar were not introduced at trial. **(SOF ¶¶ 91, 93.)** Madonado and Vicente's statements were also not introduced at trial, and neither of them testified at trial. **(SOF ¶ 111.)** Tania Astefan testified that on the day of the murder, she was with Bouto, who was her boyfriend, after school beginning at approximately 2:50 p.m., and that they were together at 3:04 p.m. (when she heard gunshots) up through approximately 3:10 p.m., when he dropped her off at home. **(SOF ¶ 106.)**

Also during trial, Bouto's criminal defense attorney indicated that they wanted to call the 911 dispatcher to impeach Michael Fleming's testimony about his description of the shooter wearing black pants because the 911 dispatcher's notes, which were disclosed to Bouto's defense

attorneys, indicated that the caller said the offender was wearing "orange shorts." **(SOF ¶ 102.)** The court did not permit this impeachment because Michael Fleming testified that he did not call 911. **(SOF ¶ 103.)**

Guevara and Halvorsen's May 16, 1993, supplementary and lineup reports were never introduced by the prosecution at Bouto's criminal trial and were not introduced by either party as exhibits, but Bouto's defense attorney used the report once to refresh Guevara's memory about the time of day during which Ruvalcaba was murdered. **(SOF ¶ 109.)** Pergande and King's September 27, 1994 supplementary report containing information from the May 14, 1993 show up at the crime scene was also not introduced by either party at trial. **(SOF ¶ 110.)**

On August 1, 1996, the jury convicted Bouto of first-degree murder. **(SOF ¶ 112.)** Bouto was sentenced to 45 years, and his conviction was affirmed on appeal. **(SOF ¶ 116.)** In April 2018, following the filing of a post-conviction petition, the Circuit Court of Cook County vacated Bouto's conviction for first-degree murder and in June 2018, the murder charges were dismissed. **(SOF ¶ 117–118.)**

***Defendant Mingey, Marron and Maher's Non-Involvement in the Ruvalcaba Investigation***

Defendant Mingey was not assigned to this Ruvalcaba homicide and had no knowledge of the case. **(SOF ¶¶ 60–62.)** The only reference to Mingey from investigation is a crime scene processing form for submitting the lineup photographs into evidence, which contains Mingey's handwritten name. **(*Id.*)** Mingey did not sign the report with his name and does not know who did, but he would have permitted someone to sign off given the time-sensitive nature of getting the photographs into evidence. **(*Id.*)** Though Marron and Maher had interactions with Vicente on his armed robbery cases, they were not assigned to this investigation, and Vicente has not

accused them of misconduct in connection with the statements he provided against Bouto. **(SOF ¶¶ 73, 80.)**

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is warranted when the non-moving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). While the court must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor (*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)), "that duty does not extend to drawing inferences that are supported only by speculation or conjecture." *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013) (quotations omitted). Summary judgment is the "put up or shut up moment in litigation" and "the non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (citations and quotations omitted). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (quotations omitted).

## ARGUMENT

### I. Bouto's Federal (Count IV) & State (Count IX) Malicious Prosecution Claims Fail

#### A. The untainted evidence established probable cause to prosecute Bouto.

The existence of probable cause "serves as a defense against both federal and state-law malicious prosecution claims." *Lee v. Harris*, 127 F.4th 666, 676 (7th Cir. 2025). "Probable

cause is a common-sense inquiry requiring only a probability of criminal activity." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021). To serve as a defense to a malicious prosecution claim, probable cause must be established when the legal process is initiated, which occurred here when a grand jury indicted Bouto on June 4, 1993. (SOF ¶ 83.) *See United States v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003) (indictment supersedes prior proceedings when determining probable cause); *see also* Ex. A, *Haynes v. Astrella*, No. 19-cv-2296, Dkt. 142, slip op. at 26 (C.D. Ill. Jan. 9, 2023) (analyzing probable cause at the moment of grand jury indictment).

At the time of Bouto's indictment, the undisputed evidence established probable cause to prosecute him for Ruvalcaba's murder. To start, Frank Escobar was with the victim at the time he was slain, he *twice* identified Bouto as the shooter, and he never recanted his identification prior to his death. (SOF, ¶¶ 30, 57.) Seventh Circuit precedent establishes that Escobar's "eyewitness 'identification,'" standing alone and "'even if questionable, [wa]s enough to give the police probable cause'" in the context of a "malicious prosecution" claim. *Moran v. Calumet City*, 54 F.4th 483, 499–500 (7th Cir. 2022) (quoting *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019)).

Beyond Escobar's identification, there was a surplus of additional probable cause. Multiple eyewitnesses independently provided contemporaneous descriptions of the shooter that closely resembled Bouto's appearance concerning both his physical traits and his clothing. (SOF ¶¶ 13–15, 34–35, 37.) Namely, police were told that the shooter was a 16–17-year-old Hispanic male, 5'6"–5'8," 120–160 pounds, with the sides of his head shaved and wearing a dark hooded sweatshirt with writing and long dark shorts. (*Id.*) All of this was consistent with Bouto's appearance, and he was located by police just blocks from the scene in the direction the shooter

reportedly fled, less than an hour after the murder, in clothing matching these descriptions. (SOF ¶¶ 17–18.)

Then Jacobo identified Bouto on scene as wearing the same clothing as the shooter, as did Michael and Margaret Fleming in a subsequent lineup at Area 5. (SOF ¶¶ 26, 57.) In addition to those who recognized Bouto by his clothing, both Rey Lozado and Frank Escobar identified Bouto as the shooter first at the scene and later in a lineup. (SOF ¶¶ 27, 30, 55, 57.) There is no evidence that any officer coached or manipulated any of these identifications. (SOF ¶¶ 28–29, 56.) In addition, police learned that Bouto had prior arrests for mob action and unlawful use of a weapon, all in the 90 days prior to this shooting. (SOF ¶ 63.)

Per the Seventh Circuit, the matching witness descriptions of Bouto's physical appearance and clothing, his gang affiliation, and geographic proximity to the scene in the direction which killer fled, cements probable cause. In *United States v. Timms*, the Seventh Circuit affirmed that probable cause existed when an officer encountered a suspect several hours after a bank robbery wearing—much like here—distinctive Karl Kani clothing described by witnesses and who matched the witness descriptions as to age, race, and height. 74 Fed.Appx. 647, 649 (7th Cir. 2003). Indeed, the Seventh Circuit has observed that against this backdrop, probable cause was so evident that "any argument that police lacked probable cause…***would be frivolous***." *United States v. Carpenter*, 342 F.3d 812, 815 (7th Cir. 2003) (affirming probable cause under the same facts as *Timms*) (emphasis added).

