**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BOUTO, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 19 CV 2441 |
| | ) | |
| v. | ) | Hon. John Kness |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS UNDER LR 56.1(b)(3)(C)**

Plaintiff Robert Bouto, by his attorneys, Loevy & Loevy, hereby submits his Statement of Additional Material Facts under LR 56.1(b)(3)(C):

## STATEMENT OF FACTS[1]

### An unknown perpetrator shoots and kills Salvadore Ruvalcaba

1. As of May 1993, in the vicinity of Roosevelt High School, Kimball Avenue was a dividing line between the many gangs in the area: the area to the west of Kimball was controlled by the "Folks," including the Spanish Cobras, IGs, SDs, and Royals, and Gs; and the east side of Kimball was controlled by the "People," including the Lion Kings, Vice Lords, and three different types of Stones street gangs, the Familia Stones, P.R. Stones, and Future Stones. Dkt. 446-6, Lozada Dep., at 106:8-107:18; Dkt. 446-7, Richmond Dep., at 82:3-83:6; Dkt. 446-4, Pergande Dep., at 65:14-23 (gangs active in the 17th district included Seventeen, P.R. Stones, Latin Kings, Spanish Cobras, Simon City Royals, Satan Disciples, Imperial Gansters, Gaylords).

[1] For the Court's ease and consistency, Plaintiff uses the name spellings used in Defendants' summary judgment filings (Dkt. 446 at 2 n.1).

2. At the time of Salvadore Ruvalcaba's murder, the Spanish Cobras had conflicts with the P.R. Stones, as well as with the Familia Stones, the Latin Kings, the Vice Lords, the Almighty Imperial Gangsters, and other gangs. Dkt. 446-7, Richmond Dep., at 82:3-83:6 ("Everybody was fighting with everybody over there."); Dkt. 446-6, Lozada Dep. at 105:18-107:24, 12:21-18:14 (describing Spanish Cobra confrontations with Familia Stones on the day of Ruvalcaba's murder), 22:13-24:1 (same); Dkt. 446-32, May 19, 1993 Grand Jury Testimony, at PageID#15176 (describing conflict between P.R. Stones and Almighty Imperial Gangsters).

3. On the afternoon prior to Ruvalcaba's death, there were multiple gang confrontations between Spanish Cobras including Rey Lozada, and opposing gang members, including a verbal confrontation at a distance between Spanish Cobras and a crowd of Familia Stones in the vicinity of West Sunnyside and Kimball that immediately preceded Ruvalcaba's death. Dkt. 446-6, Lozada Dep. at 12:21-18:14 & 22:13-24:1, 24:19-25:18, 145:20-146:12.

4. When the shooting broke out, Ruvalcaba was standing with Richmond, Rey and Jacob Lozada, and Frank Escobar, at the southwest corner of Kimball and Sunnyside amidst a crowd of people; the shooter emerged from behind the opposing crowd of Familia Stones, which was at the alley to the east of Kimball on Sunnyside; the shooter fired a volley of shots into the crowd of Spanish Cobras; and within just a few seconds, Ruvalcaba had been hit, and the shooter fled. Dkt. 446-6, Lozada Dep. at 22:17-24:1, 24:20-25:3, 145:20-146:12, 29:11-29:15, 30:4-31:24; Dkt. 446-7, Richmond Dep., at 11:14-12:2, 13:12-14:18, 15:9-16:20, 20:15-22:3, Dkt. 446-10, Richmond July 31,1996 Trial Tr., at 118:1-118:6; Dkt. 446-11, Cleared/Closed Report, at PageID#13028; Exh. 1, Maps, at 1, 2.

**Robert Bouto is innocent and had nothing to do with Ruvalcaba's murder**

5. Plaintiff Robert Bouto had nothing to do with the Ruvalcaba murder; he is innocent, as he has consistently maintained for decades, and he has been awarded a Certificate of Innocence

after wrongfully serving 23 years in prison. Dkt. 446-11, Cleared/Closed Report, at PageID#13032 (on the date of his arrest, Mr. Bouto denied shooting the victim); Dkt. 446-51, Sept. 11, 1996 Sentencing Test. at 72:21-22 (speaking on his own behalf at sentencing, Bouto said: "I truly am innocent."); Exh. 2, COI Hearing Testimony, at 116:17-117:10; Exh. 3; Order granting COI Petition; Exh. 4, Lassar Report, at 43-44 (concluding that Bouto is more likely than not innocent); Exh. 5, Guevara Dep. in Bouto, at 15:15-15:23; Dkt. 434, Defs.' Answer, at PageID #10568, ¶7.

6. As the investigating detectives knew, no physical evidence of any kind ever tied Mr. Bouto to Ruvalcaba's murder, nor was any such physical evidence presented at trial. Dkt. 446-11, Cleared/Closed Report at PageID#13029-13034; Dkt. 446-20, Aug. 1, 1996 Trial Tx. , at D-161:6 to D-164:23 (prosecution summary of evidence in closing argument); Exh. 6, Allio Report, at 5; Exh. 5, Guevara Dep. in Bouto, at 15:24-16:3 ("Q. Isn't it true that you knew there was absolutely no physical evidence indicating that Mr. Bouto had any connection to the murder?" "A. Plead the Fifth."); Exh. 7, Investigative File.

7. As Mr. Bouto's then-girlfriend Tania Astefan, and her then-friend Helen Kandah, have confirmed repeatedly: at the time the shots were fired, Astefan was embracing Bouto in a different alley, blocks from the shooting, after Bouto had picked Astefan up from Roosevelt High School. Dkt. 446-11, Cleared/Closed Report, at PageID#13032 (at the time of his arrest, Mr. Bouto told the police that "he was with his girlfriend, Tan[i]a," when the shooting occurred); Dkt. 446-20, Aug. 1, 1996 Astefan Trial Tx.. at D-82:2-D-87:21; Dkt. 446-20, Aug. 1, 1996 Kandah Trial Test., at D-114:24 to D-128:18; Exh. 8, Astefan Dep., at 44:4 to 46:5; Exh. 9, Kandah Dep., at 50:3-62:13; Exh. 4, Lassar Report, at 12-16, 27, 44 (finding "Bouto's alibi evidence more credible than" the evidence upon which he was convicted).

**Eyewitnesses at the scene provided varying descriptions of the unknown shooter and his clothing, and could not see his face**

8. When Guevara and Halvorsen were assigned to the Ruvalcaba homicide shortly after 3:00pm on May 14, 1993, they immediately drove to the crime scene at Roosevelt High School together in plain clothes, where they observed the victim's uncovered body lying in the street; did some initial work at the scene, including interviews; participated in a search of the area for the shooter; and, while searching, heard that members of the 17th district tactical team had placed a suspect in custody at 3:45pm and returned to the crime scene at 3:50pm. Dkt. 446-21, Feb. 6, 2019 Halvorsen Dep. in Montanez, at 123:13-123:32, 124:14-125:24, 126:18-127:13; Dkt. 446-10, Pergande July 31, 1993 Trial Testimony, at 183:15-185:6 (suspect placed in custody at 3:45pm); Exh. 10, General Offense Case Report, at 2 (documenting that "DET GUEVARA #20861 ARRIVED ON SCENE 1550 HRS."); Dkt. 446-8, Bouto Dep., at 160:15-164:9; Exh. 11, Photo of Guevara and Halvorsen at Crime Scene; Dkt. 446-4, Pergande Dep., at 179:23-181:21.

9. Shortly after the murder, police officers spoke at the scene with 15-year-old Rey Lozada, 17-year-old Jacobo Lozada, 19-year-old Carl Richmond, and 18-year-old Frank Escobar ("the Spanish Cobra Witnesses"), as well as several neighborhood witnesses. Exh. 10, General Offense Case Report; Dkt. 446-17, Sept. 1994 Show-Up Report, at PageID#13261; Dkt. 446-19, Halvorsen GPR; Dkt. 446-22, Fleming Dep., at 80:23-81:24, 91:19-92:4, 90:8-90:22; Dkt. 446-11, Cleared/Closed Supp Report, at PageID#13028-13029, 13030-13031.

