SIDLEY AUSTIN LLP
SIDLEY

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**MEMORANDUM**

TO: File

FROM: Daniel Greenfield
Jeff Carroll

RE: Guevara Investigation – Robert Bouto

DATE: March 3, 2015

---

## I. Introduction

We investigated three cases in which defendants purportedly confessed to the same person: Francisco Vicente. The defendants in these cases are Robert Bouto, Armando Serrano and Jose Montanez, and a third defendant.

Principally, the factual background relevant to claims of misconduct and actual innocence is as follows. On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested in connection with three armed robberies and one simple robbery he was suspected of having committed over the prior ten months. Beginning the following morning and continuing for approximately six weeks, Dets. Rey Guevara and Ernest Halvorsen reported that Vicente had obtained confessions in three unrelated murder cases. In each case, the record indicates that Vicente's confession evidence was corroborated by a second informant—Edwin Maldonado in connection with the case against Bouto; Timothy Rankins in connection with the case against Montanez and Serrano; and a still-anonymous confidential informant in connection with the case against the third defendant.[1] In two of the cases, Dets. Guevara and Halvorsen reported that Vicente first provided that evidence to someone other than them—in the Bouto case, the record indicates that Vicente first shared evidence against Bouto with Det. Maher or another detective or officer, who then alerted Det. Halvorsen; in the Montanez/Serrano case, the record indicates that Rankins first provided evidence against Montanez, Serrano, and Pacheco to Sgt. Ed Mingey, who then alerted Dets. Guevara and Halvorsen.

---

[1] Bouto, Serrano, and Montanez remain incarcerated pursuant to these convictions, whereas the third defendant was released under supervision recently.

Since Dets. Guevara and Halvorsen initially reported this information, it has been recanted by Rankins, Maldonado, and Vicente. First, beginning in 1994 and continuing to the present day, Rankins has recanted the evidence that he provided against Montanez and Serrano, alleging that it was coerced from him by a lengthy list of police and prosecution personnel, including Dets. Guevara and Halvorsen. Then, starting in 1996 and continuing to the present day, Maldonado recanted the evidence that he provided against Bouto, alleging first that he was pressured to do so by Vicente but years later also claiming that police personnel coerced him. In 2003, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated, alleging that he had been coerced by Dets. Guevara and Halvorsen. On later occasions he negotiated for various benefits in return for executing an affidavit and potentially providing testimony in connection with the Montanez/Serrano post-conviction matter. Other individuals who served time with Vicente—specifically, Lydell Williams and Valentine Gomez (aka "Tomato")—have also provided information potentially corroborating Vicente's recantations in the Bouto and Montanez/Serrano matters, respectively. Finally, some non-informant witnesses in the Bouto and Montanez/Serrano matters have described actions by Det. Guevara that, if accurate, could constitute misconduct.

For purposes of investigating these allegations, we analyzed the record and conducted interviews with individuals involved in these cases. In this report, we present a detailed statement of facts, our analyses and findings, and our conclusions regarding allegations of misconduct and claims of actual innocence in the Bouto case. We are not able to make comprehensive conclusions in the third defendant's matter.

## II. The Robert Bouto Case

### 1. Introduction

We reviewed and analyzed the complete record in the matter. We also interviewed fifteen people connected with the investigation, including the following:

- Det. Ernest Halvorsen (reporting detective)
- Carl Richmond (State's witness)
- Rey Lozada (State's witness)
- Margaret Fleming (State's witness)
- Edwin Maldonado (informant)
- Tania Astefan (alibi witness)
- Helen Kandah (alibi witness)
- Robert Bouto (defendant)

We note that Det. Guevara, Vicente, and State's witness Michael Fleming, who also had significant roles in the matter, did not consent to interviews. Specifically, Det. Guevara and Vicente have been advised by counsel not to meet with us. Fleming would not take our calls, and his mother, State's witness Margaret Fleming, informed us that he did not wish to cooperate with our investigation for reasons that we explain below.

First, we present the facts, then we present our analysis and findings, and finally, our conclusions. That analysis begins with an examination of the alibi evidence provided by Tania

Astefan and Helen Kandah. The analysis continues with our examination of the confession evidence provided by Vicente and Maldonado, including its recantation. Our analysis concludes with an examination of the evidence provided by sources other than Vicente and Maldonado, including State's witnesses Carl Richmond, Rey Lozada, Michael Fleming, Margaret Fleming, and Officer Alan Pergande.

### 2. Facts

#### a. Francisco Vicente's Arrest

On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested by Officers Lupe Pena and L. Marron in connection with three armed robberies, all class X offenses, and one simple robbery he was suspected of having committed over the prior ten months. (5/14/93 Francisco Vicente Arrest Report; 9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente, an admitted heroin addict who has acknowledged robbing people in order to support his habit, committed three of the robberies in order to steal his victim's gold jewelry, all of them at gun or knifepoint. (*Id.*) In the other, he stole a bicycle from a school-age child. (9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente also had an extensive prior criminal history. (*Id.*) He was placed into holding cell 7-2 at the 25th District Police Station. (5/15/93 Roster of Persons in Custody.)

#### b. The Shooting

Also on 5/14/93, at approximately 3:05 p.m., Salvador Ruvalcaba, 15, was shot to death outside of Roosevelt High School. (5/14/93 General Offense Case Report.) Chicago Police Department ("CPD") officers and detectives began arriving on scene at 3:25 p.m., and Dets. Guevara and Halvorsen arrived on the scene at 3:50 p.m. and 4:30 p.m., respectively. (*Id.*)

As reported by Dets. Guevara and Halvorsen in a Supplementary Report ("Supp. R."), the victim was with State's witnesses Carl Richmond and Rey Lozada, and also Frank Escobar and Jacobo Lozada, all four members of the Spanish Cobras street gang, when he was shot.[2] (5/16/93 Supp. R. by G/H.) The victim, however, was not a member of any gang. (5/9/14 Interview with Rey Lozada.)

Lozada told us that he saw "the gentleman who did the shooting" riding a bicycle in the area near the shooting on multiple occasions during the ten- to fifteen-minute period before it occurred. (*Id.*) Lozada said that he was within twenty yards of the bicycle-riding offender and, accordingly, got a close look at him. (*Id.*) Other eyewitnesses also viewed the shooter on a bicycle, Lozada said, and he recalled a post-shooting conversation in which they discussed this. (*Id.*) Lozada also informed us that he did not mention this detail to police or to the prosecution. (*Id.*) State's witness Richmond informed us that he was not in a position to have seen the offender at this time, and could shed no light on Lozada's account regarding the bicycle. (10/31/14 Interview with Carl Richmond.) We asked Tania Astefan, one of Bouto's alibi

---

[2] For purposes of clarity, we henceforth refer to Rey Lozada as "Lozada" and his brother, Jacobo Lozada, as "Jacobo."

witnesses, whether Bouto might have been riding a bicycle the day of the Ruvalcaba shooting, but she said that "he didn't have a bike," and that "I know he was walking, not riding a bike." (5/9/14 Interview with Tania Astefan.) (She was not aware that Lozada had informed us that Bouto had been riding a bicycle prior to the shooting, and did not know the reason for our question.) In response to a similar question, Bouto also denied riding a bicycle on the day of the shooting. (5/20/14 Interview with Robert Bouto.) He stated further that although he knew how to ride a bike in 1993, he did not own one. (*Id.*) (Like Tania, Bouto did not know why the question was posed, or what information Lozada had shared.)

Richmond testified that he was walking on Kimball Avenue when he saw a group of Spanish Cobras flashing gang signs across the street at members of a rival gang, the Puerto Rican ("P.R.") Stones. (7/31/96 Trial Transcript, Vol. 3 at 89.) Richmond testified that he was joined then by his friends, Lozada, Jacobo, Ruvalcaba, and Escobar. (*Id.* at 92-93.) As they began to walk away from the confrontation, according to Richmond, "someone hollered out, 'Gun!'" (5/5/15 Interview with Carl Richmond.) (That gun, according to Escobar, had been delivered to the offender by a someone riding a bicycle named "Mario." (5/16/93 Supp. R. by G/H).)[3] At that point, Richmond testified, he looked up and saw "four [P.R.] Stones running up to the corner."[4] (7/31/96 Trial Transcript, Vol. 3 at 94.) Three stopped, while one "walked all the way out to the corner, almost out to the street." (*Id.*)

That person pulled out a gun, and "started shooting." (*Id.*) Richmond told us that to evade the gunfire, he ran away from the shooter in a "zig zag" pattern and then dove to the ground. (5/5/14 Interview with Carl Richmond.) Lozada testified that when the gunfire erupted, he fell to the ground, and "looked [at] the floor" for "[a]bout" ten seconds, before then "star[ing] at who was shooting at us" for the next fifty seconds. (7/31/14 Trial Transcript, Vol. 3 at 63.) After shooting Ruvalcaba, Lozada testified, the offender fled. (*Id.* at 31.) Richmond testified that when the shooter was running away, he saw him "hand the gun to somebody in the alley." (6/1/93 Grand Jury Transcript at 7.) Richmond testified that he could not describe that person, though, because "the corner of the building was blocking my view to whoever he was handing the gun to." (7/31/96 Trial Transcript, Vol. 3 at 99.)

---

[3] For purposes of clarity, we note when a report was authored by Det. Guevara, Det. Halvorsen, or both using the following designations: "G" for Det. Guevara alone, "H" for Det. Halvorsen alone, and "G/H" for both.

[4] Some time after the show-up, after which Bouto was arrested for the shooting, teenagers William Lupo, Luis Oquendo, and Cesar Matias were also detained because they were identified by witnesses as having been "behind the offender at the time of the shooting." (5/16/93 Supp. R. by G/H.) Dets. Guevara and Halvorsen then interviewed Lupo, Oquendo, and Matias, and "[a]ll three denied being there." (*Id.*) The investigation record contains no further mention of Lupo, Oquendo, or Matias. Lupo told our private investigator, Jim Kirby, that he was at a KFC restaurant in the neighborhood with his mother when he was detained, and that he had not been at the scene of the shooting or known about it prior to being detained. (7/31/14 Interview with William Lupo.)

At the scene, CPD Officers S. Shier and C. Baumann interviewed at least six neighbors who also witnessed the shooting, State's witness Margaret Fleming, Melissa Melendez, Ida Rodriguez, Patricia Fleming, Christopher Fleming, and Melissa Costello. (5/14/93 General Offense Case Report.) Det. Halvorsen interviewed State's witness Michael Fleming, Margaret's son. (5/14/93 General Progress Report ("GPR") by H.)

Like Richmond and Lozada, the neighborhood eyewitnesses said that the shooter ran toward the victim, fired several shots, and fled. (*Id.*) Margaret Fleming said she saw the offender "r[u]n into the alley." (7/31/96 Trial Transcript, Vol. 3 at 151.) There, the offender handed the weapon to a girl with "[s]ilver piercings" on her face, she told us. (8/8/14 Interview with Margaret Fleming.) Michael Fleming also testified that he "[s]aw a man running with a gun shooting." (7/31/96 Trial Transcript, Vol. 3 at 165-66.) As reported by Dets. Guevara and Halvorsen, Michael Fleming said that the offender ran into an alley behind the Flemings' apartment and handed his weapon to a girl with "light blonde hair, wearing a red and white Jordan type pull over jacket and red pants," (5/16/93 Supp. R. by G/H), but soon lost sight of her. (7/31/96 Trial Transcript, Vol. 3 at 170-71.) Fleming then saw the offender run away, he testified. (*Id.*)

### c. On-Scene Witness Descriptions

CPD collected descriptions of the offender from at least two separate groups of witnesses—the neighborhood eyewitnesses and the Spanish Cobras.

#### (i) Vantage Point

Lozada testified that he was fifteen to twenty feet away from the shooter "when the shooting started." (7/31/96 Trial Transcript, Vol. 3 at 33-34.) Richmond testified that he was "no more than maybe 5 to 10 yards from the corner" of his side of the street, while the shooter stood six inches from the curb on his side, thus placing Richmond, in his estimation, "ten to fifteen feet; could have been twenty" feet from the shooter. (7/31/96 Trial Transcript, Vol. 3 at 95, 137-38.) However, the defense expert, private investigator David Press, testified that there were 245 feet, or about eighty-two yards, between the place where the shell casings were found and where Ruvalcaba's body came to rest. (8/1/96 Trial Transcript, Vol. 4 at D-62.) In other words, conservatively, the defense argued that this measurement indicated that eyewitnesses Richmond and Lozada were at least sixty yards away from the shooter. (*Id.* at D-176.) When we asked Lozada to demonstrate the distance between him and the shooter, he walked off a distance that we estimated to be approximately thirty yards. (5/9/14 Interview with Rey Lozada.)

But for Margaret Fleming, the distance from the neighborhood eyewitnesses to the offender is not reported. Margaret Fleming testified that she lived in a second-floor apartment unit at the time of the shooting, and that she heard what "sounded like [a] shot in front of my house," and so she ran downstairs and then outdoors. (7/31/96 Trial Transcript, Vol. 3 at 150.) At that time, she testified, she saw "a person standing . . . with a gun in his hand." (*Id.*) Margaret Fleming testified that only about three and a half feet separated her and the person holding the gun.(*Id.*)

#### (ii) Descriptions

After Officers Shier and Baumann interviewed neighborhood eyewitnesses Margaret Fleming, Melissa Melendez, Ida Rodriguez, Patricia Fleming, Christopher Fleming, and Melissa Costello, they reported that the offender was a 16-year-old white male Hispanic wearing white high-top sneakers, black ¾ length baggy pants, and a black t-shirt, with "Blk hair, shaved, with a ponytail."[5] (5/14/93 General Offense Case Report.)

The group of Spanish Cobra witnesses who were with Ruvalcaba when he was shot also were reported to have described the offender as having a ponytail. (9/27/94 Supp. R.) At a hearing, Officer Alan Pergande testified that after speaking with Richmond, Escobar, Jacobo, and Lozada, he was able to compile a description of the shooting suspect that included "black hair with shaved sides and the hair on top pulled back into a tail, small ponytail." (5/3/95 Motion to Quash Arrest Hearing at 6.) Additionally, as reported by CPD Officers Pergande and King, it was noted that they interviewed Escobar, Lozada, and Jacobo. (9/27/94 Supp. R.) Thereafter they reported that Escobar "related that a M/4/16-17, 507, 140lbs wearing a blue hoodie, black long shorts, shaved hair on sides w/ pony tail had shot the victim." (*Id*.) At trial, when asked whether the offender had a ponytail, Lozada stated, "I didn't see it." (7/31/96 Trial Transcript, Vol. 3 at 58.) On cross, Richmond was asked whether he had originally described the offender as ponytailed. He responded: "I don't recall." (*Id.* at 126.) He also said he did not recall whether the offender actually had a ponytail. (*Id.*) Officer Pergande also testified at a hearing that he received a second description that other police officers had relayed to him after speaking to other eyewitnesses, of an offender with a black T-shirt and white shoes, along with "black hair that was shaved on the side with a ponytail[.]"(5/3/95 Motion to Quash Arrest Hearing at 11.)