To be clear, Movants are *not* relying on Richmond's identifications of Bouto, nor Vicente's and Maldonado's statements. Rather, Movants rely exclusively on the undisputed, untainted evidence—Escobar's eyewitness identification of Bouto, plus multiple contemporaneous witness descriptions that corroborated one another and matched Bouto's distinctive clothing and physical

characteristics, gang affiliation, and geographic proximity. *See Wade v. Collier*, 783 F.3d 1081, 1087 (7th Cir. 2015) (probable cause existed even when disregarding the fabricated evidence). Thus, despite some questions of fact surrounding whether certain pieces of evidence were tainted, ample probable cause is established based on the remaining, untainted evidence. *United States v. Johnston*, 876 F.2d 589, 592 (7th Cir. 1989).

Because probable cause is abundantly established by the undisputed, untainted evidence alone, Movants are entitled to summary judgment on Bouto's federal and state malicious prosecution claims.

### B. Alternatively, Defendants are entitled to qualified immunity on Bouto's federal malicious prosecution claim (Count IV)

#### 1. Arguable probable cause entitles Movants to qualified immunity.

Qualified immunity protects officers who reasonably but mistakenly conclude that probable cause exists. *Spiegel v. Cortese,* 196 F. 3d 717, 723 (7th Cir. 1999). "Although closely related, for qualified immunity purposes, a determination of *actual* probable cause is separate and distinct from *arguable* probable cause." *Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648, 656 (7th Cir. 2024). Even where there is a "lack[ of] probable cause, arguable probable cause will shield an officer from suit through qualified immunity if, under the same circumstances and well-established law, a reasonable officer could have found probable cause." *Baker v. Fermon*, 799 Fed.Appx. 921, 924 (7th Cir. 2020) (citation and internal quotation marks omitted). Although qualified immunity is an affirmative defense, once raised, "the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013).

Bouto cannot carry that burden. Numerous cases—including *Timms* and *Carpenter* which also post-date this prosecution by twenty years—show that it was certainly reasonable for Movants to believe probable cause existed in 1993 when Bouto, a known P.R. Stone, was identified as the murderer by an eyewitness, found near the scene in the direction the shooter fled, and closely matched the clothing and physical appearance descriptions provided by multiple witnesses. *See, e.g.*, *Evans v. Matson*, No. 20-C-476, 2022 WL 912031, at *4 (E.D. Wis. Mar. 29, 2022) (probable cause where the plaintiff matched the suspect's race, gender, height, and clothing and was located shortly after the crime near the reported direction of flight); *People v. Robinson*, 701 N.E.2d 231, 237–38 (Ill. App. Ct. 1998) (probable cause where defendant matched a witness' description, including clothing and direction of travel); *People v. Follins*, 554 N.E.2d 345, 353–54 (Ill. App. Ct. 1990) (probable cause where officers arrested a suspect shortly after a robbery and only a few blocks from the scene because he matched a general broadcast description).

As the caselaw establishes, arguable probable cause existed, such that Bouto will be unable to carry his burden demonstrating otherwise. Movants are thus entitled to qualified immunity on the federal malicious prosecution claim.

**2. Defendants are also qualifiedly immune because this prosecution predates the Supreme Court's decision in *Thompson v. Clark*.**

Finally, from the period well before the arrest/prosecution in this case until 2022, it was well-established that there was no such federal claim for malicious prosecution under Section 1983. *See Newsome v. McCabe*, 256 F.3d 747, 750–52 (7th Cir.2001); *Albright v. Oliver*, 510 U.S. 266, 270–71 (1994). As such, Plaintiff's Fourth Amendment "Malicious Prosecution" claim as recognized in *Thompson v. Clark*, 596 U.S. 36, 49 (2022), is barred by qualified immunity.

In 2022, the Supreme Court for the first time recognized such a claim under the Fourth Amendment. *Thompson*, 596 U.S. at 49. While that jurisprudence may govern liability for cases which have occurred *subsequent* to *Thompson*, the unsettled nature of whether this was a claim means that such claims during the *Newsome/Albright* era are barred by Qualified Immunity. *See Bianchi v. McQueen*, 818 F.3d 309, 323 (7th Cir. 2016). Indeed, even in the years leading up to *Thompson*, the Seventh Circuit held that the developing law and challenges to whether *Newsome* and its progeny should be overturned was a perfect application of qualified immunity given the unsettled nature of the law. *Id*. To wit:

> [T]he Court in *Wallace* [*v. Kato*, 549 U.S. 384, 386–87 (2007)] specifically declined to address whether a malicious-prosecution claim is *ever* cognizable as a Fourth Amendment violation remediable under § 1983. The plaintiff in *Wallace* had expressly abandoned that issue, which was left unresolved in the Court's split decision in *Albright v. Oliver*, [510 U.S. 266, 270–71 (1994)]. Although some circuits have recognized such a claim, this circuit has not. With the law this unsettled, qualified immunity applies. *Id.* (emphasis in original and citations omitted).

Numerous courts around the country post-*Thompson* have held that the federal claim for malicious prosecution recognized in *Thompson* in 2022 is, in essence, not retroactive as far as qualified immunity is concerned. *See e.g. Parria v. Cvitanovich*, 2025 WL 2754743, *19 (E.D. La. 2025) (pre-*Thompson* claim barred by qualified immunity because viability of claim was not well-established prior to *Thompson*); *Moore v. City of Dallas, Texas,* 2024 WL 913368, *3 (5th Cir. 2024) (same); *Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023) (same); *Frias v. Hernandez*, 2024 WL 1252945, *8 (N.D. Tex. 2024) (overruled on other grounds by *Frias v. Hernandez*, 142 F.4th 803 (5th Cir. 2025)) (same); *Rose v. Collins*, 2022 WL 1251007, *1 (E.D. Ark. 2022) (same). Thus, Defendants are entitled to qualified immunity on this basis as well.

## II. Bouto Lacks Evidence to Support His Fabrication Claims Against Movants (Count I)

For his fabrication claim, Plaintiff "must prove that a police officer manufactured false evidence against [Bouto]" which was later used against him at trial. *Moran*, 54 F.4th at 498 (internal citation and quotation marks omitted); *Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020). "This is a high bar to clear," requiring that the officer "knew—with certainty—[that the evidence] was false." *Coleman*, 925 F.3d at 344. As to materiality, the very "essence of a due process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence." *Patrick*, 974 F.3d at 835. In other words, it is the "***[u]sing* [of] false evidence *to convict*** [that] violates a defendant's right to a fair trial." *Coleman*, 925 F.3d at 344 (emphasis added); *see also* 7th Circuit Pattern Jury Instruction 7.14 (2017) (plaintiff must prove that "knowingly fabricated evidence was introduced against Plaintiff"). Bouto's fabrication claims fall into three baskets:

1. **Fabricated Identifications:** Bouto claims that (1) Pergande and Pang fabricated the show-up identifications made by Richmond, Lozada, Escobar and Jacobo, and that (2) Halvorsen fabricated the lineup identifications made by the Flemmings, Lozada, Richmond, Jacobo, and Escobar. (Dkt. 256, TAC ¶¶ 66, 71–73.)