10. When questioned by the police at the scene initially after the shooting, prior to any identification procedure, no eyewitness was able to identify the shooter by name or nickname, and no one indicated that the shooter was known to them. Exh. 10, General Offense Case Report, at 1 (unknown offender listed by description only); Dkt. 446-17, Sept. 1994 Show-Up Report, at PageID#13261; Dkt. 446-11, Cleared/Closed Supp Report, at PageID#13030-13031; Dkt. 446-19, Halvorsen GPR; Dkt. 446-22, Fleming Dep., at 80:23-81:24, 91:19-92:4, 90:8-90:22.

11. After Officers Shier and Baumann interviewed neighborhood eyewitnesses Melissa Melendez (33 years old), Ida Rodriguez (46 years old), Melissa Costello (36 years old), Margaret Fleming, Patricia Fleming, and Christopher Fleming, they reported receiving a description from Melendez that the offender was a 16-year-old male wearing white high-tops, black ¾ length baggy pants, and a black t-shirt; who was about 5'5" and 120 pounds; and had hair that was "BLK, SHAVED W/PONYTAIL." Exh. 10, General Offense Case Report, at 1; Exh. 7, Investigative File, at 54 (showing eyewitnesses' age); Dkt. 446-4, Pergande Dep., at 162:5-162:23.

12. When Defendant Halvorsen interviewed 15-year-old Michael Fleming shortly after the shooting at the crime scene, Michael's ability to describe the shooter was limited to that the shooter was "clean shaven" and wore a "black hoodie" that was "all black," and he did not see the shooter's face or the shooter's pants, but he gave a detailed description of the height, weight, hair color, clothing, race, and age of a teenage girl he saw with the shooter. Dkt. 446-19, Halvorsen May 14, 1993 GPR; Dkt. 446-22, Fleming Dep., at 80:23-82:10, 91:19-93:11, 94:2-94:24, 97:1-98:1, 90:8-90:22, 91:19-92:4, 97:10-98:1, 186:18-187:4, 55:11-55:13; Dkt. 446-11, Cleared/Closed Report, at PageID#13029, 13031 ("they could not see [the offender's] face"); Exh. 5, Guevara Dep. in Bouto, at 37:17-38:5, 39:3-39:10.

13. A 911 caller provided a description of the shooter as wearing "baggy pants," a "black hood" and "orange shorts" that was made known to Defendants including Guevara. This fact is not contained in the investigative file for the homicide. Exh. 12, 911 EMS Call Notes, at 1-2; Exh. 4, Lassar Report, at 6 n.5; Exh. 5, Guevara Dep. in Bouto, at 115:2-115:7; Exh. 7, Investigative File.

14. The shooter wore a hoodie on his head in a manner that obscured his face, and thus eyewitnesses including Richmond, Rey Lozada, Michael Fleming, and Margaret Fleming could not see the shooter's face well enough to make any identification, as they told police officers including Guevara. Dkt. 446-7, Richmond Dep., at 15:20-15:23, 19:4-20:14, 122:7-122:15, 34:3-35:1, 63:23-

64:2, 90:1-90:9, 249:8-250:15; Dkt. 446-6, Rey Lozada Dep., at 45:6-45:19, 20:21-21:2, 21:11-21:13; Dkt. 446-11, Cleared/Closed Supp. Report, at PageID# 13031; Dkt. 446-22, Fleming Dep., at 185:6-185:20, 130:5-130:8; Exh. 5, Guevara Dep. in Bouto, at 17:20-19:17.

15. Pergande interviewed Spanish Cobra Witnesses Escobar, Rey Lozada, Jacobo Lozada, and Carl Richmond at the scene, and the only description he was able to receive from them was from Escobar, alone, that "a M/4/16-17, [5'7"], 140lbs wearing a blue hoodie, black long shorts, shaved hair on sides w/ pony tail had shot the victim." Dkt. 446-17, Sept. 27, 1994 Show-Up Supp. Report, at PageID#13261; Dkt. 446-4, Pergande Dep., at 162:24-164:4; Dkt. 446-10, Pergande July 31, 1996 Trial Tr., at 191:5-191:7.

16. When Ruvalcaba was shot and killed, his body was a significant distance (roughly 225-245 feet) west of the location of the shooter, as was known to Defendants based on the location of the shooter's bullet casings found in a grassy area in front of 3353 West Sunnyside. Exh. 7, Investigative File, at 51; Dkt. 446-11, Cleared/Closed Report, at PageID#13028; Dkt. 446-20, Press Aug. 1, 1996 Trial Tr. at D-57:4 to D-64:3; Exh. 6, Allio Report at 6; Dkt. 446-10, Reynolds July 31, 1993 Trial Tr., at 217:24-218:2.

17. Richmond and the other Spanish Cobra Witnesses were within about 10-15 feet of Ruvalcaba when he was shot and killed within seconds, and thus much too far to reliably see the shooter's face. Dkt. 446-7, Richmond Dep., at 20:22-21:3; Exh. 12, June 1, 1993 Grand Jury Tr., at 5:9-10; Dkt. 446-10, July 31, 1996 Trial Tr. at 118:19-118:23 (shooting occurred within seconds), 135:11-17, 139:17-20; Exh. 12, June 1, 1993 Grand Jury Tr., at 5:5-5:22; Dkt. 446-6, Rey Lozada Dep., at 32:8-32:14; Exh. 6, Allio Report, at 6, 8-9, 12; Exh. 13, Dysart Report, at 11-12 ("[D]istances over 100 feet, as shown above, make it extremely difficult to encode the details of a person's face, which is required in order to make accurate identification decisions").

18. Richmond told plain clothes officers he spoke with at the scene that the shooter was wearing dark shorts and a dark hoodie, and that he did not see the shooter's face. Dkt. 446-7, Richmond Dep., at 122:7-122:15, 124:17-124:18, 26:12-28:1, 29:11-30:4, 111:15-111:21.

19. The only description of the shooter that 15-year-old Rey Lozada was able to provide at the scene to police was that the shooter was wearing a blue hoodie. Dkt. 446-6, Lozada Dep., at 147:8-148:1, 149:5-149:12; Dkt. 446-11, Cleared/Closed Report, at PageID#13030-13031 (not documenting any description provided by Rey Lozada of the shooter); Dkt. 446-17, Sept. 1994 Show-Up Supp. Report (not documenting any description provided by Rey Lozada of the shooter at the scene); Exh. 10, General Offense Case Report, at 2.

20. During the course of the incident that resulted in Ruvalcaba's murder, none of the four Spanish Cobra Witnesses observed whether Ruvalcaba's shooter was a member of the P.R. Stones as opposed to a member of the Familia Stones or some other opposing gang. Dkt. 446-6, Lozada Dep. at 14:11-15:8, 22:13-24:1, 106:18-107:18 (Rey Lozada); Dkt. 446-7, Richmond Dep., at 82:3-82:23, 87:5-87:13, 105:12-105:20, 160:11-161:12 (Carl Richmond); Dkt. 446-11, Cleared/Closed Report, at PageID #:13031 (Frank Escobar and Jacobo Lozada).

**Defendant Pergande arrests Mr. Bouto 40 minutes after the murder, even though Mr. Bouto did not match the descriptions of the shooter**

21. The shooting took place in a densely populated urban area, and school had just let out from the local high school, so there were many people out in the vicinity, including many teenagers. Dkt. 446-22, Fleming Dep., at 53:16-54:24, 55:1-55:7; Dkt. 446-4, Pergande Dep., at 172:24-173:10; Dkt. 446-7, Richmond Dep., at 10:6-12:2, 14:4-14:10.

22. During the search of the area for suspects, at approximately 3:45pm on May 14, 1993, members of the 17th district tactical team including Pergande encountered Mr. Bouto and took him into custody, claiming that they did so because Mr. Bouto "fit the description of the wanted person." Dkt. 446-14, Arrest Report, at PageID#13071; Dkt. 446-11, Cleared/Closed

Report, at PageID#13027 (listing arresting officers), 13031-13032 (Guevara and Halvorsen "received information from the 017 district tactical team that they had a suspect in custody"); Dkt. 446-10, Pergande July 31, 1996 Trial Tr., at 180:2 to -185:5; Dkt. 446-4, Pergande Dep., at 127:2-127:16; Exh. 14, May 3, 1995 Mtn. to Quash Hrg Hearing Tr. (Pergande Test.) at 11:19-12:15.