At the scene, neighbor Michael Fleming described the offender as "clean shaven" according to Det. Halvorsen's handwritten notes. (5/14/93 General Progress Report by H.) Margaret Fleming told us that she also remembered the shooter being clean shaven. (8/8/14 Interview with Margaret Fleming.) However, Dets. Guevara and Halvorsen reported that neighbors Margaret and Michael Fleming stated that the offender was "wearing a hooded pull over shirt," and "they could not see his face." (5/16/93 Supp. R. by G/H.) At trial, too, Michael Fleming that he did not see the shooter's face, though there was nothing blocking his view of the shooter. (7/31/14 Trial Transcript, Vol. 3 at 167-68.) He further testified that he could not tell if the shooter was either clean-shaven or wearing his hair in a pony tail. (*Id.* at 175-76.) Margaret Fleming could not see his face, she testified on cross, because "he had the thing [hoodie] on his head," and that it was pulled down "real tight." (*Id.* at 162.) She also testified that the shooter's sweatshirt had "some sort of writing" on it, a description she is not reported to have offered prior to trial. (*Id.* at 163.)

Several of the Spanish Cobras also discussed the offender's sweatshirt. Jacobo stated, as reported by Dets. Guevara and Halvorsen, that he "saw a male wearing a dark blue pullover sweatshirt firing a gun," but did not see his face. (5/16/93 Supp. R. by G/H.) Lozada testified that

---

[5] Although not reported in the RD File, Michael Summerfelt witnessed the shooting and called 911. (5/14/93 EMS Handwritten Notes.) The notes of that call, which are not included in the investigative file, reported that the offender was wearing "orange shorts" and a "black hood." (*Id.*)

that "[b]efore he approached the corner, there was no hoodie" on the shooter, and that the shooter only put the hoodie on "[w]hen he was running towards the corner." (7/31/96 Trial Transcript, Vol. 3 at 58.) Regarding the hood, Richmond clarified that it was "one of them half hoodies" that "didn't go all the way over his head." (*Id*. at 124-25.)

d. **Robert Bouto is Detained**

At 4 p.m., Bouto, 16, and a member of the P.R. Stones street gang, was detained several blocks from the crime scene because, according to arresting Officer Pergande's testimony at trial, he "pretty much fit the description" of the offender. (7/31/96 Trial Transcript, Vol. 3 at 183.) Pergande did not find a weapon or bullets on Bouto. (*Id.* at 184.)

Officer Pergande, who arrested Bouto, testified at a hearing on Bouto's Motion to Quash Arrest that although he knew Bouto prior to arresting him, he arrested him based on the physical description that he received from multiple witnesses on the scene, including Ruvalcaba's friends Richmond, Escobar, and the Lozada brothers. (5/3/96 Motion to Quash Hearing at 12-13.) Likewise, as explained below, although Richmond knew Bouto prior to 5/14/93, Officer Pergande and Richmond each testified that Richmond provided only a physical description of the offender to him. (*Id.*) That is, Richmond did not describe the offender by name or by describing his prior interactions with Bouto, despite the fact that Richmond has indicated that he knew Bouto's street name, "Sadam," prior to Ruvalcaba's death.[6] (*Id.*; 5/5/14 Interview with Carl Richmond.) Lozada and Frank Escobar also knew Bouto prior to that day, according to Bouto (5/20/14 Interview with Robert Bouto), but also only provided physical descriptions of the offender. (9/27/94 Supp. R.)

Booking photographs indicate that Bouto was wearing a dark blue, hooded, Karl Kani-brand T-shirt with cursive writing scrawled across the front, and dark blue baggy shorts. (Robert Bouto Booking Photos.) Frontal and profile booking photographs also indicate that Bouto had a "soul patch" under his lip and a mustache. (*Id.*) Bouto was described in the arrest report prepared by Officer Pergande as having a dark complexion and short dark hair. (5/14/93 Robert Bouto Arrest Report.) The report does not describe a ponytail. (*Id.*) The frontal and profile booking photographs do not show a ponytail, either. (Robert Bouto Booking Photos.)

However, Pergande later testified that upon arrest, Bouto had a small ponytail. (5/3/95 Motion to Quash Arrest Hearing at 19-20.) With his fingers, Pergande indicated, in court, that Bouto's ponytail was about three inches long. (7/31/96 Trial Transcript, Vol. 3 at 186.) The line-up photos taken from those angles Bouto was photographed from do indicate that several other participants had short ponytails. (Robert Bouto Booking Photos.)

Officer Pergande's testimony was contradicted by several individuals. Defense alibi witness Tania Astefan, Bouto's girlfriend at the time of the shooting, testified that he did not

---

[6] Note that in an interview with us, Richmond did tell us that he identified Bouto by name to Officer Pergande (5/5//14 Interview with Carl Richmond), notwithstanding the fact that he and Officer Pergande testified contrary to that, and that no police report or other evidence so indicates.

have a ponytail. (8/1/96 Trial Transcript, Vol. 4 at D-105.) In their grand jury appearances, State informants Vicente and Edwin Maldonado both testified that Bouto described himself as not having a ponytail. (5/19/93 Grand Jury Transcript at 6, 27.) Helen Kandah, Tania Astefan's best friend at the time and Bouto's other alibi witness, told Bouto's investigator that he did not have a ponytail. (5/1/96 Answer to Discovery.) In the same report, Bouto's grandmother, Mariam Bouto, also said that he did not have a ponytail when he lived with her. (*Id.*)

On 5/1/96, Bouto provided an Answer to Discovery including information gathered from his barber and his barber's assistant regarding his hairstyle. (5/1/96 Answer to Discovery.) After correctly selecting Bouto from the police lineup photo as his former customer, Bouto's barber stated specifically that he "had cut Bouto's hair for approximately one year," and that "Bouto always wore his hair short, and that Bouto never had a ponytail." (*Id.*) The barber's assistant also told the investigator that "Bouto never had a ponytail." (*Id.*) At trial, Bouto's barber testified that regular customers like Bouto were "very familiar to me," and that Bouto did not wear a ponytail. (8/1/96 Trial Transcript, Vol. 4 at D-20-21, 23.)

At the time of his arrest, Bouto had an extensive recent criminal history, particularly in the months leading up to the shooting. (Robert Bouto Criminal History.) His prior arrests included multiple arrests for possession of cannabis and disorderly conduct, as well as a gun possession charge. (*Id.*) At Bouto's sentencing proceeding, it was brought out that he also had several assault charges, including once against his mother and once in retaliation after being accidentally struck by a baseball bat. (9/11/96, Trial Transcript, Vol. 5 at 25, 34-35.) In his interview with us, Bouto said that he was wrongfully accused of the gun charge, but acknowledged that he was involved in criminal activity at the time. (5/20/14 Interview with Robert Bouto.)

Bouto told us that he was, at the time, a recent high school dropout who was "just a flunkie, a lackey . . . a body they needed to fight their battles" in his street gang, the P.R. Stones. (*Id.*) Of his relationship with the police in 1993, Bouto said: "I was a pain in the ass. They just wanted me off the streets." (*Id.*) Bouto also speculated that police had a vendetta against him for assisting a friend with an earlier police brutality claim. (*Id.*) Helen told us that Bouto frequently caused trouble for himself with police because, although he "was a nice guy" and "had a good heart," he also "had a very, very smart mouth" and "got mouthy with the cops," including one unnamed plain-clothes officer who was "always picking on" Bouto. (2/19/14 Interview with Helen Kandah.)

After he was arrested, Bouto said the police drove him to the area near the intersection of Sunnyside and Kimball streets. (5/20/14 Interview with Robert Bouto.) Accompanying Bouto back to the scene were several other teen-agers walking nearby him when he was picked up by Officer Pergande. (*Id.*) The other teenagers did not match the description of the offender, according to Officer Pergande's testimony, but were only briefly detained based upon their proximity to Bouto. (5/3/95 Motion to Quash Arrest Hearing at 14.) When they arrived at the scene, Bouto recalled that a crowd of people had gathered and police tape had been hung to block the key sites from pedestrians. (5/20/14 Interview with Robert Bouto.) Bouto recalled: "Right there was a dead kid lying on the floor. . . . We're all looking at each other, like, 'Woah.'" (*Id.*)

e. **The Show-Up**

A show-up was conducted on scene with Bouto and his companions participating as suspects. (7/31/96 Trial Transcript, Vol. 3 at 185, 100, and 34-35). Lozada testified about the show-up, saying that police "asked me if I can identify someone, if I could identify somebody that was involved in the shooting." (7/31/96 Trial Transcript, Vol. 3 at 34.) At that time, Lozada continued, he "looked at five people standing in front of a car, the police car," and that he recognized "[t]he shooter," i.e. Bouto. (*Id.* at 35.) Richmond later testified regarding the on-the-scene show-up. Richmond said that Pergande "brought back four individuals and we were all separated and they asked us all one at a time, do you recognize any of these guys." (7/31/96 Trial Transcript, Vol. 3 at 100.) Richmond also identified Bouto at the scene. (*Id.*) Jacobo identified Bouto as wearing clothing similar to the shooter. (9/27/94 Supp. R.)

We believe, but cannot conclusively state, that show-up was conducted by Det. Guevara with the assistance of Officer Pergande. (*Id.*; 5/20/14 Interview with Robert Bouto.) Robert Bouto and Richmond both recalled Guevara participating. (5/20/14 Interview with Robert Bouto; 5/5/14 Interview with Carl Richmond.) Officer Pergande filed a Supp. R. that appears to reference the show-up (9/27/14 Supp. R.), and also testified to the events of the show-up on multiple occasions. (*See, e.g.*, 7/31/96 Trial Transcript, Vol. 3 at 186.)

As noted above, Bouto told us he knew Richmond and Lozada, both of whom identified him at the scene (and also Frank Escobar who identified him later at the lineup) "from gang-banging over the years." (5/20/14 Interview with Robert Bouto.) At a prior police line-up, Bouto and Richmond got into a fight, according to both of them. (5/5/14 Interview with Carl Richmond; 5/20/14 Interview with Robert Bouto.) Richmond described that altercation to us on two occasions and it is reported in the record in an affidavit filed under oath by Richmond in connection with the Montanez/Serrano matter. (6/7/08 Affidavit of Carl Richmond.) At trial, Richmond admitted that prior to identifying Bouto he did not like him and believed that Bouto had prior animosity toward him. (7/31/96 Trial Transcript, Vol. 3 at 112-113.) In his interview, Bouto confirmed the Area 5 confrontation, and also said that he and Richmond had had at least one other altercation, in the area near Roosevelt High School. (5/20/14 Interview with Robert Bouto.) Lozada confirmed to us that Escobar knew Bouto beforehand, but said that he himself did not. (5/9/14 Interview with Rey Lozada.) Bouto told us that Lozada, his brother Jacobo, and Escobar were participants in one of the two altercations he had with Richmond near Roosevelt High School, which involved "throwing up gang symbols and calling each other names," just a few days before the shooting. (5/20/14 Interview with Robert Bouto.) Bouto said that he knew Escobar by his street name, "Tall Frank." (*Id.*)

Although he has been steadfast that he believes Bouto was guilty of the shooting, Richmond informed us, referencing the show-up, that Det. Guevara "didn't make it fair for him at the scene." (5/5/14 Interview with Carl Richmond.) He continued: "They were bringing guys there that didn't have mustaches…. They were just bringing guys randomly…. They were bringing guys there that didn't look like him."[7] (*Id.*) Similarly, Lozada described to us a show-up with very few participants and noted, specifically, that one of the other suspects was an

overweight white teen nicknamed "Fat Rat" that didn't "look anything like" Bouto. (5/9/14 Interview with Rey Lozada.) Like Richmond, Lozada still believes that Bouto committed the crime. (*Id.*)

According to Lozada, when Bouto arrived on-scene, Lozada, his brother, Jacobo, and Frank Escobar hung back, reluctant to help police. (*Id.*) Said Lozada: "We're gang bangers and we're not supposed to tell on each other, (so) we didn't know what to say." (*Id.*) Richmond, however, according to Lozada, had no such hesitation, and was the ringleader on the scene.[8] (*Id.*) According to Lozada, when police brought Bouto to the scene in a police car, Richmond "threw himself at the car. . . . Carl went all crazy at the car."(*Id.*) Lozada said that Richmond was crying at the scene, which Lozada said was not genuine. (*Id.*) Lozada said that Richmond "knew all the detectives. He knew them by name." (*Id.*) After approaching the car, Lozada told us, Richmond then said aloud "that was him," i.e. that Bouto was the shooter. (*Id.*) That is, Richmond, according to Lozada, made it clear to everyone around—including to him and to Escobar—that he thought Bouto was the shooter. (*Id.*) Margaret Fleming told us that she was also there at the show-up. (8/18/14 Interview with Margaret Fleming.) After he had been identified as the shooter by the three rival gang members, Bouto told us, Guevara "pulled me out of the car and said, 'You did this.' I said, 'I didn't do nothing.' He said, 'You did this,' and he put me back in the car.'" (5/20/14 Interview with Robert Bouto.)

f. **Police Station Identifications**

After the show-up, eyewitnesses were taken to the Area 5 station for further identifications.

There is no report of a photo array in the record. However, Lozada described in detail with us a photo array conducted at the police station shortly after the show-up.[9] (5/9/14 Interview with Rey Lozada.) According to Lozada, after arriving at the station, he, Jacobo, Richmond, Escobar, and unnamed police officers and/or detectives sat at a table together examining photos and "pass[ing] the pictures around." (*Id.*) Those pictures, Lozada said, consisted of a Polaroid photo of Bouto, along with separate Polaroid photos of six other individuals. (*Id.*) Lozada said that "one or two of us picked the wrong person" and were informed of such, either by the unnamed police personnel or by other witnesses. (*Id.*) After being so informed, allegedly, the witnesses then selected anew. (*Id.*) Although Richmond did not recall examining photos, he did recall being gathered into a room with the other witnesses at the police station. (Interview with Carl Richmond 10/31/14; Interview with Carl Richmond 5/5/14.) According to Richmond: "We were all congregating about" and listening to "what the cops were saying and what was being said instead of being interviewed separately about what had happened." (5/5/14 Interview with

---

[8] Bouto independently corroborated this characterization of Richmond's outsized role in conversation with us. (5/20/14 Interview with Robert Bouto.)

[9] The Chicago Police Department's current directives on identification procedures states that, "In no case will a lineup or photo array be conducted without a Supplementary Report being completed." (9/18/12 Chicago Police Department Lineup Procedures.)

Carl Richmond.) We do not know whether Richmond and Lozada are describing the same or separate incidents.

To ensure Richmond's cooperation in the investigation, Richmond said that Det. Guevara threatened to prosecute him for unnamed crimes, i.e. to "put a case on me," which Richmond said in his affidavit—and confirmed to us—that he understood to mean "they would implicate me in an unsolved murder case." (6/7/08 Affidavit of Carl Richmond; 5/5/14 Interview with Carl Richmond.) Richmond told us that he at first did not want to be involved at all in the investigation into the Ruvalcaba shooting, but that Det. Guevara said, "[y]ou're gonna get involved because if you don't, we have ways to make you get involved." (5/5/14 Interview with Carl Richmond.) Det. Halvorsen, Richmond said, was not involved in the alleged conduct. (*Id.*)

At 7 p.m., a lineup was conducted at Area Five Violent Crimes. (5/16/93 Supp. R. by G/H, Line-Up Report.) As reported by Dets. Guevara and Halvorsen, Richmond, Lozada, and Escobar identified Bouto as the shooter. (*Id.*) Jacobo, Margaret Fleming, and Michael Fleming "identified the person in the number 3 spot Robert BOUTO wearing the same clothing as the shooter." (*Id.*)

We discussed the line-up identification with Richmond. (5/5/14 Interview with Carl Richmond.) Richmond told us that Det. Guevara informed the eyewitnesses which position Bouto would be standing in before they entered the identification room, help he insisted he did not need. (*Id.*) Said Richmond: "He was telling us, 'He's No. 3 in the line-up, the third one from left to right.' He told me that, he told Rey Lozada that, and he told Frank Escobar that. Every time we came back into the room, he would tell [the next witness,] 'He's No. 3.'" (*Id.*) Richmond claimed the same in an affidavit he executed on 6/7/08:

> I was asked to view a line-up that evening. Detective Guevara told the other witnesses and me that they had the shooter, and that all we had to do was identify Bouto as the shooter. He whispered to each of us what position the suspect would be in. Detective Guevara then led each of us into the room to view the line-up. Each witness came back and confirmed to the other witnesses that the suspect was in that position.