2. **Fabricated Reports:** Bouto claims that Halvorsen and Pergande (and Defendant Guevara) fabricated reports documenting the show-up and lineup identifications. (Dkt. 256, TAC ¶¶ 67, 86.)

3. **Fabricated Jailhouse Informants' Statements:** Bouto claims that Halvorsen, Maher, and Marron (and Defendant Guevara) fabricated Vicente's jailhouse statement, grand jury testimony, and reports documenting this investigative step, and that Halvorsen (and Defendant Guevara) fabricated Maldonado's jailhouse statement and grand jury testimony. (Dkt. 256, TAC ¶¶ 145, 149.)

Each are addressed in turn below, but the undisputed record establishes that Plaintiff cannot meet his burden on any of his three fabrication theories.

### A. No Movant fabricated the show-up or lineup identifications.

#### 1. Michael and Margaret Flemings' clothing identifications were neither false nor manufactured.

Bouto contends that Movant Halvorsen and Defendant Guevara fabricated Michael and Margaret Flemings' lineup identifications, where they identified that Bouto was wearing the same clothing as the shooter and to which they testified at Bouto's trial. (TAC at ¶¶ 71–88.) But neither of the Flemings has ever recanted their testimony or alleged that police pressured, coached, or improperly influenced their clothing identifications. (SOF ¶¶ 58, 99.)

This theory of due process liability thereby fails, as Bouto lacks any evidence that the Flemings' identifications were false, let alone that officers knowingly manufactured false testimony from the Flemings. *See Coleman*, 925 F.3d at 344 (no fabrication if officer did not "know—with certainty—[statement] was false"); *Iglesias v. City of Chicago*, No. 19-cv-06508, 2025 WL 3171611, at *10 (N.D. Ill. Nov. 13, 2025) (no fabrication claim where the plaintiff "presented no evidence to meaningfully counter [two witnesses'] consistent testimony that Defendants never told them to identify [the plaintiff]"); *Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *31 (C.D. Ill. Sept. 20, 2021) (no fabrication where witness confirmed trial testimony was truthful and not manufactured by officers).

#### 2. Jacobo's and Escobar's identifications were not introduced at trial, nor is there evidence that their identifications were false or manufactured.

Bouto asserts that Movants Pergande, Pang, and Halvorsen fabricated Escobar's identifications of Bouto as the shooter and Jacobo's identification of Bouto as wearing the clothing of the shooter. (TAC at ¶¶ 57-67.) <u>First</u>, these theories fail because neither Jacobo nor Escobar testified at Bouto's trial, and their identifications were never introduced as evidence.

(SOF ¶¶ 85, 91–93, 100)[2] Where "evidence we assume was fabricated…was not introduced at the trial, it could not have influenced the jury's verdict," and it thus "does not support an inference of fabrication" because the evidence "was not material," defeating such claim. *Moran*, 54 F.4th at 499. *See infra* at Sec. B at 18–20 (discussing *Moran*'s barring of such a claim). This theory is also barred by qualified immunity, as discussed *infra* at Sec. D at 21–22.

Second, prior to their untimely death, neither Jacobo nor Escobar ever recanted or claimed that their identifications were the product of police misconduct, (SOF ¶¶ 85, 91), providing an alternative—and equally dispositive—impediment to Bouto's due process claim. *See supra* at 10 (citing *Coleman*, *Iglesias*, and *Palmer* to support rejection of fabrication claim that lacks evidence of knowing falsity).

**3. No Movant manufactured Lozada's identifications or knew they were false.**

Bouto asserts that Movants Halvorsen, Pergande, and Pang fabricated Rey's show-up identification of Bouto as the shooter, and that Movant Halvorsen fabricated Lozada's lineup identification of Bouto. (TAC at ¶¶ 57–66, 73–76.) First, Lozada has denied that any police officer pressured him to identify Bouto during the show-up or lineup, and Lozada never told any Movant that his identification was false. (SOF ¶ 27–29, 56.) On this basis alone, Bouto's claim fails as a matter of law. *See Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 740 (N.D. Ill. 2016) (no fabrication where witnesses "universally stated that the Defendants did not provide them with what to say or force them to make statements at trial that they knew to be untrue").

---

[2] Movants acknowledge that, at the motion to dismiss stage, the Court cited a pair of cases predating *Patrick* and *Moran*—*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015), and *Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014)—for the proposition that a Fourteenth Amendment fabrication claim can flow from evidence not introduced at trial. (Dkt. 386, Op. at 9.) That framing has since been rejected by the Seventh Circuit as explained *infra* at Sec. B at 18–20.

It is true that Lozada recanted his identifications and trial testimony years later, (SOF ¶¶ 28, 56), but a subsequent recantation is insufficient to clear the "high bar" necessary to show that any Movant caused Lozada "to provide [them] with a statement that [the Movant] knew—with certainty—was false." *Coleman*, 925 F.3d at 344. To the contrary, it is undisputed that just moments after the shooting, Lozada provided a description of the shooter that closely matched Bouto's clothing and physical description—a description that Lozada maintains to this day was true and accurate. (SOF ¶ 14.) Against this backdrop, there simply is no evidence that any officer knew—with certainty—that Rey's identification was false. Even if there were some evidence suggesting officers had reason to *doubt* Lozada's show-up and lineup identifications (there is not), that would be immaterial, as "[e]vidence that merely impeaches aspects of [a witness'] statement or suggests [the officer] had reason to doubt [the witness'] veracity is insufficient" to prove fabrication. *Coleman*, 925 F.3d at 344–45.

Second, Movant Halvorsen's lack of personal involvement in the allegedly fabricated lineup procedures provides another independent reason to reject that claim. To sustain a § 1983 claim, Bouto "must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). The undisputed record reflects that Halvorsen was not present for or involved in the show-ups, and that Guevara was the only officer present with Lozada during the lineup at Area 5, (SOF ¶¶ 18–32, 55–56), precluding Bouto from satisfying the personal involvement requirement for movant Halvorsen with respect to the allegedly fabricated lineup identification.

**4. Movants did not manufacture or know Richmond's identifications were false.**

Bouto contends that Movants Pergande and Pang fabricated Richmond's show-up identification, and that Movant Halvorsen and Defendant Guevara fabricated Richmond's lineup

identification[3]. (SOF ¶ 24; TAC at ¶¶ 66, 71–73, 76, 222.) Starting with the show-up, Richmond has consistently testified that no officer pressured him to identify anyone during the show-up, (SOF ¶ 25), foreclosing any inference that Pergande or Pang knowingly manufactured a false identification. *See Grayson*, 157 F. Supp. 3d at 740.

Moving to the lineup, Richmond expressly testified that Guevara, and no one else, pressured him to identify Bouto. (SOF ¶¶ 46–47, 53–54.) In Richmond's own words, "it was all Guevara." (SOF ¶ 54.) As against Movant Halvorsen, then, this theory of liability necessarily fails on personal involvement grounds, as there is no competent evidence that Halvorsen was personally involved in the claimed misconduct. *Grieveson*, 538 F.3d at 776.