23. Mr. Bouto had no ponytail of any kind; his barber styled his hair "[s]hort all the way around" and did not leave a ponytail in the back, as is apparent in lineup photographs, reproduced in part below, which reflect tails or hair at the nape of the neck visible on other lineup participants, but not Bouto. Ex. 25, Lineup Photos; Dkt. 446-24, Lineup Photo; Dkt. 446-25, Lineup Photo; Dkt. 446-20, Issa Aug. 1, 1996 Trial Tr. at D-18:9 to D-19-24, D-20:7 to D-20:21, D-105:12 to D-105:18; Exh. 2, COI Hrg. Testimony, 113:1-113:16; Dkt. 446-10, July 31, 1996 Trial Tr. at 195:4 to 196:19 (discussing trial exhibit photos and confirming no ponytail shown there); Exh. 5, Guevara Dep. in Bouto, at 27:12-27:09, 28:9-28:12, 104:12 to 105:19.

<u>Tails/hair at the nape of the neck visible on other photographed members of the lineup:</u>



<u>Tails/hair at the nape of the neck not visible on Bouto:</u>





Exh. 25, Lineup Photos, (excerpted above).

24. At approximately 5'9" or 5'10," Mr. Bouto was significantly taller than the shooter eyewitnesses had described as approximately 5'5" or 5'7". Dkt. 446-4, Pergande Dep., at 171:25-172:1; Dkt. 446-23, Lineup Report, at PageID#14375; Exh. 10, General Offense Report, at 1 (5'5" height description); Dkt. 446-17, Sept. 27, 1994 Show-Up Supp. Report, at PageID#13261 (5'7" height description); Exh. 14, May 3, 1995 Mtn. to Quash Testimony, at 9:16-9:24; Exh. 5, Guevara Dep. in Bouto, at 29:11-29:16.

25. Mr. Bouto was not "clean shaven," but instead had a prominent mustache, a soul patch, and dark stubble in the area of his chin and neck. Exh. 25, Lineup Photos; Dkt. 446-25, Lineup Photo; Dkt. 446-24, Lineup Photo; Exh. 4, Lassar Report at 36, 6, 11-12; Dkt. 446-4, Pergande Dep., at 169:19-172:3; Exh. 5, Guevara Dep. in Bouto, at 28:13-29:5.





26. While two different eyewitness descriptions had initially described the shooter as wearing white shoes, Mr. Bouto wore dark shoes. Exh. 10, General Offense Case Report, at 1 (Melissa Melendez describes the shooter as wearing "white high tops"); Dkt. 446-4, Pergande Dep., at 162:5-162:23; Exh. 14, May 3, 1995 Mtn. to Quash Hrg. Tr. at 5:19-6:13 (another description provided was of "a black T-shirt with black shorts and white gym shoes"); Dkt. 446-4, Pergande Dep., at 166:21-167:24 (same); Dkt. 446-24, Lineup Photo (Bouto wore dark shoes); Dkt. 446-4, Pergande Dep., at 188:5-188:7, 167:25-168:12 (same); Exh. 5, Guevara Dep. in Bouto, at 29:6-29:12.

27. Although multiple witnesses had described the shooter as a "White Hispanic" (e.g., Dkt. 446-19, Halvorsen GPR; Exh. 14, May 3, 1995 Mtn. to Quash Tr., at 5:19-6:5), Bouto is of Iraqi Assyrian descent, and his Middle Eastern heritage was known to both his arresting officers (who referred to him by nickname "Sadam") and the Spanish Cobras. Dkt. 446-8, Bouto Dep., at 267:20-268:17, 17:15-17:20, 42:21-43:1 (Pergande and Pang called him "Sadam"); Dkt. 446-6, Lozada Dep., at 92:2-92:6 (Rey Lozada recognized Bouto's appearance as reflecting "like Arabic descent"); Dkt. 446-4, Pergande Dep., at 27:5-27:16 (recalling "stopping a group in Eastwood and Kedzie with – well, being a Muslim fitting the general description").

28. No gun was recovered from Mr. Bouto. Dkt. 446-11, Cleared/Closed Report, at PageID #13027. In a deviation from standard police practice, Guevara, Halvorsen, and Pergande had access to gunshot residue kits to test the hands of suspected shooters found within a couple hours of a shooting, but they did not request that the evidence technician conduct such a test because they knew it would exculpate Mr. Bouto. Dkt. 446-10, Reynolds July 31, 1996 Trial Tr. at 215:11-215:23; Exh. 5, Guevara Dep. in Bouto, at 48:19-48:25, 49:6-50:16; Exh. 6, Allio Report, at 6-7 ("Ignoring this potential link to firing a gun is outside of normal standard police practice."); Dkt. 446-11, Cleared/Closed Report; Exh. 7, Investigative File.

**Defendants were motivated to frame Mr. Bouto because he was a suspect in a police misconduct complaint against his arresting officers**

29. The officers who arrested Bouto on May 14, 1993 (including Defendant Pergande, Pergande's regular partner Larry King, Officer John Day, and Officer Dembowski) were members of a 17th district tactical team, "Team C," who socialized outside of work together. Dkt. 446-11, Cleared/Closed Report, at PageID #13027 (listing arresting officers), 13031-13032; Dkt. 446-14, Arrest Report, at PageID#13071 (listing arresting officers); Dkt. 446-4, Pergande Dep., at 25:22-26:23, 61:14-63:1.

30. Shortly before the Ruvalcaba homicide, Pergande, King, Day, and Dembowski had each received notice of a citizen excessive force misconduct complaint against Day, Dembowski, and King in which, they knew, Mr. Bouto had been identified as a central witness; each responded to the complaint denying any misconduct on either May 12th and May 13th of 1993. Exh. 15, Daniel George CR file, at2-5, 12468; *id.* at 12477 (Day notice); *id.* at 12480 (Day denial); *id.* at 12481 (Dembowski notice), *id.* at 12484-85 (Dembowski denial); *id.* at 12486 (King notice); *id.* at 12489 (King denial); *id.* at 18(Pergande notice); *id.* at 42 (Pergande denial); *id.* at 13 (arrest report of Bouto, signed by Day and Dembowski, in incident underlying misconduct complaint); *id.* at 5, 3

31. Mr. Bouto had seen an officer strike Daniel George during the April 12, 1993 incident, and the misconduct complaint was also corroborated by medical records documenting George's injuries, and Mr. George's sister, who called in the complaint. Dkt. 446-8, Bouto Dep., at 302:14-304:21; Exh. 15, Daniel George CR file at 2; Exh. 15, Daniel George CR file, at 3, 25, 12, 2-3, 33, 38, 29

32. A few weeks after the April 12 incident, Bouto was confronted by the 17th district officer he had seen strike Daniel George, who was upset and told Bouto words to the effect of that, "You tell Daniel he can go 'F' himself." Dkt. 446-8, Bouto Dep., at 302:14-304:21, 305:2-306:20.

33. The 17th district tactical team fed its cases to the Area Five detective division in which Guevara and Halvorsen worked, motivating Defendant Guevara to want to frame Mr. Bouto. Exh. 5, Guevara Dep. in Bouto, at 116:22-119:21 (including: "You wanted to put a case on Robert Bouto because he'd been identified as a witness in a complaint register investigation against the 17th District Tactical Team members isn't that right?" "Plead the fifth."); Dkt. 446-4, Pergande Dep., at 35:3-35:5; Dkt. 446-21, Halvorsen Dep. in Montanez, at 49:4-50:2.

**To frame Mr. Bouto, Defendants conducted a series of eyewitness identification procedures with witnesses whom they knew could not make reliable identifications**

34. After transporting Mr. Bouto to the crime scene, Pergande and Pang communicated with Guevara, and then officers including Guevara, Pergande, Halvorsen, and Pang conducted a "show-up" at the scene in which they brought certain eyewitnesses together, to look through a police car window at Bouto and several other teenagers seated in the back, handcuffed. Dkt. 446-8, Bouto Dep., at 160:15-165:3, 176:18-178:11, 199:1-199:6; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report; Exh. 11, Photo of Guevara and Halvorsen at Crime Scene; Dkt. 446-4, Pergande Dep., at 179:23-181:21, 186:5-186:14, 195:25-196:4; Exh. 4, Lassar Report, at 9; Dkt. 446-6, Lozada Dep., at 232:3-232:7, 152:10-153:18; Exh. 5, Guevara Dep. in Bouto, at 20:7-20:20.