(6/7/08 Affidavit of Carl Richmond.)

Lozada, who said he has not spoken to Richmond in seventeen years, told us, in contrast, that Det. Guevara did not tell him who to select in the line-up. (5/9/14 Interview with Rey Lozada.)

Margaret Fleming, who, according to the record of the line-up identified Bouto by clothing only (5/16/93 Supp. R. by G/H, Line-Up), told us that she went to the police station for the line-up, where she "pointed . . . out" the shooter, Bouto. (8/8/14 Interview with Margaret Fleming.) She said, however, that Bouto was dressed differently at the line up than he had been when she saw him firing the gun.[10] (*Id.*) She continued that she would never forget looking at

---

[10] There is no other assertion that Bouto was dressed differently at the police station than he had been earlier in the day.

Bouto: "He had sort of a round face. Looked like a typical Hispanic. Clean shaven." (*Id.*) Fleming did not allege that she was coerced to identify Bouto as the shooter. (*Id.*)

### g. Bouto Raises Alibi Defense

That same evening, at 8 p.m., Bouto was interviewed by Dets. Guevara and Halvorsen, at which time, as reported by Dets. Guevara and Halvorsen, Bouto "denied shooting the victim or being at the scene of the murder." (5/16/93 Supp. R. by G/H.) Bouto stated further "he was with his girlfriend, Tan[i]a," but "does not know her last name or where she lives." (*Id.*)

At 10 p.m., Bouto was interviewed again, this time by Dets. Guevara and Halvorsen and Assistant State's Attorney ("ASA") Kevin Hughes. (5/14/93 Statement by G/H.) Handwritten notes memorializing the meeting indicate that Bouto reiterated that he could not have committed the crime because he was with his girlfriend Tania. (*Id.*) Specifically, he stated: "I picked up my lady at Roosevelt High School at about 2:45" and then "walked down the alley and kissed." (*Id.*) Bouto continued: "Then I went home and sat out in front of my house. My lady's name is Tan[i]a but I don't know her last name and I don't know where she lives." (*Id.*) Bouto continued: "When I was at my house out in front Helen, Tan[i]a's girlfriend came by with Moses my friend. I don't know Helen's or Moses's last name and I don't know where they live or their phone numbers. I don't know Tan[i]a's phone either." (*Id.*)

In conversation with us, Bouto disputed the record account, explaining that he provided to Det. Guevara Tania's last name, Astefan.[11] (5/20/14 Interview with Robert Bouto.) He said that, as the notes indicated, he did not know her home address, but told the detectives that she lived "around the corner," and that her father owned a store on the first floor of her apartment building. (*Id.*) Bouto told us that he told Det. Guevara the precise route that he had walked with Tania, but that Det. Guevara had said, "This timing ain't right. I don't think the timing is right." (*Id.*) Bouto also stated that he had earlier provided this same information during an un-documented conversation with different police personnel. (*Id.*) During that earlier meeting, according to Bouto, he offered to retrieve Tania's phone number from his pager. (*Id.*) In response, Bouto told us, an unnamed officer removed the battery from his pager, thus erasing its memory and, accordingly, Tania's phone number.[12] (*Id.*)

---

[11] We interviewed Helen Kandah, Tania Astefan, and Robert Bouto on 2/19/14, 5/9/14 and 5/20/14, respectively. Helen told us that she had not been in contact with Bouto since approximately the year 2000. Tania told us that she had not been in contact with Bouto since several months before his 1996 trial. Bouto said he last saw Tania when she testified at trial, and last saw Helen in 2006 or 2007.

[12] Bouto also told us, of his interactions with CPD personnel, that he asked them to administer a gun residue test to see if he had fired a gun. He said: "They said, 'We don't do this. This ain't TV.' I said, 'You could give me a poly. You could check for gun residue, whatever you want to show I didn't do this.' They reiterated, he said, 'We don't do this. This ain't television.'" (5/20/14 Interview with Robert Bouto.) At trial, CPD forensic investigator Thomas A. Reynolds

Helen told us that Bouto told her that he had actually began to bring police to Tania's apartment, but upon arriving in the vicinity changed his mind, causing the police to abandon the effort. (2/19/14 Interview with Helen Kandah.) (Bouto, in our interview with him, did not discuss doing so. (5/20/14 Interview with Robert Bouto.).) Helen explained that Bouto said he did so in order to avoid bringing police to the Astefan home, which would have led to Tania getting in trouble with her family. (2/19/14 Interview with Helen Kandah.) According to Helen, as well as Bouto and Tania, in separate interviews we conducted, Tania's family was very strict and expressly prohibited dating. (*Id.*; 5/20/14 Interview with Robert Bouto; 5/9/14 Interview with Tania Astefan.) Tania, Helen, and Bouto explained to us that Tania would have been disciplined by her family if she were discovered to have been dating Bouto in violation of its rules, particularly given that he was a member of a street gang. (*Id.*)

Eventually Bouto did provide further identifying information. Specifically, on 9/7/94, Bouto filed an Answer to Discovery in which he notified the State that he planned to assert an alibi defense, relying on Tania, Helen, and a newly introduced person, Joanie LNU (i.e., last name unknown).[13] (9/7/94 Answer to Discovery.) That Answer included both Tania's and Helen's full names, home addresses, and dates of birth. (*Id.*) In relevant part, the Answer stated the following:

> Tania and Helen were students at Roosevelt High School in May, 1993. Tania was the girlfriend of Robert Bouto at that time. Robert Bouto had met Tania at Roosevelt High School and was walking her back to his home at 4533 N. Spaulding Avenue. Robert Bouto picked her up at school at 2:45 PM and remained with her until 3:30 PM. While Robert Bouto was walking Tania back to his house they were accompanied by Helen Kanda (sic) and Joanie LNU.

(*Id.*)

Bouto supplemented this information on 5/1/96 when he filed a second Answer to Discovery, to which he appended the transcripts of defense investigators' 11/22/95 interviews with Tania and Helen. Bouto's grandmother also provided alibi evidence at that time.[14] (5/1/96 Answer to Discovery.)

---

testified that he did not administer a gun shot residue test because none was requested by the investigating detectives. (7/31/96 Trial Transcript, Vol. 3 at 215.)

[13] Because Robert Bouto identified the two principal girls by first name only in his initial conversations with Dets. Guevara and Halvorsen, for purposes of clarity we have elected to primarily use their first names throughout this memorandum, as well.

[14] Bouto's grandmother stated the following: "That Robert Bouto awoke about 2:30 PM on May 14, 1993 and freshened up. He stated he had to pick-up his girlfriend Tania. He left the house at about 2:40 PM and proceeded to Roosevelt High School. That Robert Bouto came back home at about 3:00 PM after he left Helen Kandah and Tania Astefan. Robert then went to the bathroom, a few minutes later he asked for some toilet paper and came out approximately TEN minutes

Tania stated to Bouto's investigator that she heard gunshots while she was walking with Bouto at approximately 3:04 p.m., a time she recalled with some precision because "I was trying to get home" because "I'm going to have to be late." (*Id.* at 7.) Tania also said in her interview with Bouto's investigator that Bouto told her after they separated that he was going to go home and get money to eat. (*Id.* at 11.) In her conversation with Bouto's investigator, Tania also participated in the following conversation:

> Q: Would you be available at a later time for future statements?
>
> A: Such as going to court for him and testifying?
>
> Q: Yes.
>
> A: No.
>
> Q: Why?
>
> A: Because then my parents end up finding out everything, you know.
>
> Q: Everything about what?
>
> A: That I used to date him. I don't want them finding out….
>
> Q: Is that the only reason why you wouldn't want to testify in a court of law because they'd find out and be very upset over that?
>
> A: Yes.

(*Id.* at 18-19.)

At trial, Tania testified consistent with her earlier statements to Bouto's investigator, adding that she "got very scared" when she heard the gunshots that killed Ruvalcaba. (8/1/96 Trial Transcript, Vol. 4 at D-76-110, D-87.) On cross, ASA Dillon questioned Tania about why she did not go to the police to exonerate Bouto. (*Id.* at D-103-04.) She asserted that, when she first found out that Bouto had been arrested for murder, she did not realize when or where the murder occurred. (*Id.* at D-101.) As the investigation progressed, she testified, she did not go to the police because, "I would never go to the cops, I'm very afraid of them." (*Id.* at D-103.) She testified that she did not go to the State's Attorney's Office because "I was assuming you guys would come to me" and that, "[i]f you guys would have came to me early, I would have said

---

later after brushing his hair and brushing his teeth and so forth. Robert and I talked for about fifteen minutes and then he asked me for some money to go buy some lunch. I gave him the TEN Dollar bill that his father gave me. Robert then left our home at approximately 3:30 PM. Robert Bouto has lived with his father and myself. In that time Robert Bouto never had a pony-tail." (5/1/96 Answer to Discovery.)

something." (*Id.* at D-104.) She testified further that she was testifying only as a result of a subpoena that issued compelling her testimony. (*Id.* at D-106.)

Within the investigator's transcript, Helen stated that when the shots sounded, she "was attempting to go into the alley when I seen Robert and Tania." (5/1/96 Answer to Discovery at 7.) Then, more shots sounded, and Helen said that Tania and Bouto were "right there in the alley." (*Id.*) In total, Helen said she heard two light shots—"like firecrackers"—followed by three loud shots. (*Id.* at 9.) Helen told Bouto's investigator that she arrived home the afternoon of the shooting at precisely 3:11 p.m. (*Id.* at 11.) Like Tania, Helen testified at trial consistent with her interview with Bouto's investigator. (8/1/96 Trial Transcript, Vol. 4 at 112-145.) On cross, as he did with Tania, ASA Dillon questioned Helen about why she did not go to the police to exonerate Bouto. (*Id.* at D-140.) Helen testified that she did not go to the police or prosecutors with alibi information because she "had no idea what was going on with the lawyers or anything." (*Id.*) She testified further that she did not know that a murder had taken place until three days later, and did not immediately realize that Bouto was in custody for the crime, nor that the killing had taken place near her school. (*Id.* at 137-38.)

In our interviews with Bouto, Helen, and Tania, we discussed with each the substance of the their alibi evidence. Tania asserted that Bouto "was with me at the time of the shooting." (5/9/14 Interview with Tania Astefan.) When asked to quantify her conviction that Bouto was innocent, Tania stated, with "110 percent" certainty, that she was embracing Bouto in an alley when she was "startled" by gunshots fired in the vicinity of Roosevelt High School. (*Id.*) She noted further, again with "110 percent" certainty, that Bouto was innocent. (*Id.*)

Similarly, Helen informed us that she saw Bouto and Tania embracing in an alley as gunshots sounded in the vicinity of Roosevelt High School. (2/19/14 Interview with Helen Kandah.) Specifically, Helen said that she heard "a lot of shots" begin to sound, then she rushed into a nearby alley, where she saw Tania and Bouto embracing. (*Id.*) When asked to quantify her conviction that Bouto was innocent, Helen, a devout Catholic, responded that she was "one-thousand percent certain." (*Id.*) She continued: "[H]e did not do it. He did not do it. I'll put my hands on Jesus Christ. I'll swear on my kids' lives. He did not do it. There's no ifs, ands, or buts."[15] (*Id.*)

Bouto said that he was with Tania in an alley, alone, and that they had entered the alley in order to avoid Tania's mother, who might be driving around on the way home from grocery shopping. (5/20/14 Interview with Robert Bouto.) At that point, Bouto said, he and Tania began "kissing, making out." (*Id.*) Soon thereafter, he said they heard gun shots ring out from nearby: "Next thing you know, we just started hearing gun fire: 'Bang! Bang! Bang!' Three or four shots." (*Id.*) He said that he and Tania were by themselves when they heard the shots, and that the shots occurred approximately ten minutes after school had let out at Roosevelt. (*Id.*) Bouto did not think that Helen was looking at him and Tania when the shots sounded. (*Id.*) Bouto estimated, from the sound, that the gun shots had occurred about a "block and a half away" from

[15] At that time, Helen did, in fact, rise from the kitchen table, walk across the room, and touch her palm to a crucifix hanging on her wall to emphasize her certainty regarding Bouto's innocence. (2/19/14 Interview with Helen Kandah.)

where he and Tania were stationed in the alley. (*Id.*) (We confirmed this approximate distance in a site visit.) He also said that he did not think much of the gun shots at the time, because they were common in his neighborhood. (*Id.*) Asked if he witnessed fighting nearby, Bouto said that "we saw a bunch of people running back and forth, everyone dispersing out of there. They didn't really look like anything out of the ordinary." (*Id.*)

In his interview with us, Bouto said that after hearing the shots fired he and Tania retraced their steps down the alley. (*Id.*) At that point, at Tania's suggestion, they separated so she could go home without her parents seeing them together. (*Id.*) Said Bouto: "So we kissed and she went north toward Sunnyside and I went toward Eastwood to get something to eat." (*Id.*) Bouto said that he walked to Golden Crust pizza parlor, about two blocks away. (*Id.*)

#### h. **Informant Evidence Introduced**

At 10 a.m. on 5/15/93, ASA Hughes relayed the evidence collected thus far to ASA Sally Bray of the State's Attorney's Felony Review Unit. (5/16/93 Supp. R. by G/H.) Bray requested "that this be held as a continuing investigation," and that, in the meantime, she "wanted the R/Dets. to try and locate the offenders alleged girlfriend, Tanya, and the individual known only as Mario who handed Robert Bouto the gun." (*Id.*) The record does not indicate that the detectives did so.

As reported by Dets. Guevara and Halvorsen, at 3 p.m. on 5/15/93, Det. Richard Maher was "at work in Area Five VC on an unrelated robbery investigation." (5/16/93 Supp. R. by G/H.) Francisco Vicente was "one of the offenders in [Det. Maher's] robbery investigation" and had been transferred by Det. Maher to Area Five VC for questioning. (*Id.*) According to Dets. Guevara and Halvorsen, Vicente "informed Det. Maher, that another prisoner in the lock-up had confessed to him about committing a murder." (*Id.*) After receiving this information Det. Maher "informed Det. E. Halvorsen of this new revelation." (*Id.*)

At 5 p.m., Det. Halvorsen alone interviewed Vicente. (*Id.*) At that time, Vicente told Det. Halvorsen that an inmate, who identified himself simply as a "P.R. Stone," confessed to him and to another inmate, Edwin Maldonado, the murder of Ruvalcaba. (*Id.*) This purportedly occurred while he, Maldonado, and the P.R. Stone were being held in separate cells in cell block 7 in the 25th District Lock-Up on the morning of 5/15/93. (*Id.*)

Specifically, as reported by Dets. Guevara and Halvorsen, Vicente told Det. Halvorsen that on the evening of 5/14/93, he and Maldonado were standing in line-ups, and at that time "saw other M/WH's who were also in the office."[16] (*Id.*) The following morning, Vicente stated that he and Maldonado were joined in conversation by someone describing himself as a "P.R.

---

[16] We also spoke with now Capt. Lupe Pena, Vicente's arresting officer, who recalled Vicente conversing with other inmates in the upstairs line-up area: "Vicente was a good talker. Whether he uses that gift of gab to get information or to lie, who knows?" (7/10/14 Interview with Lupe Pena.)