**B. None of the allegedly fabricated police reports were used at Bouto's trial.**

Bouto alleges that Defendants Pergande and Halvorsen, along with Defendant Guevara, fabricated police reports documenting identification procedures and details of Guevara and Halvorsen's interactions with Vicente. (Dkt. 256, TAC ¶¶ 67, 86, 145, 149-151.) First, to sustain a fabricated evidence claim, "[t]he fabricated evidence must be material, which means 'there is a reasonable likelihood the evidence affected the judgment of the jury.'" *Moran*, 54 F.4th at 499 (quoting *Patrick*, 974 F.3d at 835).

Here, no reports were introduced by the State as evidence at trial, nor were the reports documenting the show-up or lineup used by the State to refresh Guevara or Pergande's memory about their investigative steps. (SOF ¶ 109–10.) Because none of the allegedly fabricated reports were used at trial to obtain a conviction, Bouto's claim fails on materiality grounds as a matter of

[3] Richmond and Plaintiff have both provided conflicting testimony about what occurred during the show-up. Ultimately, Defendants rely on Plaintiff's judicial admissions and asserted theory in the case that Richmond's identification influenced Rey Lozado's identification in advancing this as an undisputed fact. *See, Moran v. Calumet City,* 54 F.4th 483, 494 (7th Cir. 2022) ("An allegation in a complaint is a judicial admission that can be used against the plaintiff.")

law. *See Moran*, 54 F.4th at 499 (allegedly fabricated evidence that "was not introduced at the trial" cannot support a fabrication claim); *Patrick*, 974 F.3d at 835 (plaintiff has "the burden to prove that the fabricated evidence was used against him at his criminal trial and was material").

Movants acknowledge that, at the motion to dismiss stage, the Court cited a pair of cases predating *Patrick* and *Moran*—*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015), and *Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014)—for the proposition that a Fourteenth Amendment fabrication claim can flow from evidence not introduced at trial so long as it resulted in a deprivation of liberty. (Dkt. 386, Op. at 9.) In *Patrick*, however, the Seventh Circuit in 2020 expressly rejected this framing, noting that a "claim for…pretrial detention based on fabricated evidence sounds in the Fourth Amendment" and only "[i]f fabricated evidence is ***later used at trial to obtain a conviction***[ that] the accused may have suffered a violation of his due-process right to a fair trial." *Patrick*, 974 F.3d at 834 citing *Lewis v. City of Chicago*, 914 F.3d 472, 476–79 (7th Cir. 2020) (emphasis added).

Then, two years later, the Seventh Circuit issued *Moran* and explicitly barred the police-reports claim advanced by Bouto, holding that an allegedly fabricated police report cannot ground a fabrication claim because it was not used at trial. Per the court, "[b]ecause the evidence we assume was fabricated—the police report and the detectives' pretrial testimony—was not introduced at the trial, it could not have influenced the jury's verdict," and thus "was not material" to the plaintiff's conviction as a matter of law. *Moran*, 54 F.4th at 499. Even were Bouto to argue that the altered contents of a report "no doubt bolstered the case" against him, that would fail, as "the content of the police report is irrelevant because…the report was [not] introduced into evidence at trial." *Id.* at 499 n.8. In light of *Moran*, it is clear that Bouto's police-

report fabrication theory is not actionable. This principle also works to bar the police-report theory based on qualified immunity. *See infra* at Sec D at 21–22.

Second, any claim that Movant Pergande testified falsely at Bouto's trial about the substance found within the allegedly fabricated reports is a nonstarter because police officers testifying in criminal proceedings enjoy absolute immunity from section 1983 suits based on that testimony. *Briscoe v. Lahue*, 460 U.S. 325, 335–36, 345 (1983); *see Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022) (holding that officer was "absolutely immune from damages liability for his trial testimony").

**C. Vicente's or Maldonado's statements implicating Plaintiff were not used at trial.**

Bouto asserts that Movants Halvorsen, Maher, and Marron fabricated jailhouse informant Vicente's signed statement, grand jury testimony, and police reports documenting this investigative step. (TAC at ¶¶ 120–22, 129–35, 167, 175) Relatedly, Bouto claims that Defendants Halvorsen and Defendant Guevara fabricated jailhouse informant Edwin Maldonado's signed statement and grand jury testimony. (TAC at ¶¶ 159–67, 175.)

These claims fail because Vicente and Maldonado did not testify at Bouto's trial and none of their statements, grand jury testimony, nor the police reports documenting this investigative step were introduced against Bouto at trial. (SOF ¶¶ 109–11.) Indeed, the only party who ultimately sought unsuccessfully to introduce this evidence at trial was Bouto himself. (SOF ¶ 109.) Again, since the briefing on the parties' motion to dismiss, the Seventh Circuit has made clear that where allegedly fabricated evidence "was not introduced at the trial, it could not have influenced the jury's verdict" and it thus "does not support" a fabrication claim. *Moran*, 54 F.4th at 499.

Bouto has claimed, in the alternative, that Movants Marron and Maher—both of whom worked on the May 1993 arrest and investigation of Vicente for the unrelated armed robberies—

were involved in the fabrication of Vicente's statement. (TAC at ¶¶ 148–52, 157–58.) Plaintiff has adduced no evidence in discovery that Marron or Maher had any role in fabricating a statement from Vicente. (SOF ¶ 122.) In the case of Defendant Marron, Plaintiff chose to forego even taking his deposition and there is no evidence in the record that he engaged in any misconduct with regard to his interaction with Vicente. As such, they are entitled to summary judgment on the additional basis that there is no evidence of personal involvement. *See*, *Grieveson*, 538 F.3d at 776.

**D. Qualified immunity defeats fabrication theories predicated on Jacobo's and Escobar's identifications, reports, and Vicente's or Maldonado's statements.**

As noted above, the Court found at the motion to dismiss stage that *Armstrong* and *Fields* permit a fabrication claim based on evidence not ultimately introduced at trial. But in *Patrick*, the Court rejected using fabricated evidence to ground a due process claim predicated on injury from a pretrial seizure or detention, confining such a claim to the Fourth Amendment. 974 F.3d at 834. Movants thus posit that the law of the land is that civil plaintiffs cannot predicate Fourteenth Amendment claims on allegedly fabricated evidence that was not introduced at trial; those claims must be pled via the Fourth Amendment, or not at all.

However, to the extent the Court deems *Lewis*, *Patrick*, and *Moran* to have injected uncertainty into the jurisprudence, rather than clarity, Movants are entitled to qualified immunity on fabrication theories arising out of Jacobo's and Escobar's identifications, the police reports, and Vicente's or Maldonado's statements, as it is not clearly established that police officers can be held liable via the Fourteenth Amendment for allegedly fabricating evidence that caused a pretrial seizure or pretrial detention but was not material to a conviction because it was not introduced at trial. Where it is "not clearly established" that a particular brand of misconduct

"could violate" the subject constitutional amendment, qualified immunity necessarily attaches, entitling Movants to qualified immunity. *Reichle v. Howards*, 566 U.S. 658, 663 (2012).