35. Show-up identification procedures are less reliable than line-ups because they have no known-innocent fillers; when they occur without an admonition that the perpetrator may not be present and a suspect in handcuffs or in the back of a police cruiser is presented to the witnesses, there is a further risk of an identification not because of recognition, but because of witness deduction (e.g., "Gee, this must be the perpetrator if the police have him in custody."). For example, the 1992 IACP model policy on eyewitness identification states that show-ups should be avoided whenever possible, and recommends that only one witness at a time view the show-up, that words uttered by police suggesting that the suspect is the perpetrator be "scrupulously avoided", that a suspect is only presented to a witness one time for the purposes of identification, and that the

suspect not be handcuffed during the show-up. Exh. 13, Dysart Report, at 19-20, 22; Exh. 6, Allio Report, at 13-14.

36. Prior to the date of the Ruvalcaba homicide, Richmond, Rey Lozada, and Jacobo Lozada, on one hand, and Bouto, on the other, were acquainted with one another as rival gang members. Richmond and Rey had had prior negative interactions with Bouto, and Richmond knew Bouto by his nickname, which was "Sadam." Dkt. 446-8, Bouto Dep., at 164:5-165:24, 166:11-16, 168:10-17; Dkt. 446-6, Lozada Dep., at 39:20-40:18, 42:22-43:4, 113:15-20, 114:17-19; Dkt. 446-7, Richmond Dep., Dkt. 446-7, at 23:21-25:2; Dkt. 446-10, July 31, 1996 Trial Tr. at 112:4-113:1.

37. Guevara, Halvorsen, and Pergande deviated from accepted police practice by building the case on four teenage rival gang member witnesses, rather than by conducting identification procedures with uncompromised, adult neighborhood witnesses. Given the gang rivalry, detectives conducting a legitimate investigation would have known to be suspicious of the Spanish Cobra Witnesses' motives, document their individual descriptions of the shooter prior to any identification procedure, investigate and document the relationships between the witnesses and the police suspect, and attempt to validate any identifications from gang rivals. Exh. 6, Allio Report, at 9-10, 12-13, 15; Dkt. 446-4, Pergande Dep. at 187:7-1878:4; Exh. 5, Guevara Dep. at 19:8-19:25, 26:17-27:11.

38. In a deviation from accepted police practice, Pergande and Guevara did not document that they learned from speaking with the four Spanish Cobra Witnesses at the scene that they did not see the shooter well enough to make an identification, nor did they document the limited descriptions of the shooter that Richmond and Rey Lozada provided at the scene. Dkt. 446-11, Cleared/Closed Report; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report; Exh. 7, Investigative File; Exh. 6, Allio Expert Report, at 7 & 10; Exh. 5, Guevara Dep. in Bouto, at 17:20-19:17, 19:8-19:25, 25:7-25:16, 18:4-19:1.

39. Neither Pergande, nor Guevara, nor Halvorsen, nor any other officer documented the show-up until nearly a year and a half later, on September 27, 1994, when Pergande created a report claiming that Jacobo had identified Bouto by his clothing and Rey had identified Bouto by his face; reflecting that Carl Richmond and Frank Escobar had made no identifications at the show-up; and documenting a description he claimed to have received from Frank Escobar on May 14, 1993 at the crime scene. Dkt. 446-17, Sept. 1994 Show-Up Report; Dkt. 446-4, Pergande Dep., at 123:25-124:3, 126:9-126:16, 195:9-195:17.

40. In a departure from standard police practice, the Defendants conducting the show-up did not photograph or document the names, clothing, and appearance of any other teenagers participating with Bouto as suspects; Pergande and Guevara cannot say whether and how any of them matched the description of the shooter or his clothing. Exh. 6, Allio Report, at 14-15; Dkt. 446-17, Sept. 27, 1994 Show-Up Report; Dkt. 446-4, Pergande Dep., at 176:12-177:2, 183:11-184:22; 186:5-186:14, 126:9-126:16, 195:9-195:17.

41. Later on May 14, 1993, Guevara and Halvorsen administered a live lineup to six witnesses at the police station, and then created a police report claiming that Richmond, Frank Escobar, and Rey Lozada had identified Mr. Bouto as the shooter, and that Jacobo, Michael Fleming, and Margaret Fleming had identified Mr. Bouto as the shooter based on his clothing, and thus that 6 out of 6 witnesses had identified Mr. Bouto in some way. Dkt. 446-23, Lineup Report.

42. It is contrary to accepted police practice and training to show a witness the same suspect in repeated eyewitness identification procedures, because it is very likely that a witness viewing the second procedure will merely select the suspect they previously viewed in the first procedure. Exh. 6, Allio Report, at 14-15; Exh. 13, Dysart Report, at 19 n.50, 25-27 ("In my professional experience, I have never before encountered a case where law enforcement conducted a

showup and received a "positive identification" and then conducted a photo array followed by a live lineup.").

43. To attempt to conceal their misconduct in showing the Spanish Cobra Witnesses two different identification procedures with the same suspect, Guevara and Halvorsen falsely reported to felony review prosecutor Kevin Hughes that they "did not know about [the] show-up, so they conducted a line-up at [the] station." Dkt. 446-9, ASA Fact Sheet, at PageID#12749 ("R/D's DID NOT KNOW ABOUT SHOW-UP SO THEY CONDUCTED A LINE-UP AT STATION"); Dkt. 446-18, Hughes Dep., at 132:11-134:13; Exh. 5, Guevara Dep. in Bouto, at 20:21-22:13.

**Defendants fabricated identifications and suppressed evidence regarding the rival gang Spanish Cobra Witnesses**

44. Richmond told plain clothes officers he spoke with at the scene that the shooter was wearing dark shorts and a dark hoodie, and that he did not see the shooter's face, but they did not document this description, in a deviation from accepted practice and training, and still presented him with a show-up. Dkt. 446-7, Richmond Dep., at 122:7-122:15 ("I said I didn't see the shooter but I seen what he was wearing . . . . I gave a description of the clothing."), 124:17-124:18 (same), 26:12-28:1, 29:11-30:4 (description of officers), 111:15-111:21 ("I saw a person wearing a dark hoodie, dark shorts."); Exh. 6, Allio Expert Report, at 7 ("The basic step of recording Richmond's description of the suspect is not recorded in the investigative file."); *id.* at 10 (the failure to document such information deviates from basic law enforcement investigation training); Exh. 7, Investigative File; Dkt. 446-11, Cleared/Closed Report, at PageID#13030 & 13032; Exh. 10, General Offense Case Report; Dkt. 446-17, Sept. 1994 Show-Up Report;

45. Richmond did not make an identification at the show-up, but Guevara and Halvorsen falsely reported to ASA Hughes that he had. Dkt. 446-7, Richmond Dep., at 27:9-28:1, 90:1-90:9, 122:7-122:19, 122:18-122:21; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report, at

PageID#13261; Dkt. 446-4, Pergande Dep., at 213:13-215:7; Exh. 5, Guevara Dep. in Bouto, at 17:20-19:1; Dkt. 446-9, Felony Review Jacket, at PageID# 12749, 12754.

46. After the show-up, Richmond wanted to go home and not be involved, but Guevara and Halvorsen told him he had to go to the police station at Grand and Central, and once there, the Spanish Cobras were told by Guevara and Halvorsen that they could not leave until they viewed the lineup, and Richmond was not permitted to use the phone. Dkt. 446-7, Richmond Dep., at 28:5-28:10, 42:4-42:19, 49:3-49:11, 90:1-90:9; Exh. 5, Guevara Dep. in Bouto, at 35:21-36:9.

47. Prior to the lineups, Guevara purposefully allowed the Spanish Cobra Witnesses to see Bouto, who was handcuffed in a room, opening the door to the room and saying words to the effect of, "that's the guy that did it, right, that's the guy." Exh. 2, COI Hrg. Tr., at 111:12-112:18; Dkt. 446-7, Richmond Dep., at 31:5-33:2; Exh. 16, Rey Lozada Affidavit, at 4¶6; Dkt. 446-6, Rey Lozada Dep., at 48:18-49:8; Exh. 5, Guevara Dep. in Bouto, at 32:8-33:2, 33:17-34:5.