Stone," whom Vicente referred to as "Stone Boy." (*Id.*) Vicente told the P.R. Stone that he was a member of the "Almighty" street gang.[17] (*Id.*) Vicente related the following to Det. Halvorsen:

> "Stone Boy" said that he was in for the murder. He asked "Stone Boy" if he did the murder. "Stone Boy" said, "Yeah, I shot a Spanish Cobra, I was with my lady." . . . "Stone Boy" said that he went to Roosevelt High School to pick up his bitch. "Stone Boy" and the bitch were walking by the school when he heard gunshots. "Stone Boy" met up with his "Stone Brothers", (sic) the Shorties. "Stone Boy" said that the Shorties told him that the Cobras, had just popped at them. "Stone Boy" said that a Shorty, drove up to him and handed him a gap. "Stone Boy" said that some Spanish Cobras came up and started, representing. "Stone Boy" pulled out the gun a 9 mm pistol, and started popping at the crowd. He popped 4-5 times. One of the people started yelling, "I'm Hit." The Shorties broke and, ran off. "Stone Boy" turned around and gave the gap to his lady. "Stone Boy" and his lady walked about two blocks away. His lady panicked and gave the gun back to him. "Stone Boy" said he got rid of the gun and went back by his ladies house. "Stone Boy" stated that he owed the nation a gap because he got rid of the gap he used. "Stone Boy" said I did this shit, there are three young studs that picked me out, how much time do you think I'll do.

(*Id.*)

After Vicente shared this information with Det. Halvorsen, the 25th District Lock-Up records were examined, and "[i]t was determined from the Roster of Persons in Custody Log, that Francisco Vicente, Edwin Maldonado, and Robert Bouto were all held in cell block 7" in cells 7-2, 7-4, and 7-6, respectively. (*Id.*) At that time "[i]t was also determined that Edwin Maldonado had already been sent to court and could not be interviewed." (*Id.*)The Roster of Persons in Custody Log indicates that every cell in the block was filled. (5/14/93 Roster of Persons in Custody Roster.)

On 7/24/96, Bouto filed a Supplemental Answer to Discovery in which his investigator noted, after taking measurements at the 25th District Lock-Up, that because of the distance between Vicente's and Bouto's cells, "it would be very difficult for conversations to be heard from one cell to another." (7/24/96 Answer to Discovery.) We visited the 25th District Lock-Up and determined that per the cell assignments in the roster of persons in custody log, Bouto and Vicente were separated by at least twenty-seven feet. We also determined that if Bouto and Vicente were to have stood anywhere within their cells other than the sides nearest each other, the distance could have been as many as fifty feet.

---

[17] Vicente stated to a grand jury on 5/19/93 that he purposely obscured his gang affiliation in order to gain the confidence of the P.R. Stone. (5/19/93 Grand Jury Transcript.) Specifically, Vicente said that he told Bouto that he was an "Almighty," hoping that Bouto would think that he was an "Almighty Latin King," a gang affiliated with the P.R. Stones, rather than an Almighty Imperial Gangster, a gang affiliated with the opposing "nation" of street gangs, a group that includes the Spanish Cobras. (5/19/93 Grand Jury Transcript at 8-9.)

There is some evidence, however, that Vicente and Bouto may have been in adjacent cells for a time. On 11/21/95, Bouto gave an interview to his private investigator. (5/1/96 Answer to Discovery.) At that time, Bouto stated that detectives removed him from cell 7-6 and brought him upstairs, at which time he alleged the detectives "told him he committed the murder." (*Id.*) When Bouto was returned to the cell block, he alleged that he was placed in cell 7-1. (*Id.*) Approximately ten minutes later, Bouto alleged, Vicente was placed into cell 7-2. (*Id.*) Bouto allegedly stated that although "[t]here was very little conversation between" them, Vicente told Bouto that Vicente had passed up an opportunity to escape and that detectives provided him with food, including candy bars. (*Id.*) In fact, Bouto alleged that Vicente sold him a candy bar for $10 that Vicente claimed had been given him by detectives. (*Id.*) (Vicente provided statements to undergraduate students investigating potential wrongful convictions that may corroborate Bouto's statement to his investigator. Specifically, he stated: : "[They told me to] talk to him, carry out a little friendship." (Undated Affidavit Notes.))

At 6:35 p.m. on 5/15/93, Vicente signed a handwritten statement prepared by Det. Halvorsen and ASA Hughes, in which he detailed a confession obtained from the inmate several cells away who, according to the handwritten statement, volunteered a description of himself as "the P.R. Stone with the shaved head on the side and that he did not have a pony tail just shaved side." (5/15/93 Francisco Vicente Handwritten Statement by H.) As reported by Dets. Guevara and Halvorsen, thereafter, ASA Hughes approved murder charges against Bouto. (5/16/93 Supp. R. by G/H.) Dets. Guevara and Halvorsen then "requested that this case be filed, CLEARED BY ARREST/CLOSED." (*Id.*)

We discussed with Det. Halvorsen the evidence he and Det. Guevara reported that Vicente obtained from Bouto. Det. Halvorsen told us he did not have any recall of the Bouto case.[18] (7/1/14 Interview with Ernest Halvorsen.) He then asked to review the police reports in the Bouto record for purposes of refreshing his recollection. (*Id.*) After he reviewed them, he stated, based upon his review but not on his personal recollection: "Bouto was held overnight" while we "tri[ed] to locate Tania." (*Id.*) It appears that we were "[u]nable to locate" her. (*Id.*) Then, Bouto "gives this statement" to me. (*Id.*) He then "gives a handwritten statement to Kevin Hughes. After that, Bouto is charged." Det. Halvorsen noted further that it appeared that "Vicente's statement was the deciding factor in charging Bouto." (*Id.*) Det. Halvorsen concluded: "You read this thing, he didn't even see the guy in this jail. They were just yelling back and forth across the cell block. Why Bouto decided to talk to this guy is beyond me." (*Id.*)

On 5/19/93, Vicente testified before a grand jury in the presence of then ASA (now judge) Mary Roberts, at which time he detailed a confession to murder obtained from the inmate several cells away. (5/19/93 Grand Jury Transcript.) Vicente did not testify to having shared the Bouto confession with Det. Maher. Instead, he testified that he shared it with the "arresting officer in my case." (*Id.* at 17.) As noted above, Vicente was arrested by Officers Pena and Marron. The relevant excerpt follows:

---

[18] Specifically, he said: "The case itself, I remember nothing. Someone encounters one homicide case in their life, they remember everything. I've had dozens, if not hundreds. I'd like to remember everything I possibly can for you guys, but it seems everything gets jumbled together." (7/1/14 Interview with Ernest Halvorsen.)

Q: Now after [Bouto] told you this, did you tell anyone? . . .

A: I did.

Q: And when, when did you have an opportunity to tell someone?

A: While they were taking me upstairs for questioning. The arresting officer in my case, I was talking to him in the elevator and I happened to tell him, you know, about the murder and about the Spanish Cobra being shot and that if he knew anything about the Spanish Cobra, you know, did he make it or anything.

Q: Okay. Now after you told him that, did you have an opportunity to talk to Detective Halvorsen and an Assistant State's Attorney by the name of Hughes?

A: Yes.

(*Id.*)

On the same day, Maldonado also appeared before the grand jury, again in the presence of ASA Roberts, and also detailed a confession obtained from an inmate several cells away who described himself as having "[s]hort hair on the sides and no ponytail." (*Id.* at 27.) Maldonado's grand jury testimony largely aligned with that tendered by Vicente. Specifically, Maldonado said that Bouto told him that "I shot a Spanish Cobra. I was with my girlfriend." (*Id.* at 31.) The rest of the narrative that Maldonado told to the grand jury also aligned precisely with Vicente's testimony almost verbatim. Maldonado, like Vicente, said that Bouto said to them, after confessing, "I did this shit and how long you think I'm going to do." (*Id.* at 37.) Vicente and Maldonado both testified that they saw Bouto upstairs prior to conversing with him in the lock-up. (*Id.* at 7, 28.) This is the only reporting in the record of Maldonado's evidence. Indeed, ASA John Dillon later stated in response to testimony regarding Maldonado that "there was never a handwritten statement taken from" him, although he acknowledged the fact that Maldonado represented in his affidavit recanting the evidence against Bouto that one had been executed. (6/12/96 Motion to Suppress ID Hearing at 50.)

We asked Lozada to read and respond to Vicente's statement. (5/9/14 Interview with Rey Lozada.) We did not inform Lozada why we wanted him to review the confession statement. After reviewing Vicente's statement, Lozada announced: "Nothing happened the way he said it." (*Id.*) He than proceeded to detail the errors with Vicente's statement, starting with the fact that no initial set of shots occurred, and that he had been "close enough to have heard shots if shots would have been fired." (*Id.*) Lozada continued: "There was never a shooting before then. That's a lie. . . . [T]he cops would have heard it right away and been there. . . . The two security guards, [pejoratively nicknamed] 'Beavis' and 'Butthead,' would have seen it. They walked back and forth." (*Id.*) He also told us that Ruvalcaba did not say "I'm hit, I'm hit" upon being shot.

Bouto denied in his conversation with us that he confessed to Maldonado or Vicente. (5/20/14 Interview with Robert Bouto.) He told us that he "barely said a word" while in the lock-

up,[19] but that Det. Guevara nonetheless summoned him at one point from there. (*Id.*) At that time, Bouto said, Det. Guevara said, "I've got you, I've got you. You talk too much." (*Id.*) Bouto said that he thought that Det. Guevara was referring to a drug sale he had executed while in the lock-up. (*Id.*) However, Det. Guevara continued: "You opened your mouth. I've got someone saying you did this. . . . You're down there telling people you committed a murder. You're down there bragging." (*Id.*) In his earlier, pre-trial interview with his investigator, Bouto told a variation of this same story, saying that "the Detectives took him out of his cell, 7-6, and brought him upstairs and told him that they had him on tape making a confession to the murder. Bouto again denied that he committed the murder[.]" (5/1/96 Answer to Discovery.) When Bouto denied this, he said, Det. Guevara responded, "I'm done with you. I've got everything I needed." (*Id.*)

Richmond informed us in our interview with him that when Det. Guevara emerged from an interview with Bouto on 5/14/93, he announced, "I've got him." (5/5/14 Interview with Carl Richmond.) Richmond said he now assumes—incorrectly—that Bouto signed a statement implicating himself. (*Id.*) Presumably, this was the meeting in which Bouto tendered his alibi, minus last names and addresses for the key witnesses, and at which time Det. Guevara reportedly told Bouto that the timing did not line up. (5/20/14 Interview with Robert Bouto.)

### i. **Informant Evidence Partially Recanted**

Bouto filed a motion to reduce his bond on 6/7/93, noting that he was aware that "an individual whom he believes is known as 'Lobo' Maldonado will give or has given a statement alleging that … Bouto made statements acknowledging his participation in a shooting." (6/7/93 Motion to Reduce Bond.) Bouto argued that he "adamantly denies ever having made any such statement" and will offer evidence "from another inmate who will attest that 'Lobo' Maldonado has fabricated that story in exchange for preferential treatment regarding his pending matters in the criminal courts building." (*Id.*) Bouto argued further he has an alibi and has knowledge of an "occurrence witness who told police officers that he … was not the shooter." (*Id.*)

Then, on 3/6/96, Lydell Williams, who had been an inmate in cell block No. 7, in a cell adjacent to Bouto's, on the day of the purported Bouto confession to Vicente, was interviewed by Bouto's defense investigators. (5/1/96 Answer to Discovery.) Williams told Bouto's investigators that in addition to the fact that he had never heard Bouto confess to murdering Ruvalcaba, on approximately 5/16/93, while he and Vicente were riding on a bus to court, Vicente "told Williams that Vicente had given up Bouto and made a deal to reduce his time with the state." (*Id.*) The investigator's report continues: "Williams said [Vicente] gave up this guy and [Bouto] did not do that murder. Vincente (sic) told him [']yeah, he was protecting himself. He was not going to go away for a long time now that he had something to bargain with.[']" (*Id.*) In a phone call with us, Williams recalled only that "something happened with Bouto at the jail" but was not able to shed any additional light on his statement to Bouto's investigators because he

[19] Although Bouto told us he did not speak with Vicente in the lock-up, he told us that he did later speak with Vicente during a ride to 26th and California, during which they were handcuffed together and smoked marijuana. (5/20/14 Interview with Robert Bouto.)

did not remember the details , presumably due to the passage of time. (2014 Interview with Lydell Williams.) In conversation with us, Bouto recalled Williams being in a cell adjacent to him, telling us that he sold to him a small amount of crack cocaine. (5/20/14 Interview with Robert Bouto.)

On 4/30/96, Maldonado recanted, via affidavit, his grand jury testimony implicating Bouto in the murder of Ruvalcaba, stating that Vicente had encouraged him to do so, and that Bouto was "innocent." (4/30/96 Affidavit of Edwin Maldonado.) Maldonado's affidavit also stated, in part, that, "Robert Bouto never confessed to me or to Francisco Vicente about committing a murder," and he called his statements to both the Chicago Police Department and the Grand Jury "false." (*Id.*) Specifically, he stated in the affidavit that Vicente approached him in lock-up and said "he had a way … to get out of the charges we were in custody for." (*Id.*) Vicente then allegedly told Maldonado that he was going to "set up" Bouto by "implicating him for murder," the affidavit states. (*Id.*) Vicente, according to Maldonado's affidavit, allegedly "put great pressure" on Maldonado "to make similar statements." (*Id.*) He said that, "[s]ince Bouto was a P.R. Stone, Vicente said, 'Let's make it up and help ourselves out.'" (4/30/96 Affidavit of Edwin Maldonado.) Maldonado noted in his affidavit that he "feared great bodily harm" from Vicente, a "respected member of the IG's."[20] (*Id.*) Although he did not independently recall Vicente's name when we interviewed him, referring to him as "that Imperial Gangster," Maldonado also stated to us that Vicente drove him to implicate Bouto. (3/2/14 Interview with Edwin Maldonado.)

Maldonado said in the affidavit, as well, that he was provided the facts by an ASA and a detective:

> A short time later I met with an assistant state's attorney who told me what Francisco Vicente had stated to them. I then repeated to them the same thing that the assistant state's attorney told me. I made a statement and signed my signature on that statement at the urging of the assistant state's attorney and the Chicago Police Department. The contents of the statement was what the state's attorney told me that Francisco Vicente had earlier said to them and the police. If they did not tell me what Francisco Vicente had told them, I would not have been able to corroborate Francisco Vicente's statements. I made the statement according to what they told me.

(*Id.*) Maldonado did not allege coercion by CPD or State personnel at that time, saying only that they provided him with Vicente's story. (*Id.*)

Maldonado reiterated to us the above allegations from his affidavit, executed nearly twenty years prior, but also alleged coercion for the first time: "The officers took me into a separate room. They said they will let me and Vicente go if we went ahead and do what they say and sign this statement that they had typed up. 'This is what we want you to say. We're going to show  you the lineup.' Vicente said, 'Let's just go along with it, and we'll get out of it.'" (3/2/14 Interview with Maldonado.) He continued, stating  that CPD personnel informed him that he

---

[20] Maldonado stated that his resolve was further weakened by severe "withdrawal symptoms from my heroin habit." (4/30/96 Affidavit of Edwin Maldonado.)