## III. Bouto's Suggestive Identification Claim Is Foreclosed as a Matter of Law Or, Alternatively, by Qualified Immunity (Count I)

Bouto's claim that Movants used unduly suggestive identification procedures that violated his due process rights fails as a matter of law. (*E.g.*, Dkt. 256, TAC ¶ 377.) First, in *Blackmon v. Jones*, the Seventh Circuit held that "the police [do not] violate a suspect's constitutional rights by showing witnesses a suggestive photo array or conducting a suggestive lineup." 132 F.4th 522, 524–25 (7th Cir. 2025). The "appropriate remedy" for such concerns is "exclusion of the evidence at trial, not damages." *Id.* at 526.[4] This civil case, however, provides no recourse for a standalone claim of unduly suggestive identification, such that it must be rejected. *Id*.

Second, alternatively, *Blackmon* forecloses Bouto's suggestive identification claim under qualified immunity because "[b]efore 2002 neither this circuit, nor any other, had held that an officer could be liable for employing suggestive identification procedures." 132 F.4th at 526. The events at issue occurred nearly ten years prior in 1993, and there was no clearly established law at the time imposing liability for an unduly suggestive identification. *See Iglesias*, 2025 WL 3171611, at *10–11 (qualified immunity bars unduly suggestive identification claim arising from events that occurred in early 1990s); *Johnson*, 2025 WL 903813, at *24 (same). Movants are entitled to summary judgment on the suggestive identification claim.

## IV. Summary Judgment Is Warranted on Bouto's *Brady* Claims (Count II)

To prevail under *Brady v. Maryland*, 373 U.S. 83 (1963), Bouto must show "[1] the evidence in question was favorable to him, [2] the police 'suppressed' the favorable evidence, and [3]

[4] *Blackmon* recognized a narrow exception for "unusual circumstances" where suggestive identification procedures were accompanied by fraud or manufactured evidence. 132 F.4th at 525–26. Such a claim manifested in Bouto's fabricated evidence claims, which fail as a matter of law. *Supra* at Sec. II.A.

prejudice ensued because the suppressed evidence was material." *Holloway v. City of Milwaukee*, 43 F.4th 760, 768 (7th Cir. 2022) (brackets inserted). Moreover, for a civil claim premised on *Brady*, Bouto must show that the Movant responsible for the suppression "acted intentionally or at least recklessly in failing to turn…over" the evidence. *Moran*, 54 F.3d at 493.

Bouto asserts that four baskets of evidence were suppressed in violation of *Brady*:

1. Movants Pergande, Pang, and Halvorsen (and Guevara) suppressed General Progress Reports ("GPRs") documenting interviews with witnesses. (TAC ¶ 90.)

2. Defendants (Bouto never specified which ones) suppressed evidence related to a 911 call. (TAC ¶¶ 377, 383.)

3. Movant Halvorsen (and Defendant Guevara) withheld the tactics used to obtain identifications of Bouto. (TAC ¶ 146.)

4. Movant Pergande withheld an excessive force complaint against three non-party officers that was unrelated to the homicide investigation. (Dkt. 256, TAC ¶ 91.)

As outlined below, Bouto's *Brady* allegations fail for a host of reasons.

**A. There is no evidence supporting the existence of additional GPRs.**

Bouto contends that Pergande, Pang, and Halvorsen suppressed GPRs that documented interviews with scene witnesses Richmond, Lozada, Escobar, and Jacobo, and interviews with lineup fillers William Lupo, Luis Oquendo, and Cesar Matias. (SOF ¶ 119.) There is no evidence that these GPRs exist, rendering this theory of liability premised exclusively on speculation, which cannot be used to defeat summary judgment. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) (plaintiff's "mere speculation that a RAMIS report and report concerning [the victim's boyfriend] may have existed, however, cannot be the basis for his *Brady* claim"). Instead, the undisputed record reflects that two pages of GPRs were created in this investigation, and both pages were disclosed prior to Plaintiff's criminal trial. (SOF, ¶ 107.)

Having had the benefit of robust discovery in this case, Plaintiff has adduced no evidence upon which a jury could find that additional GPRs exist and were suppressed by any of the Movants.

**B. Evidence of the 911 call was not suppressed nor was it exculpatory.**

Bouto contends that unspecified Defendants suppressed evidence of a 911 call in which a witness' description of the shooter did not match Bouto. (SOF ¶ 120.) First, evidence of this call was not suppressed. The State disclosed the identity and the notes of the 911 dispatcher to Bouto's attorney, who also knew the identity of the 911 caller through his own investigation. (SOF ¶ 102.) Bouto had the opportunity to make use of the evidence related to the 911 call at trial by having the caller or dispatcher testify, but his attorney made the strategic decision not to do so. (SOF ¶ 102, 104.) Because Bouto cannot "demonstrate that [any Movant] blocked the [evidence] from disclosure 'in time for [him] to make use of it' and that 'it was not otherwise available to [him] through the exercise of reasonable diligence,'" this *Brady* claim fails. *Goudy v. Cummings*, 922 F.3d 834, 838 (quoting *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008)); *see United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) ("even if the government failed to disclose material evidence, the evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence").

Second, no Movant was personally involved in documenting the 911 call or suppressing evidence related to it. (SOF ¶ 102.) Under analogous circumstances, the court in *Bolden v. City of Chicago* rejected a plaintiff's *Brady* claim that defendants suppressed 911 call records because "it is too speculative, without more, to attribute personal responsibility to these defendants." No. 17 CV 417, 2019 WL3766104, at *9 (N.D. Ill. Aug. 9, 2019). Also—necessarily—because no Movant was involved in the handling of the allegedly suppressed evidence, Bouto cannot satisfy

the culpability threshold, i.e., he cannot show that any Movant "acted intentionally or at least recklessly in failing to turn… over" evidence related to the 911 call. *Moran*, 54 F.4th at 493.

**C. No Movant was involved in the purportedly withheld identification tactics and, regardless, this is not a viable *Brady* claim.**

Bouto contends that Defendant Guevara and, on some occasions, Movant Halvorsen suppressed the tactics used to obtain identifications from Richmond and Rey Lozada.[5] Specifically for Halvorsen, Bouto alleges "Detectives Guevara and Halvorsen allowed the witnesses to view photographs of Robert Bouto at Area 5 detective headquarters." (TAC, ¶ 73).