48. Prior to the lineups, Guevara purposefully showed the Spanish Cobra Witnesses a Polaroid photograph of Mr. Bouto taken that day, and also allowed them to see Mr. Bouto through a one-way mirror, so that they knew to pick Mr. Bouto at the lineup. Dkt. 446-7, Richmond Dep., at 34:3-36:22, 42:20-43:11, 130:22-131:8, 249:8-250:15, 253:15-254:4; Exh. 5, Guevara Dep. in Bouto, at 30:1-32:6, 33:11-33:16; Exh. 16, Rey Lozada Affidavits, at 2 ¶¶6-7 & 4 ¶¶6-7; Dkt. 446-6, Lozada Dep., at 76:20-78:13, 48:18-49:21, 52:1-52:3, 234:11-235:13.

49. Guevara responded to Richmond denying that he saw the shooter's face by "trying to sell it" to Richmond that Bouto was the shooter, such as by saying words to the effect of, "look, he's got the same clothes," and telling Richmond that Bouto was the shooter over and over again; eventually, "in so many words he told me that he could make my life very miserable if I don't play ball with him." Dkt. 446-7, Richmond Dep., at 34:3-34:22, 34:17-35:1, 35:21-36:12 ("He kept trying to tell me that this is the guy, this is the clothes he's got on, we got the guy. You know, I kept telling

him that I didn't see the shooter. And he kept telling me, yes, I did. And I was, like, I saw what he was wearing, I didn't see his face. And he kept telling me, yeah, I saw him. He kept trying to sell it to me. And when he seen -- I feel that when he seen that I didn't want to jump onboard with that bullshit, that's when he came at me in another direction. He told me that he could make my life miserable if I don't play ball."), 36:23-37:24 ("the way I understood it was he wanted me to identify Robert Bouto"), 40:3-40:11, 249:8-250:15, 251:22-252:16 ("He says we have the guy, you are going to identify him, and if you don't, I'm going to make your life miserable, is what he told me."), 253:7-253:12.

50. Richmond was a well-known gang member in the area from a poor background; he understood that Guevara was threatening to pin a criminal case on Richmond if he did not identify Bouto, and so he falsely identified Bouto as the shooter in the lineup and did not reveal the truth to the prosecutors on the case because, he "didn't want what was happening to [Bouto to] happen to me." Dkt. 446-7, Richmond Dep., at 35:23-39:17 ("He told me that if I don't jump onboard with this, that he could make something – he could make something happen to me. He told me that he would put a case on me, in so many words. He didn't say it exactly like that, but as he was conversating, he was letting me know that he was in control and that I was going to do what he told me to do…He would have put a case on me and jammed me up the same way he did Robert Bouto."), 36:17-36:22, 37:14-24, 38:1-39:17, 43:16-44:16, 47:2-47:10 ("Q. And why did you pick out Robert Bouto? A. Because I didn't want what was happening to him happen to me."), 50:11-51:3.

51. Guevara also suppressed the improper tactics and Polaroid photograph detectives used at the lineups by excluding that information and the Polaroid photograph from the investigative file to conceal this exculpatory information. Exh. 5, Guevara Dep. in Bouto, at 30:1-32:6, 33:11-33:16 (photograph); *id.* at 25:7-25:11, 17:20-19:17, 19:2-19:25, 22:19-23:13, 24:9-26:10,

26:11-33:2, 33:17-34:5, 33:3-33:10, 34:6-34:20, 35:21-36:9, 36:10-15, 20:21-22:13 (other tactics used); Dkt. 446-23, Lineup Report; Exh. 7, Investigative File; Dkt. 446-18, Hughes Dep., at 125:18-126:19.

52. When it was time for grand jury proceedings, Halvorsen showed up at Richmond's house to get him to testify, and Richmond complied because he felt he had no choice given Guevara's prior threats. Dkt. 446-7, Richmond Dep., at 49:14-50:10, 138:2-138:21.

53. Prior to trial, Richmond had a series of run-ins with Guevara and/or Halvorsen on the streets, including one occasion in which Guevara told Richmond to remember what Guevara had told him and that he would be expected to testify at Bouto's trial; Halvorsen played "good cop" to Guevara's "bad cop." Dkt. 446-7, Richmond Dep., at 51:4-52:17.

54. Guevara had instructed Richmond that he should make his account "convincing," and so Richmond tried to provide a convincing account when he testified at trial against Mr. Bouto. Dkt. 446-7, Richmond Dep., at 163:4-163:14.

55. When Richmond moved out of Chicago in January 2019, he called Mr. Bouto's attorney unprompted after seeing a segment on Bouto's case on the news, and told the attorney he'd like to come clean about Bouto's case. Richmond did so because, "My conscience can't take it anymore, man," and he felt safer given his move out of Chicago in October 2018. Dkt. 446-7, Richmond Dep., at 58:8-62:11, 63:4-63:6, 77:4-78:7, 211:9-211:18, 212:24-214:24.

56. Although Pergande claimed in a September 1994 report that Rey identified Bouto as the shooter at the May 1993 show-up "by his face" (Dkt. 446-17, Show-Up Supp. Report, at PageID#13261), Lozada and Pergande do not recall whether Rey identified anyone at the show-up and Guevara pleads the Fifth as to what occurred at the show-up with Rey. Dkt. 446-6, Lozada Dep., at 47:4-47:25; Dkt. 446-4, Pergande Dep., at 216:15-216:24; Exh. 5, Guevara Dep., at 24:9-25:16.

57. Rey viewed the lineup after one or more Spanish Cobras had gone before him; he identified Bouto even though he had not seen the shooter's face well enough to make any identification because, he says, he felt like "that's what everyone was doing." Dkt. 446-6, Lozada Dep., at 55:6-57:1; Exh. 16, Rey Lozada Affidavits, at 2 ¶¶8-9 & 5 ¶¶8-9 ("After we had all seen Bouto's photograph, we all went to view a line-up. I picked out Bouto because I was still following the lead of the older guys I was with . . . I cannot say if he was the shooter or not because I could not see the shooter's face well enough.").

58. Rey Lozada did not testify before the grand jury because he knew he was wrong for falsely identifying Bouto; he testified at trial only after he had been arrested for failing to appear and threatened by officers with perjury charges. Dkt. 446-6, Lozada Dep., at 63:14-65:2, 66:7-66:19, 180:20-183:23.

59. Just as Guevara had done with Richmond, Guevara pulled Escobar, Rey, and Jacobo out privately, before the line-up procedure, to fabricate false identifications from them. Dkt. 446-7, Richmond Dep., at 33:3-34:16, 249:4-251:21; Exh. 5, Guevara Dep., at 18:4-19:7, 29:17-29:20, 30:1-30:24.

60. Clothing lineup identifications were not an accepted procedure for the Chicago Police Department in 1993; they did not count as an identification, officers were not trained to conduct them, and their value was considered "at best dubious." Exh. 17, Rule 30(b)(6) Testimony for City of Chicago, John Foster, at 209:5-210:1, 210:24-211:12; Exh. 4, Lassar Report, at 40-41 (discussing research that "clothing-based identifications are inherently unreliable"); Exh. 17, Rule 30(b)(6) Notice, Topic 1(c).

61. Jacobo Lozada was able to describe the shooter prior to identification procedures only as wearing a "dark blue pullover sweat shirt," with no other information about his appearance or clothing, but Guevara and Halvorsen falsely documented and told ASA Hughes that he was able

to make a legitimate identification of Mr. Bouto at the lineup based on clothing alone. Dkt. 446-11, Guevara/Halvorsen Cleared/Closed Report, at PageID#13031; Dkt. 446-17, Sept. 27, 1994 Show-Up Report, at PageID#13261 (including a description of the shooter by Frank Escobar, but not Jacobo Lozada); Exh. 10, General Offense Case Report (not recording any description of the shooter provided by Jacobo Lozada); Dkt. 446-14, Arrest Report, at PageID#13071 (not recording any description of the shooter provided by Jacobo Lozada); Dkt. 446-23, Lineup Report, at PageID#14375 (claiming Jacobo identified Mr. Bouto by his clothing); Dkt. 446-9, Felony Review Jacket, at PageID#12749, 12755 (claiming Jacobo identified Mr. Bouto by his clothing); Exh. 5, Guevara Dep., at 18:4-19:7, 29:17-29:20, 30:1-30:24.