"needed" to "point someone out in a line up," and to "make sure you pick the right guy there," Bouto, and that "they would talk [him] through it." (*Id.*) Maldonado said that CPD officers told him that he would be released if he cooperated, but that they could "make things hard" for him if he refused. (*Id.*) Maldonado specifically stated at that time that Det. Guevara, who he recognized in a photo he reviewed, had helped drive him to implicate Bouto. (*Id.*)

#### j. **Bouto Raises Allegations of Police Misconduct**

In addition to claiming that Vicente and Maldonado fabricated the confession evidence against him, Bouto raised two separate allegations of misconduct, both connected to the identification of him. On 5/1/96, Bouto filed an Answer to Discovery in which he alleged the following:

> Bouto advises that when he was at Area 5 Detective Guevara opened the washroom door where Bouto was handcuffed and asked if the Lozada brothers and Richmond could make a positive identification prior to the lineup being done.

(5/1/96 Answer to Discovery.)

Bouto alleged in a Motion to Suppress Identification that the Lozada brothers were also there at the time (Undated Motion to Suppress ID). Lozada told us that he only heard about, but did not witness, the incident. (5/9/14 Interview with Rey Lozada). However, he testified at a hearing on Bouto's Motion to Suppress Identification hearing that he did not see Bouto handcuffed to a "latrine." (6/12/96 Motion to Suppress ID Hearing at 28.) Richmond told us that he did see Bouto handcuffed in the bathroom (5/5/14 Interview with Carl Richmond), but he also testified at a hearing on Bouto's Motion to Quash Identification that he did not. (6/12/96 Motion to Suppress ID Hearing at 37-38.) Maldonado also stated that he recalled seeing Bouto handcuffed in an upstairs bathroom at the lock-up. (4/30/96 Affidavit of Edwin Maldonado; 5/1/96 Answer to Discovery.)

Also, in Bouto's Motion to Suppress Identification, upon which a hearing was conducted on 6/12/96, Bouto alleged that he was described to witnesses at both the show-up and the line-up as the "Murderer." Bouto alleged further that in his presence at the 25th District police station, Det. Guevara described Bouto to Richmond, Lozada, Jacobo, and Frank Escobar as "the shooter." On 6/12/96, at the hearing on the motion, Pergande testified that prior to the show-up, he informed CPD that he wanted witnesses to observe Bouto for purposes of determining if he was "the shooter," but that he did not make that statement in the presence of witnesses. (6/12/96 Motion to Suppress ID Hearing at 10.) Lozada testified that prior to the show-up he was asked by CPD to "see if any of them were the shooter." (*Id.* at 24.) Richmond testified that he knew Bouto prior to identifying him at the show-up as the "shooter." (*Id.* at 35-36.)

#### k. **Trial of Robert Bouto**

Beginning 7/29/96, Bouto was tried for the murder of Ruvalcaba. Neither Maldonado, who had already recanted, nor Vicente, testified. Richmond, Lozada, Margaret and Michael Fleming, and Officer Pergande testified for the State. Lozada identified Bouto in court as the shooter. (7/31/96 Trial Transcript, Vol. 3 at 36.) Richmond also identified Bouto in court as the

shooter. (*Id.* at 96.) Margaret Fleming and Michael Fleming identified Bouto in court as the person they identified at the line-up by clothing. (*Id.* at 155, 173.) Tania, Helen, and Bouto's barber, Mario Issa, testified for the defense. At the conclusion of the jury trial, Bouto was convicted and sentenced to forty-five years. (9/11/96 Trial Transcript, Vol. 5 at 73.) Speaking on his own behalf at sentencing, Bouto said: "I truly am innocent." (*Id.* at 72-73.)

l. **Sentencing of Francisco Vicente**

On 9/23/96, approximately two months after the last of the three cases in which Vicente provided evidence concluded with a guilty verdict, Vicente was sentenced on his three armed robberies and one simple robbery. (9/23/96 Change of Plea Hearing.) ASA Dillon represented the State at that hearing and recommended a sentence of nine years. (*Id.*) Vicente had previously acknowledged that each of his three pending Class X charges for armed robbery carry sentences of between 6 and 30 years and his single simple robbery charge carries a sentence of three to seven years. (10/18/94 Trial Transcript, Vol. 2 at 72, 76.) Vicente was sentenced in accordance with the State's request. (9/23/96 Change of Plea Hearing.)

Before the sentencing judge was also a letter from Lt. Earl F. Tucker, a Division Nine Shift Commander. In that letter, Lt. Tucker described Vicente's assistance in procuring for him photos of a corrections officer "standing in the cell with his arm around several inmates and money on the bed." (9/22/96 Lt. Tucker Letter.) As a result of that assistance, Lt. Tucker noted that "[i]t has been brought to my attention that his life, along with his families [sic] has been threatened after he gets out …. [and] states attorney John Dillon is aware of the danger his family is in." (*Id.*)Tucker noted further that "the service that he gave us is extraordinary." (*Id.*) He concluded with "any consideration that you deem fit may or may not have any influence on future actions." (*Id.*) It is not clear whether that letter did in fact influence the sentence.

m. **Francisco Vicente Recants**

Seven years later, on 6/19/03, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated[21], after he was coerced by Dets. Guevara and Halvorsen. (6/19/03 Email.) On later occasions he negotiated for various benefits in return for executing an affidavit (5/26/04 Francisco Vicente Affidavit) and potentially providing testimony in the Montanez/Serrano post-conviction case.

n. **Bouto Seeks Clemency on Grounds of Actual Innocence**

Although Bouto claimed to have missed the deadline to file an Illinois post-conviction petition or a Section 2254 federal habeas petition "due to erroneous advice from lawyers," on

---

[21] Det. Halvorsen told us that he did not remember that Vicente had also received a confession in the third defendant's matter, stating: "That's news to me." (7/1/14 Interview with Ernest Halvorsen.) When we asked him to examine the Supp. R. attributed to him and Det. Guevara reporting Vicente's information, Det. Halvorsen expressed surprise, stating: "He got another one? In the Cook County jail?" (*Id.*) Det. Halvorsen then stated of Vicente, "This guy's a roving confession elicitator" [sic]. (*Id.*)

5/27/05, Bouto filed a Petition for Executive Clemency, claiming actual innocence. (5/27/05 Bouto Petition.) Bouto also wrote that he believed that the P.R. Stones street gang knew who actually committed the crime, but "they refused to turn in the person" even though he "asked and begged them to help me." (*Id.*) Bouto wrote that "they told me to be tough and hang in there and everything will be alright." (*Id.*)

Within the clemency petition, Bouto reiterated information already in the record, but added several relevant details. First, Bouto claimed that eyewitnesses Richmond and Lozada both walked up to the police car that brought him to the scene of the Ruvalcaba slaying, and that "Richmond looked at me and smiled, at that point it was clear that he was going to implicate me as being involved with the incident." (*Id.*) Finally, Bouto reiterated his alibi defense, claiming:

> On May 14, 1993, I left the apartment, where I lived with my father, at 4533 N. Spaulding, in Chicago, at around 2:30 p.m. to pick up my girlfriend, Tania Astefan, at Roosevelt High School located at the corners of Kimball and Wilson. I waited across the street for her to be dismissed at 2:45 p.m. A friend of Tania's, Helen Kanda, came out of the school and told me that Tania was running late but was on her way. Five minutes later Tania came out. We started walking with Helen and another girl named Joanie. Helen and Joanie were walking behind us by about five feet as we walked on Wilson towards Kedzie Avenue. Tania and I decided to walk south toward Christiana Street and into the alley. Halfway down the alley, we heard 3 to 4 gunshots ahead of us. Fearful, we turned and went back the way we entered to Wilson Avenue where we then walked to Sawyer Street. I dropped Tania off there and went on to Golden Crust Pizza Restaurant at Eastwood and Kedzie.

(*Id.*)

### 3. **Analysis**

Having presented the facts, we now begin our analysis. That analysis begins with an examination of the alibi evidence provided by Tania Astefan and Helen Kandah. The analysis continues with our examination of the confession evidence provided by Francisco Vicente and Edwin Maldonado, including its recantation. Our analysis concludes with an examination of the evidence provided by sources other than Vicente and Maldonado, including State's witnesses Carl Richmond, Rey Lozada, Michael Fleming, Margaret Fleming, and Officer Alan Pergande.

#### a. **Bouto's Alibi Evidence**

We begin our analysis of Bouto's alibi evidence by considering the consistency of the alibi evidence. Next we consider the credibility of the alibi witnesses. Finally, we consider the timing of Bouto's alibi evidence. We conclude our analysis of Bouto's alibi evidence by presenting our finding on it.

##### (i) **Consistency of Alibi Evidence**

As to the material facts of each of their stories, Helen and Tania have both been largely consistent through nearly twenty years of talking about the afternoon of the Ruvalcaba murder.

As discussed above, each has spoken three times about the events. On 11/22/95, each was interviewed separately by investigators hired by Bouto's trial defense counsel. About a year later, both testified at trial, for the defense. Finally, both submitted to interviews with us to assist in this investigation.

Tania, for her part, has said in all three instances that Bouto picked her up from school at approximately 2:45 p.m. the afternoon of the shooting, at which time they began to walk, along with Helen, her best friend at the time. At some point, the couple walked into an alley, she has stated, and hugged and kissed. At this time, she states in all instances, the shots that killed Ruvalcaba rang out, frightening her. Tania, in both her conversation with Bouto's investigator and at trial, placed the time of the shooting at 3:04 p.m., saying she recalls the time because her parents imposed a strict after-school curfew of 3:05 p.m. Soon thereafter, she and Bouto walked out of the alley, eventually separating for the evening.

Likewise, the core elements of Helen's recollection have remained consistent. She has maintained that she first met Bouto outside of Roosevelt High School, having been released from school with her class a few minutes earlier than Tania. Once Tania joined them, all three began walking together, she has maintained, with the couple eventually breaking away from the group and entering an alley. Helen has also referred in all cases to the presence of a third girl, an unpopular Roosevelt student named Joanie. Helen described to Bouto's investigators two sets of shots in rapid succession, a pair of lighter shots that she compared to firecrackers, followed by a series of louder gun shots. Helen has consistently said that she walked into the alley as the shots sounded, at which time she saw Bouto and Tania together.

It is also instructive to examine Bouto's own words regarding his alibi. Bouto has consistently maintained that he was with Tania, kissing in an alley, when the shots sounded that killed Ruvalcaba. However, Bouto has provided inconsistent evidence regarding at least two secondary details: (1) Helen's observation of him and Tania; (2) his post-shooting but pre-arrest whereabouts.

With respect to the former, handwritten notes reflecting a conversation between Dets. Guevara and Halvorsen and ASA Hughes and Bouto indicate that Bouto told them that Helen visited his house after the shooting. Since then, however, he has stated on the record that Helen walked with the group, meeting him outside the school. In conversation with us, finally, Bouto told us that he did not recall Helen seeing him and Tania at that time. Neither did he recall mentioning Helen to the police, though we see no other way they would have known her name.

With respect to the latter, Bouto has maintained, including in his interview with us and in his clemency petition, that he did not go home between separating from Tania and going to Golden Crust Pizza, where he was arrested. However, he reportedly told Dets. Guevara and Halvorsen and ASA Hughes the night of his arrest that he did go home. Tania also stated in her interview with Bouto's investigator that Bouto told her he was going to stop home for money so he could go eat, which aligns with the recollection of his grandmother Mariam Bouto, detailed above.

**(ii) Credibility of Alibi Witnesses**

Regarding background, Tania appears to have been raised in a strict, religious household. Although she briefly dated Bouto, there is no evidence or allegation that Tania was involved with gangs. Further, Tania was an honor roll student with near-perfect attendance at Roosevelt High School. (8/1/96 Trial Transcript, Vol. 4 at 78.) She later graduated from Northeastern Illinois University in Chicago. Currently, Tania is a married, working mother of three. She has long been employed by Banner Health Systems in Arizona, where she is a management-level executive recruiter. Similarly, Helen was raised in a strict, religious household, and she remains devout. (2/19/15 Interview with Helen Kandah.) Also as is the case with Tania, there is no evidence or allegation that Helen was involved with gangs. Like Tania, Helen graduated from Roosevelt High School, and Helen attended at least some college. (8/1/96 Trial Transcript, Vol. 4 at D-113-114.) Currently, Helen is a married mother of three, and lives in Skokie. (2/19/14 Interview with Helen Kandah.)

Regarding incentives to falsely testify, at the time of the Ruvalcaba murder, Tania and Bouto, both young teenagers, had been dating for only several weeks, and Tania testified that it was "not serious." (*Id.* at D-84.) Helen corroborated that description to us, characterizing Tania's relationship with Bouto as short-term and casual. (2/19/14 Interview with Helen Kandah.) For the most part, Helen explained, Tania and Bouto's relationship existed only during the short period of time when they walked home from school together. (*Id.*)

Helen appears to have had an even more tenuous connection to Bouto, explaining to us that she and Bouto were just acquaintances at the time of Ruvalcaba's murder. (*Id.*) She later grew closer to him after he was incarcerated. (*Id.*) She felt empathy for him, she explained, because she believed his life had been ruined by a wrongful charge and conviction. (*Id.*) Helen was friendly with Ruvalcaba at the time of his death, and testified that she "freaked out" when she learned that he had been murdered. (*Id.*)

Helen testified that she met with Bouto approximately five times between his arrest and trial. Tania also testified that she met with Bouto approximately five times between his arrest and trial, which, we recognize, may have afforded them the opportunity to prepare a false alibi in concert. However, there is no allegation that Bouto forced Tania or Helen—through threats or coercion, for instance—to provide false alibi evidence. In their meetings with us, both Tania and Helen denied that Bouto had coerced them, and each indicated, independently, that they had long since lost touch with Bouto. Nor was either Tania or Helen in contact with anyone representing Bouto's interests, such as counsel.

Related to this point, neither Tania nor Helen appeared at trial voluntarily, but rather were subpoenaed. Tania and Helen have consistently stated since 11/22/95, the date of their interviews with Bouto's investigator, that they did not wish to participate in Bouto's trial for fear that they would be subject to severe discipline from their parents. As was detailed prior to and during trial, Tania came from a strict, traditional Middle-Eastern family, was expressly forbidden from dating, and feared repercussions for doing so.

Tania also confirmed as much in conversation with us, and Helen elaborated, explaining that Tania was routinely subject to significant discipline for infractions of household rules.[22] Helen, for her part, noted that her parents, both Iraqi immigrants, were terrified of the police as a result of historical experience in Iraq. (2/19/14 Interview with Helen Kandah.) They would have been very upset with her, she explained, if she were to involve her family in a police investigation. (*Id.*)

Third, in their conversations with us, Tania and Helen presented themselves as truthful individuals. Each was cooperative, and offered to meet further should it be necessary, although they wondered, too, what point there was in contacting them now given that Bouto may be released from prison next year.

(iii) **Timing of the Alibi Evidence**

Important to the veracity of Tania and Helen's alibi evidence is the timing of the shooting at approximately 3:05 p.m. Tania, as noted above, recalled that the shots had sounded at 3:04 p.m. If she is correct about the time that she was with Bouto, then it would indicate that the shots that she heard were those that killed Ruvalcaba. This is the time of the shooting as described in multiple contemporaneous police reports, and there is no indication in the investigative record that the shooting took place at any time other than 3:05 p.m. Neither is there any indication that another shooting took place at the same time shortly before or after 3:05 p.m. (As discussed below, although Vicente stated that a preliminary gunfight proceeded the firefight that killed Ruvalcaba, his statement is not corroborated by the record or by any witness we spoke to.)

(iv) **Finding on Alibi Evidence**

Our examination of Bouto's alibi evidence leads us to conclude that it is more likely than not that, as Bouto has maintained from his first meeting with Dets. Guevara and Halvorsen and ASA Hughes, that he was embracing in an alley with his high school girlfriend Tania Astefan when the shots that killed Ruvalcaba were fired. All three principal figures here have gone on record multiple times during the twenty years since the shooting. Each tells a detailed account that varies from the other not materially, but rather in the ways one would expect from people who experienced the series of events from slightly differing perspectives. As discussed above, Tania and Helen both present as credible eyewitnesses.