First, there is no evidence—only Bouto's pleading allegations—that Halvorsen directed witnesses to view photographs of Bouto or even knew it happened. Rather, scene witnesses Rey Lozada, Jacobo Lozada, and Carl Richmond independently looked through a folder of photographs that included Bouto, sitting on a desk, and that no officer provided the photos or directed the witness to view them. (SOF ¶ 49.) "Individual liability under § 1983…requires personal involvement in the alleged constitutional deprivation," of which there is no evidence for Halvorsen on this theory of liability, warranting summary judgment. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Second, and just as dispositive, Bouto's attempt to recast his fabrication and suggestive identification contentions as a *Brady* suppression claim is foreclosed by binding precedent. In *Saunders-El v. Rhode*, the Seventh Circuit rejected a *Brady* claim based on an officer's silence about his own alleged improper tactics because "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." 778 F.3d 556, 562 (7th Cir. 2015); *see also Iglesias*,

[5] Bouto does not identify any other Movant as having been involved in this alleged suppression, nor is there evidence that any other Movants was personally involved. (SOF ¶ 121.)

2025 WL 3171611, at *14 (awarding summary judgment to defendants "as to the alleged suppression of their fabrications").

However, if this Court were to disagree and find uncertainty in the jurisprudence, Movants are entitled to qualified immunity, as it was not clearly established in 1993 that police officers could be held liable via the Fourteenth Amendment for allegedly staying silent about their own improper tactics. Where it is "not clearly established" that a particular brand of misconduct "could violate" the subject constitutional amendment, qualified immunity necessarily attaches, entitling Movants to qualified immunity. *Reichle v. Howards*, 566 U.S. 658, 663 (2012).

### D. The excessive force complaint was not suppressed nor material and, alternatively, Movants are entitled to qualified immunity.

Bouto contends that Movants Pergande and Pang suppressed a non-sustained excessive force complaint that was brought by Rahela George—the mother of one of Bouto's fellow P.R. Stone gang members—against non-party officers Day, Dembowski, and King, when George and Bouto were arrested for mob action prior to the Ruvalcaba murder. (Dkt. 256, TAC ¶ 91; SOF ¶¶ 113–14.) Bouto speculates that because he was a witness to the non-sustained complaint, Movants Pergande and Pang retaliated by pinning him with the Ruvalcaba murder. *Id.*

First, this evidence was disclosed and used by Bouto's defense attorney during his sentencing hearing. (SOF, ¶ 115.) Unsurprisingly, this evidence was not used at Bouto's trial because his defense attorney successfully barred any mention of Bouto's prior arrest for mob action. (SOF, ¶ 92–93.) Regardless, it was disclosed, precluding the evidence from serving as the basis for a *Brady* claim. *See Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) ("there is no *Brady* violation that could support a § 1983 claim" based on "evidence [that] was not suppressed").

Second, even had the evidence not been disclosed personally by Defendants, the evidence was not suppressed within the meaning of *Brady* because Bouto was a witness to the alleged

excessive force and knew of George's complaint prior to his arrest for murder in this case. (SOF, ¶¶ 114–15.) *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (no suppression when plaintiff knew of alleged *Brady* evidence); *see also Hill*, 2014 WL 4922319, at *3. ("a *Brady* claim cannot rest entirely on facts known to the plaintiff during his criminal trial").

Third, the evidence was not material because the non-sustained complaint was inadmissible. Therefore, there is no reasonable probability that the proceeding would have resolved differently. *Beaman v. Freesmeyer*, 776 F.3d 500, 509 (7th Cir. 2015) (holding that inadmissible polygraph evidence "was not *Brady* material," therefore, "[i]ts non-disclosure cannot form the basis of liability"); *People v. Jackson*, 182 N.E.3d 594, 604 (Ill. 2021) ("mere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case does not raise an inference of bias or motive to testify falsely and 'is not admissible to impeach the officer.'").

Fourth, Movants Pergande and Pang are entitled to qualified immunity because, in 1993, there was no law clearly establishing a constitutional duty for officers to disclose an inadmissible, non-sustained excessive force complaint filed against non-party officers (not Pergande or Pang) that was unrelated to their allegedly improper investigative tactics during the Ruvalcaba homicide investigation. *See Beaman*, 776 F.3d at (7th Cir. 2015) (qualified immunity on *Brady* claim where plaintiff "points to no cases pre–1995 where the Illinois Supreme Court, or any Illinois court for that matter, found that inadmissible polygraph tests, *or any other type of inadmissible evidence*, could constitute *Brady* material") (emphasis added).

### E. Because the culpability standard necessary for a civil *Brady* claim remains in flux, Defendants are qualifiedly immune from *Brady* liability.

While the Seventh Circuit has made clear that "Section 1983 claims cannot be founded on negligence," *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006), it has been unable to settle on the specific heightened standard of culpability to govern § 1983 *Brady* claims. In October, the

Seventh Circuit conceded that it "ha[s] not resolved whether reckless conduct can create liability for a *Brady* suppression claim." *Mims v. City of Chicago*, 155 F.4th 970, 975 (7th Cir. 2025). Instead, the court presumed that officers must have "acted intentionally or at least recklessly" in concealing evidence. *Id.* (citation and internal quotation marks omitted). But even a threshold of intentionality—which, again, the Court has *not* instituted outright—would put the Seventh Circuit at odds with those circuits that follow *Youngblood v. Arizona*, 488 U.S. 51 (1988), to require bad faith before *Brady* liability can be imposed. *E.g., Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014) (*Brady* violation required that "[o]fficers suppressed the evidence in bad faith"); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) ("bad faith standard should likewise apply to due process claims that law enforcement officers preserved evidence favorable to the defense but failed to disclose").

As the Supreme Court routinely cautions, "'if judges…disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.'" *Pearson v. Callahan*, 555 U.S. 223, 245 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)); *see Reichle*, 566 U.S. at 669–70. Here, the Seventh Circuit itself and its sister circuits more broadly have been unable to coalesce on a *Brady* culpability threshold. "If appellate judges sitting in quiet chambers can't agree on the law, why should an officer know what law is clearly established…?" *Aska v. Yingling*, at *13 (N.D. Ill. Jan. 23, 2026). Because the uncertainty in the law precludes officers from ascertaining the intent with which they must act before *Brady* liability attaches, the right upon which Plaintiff's civil *Brady* claim is premised is not clearly established, requiring qualified immunity.

**V. Bouto's Destruction of Evidence Claims Fail (Count III)**

To prevail on a destruction of evidence claim, Bouto must put forth admissible evidence showing that: "(1) the [Defendants] acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that [Bouto] was unable to obtain comparable evidence by other reasonably available means." *York*, 34 F.4th at 559 (citation and internal quotation marks omitted). Bouto alleges: (a) Movants declined his requests for a gunshot residue test and polygraph exam; and (b) Movant Pang removed the battery from Bouto's pager, thereby "erasing its memory" and the phone number of his purported alibi witness, Tania Astefan. (Dkt. 256, TAC ¶¶ 92–106.) Both theories fail on the merits and based on qualified immunity.