62. Showing eyewitnesses who described the shooter only as wearing a "dark blue pullover sweat shirt" or a "hooded pullover shirt" the May 14, 1993 clothing lineup with Mr. Bouto was a deviation from accepted police practice, because Mr. Bouto was the only witness who was even arguably wearing clothing that fit that description, reducing the probative value of any identification of the shooter's clothing. Dkt. 446-24; Exh. 6, Allio Report, at 15-16 ("Standard police practice for a live line-up would be to find … subjects wearing similar clothing as to allow the witness to view an unbiased line-up…. Bouto was the only person wearing a dark-colored short sleeve hooded sweatshirt."); Exh. 4, Lassar Report, at 40-41 ("At the very least, in order to yield a reliable identification of an offender, the suspect should be surrounded by individuals who appear similar to the suspect."); Exh. 17, Rule 30(b)(6) Testimony for City of Chicago, John Foster, at 209:5-210:1, 316:11-316:16, 210:24-211:12, 272:5-272:9; Exh. 18, Rule 30(b)(6) Notice, Topic 1(c); Exh. 5, Guevara Dep., at 18:4-19:7, 29:17-29:20, 30:1-30:24.

**Defendants fabricated and suppressed identification evidence regarding neighborhood witnesses Michael and Margaret Fleming**

63. Before showing Michael Fleming the lineup with Mr. Bouto in it, Guevara and Halvorsen fabricated his identification by manipulating him to "match" his clothing description to

some description that purportedly had come from other eyewitnesses. Dkt. 446-22, Fleming Dep., at 82:14-83:5 ("Q. Do you remember why you were there at the police station? <u>A. Yeah, they wanted to make sure that the description actually matched everybody else's description, and then they showed us a line-up.</u> I don't know, there was six or seven people in a line-up. Q. When you say 'they wanted to make sure the description matched,' what do you mean? A. From my description to the other witnesses' description. Q. So they wanted to make sure that the description that you had of the perpetrator matched the description that the other eye witnesses had for the perpetrator? A. Correct."); Exh. 5, Guevara Dep., at 38:6-39:2.

64. When Michael viewed the lineup, he selected the person that fit the description that he had been provided by police as purportedly having come from the other eyewitnesses, collectively. Dkt. 446-22, Fleming Dep., at 121:8-121:22 ("[H]e did fit the description that *they had* in the line-up.") (emphasis added); *id.* at 120:16-120:24 ("*We* identified him through a line-up because … the person that we all picked out was the person that was wearing the same clothing that *we* seen.").

65. Michael's descriptions of the shooter's clothing evolved over time to more closely match the attire he saw on Bouto at the lineup, from the description provided to Halvorsen (a "black hoodie" that was "all black" on a "clean-shaven" shooter), to Guevara and Halvorsen's supplementary Cleared/Closed report (a "hooded pullover shirt"), to his 1996 trial description (a blue hoodie, three-quarter length black shorts, white socks, and black shoes). Dkt. 446-19, Halvorsen GPR; Dkt. 446-11, Cleared/Closed Report, at PageID#13031; Dkt. 446-10, July 31, 1996 Trial Tr., at 166:18-167:7; Exh. 4, Lassar Report, at 37 ("The inconsistencies of Michael Fleming's descriptions and statements do give us pause."), 40. At the time of the deposition, he no longer recalled the shooter's clothing other than that the shooter wore a black hoodie. Dkt. 446-22, Fleming Dep., at 183:15-183:19.

66. Michael told police that the shooter did not go west of the alley outside the rear of his home at 3338 W. Sunnyside, fired the shots from the intersection of that alley and West Sunnyside, before going straight north up the alley, which conflicts with the physical bullet casings evidence found substantially further east outside 3353 West Sunnyside. Dkt. 446-22, Fleming Dep., at 109:9-110:13, 65:23-66:24, 112:8-112:14, 184:12-185:9; Exh. 1, Maps, at 1, 2; Exh. 19, Evidence Property Receipt; Dkt. 446-11, Cleared/Closed Report, at PageID #13028; Exh. 6, Allio Report at 6; Exh. 5, Guevara Dep. in Bouto, at 40:18-41:17.

67. Guevara and Halvorsen fabricated in their Cleared/Closed Report that Michael had stated that, "[t]he offender was standing on street in front of the apartment building entrance at 3353 W. Sunnyside," which was false, to conceal that Michael's account did not match the existing physical evidence of the casings. Dkt. 446-11, Cleared/Closed Report, at PageID#13031; Dkt. 446-22, Fleming Dep., at 184:12-185:9; Exh. 5, Guevara Dep. in Bouto, at 40:18-41:17.

68. Michael made an identification of Bouto at the 1996 trial based on recalling his face from the line-up; he had not seen the shooter's face during the shooting and thus was not able to identify Bouto at trial based on any memory of witnessing the shooting. Dkt. 446-22, Fleming Dep., at 139:17-140:16; Dkt. 446-10, July 31, 1996 Trial Tr. at 154:10-154:16.

69. Margaret Fleming was inside her apartment, which was on the second floor of 3338 West Sunnyside, when she heard the shots fired; she claimed to have somehow run downstairs, which required going down several different staircases, and out the door fast enough to see the shooter still outside, but no detective documented any questioning of her on the plausibility of her account. Dkt. 446-10, July 31, 1996 Trial Tr. at 148:23-150:12 & 152:7-152:13; Dkt. 446-22, Fleming Dep., at 42:2-43:24, 44:5-44:14, 31:11-31:14; Dkt. 446-11, Cleared/Closed Report, at PageID#13031; Exh. 7, Investigative File.

70. Guevara and Halvorsen's supplementary Cleared/Closed report reflects that Margaret and Michael Flemming could describe the shooter to them only as wearing a "hooded pullover shirt" with no more information. Dkt. 446-11, Cleared/Closed Report, at PageID#13031. In a deviation from accepted investigatory practice, Guevara and Halvorsen did not contemporaneously document any description of the shooter provided by Margaret alone prior to the lineup. Exh. 6, Allio Report, at 9-10 ("I would expect detectives, at a minimum, to ask Margaret Fleming to describe the offender prior to viewing a lineup, and to document her response. I see no evidence that this basic investigatory step was taken.").

71. At Bouto's 1996 trial, Margaret abandoned her prior documented description of Bouto's clothing (merely a "hooded pullover shirt") and instead testified that the shooter wore the exact clothing that Bouto was wearing during the lineup that she viewed: a dark hoodie, three-quarter length dark blue shorts, white socks, and black shoes. Dkt. 446-10, July 31, 1996 Trial Tr., at 151:8-151:21; Exh. 5, Guevara Dep., at 14:20-15:4, 29:17-29:20.

72. Margaret died before she could be deposed in this case (Dkt. 446-22, Fleming Dep., at 31:8-31:17), but she revealed to a Lassar Report investigator that the shooter that she had actually seen was "wearing a diff[erent] outfit at the line-up then from the shooting." Exh. 32, Notes from Lassar Interview with Margaret Fleming, at 2.

**Defendants fabricated and suppressed evidence to make Mr. Bouto's alibi appear unlikely and impossible to corroborate**

73. When interrogated first by Pang and Pergande, and then subsequently by Guevara, Mr. Bouto told them how to locate his girlfriend: although he did not have her exact address memorized, he said she lived on the first floor of the building at the corner of Kedzie and Sunnyside right above the photo studio owned by her father, and identified her by her first and last names, Tania Astefan. Dkt. 446-8, Bouto Dep., at 203:7-206:5; Exh. 2, COI Hrg. Tr., at 109:15-110:11; Dkt. 446-11, Cleared/Closed Report, at PageID #:13032 (documenting interview with Guevara).

74. To fabricate evidence Mr. Bouto's alibi was suspicious, create the false impression that Mr. Bouto was trying to keep investigators from checking his alibi, and justify their failure to investigate the alibi, Guevara and Halvorsen fabricated that Bouto "does not know [his girlfriend Tania's] last name or where she lives," and that Bouto could not provide that information when interrogated. Dkt. 446-11, Cleared/Closed Report, at PageID#13032; Exh. 5, Guevara Dep. in Bouto, at 41:23-48:15.