We acknowledge that Bouto's story has shifted, in some aspects, over the last twenty years. First, Bouto did not mention the presence of Helen Kandah in his first meeting with police or to us. However, this should not be surprising, as Bouto did not believe at the time that Helen was nearby him during the key moment, and would not have had reason to see her while he embraced Tania, and we spoke with him twenty-one years after the events occurred. He has also inconsistently recalled his whereabouts between the time he separated from Tania and the time he was picked up by Officer Alan Pergande while entering Golden Crust Pizza. While we think it

---

[22] Helen told us that Tania faced physical punishment by her father from time to time for violating his house rules, and Bouto later corroborated in conversation with us that Tania came from a strict, "traditional" family, particularly when it came to dating.

understandable that one would misremember this kind of non-essential detail, we also cannot dismiss the possibility that this is not a simple failure of memory but instead an attempt to withhold information.

Likewise, we consider it more likely than not that Bouto did omit details regarding Tania's address and last name, which harmed his credibility with police at the time although we believe he likely did so in order to avoid causing trouble for Tania with her family. Beyond that, if it is true that Bouto claimed not to know his girlfriend's and her friend's last names or addresses, it makes sense that Dets. Halvorsen and Guevara did not pursue Tania for follow-up questioning. It may have very well seemed unlikely that Bouto would not know any of those details, and his withholding of that information may have convinced them that he had invented an alibi.

Notwithstanding Bouto's flawed credibility in these regards, we remain confident that Tania and Helen's alibi evidence is truthful and do not consider it likely that all three coordinated a falsehood that they carry out to this day.

b. **The Evidence Obtained From Vicente and Maldonado**

We begin our analysis of the informant evidence by examining the circumstances of Bouto's purported confession. Second, we compare Vicente's and Maldonado's evidence with evidence obtained from other sources. Third, we examine Vicente's and Maldonado's recantations of that evidence.

(i) **Circumstances of Purported Confession**.

As explained above, the roster of persons in custody log indicates that Vicente and Bouto were, at least initially, incarcerated in cells separated by a minimum twenty-seven-foot distance, and potentially as many as fifty feet. Although Bouto did say in one interview, to his trial counsel's investigator, that he was briefly in a cell adjacent to Vicente, there is no allegation in the record that the alleged conversation took place while they were housed in adjacent cells. Indeed, Vicente and Maldonado both testified before the grand jury that their cells were situated as described by the roster. Moreover, Vicente told students investigating potential wrongful convictions that "he and Bouto had to yell to one another between their cells to communicate during this time," which would tend to corroborate the information contained in the roster.

Assuming that Vicente and Bouto were primarily held in cells 7-6 and 7-2 as the roster indicates, our visit to cell block 7 leads us to credit Bouto's investigator's opinion that ""it would be very difficult for conversations to be heard from one cell to another." At either distance, we could not hear each other without raising our voices considerably, as the acoustics of Cell Block No. 7 also render conversation difficult. Even in an otherwise empty and silent cell block—i.e., with no other inmates—we found extended conversation very difficult as a result of both distance and echo effects. Routine, short phrases were often incomprehensible. Under the circumstances that existed at the time of Bouto's purported confession to Vicente—i.e., a full block with six other inmates—the din of conversation and movement may have made attempts to carry out sustained conversation even more difficult.

Not only were the cells far apart, spatially, but their alignment in the room would have made it difficult for Bouto to know who else was in the cell block at the time of his purported confession. From his cell, Bouto could not have seen the individuals in any other cell. Nor could Bouto have seen from his cell the area adjacent to the entrance to the cell block. As well, Vicente testified in the third defendant's case that the cells were frequently patrolled by CPD, which current CPD officers confirmed to us during our visit. Thus, because of the lack of visibility of the rest of the room from inside Bouto's cell, he could not have known for sure that CPD personnel were not in the room and in a position to overhear his conversation with Vicente. Nor could he have known that a rival gang member affiliated with, for instance, the Spanish Cobras, was not nearby, listening in.

The cells were also equipped with a two-way intercom, through which CPD officers could have surreptitiously listened in on the inmate conversations. During our site visit, CPD personnel confirmed that inmates were aware that the two-way intercom was in use because they responded over the intercom to requests from inmates. Even if we assume that the two-way intercom was not used during the twelve- to fourteen-hour period Bouto was incarcerated prior to purportedly confessing to Vicente, Bouto had been arrested several times prior to 5/14/93, including the night before, and may have been aware of this prior to 5/14/93.

Assuming that Bouto and Vicente were in adjacent cells for at least some period of time, they may have been able to converse. Note, however, that this placement of the two inmates receives mention nowhere else in the record, and Bouto did not mention it in his interview with us, saying instead that his only meaningful conversation with Vicente occurred on a later ride from Area 5 lock-up to Cook County Jail. As noted above, Vicente did not, in any of his statements or testimony in the case, say that the Bouto confession occurred while the two were in adjacent cells. All of that being said, we note that conversation would have been more feasible from that distance as a result of a reduction of the acoustical problems described above. Proximity would not, however, entirely negate the other problems identified, including the fact that it seems unlikely that Bouto would confess to a murder to a stranger, a point that Det. Halvorsen raised in our interview with him.

(ii) **Comparison of Confession Evidence to Evidence Obtained from Other Sources.**

There are several aspects of Bouto's purported confession that either accurately reflect Ruvalcaba's murder or, at the least, reflect information gathered by police in the hours after the shooting and memorialized in the investigation record. That Vicente and Maldonado were reported to have shared this information leads us to consider a few possibilities. First, they may have obtained this information from Bouto, who actually did commit the crime and confess on the morning of 5/15/93. Second, they may have obtained this information in some other way, either from police or ASAs investigating the case, from an innocent Bouto, who nonetheless may have known some details about the crime from his own discussions with police and prosecution personnel, and shared it with his cell mates, or from some combination thereof.

To determine which of these is more likely, first, we consider whether Vicente or Maldonado provided any verifiable information that had not been reported by police prior to Vicente's statement or Maldonado's grand jury testimony. Second, we consider whether Vicente

or Maldonado provided any inaccurate information that had been reported by police prior to Vicente's statement or Maldonado's grand jury testimony. Neither Vicente nor Maldonado provided any verifiable information that had not previously been reported by police. Vicente did, however, provide three pieces of information that, although not reported by police prior to his statement, appear to be inaccurate. We begin with the verifiable information previously reported by police.

First, according to Vicente and Maldonado, Bouto told them that he had picked up his girlfriend at Roosevelt High School prior to shooting Ruvalcaba. As detailed above, hand-written notes dated the previous evening reflected Bouto's alibi statement. At that time, Bouto told Dets. Guevara and Halvorsen and ASA Hughes that he was with girlfriend at the time of the shooting and had picked her up at Roosevelt High School. As well, neighborhood eyewitness Michael Fleming had told Halvorsen that the shooter had handed his gun after the shooting to a blonde female wearing red.[23]

Second, Vicente claimed in his statement and Maldonado testified before the grand jury that Bouto shared with them his gang affiliation—P.R. Stones—and that the murder was a result of a confrontation between the rival P.R. Stones and Spanish Cobras. That Bouto was a P.R. Stone was known to CPD prior to the Ruvalcaba murder, and CPD's knowledge of his gang affiliation was one of the reasons that Officer Pergande brought him to the crime scene. Moreover, that the murder of Ruvalcaba resulted from a gang-related confrontation between Bouto's P.R. Stones and the rival Spanish Cobras was reported to police in the immediate aftermath of the shooting by eyewitnesses Richmond, Lozada, Jacobo, and Frank Escobar.

Third, Vicente said that Bouto told him that the gun was delivered by a "shorty" who came up to Bouto and handed him a gun. Maldonado testified similarly before the grand jury. A police report notes that someone recognized as "Mario" delivered the gun to the shooter via bicycle.

Fourth, Vicente stated that Bouto said that he handed the gun to his "lady" after the shooting, and Maldonado testified similarly before the grand jury. Recall that within minutes of the shooting, Det. Halvorsen had obtained from neighborhood resident Michael Fleming a description of a female accomplice wearing all or mostly all red, to whom the offender handed his weapon.

Fifth, Vicente stated that Bouto had told him that he had shot Ruvalcaba using a 9 mm pistol. By that time, crime scene investigators had already identified shell casings found at the scene as having been fired from a 9 mm gun, which is noted in the 5/16/93 Supp. R.

---

[23] Tania Astefan, by all accounts, had dark hair, and was never blonde. A contemporaneous photo of her that we acquired from Helen Kandah verifies that information. Current photos of Tania also depict her with dark hair. We asked Bouto what she was wearing the day of the Ruvalcaba shooting. He told us that she was wearing a "baby blue blouse" and "black pants." (5/20/14 Interview with Robert Bouto.)

Vicente and Maldonado provided only three pieces of material information that had not previously been reported. None can be verified, however. First, they detailed an initial shooting prior to the one that killed Ruvalcaba. That fact is significant because only if there were two distinct shootings could Bouto have been with Tania at the time that shots were reported fired but nevertheless killed Ruvalcaba. Second, they said that Bouto told him that a group of "shorties," i.e. young gang members, came to summon him to the scene of those shots. Finally, according to Vicente's and Maldonado's accounts, Bouto stated that upon being gunned down, Ruvalcaba stated, "I'm hit, I'm hit."

Regarding the first piece of material information that had not previously been reported, according to Vicente's statement, Bouto was walking with his girlfriend near Roosevelt High School when he "heard some shots." Vicente then said that Bouto told him that his "Stone Brothers, the shorties, came up to him and his lady and told him that the Cobras had popped [i.e., shot] at them." As an initial matter, other than Vicente's statement, there is no allegation by the police or the prosecution that there were two sets of gun shots. Moreover, no witnesses reported two sets of shots as described by Vicente, including both civilian neighborhood witnesses and witnesses who were opposition gang members.[24] Richmond told us that he did not recall hearing or seeing any shots other than the ones purported to be from Bouto. Moreover, as noted above, Lozada told us that Vicente's allegation regarding the earlier shooting was "a lie." He continued: "The two security guards, [pejoratively nicknamed] 'Beavis' and 'Butthead,' would have seen it. They walked back and forth."

Second, Vicente and Maldonado say that Bouto had told them that he was alerted to the circumstances of the first set of shots by his "'Stone Brothers,' the Shorties." According to Vicente, "the Shorties told him that the Cobras, had just popped at them." At that point, "a Shorty, drove up to him and handed him a gap." As noted above, the record does include eyewitness reports of a delivery-by-bicycle of the murder weapon. However, the conversation between Bouto and the so-called "shorties" only appears in Vicente's statement and his and Maldonado's grand jury testimony and, accordingly, it cannot be corroborated.

Finally, Vicente and Maldonado provide one additional piece of evidence not reported prior to Vicente's statement or Maldonado's grand jury testimony. Specifically, according to Vicente's and Maldonado's accounts, Bouto informed them that upon being gunned down, Ruvalcaba stated, "I'm hit, I'm hit." Both Richmond and Lozada, each of whom was far nearer to Ruvalcaba than the offender, informed us that detail was false. Thus, this piece of evidence, too, cannot be corroborated. (5/5/14 Interview with Carl Richmond; 5/9/14 Interview with Rey Lozada.)

(iii) **Vicente's and Maldonado's Recantations**

First, we examine the consistency of Vicente's recantations. Second, we examine the consistency of Maldonado's recantations. Third, we examine potential benefits received by both

---

[24] Helen described two sets of shots to Bouto's investigators, but in rapid succession, not minutes apart.

informants in exchange for recantations. Fourth, we examine potential benefits received by both informants in exchange for providing evidence against Bouto.

### (a) Consistency of Vicente's Recantations of the Evidence Against Bouto

Vicente is reported to have stated to multiple people, on multiple occasions over a period spanning more than a decade, that the confession evidence he provided against Bouto was fabricated. Those recantations are consistent with respect to the claim that the evidence he provided against Bouto was fabricated. Notably, while Vicente has long maintained that Bouto did not confess to him, he has no independent knowledge of Bouto's guilt or innocence.

### (b) Consistency of Maldonado's Recantations of the Evidence Against Bouto

Edwin Maldonado has maintained for nearly two decades, from shortly before trial to a 3/2/14 interview with us, that the evidence he provided against Bouto was fabricated. Like Vicente, Maldonado has maintained consistently that this evidence was fabricated, but he has provided inconsistent reasons for having done so.

Maldonado's three recantations—first to Bouto's investigators, then formally via an affidavit, and finally in a 3/2/14 interview with us—share several core facts. Most importantly, Maldonado has been unwavering in his contention that Bouto did not confess to a murder while the two were in the Area 5 lockup together. He has said, also, that he did not know Bouto before that day of the purported confession. He has also consistently implicated Vicente as the person who in large part instigated his participation. Maldonado has also consistently stated that he was assisted in implicating Bouto by both CPD personnel and prosecution personnel. Finally, Maldonado has said throughout his various recantations that he was suffering drug withdrawal symptoms at the time of his implication of Bouto, which played a role in his decision to implicate Bouto.

While Maldonado has maintained his core allegations, the recantations are also marked by some inconsistencies. First and foremost, Maldonado inconsistently discusses CPD personnel's role in his decision to give false evidence against Bouto. In his affidavit, Maldonado appears to place all of the blame on Vicente, his co-informant, for encouraging him to implicate Bouto. The police and prosecution, on the other hand, are only involved insofar as they give to him Vicente's story. When speaking to us, however, Maldonado said that CPD personnel played a larger role, actively coercing him, and that "cops back then" expected gang members to provide false information against rivals at risk of being framed for crimes themselves. (3/2/14 Interview with Edwin Maldonado.) Maldonado told us that, in the Bouto case, "cops said 'make sure you pick that guy there'"—i.e, Bouto—and that "they would talk [him] through it." (*Id.*)

Second, Maldonado has also provided inconsistent details regarding his biography, which harms his credibility with us to some degree. Initially, in his interview with Bouto's investigators, Maldonado said that he was in the same gang as Vicente, the Imperial Gangsters, which incentivized his cooperation in the scheme to falsely accuse Bouto. In his affidavit, Maldonado does not directly identify himself as a member of the Imperial Gangsters, although

he implies it by stating that "Francisco Vicente was a respected member of the IG's (Imperial Gangsters), and I felt that I had to do what he told me to do or else face trouble." However, when he spoke with us, Maldonado said he was never a member of the Imperial Gangsters, but rather the Maniac Latin Disciples. (3/2/14 Interview with Edwin Maldonado.) He also said that the nickname used for him throughout the Bouto record, including in his interview with Bouto's investigator, was wrong. (*Id.*) He was not known as "Lobo," Maldonado said, but rather as "Count." (*Id.*) Finally, Maldonado acknowledged to us that the birth date he stated at his Grand Jury appearance was inaccurate by five years. (*Id.*)

We also note that although he believes that Bouto was innocent, and claims at various times that Vicente, CPD personnel, and prosecution personnel had assisted him in his role in implicating Bouto for the Ruvalcaba murder, Maldonado also said that his heavy drug use in the mid-1990s had made some events difficult to recall. (*Id.*) For example, he did not remember executing the affidavit. (*Id.*) He told us, however, that he has been sober for six years at the present time. (*Id.*)

(c) **Benefits Offered or Provided for Recanting**

At the time Maldonado recanted prior to Bouto's trial, he was incarcerated at Cook County Jail. There is no evidence that he received a benefit for recanting. Moreover, potentially, he risked more by antagonizing the State than he could have hoped to have gained by recanting. By the time Maldonado spoke to us, repeating his allegation, Bouto's case had been inactive for many years, time-barred as to both Illinois post-conviction and Section 2254 federal habeas. Bouto is not currently represented by counsel and, accordingly, no advocate was in a position to attempt to negotiate benefits for Maldonado in exchange for recanting the grand jury testimony he provided against Bouto. Notably, Maldonado was, upon first contact, extremely reluctant to submit to an interview with us.