**A. There was no constitutional duty to perform a gunshot residue test or polygraph examination.**

First, there was no constitutional duty for Movants to create exculpatory evidence for Bouto by performing a gun residue test or administering a polygraph examination. Per the Supreme Court, "police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988). Moreover, "officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established." *Mustafa*, 442 F.3d at 548. Under either of these principles, there was no federal requirement that Movants conduct a gunshot residue test or polygraph examination, meaning there was no constitutional duty for them to tortiously violate—in the vein of destruction of evidence or otherwise—requiring summary judgment for Defendants.

Second, for essentially the same reasons, it was not clearly established in 1993 that the Constitution required Movants to perform Bouto's desired tests. Because Bouto will be unable to

carry his burden by marshaling caselaw demonstrating such a duty existed in 1993, Movants are entitled to qualified immunity. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

Third, Bouto's claim is too speculative to survive summary judgment. As a matter of law, the exculpatory value of a gunshot residue test or polygraph examination, or any other similar types of *latent evidence*, is only apparent after testing. *See Gray*, 648 F.3d at 567 ("Latent exculpatory evidence is evidence that requires processing or supplementation to be recognized as exculpatory"). The Supreme Court expressly forecloses such evidence from grounding a destruction claim, holding that where "no more can be said" of the evidence "than that it ***could have*** been subjected to tests, the results of which ***might have*** exonerated the defendant," there is no destruction claim. *Youngblood*, 488 U.S. at 57 (emphases added).

Fourth, the failure to conduct a polygraph examination cannot be the basis of a due process claim, theorizing that the evidence's destruction prevented its use at trial, because polygraph results are inadmissible. *See, e.g.*, *Beaman*, 776 F.3d at 507 (holding plaintiff could not prove materiality because the non-disclosed polygraph exam was inadmissible); *People v. Gard*, 632 N.E.2d 1026, 1032 (Ill. 1994) (holding polygraphs inadmissible).[6] Finally, against this backdrop, there is no evidence that any Movant acted in bad faith. *See, Youngblood*, 488 U.S. at 58.

**B. Bouto's pager-erasure theory lacks competent evidence to establish destruction.**

Bouto also claims that Movant Pang destroyed his alibi's contact information when Pang removed the battery from Bouto's pager thereby erasing its memory and preventing his alibi from being corroborated through his girlfriend. (Dkt. 256, TAC ¶¶ 92–95.) More specifically, when Felony Review ASA Hughes interviewed Bouto on the evening of May 14, 1993, Bouto provided an alibi—he was with his girlfriend Tania Astefan—but he could not provide her phone

---

[6] Bouto could have submitted himself to a polygraph examination at any time, of course, which would have been immaterial, as such evidence is inadmissible and has no bearing on guilt or innocence.

number to corroborate his alibi because Movant Pang had removed the battery from Bouto's pager, allegedly erasing its memory and, with it, the last number from which Tania contacted him. (SOF ¶ 40–41, 70.) This claim fails because Bouto cannot identify admissible evidence to support any of the elements of such a due process destruction claim.

First, Bouto cannot establish that the pager's memory was erased when Movant Pang allegedly removed the battery. Bouto never testified that he observed the pager after the battery was removed to know its memory was erased. Nor is there any evidence regarding the type or model of pager Bouto possessed from which an inference may be drawn showing that removing the battery would have erased the pager's memory. Bouto merely speculates that taking out a battery caused erasure. *See Rice v. Burks*, 999 F.2d 1172, 1175 (7th Cir. 1993) ("Just because an unfortunately (perhaps purposely) unclear record leaves open a universe of possibilities…does not mean a trial is necessary to sort through the hypothetical possibilities").

Second, the exculpatory evidence—contacting Tania to corroborate Bouto's alibi—was easily obtainable by other reasonable means. *United States v. Kimoto*, 588 F.3d 464, 489–91 (7th Cir. 2009) (rejecting destruction claim where comparable evidence was obtained from other sources); *United States v. Ludwig*, 641 F.3d 1243, 1254 (10th Cir. 2011) (no destruction claim where evidence is available by other means, "namely, by calling and questioning the witnesses to the event"). Tania was Bouto's girlfriend at the time, and he knew the approximate location where she lived. (SOF ¶ 70.) Defendant Officers, ASAs, or (most importantly) Bouto himself could have tracked down Tania to discuss his alibi, which Bouto *actually did* because Tania testified at Bouto's trial to his alibi defense. (SOF ¶¶ 70, 105–106.) Indeed, the pager was not even a reasonable method to obtain Tania's contact information, as the number from which she paged Bouto from various numbers. (SOF ¶ 40.)

Third, Tania's testimony at Bouto's trial forecloses any claim that his fair trial rights were affected by the mere erasure of his pager's memory. The key to a destruction claim is that the exculpatory evidence *cannot* be used, but here, the exculpatory evidence—Tania's corroboration of Bouto's alibi, not a random phone number she paged Bouto from—was used, eviscerating any *Brady* claim premised on the alleged erasure of the pager's memory. (SOF ¶ 106); *Kimoto*, 588 F.3d at 489–91 (rejecting destruction claim where destroyed evidence did not impair defendant's ability to present defense).

Fourth, Bouto cannot show that Pang acted in bad faith or that it was apparent to Pang that, by removing the battery, he would erase the pager's memory that contained the last number Tania paged Bouto or that doing so would somehow foreclose all avenues to contact Tania or assess Bouto's alibi. (SOF ¶¶ 70, 106.) This is dispositive, as "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence ***at the time*** *it was lost or destroyed*." *Youngblood*, 488 U.S. at 56 n.*. At most, Pang was negligent, but "mere negligence by police does not amount to a constitutional violation." *York*, 34 F.4th at 562.

Finally, Pang is entitled to qualified immunity because it was not clearly established in 1993 that removing a pager battery and thereby erasing its memory, which provided one of many avenues to obtain a witness's contact information, could give rise to a destruction-of-evidence claim. *See, e.g.*, *Harrell v. Cook*, 169 F.3d 428, 433 (7th Cir. 1999) (reversing lower court's denial of qualified immunity where officers destroyed potentially useful evidence that was not the sole means of proving the claim and whose exculpatory value was speculative).

## VI. No Involvement Entitles Mingey, Marron, and Maher to Summary Judgment.

To sustain a § 1983 claim, Bouto "must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). While all defendants have asserted this defense with regard to specific claims, it is worth separately raising that the unrebutted record reflects that Movants Mingey, Marron, and Maher did not have personal involvement in the underlying Ruvalcaba murder investigation. The only involvement of Marron and Maher is their interactions with witness Francisco Vicente, but concerning a separate investigation into armed robberies for which he was a suspect. (SOF ¶ 73.) Even more attenuated, Mingey's name—signed by someone else—appears on a single crime scene processing report used to inventory the lineup photographs. (SOF ¶ 61.) As such, these Movants are additionally entitled to summary judgment on all claims because there is no evidence in the record of any personal involvement with regard to any of Bouto's allegations.