75. Tania Astefan had strict parents who did not permit dating, and so she would page Bouto from various locations like friend's houses or pay phones, or he would pick her up from Roosevelt High School, and that is how they would get in touch with one another. Exh. 8, Tania Astefan Dep., at 20:7-21:6, 46:6-46:24, 140:15-141:18; Exh. 2, COI Hrg. Tr., at 89:19-91:10.

**When the felony review supervisor refused to approve charges, Guevara and Halvorsen fabricated additional evidence from jailhouse informants Francisco Vicente and Edwin Maldonado**

76. The decision-maker as to whether to approve charges against Bouto was ASA Kevin Hughes's supervisor, ASA Sally Bray (Dkt. 446-18, Hughes Dep., at 31:2-34:4, 37:23-39:4, 113:7-113:31, 137:13-137:21, 115:24-117:1), who invoked privilege as to her decision-making process and moved to quash Defendants' subpoena for her deposition until Defendants withdrew it. Dkts. 363, 366, 367.

77. At 10 a.m. on May 15, 1993, when ASA Hughes relayed the evidence collected thus far to ASA Sally Bray of the State's Attorney's Felony Review Unit, Bray declined to approve charges, requested "that this be held as a continuing investigation," and stated that she "wanted the R/Dets. to try and locate the offenders alleged girlfriend, Tan[i]a, and the individual known only as Mario who handed Robert Bouto the gun." Dkt. 446-11, Cleared/Closed Report, at PageID #:13032; Dkt. 446-18, Hughes Dep., at 116:9-117:13; Exh. 21, Guevara Memo to Watch

Commander, at 1 ("The Felony Review A.S.A. has requested additional investigation before approval of charges.")

78. Guevara and Halvorsen made no attempt to locate Bouto's girlfriend Tania or Mario, which was a departure from accepted police standards. Dkt. 446-11, Cleared/Closed Report; *id.* at PageID#13032-13034; Exh. 6, Allio Report at 19-20, 5; Dkt. 446-4, Pergande Dep., at 190:1-192:13; Exh. 5, Guevara Dep. in Bouto, at 41:23-48:1, 50:17-53:17.

79. Instead, Guevara and Halvorsen fabricated false written and oral statements from known drug addict and arrestee Francisco Vicente that Bouto had supposedly confessed to the Ruvalcaba homicide. They did so by feeding Vicente facts about the Ruvalcaba homicide, coercing him, threatening him, beating him, and making undisclosed promises of leniency in his robbery cases. Dkt. 446-29, Vicente Dep. in Montanez, at 12:10-13:3, 25:19-26:22, 27:9-28:22, 44:11-45:7, 46:13-47:12, 72:2-74:1, 92:14-96:12; Dkt. 446-30, Vicente Dep. in Bouto, 41:3-41:12, 43:7-48:23, 55:14-57:6, 59:21-60:22, 74:11-76:14, 76:20-78:7, 79:24-80:4, 98:19-99:14, 143:19-144:3, 281:1-282:21; Exh. 7, Investigative File, at 29-33; Dkt. 446-1, Maher Dep., at 129:12-130:24; Dkt. 446-11, Cleared/Closed Report, at PageID#13032-13034; Exh. 5, Guevara Dep. in Bouto, at 54:2-66:19, 71:22-78:23, 80:1-80:15, 96:2-97:18, 97:19-98:2.

80. In total, Guevara and Halvorsen fabricated false evidence in three separate murder investigations, over the course of just a few months in 1993, that Vicente had supposedly received confessions from the police suspects, as Vicente has since revealed. Dkt. 446-29, Vicente Dep. in Montanez at 12:10-13:3, 25:19-26:22, 27:9-28:22, 44:11-45:7, 46:13-47:12, 72:2-74:1, 92:14-96:12; Dkt. 446-30, Vicente Dep. in Bouto, 69:5-71:14, 74:11-76:14, 79:24-80:4, 89:18-91:10, 98:19-99:14, 143:19-144:3, 281:1-282:21; Exh. 5, Guevara Dep. in Bouto, at 54:2-66:19, 71:22-78:23, 96:2-97:18, 97:19-98:2; Exh. 5, Guevara Dep. in Bouto, at 80:1-80:15.

81. In the Ruvalcaba homicide case, Vicente's statement was demonstrably false in that he claimed that, according to Mr. Bouto, the victim had said, "I'm hit, I'm hit," but none of the eyewitnesses reported that Ruvalcaba had made any statements as he died. Exh. 4, Lassar Report, at 5-6; Exh. 7, Investigative File, at 32 & 23; Dkt. 446-7, Richmond Dep., at 20:15-23:5; Dkt. 446-6, Lozada Dep., 32:20-34:5; Dkt. 446-10, July 31, 1996 Trial Tr., at 108:20-110:20, 134:7-135:6; Dkt. 446-11, Cleared/Closed Report, at PageID#13029-13033.

82. At the time of the supposed 10:00-10:30a.m. confession from Bouto to Vicente and Maldonado (Dkt. 446-11, Cleared/Closed Report, at PageID#13033), the three men were in, respectively, holding cells 7-2, 7-4, and 7-6; the cells between them were occupied by other men; and the substantial distance between cells and general noise level meant that Bouto's confession would have had to have been shouted across cells at loud volume had it occurred. Exh. 7, Investigative File, at 36 (Roster of Persons in Custody); Exh. 4, Lassar Report, at 28-29; Exh. 2, COI Hearing Tr., at 150:17-151:2; Dkt. 446-47, Frycek Report, at 15472.

83. Defendant Maher joined the conspiracy with Guevara to fabricate evidence at around 3:00pm on May 15, 1993, when Maher arrived at work; it was then that Guevara communicated with Maher about the Ruvalcaba homicide and himself specifically assigned Defendant Maher to investigate the robberies committed by Vicente. Dkt. 446-1, Maher Dep., at 43:1-43:7; Exh. 5, Guevara Dep. in Bouto, at 66:20-71:16.

84. Maher, Guevara, and Halvorsen fabricated that "Francisco VINCENTE informed Det. MAHER, that another prisoner in the lock-up had confessed to him about committing a murder" while Maher transported Vicente from the lockup, and that Maher "informed Det. E, HALVORSEN of this new revelation" (Dkt. 446-11, Cleared/Closed Report, at PageID#13032-33), but this claim was false. Dkt. 446-30, Vicente Dep. in Bouto, 43:7-48:23, 61:3-61:22; Dkt. 446-29, Vicente Dep. in Montanez, at 12:10-13:3, 24:24-26:22; Group Exh. 27, Maher Reports, at, e.g., 11-

12, 20, 30-31 (no mention of any inculpatory statement by Vicente about Bouto); Dkt. 446-1, Maher Dep., at 108:13-108:22, 109:16-109:25, 120:1-120:11, 120:17-121:5 (admitting that Vicente did not tell Maher about a murder confession); Exh. 5, Guevara Dep. in Bouto, at 54:2-78:23, 96:2-98:2.

85. Halvorsen claimed that he received the information about Vicente from Maher on May 15, 1993, at 3:00pm, when Halvorsen arrived at work, but this was fabricated; lockup records reflect that Maher did not even begin to sign Vicente out of the lockup until 4:00, and it was after this time that Vicente supposedly told Maher about a lockup confession. Dkt. 446-21, Halvorsen Dep. in Montanez, at 132:2-132:33; Dkt. 446-1, Maher Dep., at 108:13-110:22, 120:1-120:11.

**The Vicente and Maldonado fabrications were used against Mr. Bouto to persuade ASA Bray to approve charges**

86. The only investigatory events documented by Guevara and Halvorsen between when ASA Bray initially declined to approve charges on May 14, requesting additional investigation, and then subsequently approved charges on May 15 were: (1) Vicente's supposed inculpation of Bouto, as purportedly received, investigated, and documented by Maher, Guevara, and Halvorsen; (2), the suggestion in Vicente's statement and Guevara and Halvorsen's police reports that a second witness, Maldonado, would soon confirm Vicente's inculpation of Mr. Bouto; and (3) a lockup records confirmation that Vicente, Maldonado, and Bouto "were all held in cell block 7." Dkt. 446-11, Cleared/Closed Report, at PageID#13032-34; Exh. 4, Lassar Report at 18, 43 (memorializing Halvorsen's admission that Vicente's statement was a "'deciding factor in charging Bouto.'"); Exh. 23, Lassar Dep., at 47:14-48:8, 50:12-17, 80:1-80:6; Exh. 20, Notes from Lassar Interview with Halvorsen, at 5; Exh. 5, Guevara Dep. in Bouto, at 79:1-79:25.