Finally, there is no evidence that Lydell Williams was offered a benefit in exchange for relaying Vicente's recantation to Bouto's investigator.

Vicente recanted before negotiating for various benefits in return for his testimony in the Montanez/Serrano matter.

(d) **Benefits for Providing Evidence Against Bouto**

Vicente may have received benefits for participating in the Bouto case. Foremost among them, on a potentially lengthy sentence, Vicente served only three years.[25] ASA Dillon, who prosecuted the case against Bouto, represented the State at Vicente's sentencing hearing, and

---

[25] It is impossible to predict what sentence Vicente would have received had he not cooperated with the Bouto, Montanez/Serrano, and third defendant investigations and still pleaded guilty. Had he gone to trial and been convicted on the three armed robberies and one simple robbery, the maximum sentence he could receive allegedly would be ninety-seven years. It is reasonable to assume, however, that pleading guilty on those charges would have resulted in sentence far shorter than ninety-seven years even if he did not cooperate.

recommended a nine-year sentence at that time. It is possible that his apparent assistance in breaking up a drug-smuggling ring may also have contributed to the sentence he received, although his reported efforts there were not mentioned at the hearing or, indeed, outside of the unsigned letter from Lt. Tucker. After reportedly providing evidence against Bouto, Montanez/Serrano/Pacheco, and the third defendant, Vicente also was transferred to the witness quarters at Cook County Jail. There, he testified in the Montanez/Serrano matter, he was allowed visitors, contact visits, and home-cooked meals. (10/18/94 Trial Transcript, at 79-80.)

There is no indication that Maldonado received sentencing benefits for his participation against Bouto. He has stated, however, to us that he hoped for such benefits, and that Vicente told him that this was a possibility for both of them. Maldonado told us that, "I lied. I lied. I was trying to get out of trouble, and it cost" Bouto. (3/2/14 Interview with Edwin Maldonado.)

(iv) **Findings Regarding Vicente's and Maldonado's Evidence**

We find that it is more likely than not that Bouto did not confess to the murder of Salvador Ruvalcaba while in the Area 5 lock-up. Thus, it is more likely than not that the two informants instead obtained the verifiable information in other ways, either from police or prosecution personnel or from Bouto himself, who may have been knowledgeable about the details of the case due to the discussions with police and the State in which he professed his innocence. First, it is implausible that Bouto would have confessed the intimate details of this level of crime to a room full of strangers, and our visit to the cell block verified that, even had he been so inclined to do so, the conditions—namely the acoustics of the room and his distance from Vicente, in particular—would have made this difficult to do. We are also swayed by the contents of the purported confession, which lacks verifiable information not already reported in the record but contains verifiably false or otherwise likely false information, detailed above. Had the confession been legitimate, we would have expected that one of the two men would have shared at least some verifiable details not already collected by investigators. Also, while we would expect that their stories of the same event would mostly align, that Maldonado offered largely a verbatim recitation of Vicente's evidence, also makes us suspicious of the veracity of the evidence and leads us to this finding.

Finally, we also give some weight both to the fact that we consider it unlikely that Vicente would have obtained three separate confessions to three unrelated crimes and that we have independently determined that Vicente likely fabricated those other confessions, too.[26]

c. **Evidence Obtained From Sources Other Than Vicente and Maldonado**

---

[26] Although we did not make a finding regarding innocence in the third defendant's case, we did for several reasons determine that the confession to Vicente in that matter, purportedly occurring in the "Bullpen" waiting room at the Cook County Jail while the two were surrounded by several other people, was fabricated.

First, we here analyze the evidence in connection with eyewitness descriptions of the offender. Second, we analyze the evidence in connection with the circumstances under which the identifications of Bouto were conducted.

(i) **Eyewitness Descriptions of Offender**

We present here the evidence concerning eyewitness descriptions of the offender. First, we present evidence concerning eyewitness descriptions of the offender's hairstyle, and Bouto's hairstyle at the time of his arrest. Second, we present evidence concerning eyewitness descriptions of the offender's facial hair, and Bouto's facial hair at the time of his arrest. Third, we present evidence concerning State's witness Lozada's statement that the offender was canvassing the crime scene on a bicycle during the period preceding the shooting.

(a) **Offender's Hair**

The fact that various witnesses told police that the shooter wore his hair in a ponytail has been a point of contention by Bouto and his defense counsel throughout the course of the case. They have argued that Bouto did not wear his hair in a ponytail, and thus could not have been the shooter.

First, if the shooter did indeed wear his hair in a ponytail, it would seem to definitively rule out Bouto as the perpetrator. Although line-up photos were all taken from either the front of Bouto or in side profile, it is evident from our examination of the profile photos that Bouto did not have a ponytail when he was arrested shortly after the shooting.[27] Several other individuals in the line-up did wear their hair in short ponytails or rat-tails, and even from these angles, that they have them is evident. The photographic evidence establishes that Bouto did not have a ponytail upon being arrested.

On this topic, an additional point is worth noting. We agree with defense counsel's argument at the 5/3/95 Motion to Quash hearing that the absence of a photograph showing Bouto with a ponytail is circumstantial evidence that he did not have one. Put another way, under circumstances where the offender was described by multiple sources at multiple times as having a ponytail, if the offender had a ponytail upon arrest, the police likely would have photographed it or noted it in the arrest report. Recall, too, that no report describes Bouto as having a ponytail and, in fact, both Vicente and Maldonado describe him as not having a ponytail.

On the question of whether the shooter wore a ponytail, we afford considerable weight to the fact that the tail was described by two groups of independent witnesses, the six neighbors

---

[27] There is no evidence or allegation that Bouto shaved his ponytail in the short time between Ruvalcaba's death, and Bouto's arrest nearby and, as noted above, there is circumstantial evidence he did not. First, his barber told his investigators and testified at trial that Bouto did not have a ponytail. Second, Tania denied that he ever had a ponytail in a meeting with Bouto's investigator, at trial and in conversation with us. Third, Helen told us that Bouto never had a ponytail because his grandmother would not have allowed it.

listed in the initial case report, and the Spanish Cobra eyewitnesses. While the shooter is sometimes described as having worn a hooded sweatshirt, as discussed above only Margaret and Michael Fleming, among eyewitnesses, stated prior to trial that the hood was up when they saw the shooter, and Margaret informed us that his hood was only up a portion of the time that she saw him. In the initial description gathered from neighbors, there is no mention of a hood, either on or off of the shooter's head.[28] The neighbors are credited with describing a ponytailed offender wearing a black T-shirt. While it is theoretically possible that that the multiple groups of witnesses independently got the ponytail detail wrong, in the chaos of the moment, they did converge on certain other aspects of the description, including the length and hue of the offender's shorts, and the fact that he was wearing a dark shirt, rendering a significant error in connection with a defining characteristic unlikely.

To be sure, the Spanish Cobra witnesses, Ruvalcaba's friends, and the shooter were facing one another, with a city street in between them, when the shots were fired. The view would have been of the offender's face, not the back of his head. In other words, had this been their only view of him, they would have had no way of knowing whether the offender was wearing a pony tail or not. However, in his interview with us, Lozada said that Jacobo and Richmond both mentioned the tail. (5/9/14 Interview with Rey Lozada.) Lozada also told us that the offender, who he still believes was Bouto, had been riding a bicycle before the shooting, which would have afforded the eyewitnesses another opportunity to see a ponytail. It is also possible that the eyewitnesses saw the ponytail as they looked back at the fleeing offender. Richmond and Lozada both acknowledged doing so from the ground, after the shooting. At trial, as discussed above, Lozada said that the shooter did not put his hood up until he fired the fatal shots, and Richmond called the shirt "one of them half hoodies" that still afforded him a look at the shooter's hair.

In sum, we find that the weight of the evidence indicates that the offender had a ponytail, and Bouto did not.

### (b) **Bouto's Facial Hair**

As detailed above, record evidence photos indicate that Bouto had a visible mustache, "soul patch," and a very slight goatee on the day of the shooting. However, no eyewitness descriptions noted the presence of facial hair on the shooter, and the hand-written General Progress Report prepared by Det. Halvorsen noted that eyewitness Michael Fleming described the shooter as "clean shaven."

Whether this aspect of the descriptions is an indication of Bouto's innocence is dependent upon whether the witnesses would have gotten a good enough look at the shooter's face to determine the presence of facial hair. In this instance the Spanish Cobra witnesses would have

[28] We include here only the six neighborhood witnesses listed on the initial crime scene report and not 911 caller Michael Summerfelt, who noted a "hood," but not whether it was up or down, and also was the only witness to describe orange rather than dark shorts worn by the shooter, suggesting he may have confused the offender with someone in the vicinity of the offender—i.e., perhaps one of the three individuals described as next to the offender as he fired the weapon.

been positioned to see facial hair, as the offender was facing them. However, that fact does not necessarily mean that they would have noticed it and in the immediate aftermath of the shooting told police investigators about it. There was some distance between the shooter and the witnesses, as many as sixty-five yards. It is possible that they would not have noticed Bouto's facial hair from that distance. It is also quite possible that the eyewitnesses simply did not see the shooter for a long enough time to make the facial hair determination. According to both Richmond and Lozada, in our interviews with them, the shooter emerged from a group of Puerto Rican Stones gang members, at which time he began firing into the crowd of Spanish Cobras. Their focus would very likely have been on fleeing gun fire rather than cataloguing the shooter's facial hair.[29]

The inconsistencies of Michael Fleming's descriptions and statements do give us pause. Fleming specifically described the shooter as "clean shaven." (At trial Bouto's defense counsel failed to confront Fleming with a prior inconsistent statement as to this fact.) Likewise, Margaret Fleming told us that the offender was clean-shaven.

Although we recognize the possibility that Bouto's facial hair may have been a detail that witnesses did not notice or simply failed to see due to fast-moving circumstances at the scene, we do accord some weight, although non-dispositive, to the fact that Bouto had facial hair and no witness so described the offender.

(c) **Rey Lozada Informs Us That The Offender Canvassed Area on Bicycle Prior to Shooting.**

Lozada is unlikely to have seen Bouto riding a bike. The bicycle detail was not noted in the record, so, to the best extent we can tell, Bouto was never aware of the allegation. Nonetheless, both he and Tania, in independent interviews with us, said Bouto had been on foot the entire afternoon, not on a bicycle.

It is quite possible that the bicycle description is simply a mistake that Lozada made due to the passage of more than twenty years since the incident. Although there is a description in the record of a person named "Mario" delivering a gun on a bicycle to the shooter, there is nothing that matches up with Lozada's description of the shooter on a bicycle. As noted above, fellow eyewitness Richmond told us that he did not see Bouto on a bicycle, although he conceded that he had not arrived in time to see the events leading up to the shooting. Nonetheless, this did not

---

[29] The presence of a gun, particularly a gun fired into the crowd, also contributes to the skepticism with which we must treat the eyewitness identifications in this case. In a phenomenon that expert Elizabeth Loftus discusses in her book "Eyewitness Testimony," "a crime victim might spend a great deal of time concentrating on the gun that the assailant is waving about, and much less time processing other aspects of the situation. In fact, there is some evidence that this is exactly what people do. The term weapon focus has been used to refer to the situation in which a crime victim is faced with an assailant who is brandishing a weapon. The weapon appears to capture a good deal of the victim's attention, resulting in, among other things, a reduced ability to recall other details from the environment, to recall details about the assailant, and to recognize the assailant at a later time."

seem like an aspect of the story that Richmond was familiar with, even from speaking to others. Perhaps Lozada saw someone other than the shooter on a bicycle before the shooting, and in the years hence has conflated the two individuals in his mind. Perhaps there was no bicyclist at all, and Lozada is confusing the afternoon of 5/14/93 with another afternoon. Without any corroborating statements unearthed, it is difficult to know.

Had Lozada actually seen the shooter on a bicycle before the shooting, that would make it much less likely that Bouto was the offender. However, the lack of corroboration of Lozada's account, either contemporaneous or in the course of our investigation, limits its value to our findings.

(ii) **Eyewitness Identifications of Bouto**

Beginning with the on-scene show-up, there are many reasons to believe that the identifications of Bouto as the shooter may have been undermined and, thus, ultimately unreliable. As an initial matter, eyewitness Richmond told us in our interview with him that he did not believe that the show-up process was fair to Bouto. It is notable that Richmond is the one raising these allegations. First, Richmond still believes that Bouto was the shooter, and, in fact, was at first hostile toward our attempts to interview him about the incident. Richmond, in conversation with us, described Ruvalcaba as his "best friend" and made it clear that he hopes Bouto serves out the remainder of his sentence. (5/5/14 Interview with Carl Richmond.) The fact that Richmond has no vested interest in Bouto's release, still believes him guilty, and in fact wants to see the conviction maintained, lends his allegations about the show-up and line-up some degree of credibility.

Second, the nature of their relationship was such that Richmond may have been predisposed to identify Bouto, as it has been established that Richmond did not like Bouto at the time of the shooting.[30] Moreover, Richmond believed that Bouto had every reason to want to harm him, and told us that he thought Bouto intended to shoot him, not Ruvalcaba. In other words, the idea of Bouto as the shooter made sense to Richmond. Nonetheless, there is no indication in the record that Bouto told Pergande, the investigating officer at the scene, that Bouto was the shooter. Instead, he offered only a physical description of an offender. Richmond knew Bouto and recognized him right away when he was brought to the scene by Pergande. That familiarity, reasonably should have led to Richmond identifying Bouto by name or other characterization as the shooter, rather than giving a mere physical description of a shooter.

The circumstances of the shooting may further undermine Richmond's show-up identification of Bouto. At that distance, it may have been difficult to distinguish Bouto from any number of teenagers, especially when the opportunity to see the offender was limited, as it was, according to Richmond's testimony, while Richmond ducked for cover to evade gunfire, perhaps at a distance as great as sixty yards away.

---

[30] Loftus, in "Eyewitness Testimony," discusses the phenomenon of "unconscious transference[,] . . . in which a person seen in one situation is confused with or recalled as a person seen in a second situation."

If it is true that, as Bouto said, Lozada and Escobar had been involved in a prior altercation with him, as well, then Lozada and Escobar may have also been predisposed to identify Bouto as the offender. Even if that was not the case, though, Richmond's actions at the scene, as detailed above, may have served to hinder the reliability of any subsequent identifications of Bouto as the shooter. According to Lozada, who still believes that Bouto was the shooter and alleges no misconduct by Dets. Guevara or Halvorsen, Richmond first loudly identified Bouto, and made a significant showing of his certainty that Bouto had been the offender. This created the possibility that the other eyewitnesses were responding not to their own belief that Bouto had shot Ruvalcaba, but rather to Richmond's expressed certainty.

The show-up, of course, was just one identification of Bouto in a series of them on the relevant date. Although we have not been able to confirm that a photo array was conducted as Lozada described—Richmond told us he did not recall examining photos but described a group interview with police and witnesses—we believe it possible that it was. First, as a gang member rival to Bouto and as a friend of the decedent, Lozada, like Richmond, does not appear to be incentivized to fabricate information that calls into doubt the reliability of Bouto's conviction, although he certainly could be mistaken or confusing it with another case. Second, Dets. Guevara and Halvorsen often conducted photo arrays. We note, however, it is not clear why a photo array would have been necessary in this matter given the show-up conducted on scene, unless police sought additional positive identifications from witnesses beyond Richmond, Lozada, and Escobar.