## VII. Judgment Is Warranted on Bouto's Failure to Intervene Claim (Count VI)

A plaintiff states a federal claim for failure to intervene by showing that a "constitutional violation has been committed by a law enforcement official; *and* the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Under § 1983, failure to intervene is "a way to prove the liability of a state actor who was not a direct participant in the challenged wrongdoing." *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *10 (N.D. Ill. Feb. 6, 2014).

First, Bouto's failure to intervene claim rests primarily on his allegations of fabricated police reports, coerced identifications, and *Brady* violations as outlined above. Because Bouto "failed to establish an underlying constitutional violation that would allow [him] to prevail on a failure to intervene claim," summary judgment on Count VI is warranted. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Second, and relatedly, Bouto has no evidence that the Movants who were

not involved in this purported misconduct were *aware of it* and had a *realistic opportunity* to intervene. *Yang*, 37 F.3d at 285. Thus, his failure to intervene claim fails on the merits.

Finally, Movants are also entitled to qualified immunity because it was not clearly established in 1993 that officers could be personally liable for failing to intervene in the investigative misconduct alleged here—fabrication, suppression, or destruction of evidence. It is Bouto's burden to defeat qualified immunity by showing that the constitutional rights that Bouto claims were violated were "clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citation and internal quotation marks omitted).

Bouto cannot meet that burden. There is no closely analogous case establishing that, as of 1993, officers could be personally liable for failing to intervene in alleged investigative misconduct giving rise to Fourteenth Amendment fair trial claims. The seminal decision recognizing failure-to-intervene liability, *Byrd v. Brishke*, held only that officers who failed to stop an ongoing beating in their presence—a Fourth Amendment excessive force violation—could be liable under § 1983. 466 F.2d 6, 11 (7th Cir. 1972). Between *Byrd*'s issuance and the alleged misconduct here in 1993, no Seventh Circuit or Supreme Court decision expanded that theory of liability to encompass the Fourteenth Amendment claims lodged by Bouto.

That historical limitation is dispositive. As the Seventh Circuit recently emphasized in *Blackmon v. Jones*, qualified immunity applies where it was not clearly established that "officers could be personally liable" for the asserted constitutional violation. 132 F.4th 522, 526 (7th Cir. 2025). Because "[b]efore [1993] neither this circuit, nor any other, had held that" failure to intervene liability encompassed allegations of fabrication, suppression, or destruction of evidence, Movants are entitled to qualified immunity. *Id*.

Fourth, Seventh Circuit Judge Frank Easterbrook recently cast doubt on the viability of the failure to intervene theory of § 1983 liability, explaining that "'[f]ailure to intervene' sounds like vicarious liability," which is untenable, as "[t]he Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. N.Y. City of Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To preserve the defense, Defendants contend that Judge Easterbrook's is correct, *Byrd* and its progeny are untenable in light of *Monell*, and failure to intervene liability cannot attach via § 1983 as a matter of law.

## VII. Bouto's Federal (Count V) and State (Count XI) Conspiracy Claims Also Fail

### A. Absence of underlying tort violations requires dismissal of conspiracy claims.

"[C]onspiracy is not an independent basis of liability in § 1983 actions," *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008), and it "is not an independent tort" when brought under Illinois state law. *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 41. Like failure to intervene, conspiracy claims are derivative of the federal constitutional and state law malicious prosecution claims, and where those underlying claims fail, so do the conspiracy claims. Because Bouto lacks viable direct liability claims, his derivative conspiracy claims necessarily fail. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017); *Tri-Plex*, 2024 IL 129183, ¶ 42.

### B. There is no evidence to support Bouto's conspiracy claims.

To establish liability for a conspiracy under § 1983, a plaintiff must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman*, 776 F.3d at 510; *see Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017) (a "defendant who innocently

performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy").

Here, Bouto has no evidence—circumstantial or otherwise—of a conspiratorial agreement amongst Movants. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (circumstantial evidence may provide adequate proof of a conspiracy, but such evidence cannot be speculative); *Grayson*, 157 F. Supp. 3d. at 744–45, 747 (dismissing conspiracy claim under Illinois law and § 1983 conspiracy based on same analysis that there was no evidence of an agreement). Therefore, Bouto's federal and state law conspiracy claims fail against Movants.

**C. § 1983 conspiracy fails because there are no private actor defendants.**

"'To establish §1983 liability through a conspiracy, a plaintiff must demonstrate that…a state official ***and a private individual(s)*** reached an understanding to deprive the plaintiff of his constitutional rights….'" *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013) (quoting *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012)) (emphasis added). A federal "conspiracy claim is superfluous" where "all named defendants are state actors." *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2014). Bouto's § 1983 conspiracy theory cannot proceed as a matter of law because, "all named defendants are state actors." *Turley*, 729 F.3d at 649; *e.g., id.* at 649 n.2 ("[w]hen, as here, the defendants are all state actors, 'a [federal conspiracy] claim does not add anything except needless complexity'") (quoting *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009)).

**D. Defendants are qualifiedly immune from § 1983 conspiracy liability.**

Where courts are divided on an issue central to the claim, qualified immunity applies because "a reasonable official lacks the notice required before imposing liability." *Ziglar*, 582 U.S. at 154. As explained above, the no private actor defense is central to the viability of a § 1983

conspiracy claim. The remaining question, then, is whether either issue was so clearly resolved in 1993 that "reasonable officers in [Movants'] positions would…have known with any certainty" that their actions subjected them to liability. *Id.* at 155. It was not. The no-private-actor defense is already well entrenched as demonstrated by *Turley*, *Cooney*, *Lewis*, and *Fairley*. Because Bouto "bears the burden of demonstrating the violation of a clearly established right," *Purtell v. Mason*, 527 F.3d 651, 621 (7th Cir. 2008), and the state of the law forecloses that showing, Movants are entitled to qualified immunity.

## IX. Summary Judgment Is Warranted on Bouto's IIED Claim (Count VIII)

Bouto's IIED claim is based on the same conduct that allegedly violated his constitutional rights. Because the constitutional claims against Movants fail, Bouto's IIED necessarily fails. *Cooney v. Casaday*, 735 F.3d 514, 521 (7th Cir. 2013). (IIED claim fails when premised on alleged constitutional violations that also fail). Accordingly, summary judgment must enter for Movants on Count VIII.

## X. Summary Judgment is Warranted on *Respondeat Superior* and Indemnification Claims

Plaintiff also brings *respondeat superior* and indemnification claims against the City. "[C]laims…for respondeat superior and indemnity" against a municipal entity "are derivative liability claims that depend on [Plaintiff] prevailing against at least one of the individual defendants." *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). "Because the individual defendants are entitled to summary judgment in their favor, the claims against [the City] must fail as well." *Id. Respondeat superior* liability is also limited to state-law claims, so to the extent the state law claims against the officers are dismissed, so is the *respondeat superior* claim.

## CONCLUSION

Movants are entitled to summary judgment on all claims.