87. ASA Hughes received and relied on information from Guevara and Halvorsen to create his felony review notes, and he trusted law enforcement to conduct a fair investigation, conduct fair identification procedures, and disclose material information about identification procedures. Dkt. 446-18, Hughes Dep., at 47:3-47:12, 72:19-73:23, 126:20-129:17, 76:6-77:6.

88. In his felony review jacket ASA Hughes did not document any reason to doubt the credibility of any of the show-up, lineup, and clothing identifications evidence, or any improper or undisclosed police tactics used with Vicente, which he would have done had he been aware of such information. Dkt. 446-9, Felony Review Jacket; Dkt. 446-18, Hughes Dep., at 55:17-55:23, 121:5-124:16.

89. Had any of the following been known to ASA Hughes, it would have influenced Hughes's personal opinion on the credibility of the evidence and whether probable cause existed to charge and prosecute Bouto: improper and suggestive lineup tactics (Dkt. 446-18, Hughes Dep., at 125:18-126:19); Bouto's status as a witness in a misconduct complaint against officers who arrested him (*id.* at 126:20-129:17); intentional fabrication by police of Vicente's statement, including through force, feeding facts, and undisclosed offers of leniency (*id.* at 121:5-123:25); information that Vicente claimed to have heard confessions in multiple murder cases (*id.* at 119:24-120:18, 145:14-146:11); and information that called into question the integrity of the police investigation (*id.* at 123:1-123:19, 124:25-125:11).

**Vicente and Maldonado's fabricated statements were used to indict Mr. Bouto before the grand jury**

90. Guevara and Halvorsen proceeded to fabricate a false statement from heroin addict and arrestee Edwin Maldonado that he heard Mr. Bouto's supposed confession in the lockup with Vicente. Exh. 5, Guevara Dep. in Bouto, at 82:1-97:18; Exh. 4, Lassar Report; Exh. 26, Maldonado Memorandum, at 2, 3, 4, 5; Exh. 22, Greenfield Dep., at 25:4-29:6, 32:4-35:10; Dkt. 446-43, Maldonado Affidavit; Exh. 4, Lassar Report, at 21-22, 28-34.

91. Both Vicente and Maldonado falsely testified before the grand jury that Bouto had supposedly confessed to the Ruvalcaba homicide in their presence, and the grand jury indicted Bouto. Dkt. 446-32, May 19, 1993 Grand Jury Tr. at PageID#15169, 15177-15184, 15187-15189 (Vicente); *id.* at 15191-15204 (Maldonado); Dkt. 446-37, June 4, 1993 Indictment.

**Defendants' scheme prevented Mr. Bouto from giving testimony in the police misconduct complaint against his arresting officers**

92. Police supervisors and felony review prosecutor ASA Kevin Hughes should have been notified about Bouto's status as a witness against certain of his arresting officers, but were not. Dkt. 446-18, Hughes Dep., at 126:20-129:17; Exh. 6, Allio Report, at 21-22; Dkt. 446-11, Cleared/Closed Report; Exh. 7, Investigative File; Exh. 5, Guevara Dep. in Bouto, at 116:22-119:21.

93. Due to his arrest and incarceration beginning on May 14, Bouto was never able to be interviewed regarding the complaint, which, on May 25, 1993, was deemed "non sustained" for insufficient evidence, with the result finalized by July 1993. Exh. 15, Daniel George CR File; *id.* at 3, 46; Dkt. 446-14, Arrest Report.

**It took Mr. Bouto 26 years to free himself from the wrongful incarceration Defendants caused him**

94. At Mr. Bouto's criminal trial, the prosecution's case hinged on the eyewitness identifications of Mr. Bouto by Richmond and Lozada, and the clothing identifications of Mr. Bouto by Michael and Margaret Fleming. Dkt. 446-20, Aug. 1, 1996 Trial Tx., at D-161:6 to D-164:23 (prosecution summary of evidence in closing argument); Exh. 6, Allio Report, at 5.

95. In 2013, the City hired and paid for Sidley & Austin to conduct a comprehensive investigation on its behalf of certain cases investigated by Defendant Guevara and issue a determination as to whether there was police misconduct in Mr. Bouto's case and whether Mr. Bouto was likely innocent. Exh. 23, Lassar Dep. Excerpts, at 23:3-23:7, 39:13-39:23, 40:8-40:20, 57:15-58:3.

96. The City-commissioned final report by Sidley & Austin included admissions such as that Mr. Bouto is more likely than not innocent; it was "more likely than not that Det. Guevara engaged in misconduct"; "the eyewitness testimony, the linchpin of the conviction of Bouto, [is] unreliable"; and "Bouto's alibi evidence more credible than the eyewitness identifications of Bouto

as the shooter, and certainly more credible than the purported jailhouse confession to Vicente and Maldonado." Exh. 4, Lassar Report, at 43-44, 1-2.

97. Defendant Guevara has repeatedly invoked his Fifth Amendment right against self-incrimination in response to all questions about the Ruvalcaba homicide investigation, including fabrication of the Spanish Cobra Witness identifications, the clothing identifications of Michael and Margaret Fleming, the fabrication of Mr. Bouto's supposed "confession" to Vicente and Maldonado, and the suppression of exculpatory and impeaching evidence. Exh. 5, Guevara Dep. in Bouto; Dkt. 435 (Guevara's Answer to 3d. Am. Compl.); *see also* e.g., Exh. 5, Guevara Dep. in Bouto, at 134:19-140:23 (pleading the Fifth even after being informed that he could do so only if a truthful answer would implicate him in a crime); *id.* at 14:20-14:23 ("Sir, isn't it true that you intentionally framed Robert Bouto for a murder that he did not commit?" "A. I take the Fifth."); *id.* at 15:5-15:9, 116:22-119:21, 132:6-132:15, 130:11-130:17, 130:18-130:22, 131:8-131:12 (intentionally framed Mr. Bouto); *id.* at 25:7-25:11, 17:20-19:17, 19:2-19:25, 22:19-23:13, 24:9-26:10, 26:11-33:2, 33:17-34:5, 33:3-33:10, 34:6-34:20, 35:21-36:9, 36:10-15, 20:21-22:13 (fabricated and suppressed evidence involving Spanish Cobra witnesses); *id.* at 37:17-41:17 (fabricated and suppressed evidence involving Flemings); *id.* at 40:23-44:23, 45:7-48:1, 48:19-48:25, 49:6-50:16, 52:3-53:21 (fabricated and suppressed evidence to conceal and delegitimize Mr. Bouto's legitimate alibi); *id.* at 54:2-71:16, 71:22-78:23, 80:1-80:15, 82:1-98:2, 106:11-107:1 (fabricated and suppressed evidence involving Vicente and Maldonado); *id.* at 129:24-130:17 (violated due process); *id.* at 131:3-132:3, 132:16-132:23 (malicious prosecuted Mr. Bouto); *id.* at 133:1-134:4 (failed to intervene); *id.* at 15:5-15:9, 130:11-130:22, 131:8-131:12, 132:6-132:15 (conspired to deprive Mr. Bouto of constitutional rights).

98. When asked questions about the Ruvalcaba homicide investigation in another case, *Montanez v. Guevara, et al.*, No. 17 CV 4560 (N.D. Ill.), Defendant Halvorsen initially pleaded the Fifth Amendment on the grounds that truthful responses could incriminate him (Exh. 24, Apr. 20,

2018 Halvorsen Dep. in Montanez), before later giving a substantive deposition (Dkt. 446-21). Halvorsen pleaded the Fifth in response to questions about the Ruvalcaba homicide investigation, he and Guevara's dealings with Vicente and Maldonado, and their conspiratorial misconduct to frame innocent people for crimes they did not commit. Exh. 24, Apr. 20, 2018 Halvorsen Dep. in Montanez, at 32:17-51:20, 68:15-71:24, 93:10-23, 324:10-329:23.

Respectfully submitted,

**ROBERT BOUTO**

BY: /s/ Ruth Brown
*One of Plaintiff's Attorneys*

Jon Loevy
Russell Ainsworth
Ruth Z. Brown
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900