Like the show-up, the circumstances of the photo array, if reported accurately by Lozada, took place under circumstances rendering its utility questionable. First, the witnesses would have looked at the Polaroid photos shortly after already seeing Bouto at the scene during the show-up, increasing the likelihood that they would have identified him not necessarily because he was the shooter, but because he had already been presented to them as such.[31] Second, guidelines regarding suspect identification processes advise that witnesses make their identification independently, outside of the presence of other witnesses, who might act as an influence.[32] In this instance, if Lozada's account is accurate, those present actually corrected other witnesses, serving to further undermine the reliability of the selection. Finally, the photo array might have impacted the reliability of the line-up held soon after, because it gave the eyewitnesses yet another opportunity to view Bouto ahead of time and associate his face with the shooting and informed witnesses of the identity of the suspected offender.

---

[31] Behrman, B.W. & Vayder, L.T. (1994). "The Biasing Influence of a Police Showup: Does the Observation of a Single Suspect Taint Later Identification?" *Perceptual and Motor Skills*, 79, 1239-1248. The study examined whether the presentation of an innocent person in a show-up would affect eyewitness performance at a lineup. The authors found that the witnesses, here viewing the lineup five to seven days later, were significantly more likely to again select the innocent suspect from the lineup than a control group who had not viewed the showup.

[32] Paterson, Helen M.; Richard I. Kemp; Jodie R. Ng (January-February 2011). "Combating Co-Witness Contamination: Attempting to Decrease the Negative Effects of Discussion on Eyewitness Memory." *Applied Cognitive Psychology* 25 (5): 43-52.

There is also evidence that Det. Guevara showed Bouto to the line-up witnesses while he was handcuffed in a bathroom, perhaps prior to the line-up. If this was indeed the case, it would have given the witnesses another opportunity to familiarize themselves with Bouto as the shooting suspect, and also, as an unendorsed and undocumented method of identification, also evidences potential police misconduct. Assuming this event took place as the bulk of the evidence suggests, it is unclear whether this qualifies as a third viewing prior to the lineup procedure, as it is unclear whether this incident took place before or after the lineup. Bouto told us in our interview with him that it did occur prior to the line-up, saying that the door "opened up and Detective [Guevara] said, 'That's the one who did it,' and a bunch of guys said, 'Yeah, that's him. That's him.'" (5/20/14 Interview with Robert Bouto.)

Finally, the accuracy of identifications of Bouto as the shooter at the Area 5 line-up may also be questionable. First, this was, at the very least, the second identification of Bouto that day and possibly the third or fourth, depending on whether the photo array discussed above and a bathroom viewing discussed above actually occurred as described to us. However, there is little doubt that by the time of the line-up, the eyewitnesses—in particular the Spanish Cobra eyewitnesses who positively identified him—were familiar with Bouto as the suspect. Notably, neighborhood witness Margaret Fleming also said that she saw Bouto at the show-up, though this is not elsewhere documented. Those who do not appear to have participated in the show-up or photo array, including Margaret Fleming and her son Michael, were only able to identify Bouto as wearing clothing similar to that worn by the offender. (Jacobo, who participated in both the show-up and possibly the potential photo-array, also identified Bouto only by clothing at the line-up.)

On the last point, some scholars have argued that clothing-based identifications are inherently unreliable.[33] At the very least, in order to yield a reliable identification of an offender, the suspect should be surrounded by individuals who appear similar to the suspect.[34] Here, the offender's clothing was a central component of the identification process. As mentioned above, at least three eyewitnesses, Jacobo, and Margaret and Michael Fleming, identified Bouto, not by his facial appearance, but because he was wearing clothing the same or similar to the shooter. However, Bouto was the only member of the lineup wearing a hooded shirt, as well as the only member of the lineup wearing shorts of the length described by witnesses. One lineup member wore red pants and a white Chicago Bulls T-shirt. Another one wore white pants. All wore outfits that varied in significant ways from both Bouto and from the initial descriptions of the

---

[33] "Clothing bias occurs when the clothing worn by a suspect at the time of the identification is similar to the clothing of the culprit described by the witnesses. Clothing bias can produce mistaken identifications in lineups, but it provides an even bigger problem in showups." *See* the 2012 Psychology Press book "The Psychology of Eyewitness Identification," which was written by James Michael Lampinen (professor of psychology at the University of Arkansas), Jeffrey S. Neuschatz (associate professor and chair of the psychology department, University of Alabama-Huntsville), and Andrew D. Cling (professor and chair of the department of philosophy at the University of Alabama-Huntsville).

[34] See supra.

shooter, taken by investigators before Bouto was picked up. Under these circumstances, it was unlikely that the process would have yielded an identification of anyone but Bouto.

Moreover, Bouto's general clothing style (hooded shirt, shorts) was very common at the time, as was the specific brand of shirt he wore. Indeed, according to contemporaneous news accounts, hooded Karl Kani shirts like the one Bouto wore at the time of his arrest were very fashionable at the time. A 7/4/93 Chicago Sun-Times newspaper article, detailing youth fashion trends at the Taste of Chicago festival, noted that "'Kani,' as in Karl Kani, is the designer name of the moment, scrawled across hooded shirts, shorts and baseball caps worn by kids and teenagers." Later that year, on 12/19/93, the Los Angeles Times quoted a teen-age mall-goer that called Karl Kani clothing "the hottest thing going." Helen Kandah also told us that Kani-brand clothing was ubiquitous at her high school in the summer of 1993. (2/19/14 Interview with Helen Kandah.)

Finally, it may be notable that we assessed Margaret Fleming as somewhat unreliable in her conversations with us. Fleming's recall of certain details was the worst of any witness we spoke to. For example, she recalled that the shooter wore a white T-shirt and blue jeans, but not a hood. (8/8/14 Interview with Margaret Fleming.) She later changed her recollection, aligning it more with the record evidence, but this was only after we had refreshed her recollection, and it is unclear whether she truly remembered the details of the shooting, or was instead extremely suggestible. (*Id.*) She explained to us that she suffers from post-traumatic stress disorder after being shot in her neighborhood by a gang member while she was serving on a neighborhood crime watch program. (*Id.*) Fleming said: "You're talking to a real dummy. I was diagnosed with PTSD and severe panic attacks." (*Id.*)

Having discussed reasons that the identifications of Bouto as the shooter may have been unreliable, we now turn to the reasons that the identifications may have in fact been reliable.

First, we above noted that Richmond loudly, immediately, and confidently identified Bouto as the perpetrator when Bouto was brought to the scene in Pergande's police car. Though this certainly may have tainted the other eyewitnesses' identification of Bouto due to the power of suggestion, we also do not dismiss the idea that a rapid and confident identification of Bouto may tilt in favor of reliability.

Second, Bouto did share some characteristics with descriptions of the shooter gathered from eyewitnesses. To start, he wore a dark-colored, hooded shirt, along with ¾-length, dark shorts. Although he is Middle Eastern, Bouto's skin tone, particularly in his neighborhood, could certainly lead one to identify him as Hispanic, as witnesses had. The fact that Bouto shared at least some characteristics with the shooter could be judged to support the reliability of the identifications of him as the shooter.

Third, there is the sheer number of identifications of Bouto as the offender. The charging of Bouto was based not on identification by a single witness, or even two, but rather identifications of him as the shooter by several witnesses—specifically, three who identified him positively and three who identified him by his clothing. Included were neighborhood witnesses Margaret and Michael Fleming, who identified him by his clothing, as well as several rival gang members who had witnessed the shooting, including State trial witnesses Richmond and Lozada,

as well as Frank Escobar and Jacobo, Lozada's brother who identified Bouto by his clothing. Even as many as six identifications are not a guarantee of accuracy, particularly in light of much of the context discussed in the section above. However, all things being equal, six identifications of an offender are certainly more reliable than a lower number.

Finally, unlike the circumstantial witnesses who would later recant their allegation that Bouto had confessed to the crime, none of the living eyewitnesses who identified Bouto as the shooter have since disavowed their identifications. Richmond and Lozada both still believe that they identified the correct person, despite Richmond's contentions about the process being tainted by alleged police misconduct. As well, Margaret Fleming expressed no hindsight uncertainty about her selection of Bouto as the shooter. We have been unable to speak to Michael Fleming. However, his mother Margaret told us that he told her, "Mom, you know more about that because you were right there." (8/8/14 Interview with Margaret Fleming.) She continued: "I saw way more of this than my son did. He just saw the aftermath." (*Id.*)

(iii) **Finding Regarding Evidence Obtained From Non-Informants**

The number of identifications of Bouto by eyewitnesses makes the charging of him with Ruvalcaba's murder, at the time, understandable. However, we ultimately find that the evidence shows that it is more likely than not that the identifications were mistaken.

To recapitulate, the descriptions of the shooter, collected before Bouto was arrested, suggest that the witnesses more likely than not saw someone other than Bouto fire the weapon that killed Ruvalcaba. We recognize, and discussed above, the fact that eyewitnesses make mistakes in their flash descriptions of offenders. Thus, it is not out of the realm of possibility that a witness might misremember a ponytail where none actually existed. However, here, that the shooter wore a ponytail was the consensus among two groups of independent witnesses. This leads us to believe that it was more likely than not that the shooter wore his hair in a ponytail. Likewise, mistakes could be made with respect to facial hair. However, we ultimately believe that someone, from a group of nearly a dozen witnesses named in the investigation record, would have noted that the shooter wore facial hair. Instead, the only description tendered regarding this aspect of the shooter's appearance was by Michael Fleming, who said that the person he viewed was "clean shaven," a description corroborated by Margaret Fleming, whereas Bouto was not, but wore a mustache and a "soul patch." It is true that Bouto's clothing matched some of the general descriptions obtained in the immediate aftermath of the shooting. But the descriptions were not precise—for example, there is no contemporaneous indication that the shooter had been wearing a shirt with writing on its front—and Bouto's style of apparel was common at the time..

We now, then, address the next step in the identification of Bouto as the killer of Salvador Ruvalcaba. We note, first and foremost, that Richmond's actions at the show-up likely affected the reliability of all identifications that would come afterward. Richmond, recall, told us that the identification procedure was "unfair" for Bouto because Bouto was the only one at the scene who resembled the description of the offender. But it may be that Richmond's on-scene actions, independently related to us by Lozada and Bouto and corroborated in large part by the record evidence, played a significant part in making this so. Lozada also described a photo array, which Richmond may have partially corroborated, conducted under circumstances that, if

accurate, render it unreliable. We note also that Bouto was placed in a lineup with a group of fillers that were not dressed similar to him. Finally, we take note of the fact that some witnesses viewed Bouto up to four times, making it increasingly likely that they would identify him as the shooter, while increasingly unlikely that they were doing so because he actually was the shooter. Indeed, with so many opportunities to see Bouto, it is difficult to imagine that the eyewitnesses, viewing the line-up, would have selected anybody other than the person they saw just a few hours before, on the scene, dressed exactly the same.

### 4. Conclusion

#### a. Regarding Allegations of Misconduct

As to our first task in the Robert Bouto matter, we find it unlikely that Det. Guevara purposefully provided informants Francisco Vicente and Edwin Maldonado with false information in an effort to implicate Robert Bouto in the murder of Salvador Ruvalcaba. At the time Vicente provided the evidence, Det. Guevara and his partner, Det. Halvorsen, had already obtained positive identifications of Bouto as the shooter from three eyewitnesses, and partial, clothing-based identifications from three others. This, we feel, may have been enough evidence to charge Bouto with the slaying, rendering the informant evidence unnecessary, although Det. Halvorsen told us after reviewing the police record that Vicente's information was the "deciding" factor in the charging decision. Thus, Dets. Guevara and Halvorsen may have had little motive to elicit false informant testimony. Likewise, Vicente does not purport to have first gone to Det. Guevara with the confession information, but rather to either Det. Richard Maher, or one of the arresting officers, Capt. Lupe Pena or Officer L. Marron. The involvement of other CPD personnel makes it less likely that Dets. Guevara or Halvorsen, would have initiated such a scheme with Vicente and Maldonado. Finally, Bouto's inconsistent story about how much contact he had with Vicente makes it difficult to make any determination regarding how much he may have revealed to Vicente about the crime he was accused of committing.

However, we do find it more likely than not that Det. Guevara engaged in misconduct in two instances. First, it is more likely than not that he told Richmond, and perhaps others, who to select from the lineup. Richmond believes Bouto guilty, and would have little to no motive to falsely attempt to undermine the identification process that helped lead to his conviction of the murder of Richmond's "best friend" Ruvalcaba. Second, we find it more likely than not that Det. Guevara engaged in misconduct when showing witnesses Bouto handcuffed to a bathroom fixture. Although accounts of the timing differ, possibly due to the passage of time, multiple independent recollections of this event leave us confident that it happened. The most likely scenario, we find, is that Det. Guevara showed the witnesses Bouto, in the bathroom, as a precursor to the line-up process.

#### b. Regarding Claims of Actual Innocence

As to the task of determining the actual innocence of Robert Bouto, we find it more likely than not that Bouto is innocent of the murder of Salvador Ruvalcaba.

First, as discussed above, Bouto has maintained a credible and corroborated alibi from the night of the shooting until the present day. That alibi has never been substantively

undermined, even at trial. We find Bouto, despite some inconsistencies in his retelling, convincing as to the core assertions of his alibi story. We find Tania Astefan and Helen Kandah, meanwhile, credible and convincing.

Second, for multiple reasons, we find it more likely than not that both Francisco Vicente and Edwin Maldonado fabricated the event of Bouto's confession to the crime. The confession, as detailed in the record, is simply not plausible. We do not believe that the conversation, as alleged, could have taken place given the acoustics and other elements of the cell block as detailed above. Neither do the contents plausibly relate a confession, due to the fact that, first, the confession contains only verifiable information already collected by Dets. Guevara and Halvorsen and, second, other information included in the purported confession is either unverifiable or, simply, false.

Third and finally, we find the eyewitness testimony, the linchpin of the conviction of Bouto, unreliable. While it is true that Bouto marginally fit the description of the offender, the presence of a Hispanic-appearing teen, wearing dark clothing with a hood, scarcely would have narrowed the field of potential suspects in the summer of 1993, especially in the neighborhood of the shooting. On the other hand, reported details like the ponytail and the clean shave do not align with Bouto whatsoever. We suspect that in the aftermath of the shooting, Richmond, eager for swift justice, quickly pinned the blame on a suspect that made sense to him. Others likely followed. All of the station house identifications that followed, as discussed above, were tainted either by possible misconduct by Det. Guevara or by other circumstances that otherwise rendered them inherently inaccurate. Eyewitness identifications can be unreliable for a multitude of reasons, and many, if not most, are present here, as we detailed above. Thus, we find that the identifications of Bouto were likely mistaken.

In sum, we find Bouto's alibi evidence more credible than the eyewitness identifications of Bouto as the shooter, and certainly more credible than the purported jailhouse confession to Vicente and Maldonado. Although we accord some weight to the improbability that Vicente received three separate confessions to three unrelated murders in 1993, two of them within six weeks of each other, it does not meaningfully impact our conclusion here. In other words, even if this were the only confession Vicente purportedly received, our analysis would not change. Thus, it follows that we must also find it more likely than not that someone other than Robert Bouto shot and killed Salvador Ruvalcaba on the afternoon of 5/14/93.