**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***Robert Bouto v. Reynaldo Guevara, et al.***
**(Case No. 1:19-cv-02441)**

**Report Date: October 7, 2022**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In July 2022, I was contacted by attorneys representing Mr. Robert Bouto and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Bouto for the 1993 murder of Salvador Ruvalcaba. In 2018, 25 years after his arrest, the Circuit Court of Cook County vacated Mr. Bouto's conviction and all charges against him were dismissed. In May 2019, Mr. Bouto was granted a Certificate of Innocence in this case. I am being compensated for expert services in this case at a rate of $350/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 80 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 175 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as Appendix B.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. 3rd Amended Complaint (filed 11/11/20)
2. Alan Pergande trial transcript
3. Alan Pergande deposition transcript (4/27/21)
4. Arafat Issa trial transcript
5. Bouto Arrest Report
6. Carl Richmond affidavit (6/7/08)
7. Carl Richmond trial transcript
8. Carl Richmond Report of Proceedings transcript (1/24/19)
9. Carl Richmond deposition transcript (2/1/21)
10. Certificate of Innocence Order (3/27/19)
11. Cleared Closed Report (5/16/93)
12. Closing Arguments (trial transcript)
13. Color photographs of Lineup (5/14/93)
14. Color photograph of Robert Bouto (5/14/93)
15. Crime Scene Processing Report 526 (5/14/93)
16. Crime Scene Processing Report 730 (5/14/93)
17. Crime Scene Processing Report (5/15/93)
18. David Press trial transcript
19. General Offense Case Report (5/14/93)
20. Halvorsen Progress Report (5/14/93)
21. Lassar Memo (3/15/15)
22. Margaret Fleming trial transcript
23. Michael Fleming trial transcript
24. Michael Fleming deposition transcript (12/2/20)
25. Opening Statements (trial transcript)
26. Rey Lozada trial transcript
27. Rey Lozada affidavit (2016)
28. Rey Lozada deposition transcript (5/17/21)
29. Supplementary Report (5/15/93)
30. Supplementary Report (5/16/93)
31. Supplementary Report on Lineup (5/16/93)
32. Supplementary Report (6/8/93)
33. Supplementary Report on Showup (9/27/94)
34. Motion to Quash testimony (5/3/95)

If other materials related to eyewitness identification are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

**III. Overview of Case & Summary of Opinions**

**Important dates:**

May 14, 1993, 3:05pm. Shooting and murder of Salvador Ruvalcaba.

May 14, 1993, 4:00pm. Mr. Bouto is arrested and provides an alibi.

May 14, 1993, unknown time: Showup identification with Mr. Bouto takes place at the scene of the shooting. Mr. Bouto and his clothing are identified by several witnesses.

May 14, 1993, 7:00pm: Lineup. Viewed by 6 witnesses: Carl Richmond, Frank Escobar, Jacobo Losada, Rey Losada, Michael Fleming, and Margaret Fleming. According to the police report, all 6 witnesses either identified Mr. Bouto or identified his clothing as that being worn by the shooter.[1]

July 29, 1996: Trial begins. Mr. Richmond, Rey Lozada, Margaret Fleming, Michael Fleming and Officer Pergande testify. Mr. Richmond and Rey Lozada identify Mr. Bouto as the shooter and Margaret and Michael Fleming identify Mr. Bouto as the person in the lineup who's clothing matched the shooter's clothing. The defense calls two alibi witnesses, Tania Astefan and Helen Kandah, and Mr. Bouto's barber Mr. Issa. Mr. Bouto is convicted and sentenced to 45 years imprisonment.

April 30, 2018: Conviction is vacated.

June 25, 2018: Charges are dismissed.

January 24, 2019: Hearing (Mr. Richmond testified)

March 27, 2019: Certificate of Innocence granted

**Summary of "Identifying" Witnesses**

1) **Carl Richmond** (age 19, Spanish Cobra). Friend of victim, near him when he was shot. From police report, identified Mr. Bouto as the shooter from the lineup. At trial, he made a positive in court identification of Mr. Bouto as the shooter. (TT P. 101)

   In a 2008 affidavit and in his 2014 interview with investigators, Mr. Richmond provided information that he was pressured by Det. Guevara to be involved in the case and that if he did not agree, Mr. Richmond believed that he would be implicated in an unsolved murder by Det. Guevara. In his 2019 testimony, he was asked why he identified Mr. Bouto as the shooter at trial and he responded that he wanted to keep Det. Guevara off his back. (P. 30)

   In 2019 (P. 36-37) and 2021 (P. 78), Mr. Richmond testified that he was sorry for identifying Mr. Bouto as the shooter and has regretted doing so for many years.

[1] In a 2014 interview with investigators, Margaret Fleming indicated that Mr. Bouto was wearing different clothing at the lineup than during the shooting. This appears to be the only reference by any witness suggesting that the shooter's clothing was changed from the shooting (approximately 3pm) to the lineup (7pm). This is also inconsistent with her trial testimony and the police file which both indicate that Ms. Fleming selected Mr. Bouto from the lineup based on the clothing.

2) **Rey Lozada** (age 15, Spanish Cobra). Friend of victim, near him when he was shot. According to his trial testimony, he never saw the shooter before 5/14/93.[2] According to a 9/27/94 Supplemental Report, Rey viewed a showup identification procedure at the scene of the crime within an hour of the shooting and identified Mr. Bouto as the shooter.[3] From a 5/16/93 police report, Rey Lozada also identified Mr. Bouto as the shooter from the lineup at approximately 7:00pm on the day of the shooting. If these reports are accurate, Rey would have viewed Mr. Bouto in two identification procedures – within hours of each other – where Mr. Bouto was the only person wearing clothing similar to that described by the witnesses. Further, it is possible that Rey viewed photos of Mr. Bouto at the police station before viewing the live lineup. (Depo P. 48-9) At trial, for what appears to be the first time, Rey described the shooter and two or three other people running towards him (and his group) before the shooting began. (TT P. 32) During trial, he identified Mr. Bouto as the shooter. (TT P. 39)

   In 2016 Rey Lozada signed an affidavit saying that he identified Mr. Bouto at the showup because Mr. Richmond was acting angry about the death of their friend and indicated that the shooter was Mr. Bouto. According to his deposition testimony, Lozada went along with Mr. Richmond (and other witnesses, P. 47) and selected Mr. Bouto. He testified in his 2020 deposition that he does not know who shot his friend Mr. Ruvalcaba (Depo P. 21) because he never saw the shooter's face. (Depo P. 45)

3) **Margaret Fleming** (age 39, lived near shooting). From the police report, it appears that she and her son Michael were interviewed together. They reported seeing the shooter across the street and they saw him fire his gun 4-5 times. They did not see his face but described him wearing a hooded pull over shirt with the hood pulled tight. From the police report, she allegedly identified the clothing worn by Mr. Bouto in the lineup as the clothing worn by the shooter. She testified at trial that she heard shots, ran down from her second story apartment to the street where she stood 3.5 feet from the shooter. (P. 151) She also testified that she did not see the person shoot and the entire event was very fast. (P. 160)

4) **Michael Fleming** (age 15, lived near shooting). From the police report, he was interviewed with his mother, Margaret. He did not see the face of the shooter, only the clothing. After the shooting, he saw the shooter go into an alley and give a gun to a female with blonde hair. The female then gave the gun back to the shooter, who left the scene. At the lineup, Michael identified the clothing worn by Mr. Bouto as being the clothing worn by the shooter. At trial, he identified Mr. Bouto as being the person who he selected from the lineup. In his 2020 deposition, Mr. Fleming repeated the assertion that "we" selected Mr. Bouto from the lineup because of the clothing he was wearing.

5) **Frank Escobar** (age 18, Spanish Cobra). Friend of victim, with him when he was shot. From the police report, he allegedly saw a person he knows (Mario) hand a gun to the shooter. After his friend was shot, he ran to get away from the shooting. From the police report, identified Mr. Bouto as the shooter from the lineup. Mr. Escobar was killed in September 1993.

6) **Jacobo Lozada** (age 17, Spanish Cobra). Friend of victim, near him when he was shot. From the police report, identified the clothing worn by Mr. Bouto in the lineup as the clothing worn by the shooter. Mr. Lozada was shot and killed in July 1994.

---

[2] In a 2014 interview with Rey Lozada, investigators learned that he allegedly saw the shooter on a bicycle prior to the shooting. There is no mention of this description in the police file and Mr. Richmond did not recall (in 2014) the shooter having been on a bicycle. Therefore it is unclear whether this is an accurate recollection by Mr. Lozada.

[3] It should be noted that there was no contemporaneous reporting by police in the police file regarding the showup procedure. The first reference to the showup in the police file appears to be a single Supplementary Report 16 months after the shooting.

**Other Non-Identifying Witnesses:**

7) Melissa Melendez
8) Ida Rodriguez
9) Patricia Fleming
10) Christopher Fleming
11) Melissa Costello

**Overall Opinions**

My overall opinion in this case is that law enforcement repeatedly provided witnesses with multiple opportunities for co-witness contamination which very likely influenced their statements, identifications and subsequent testimony. Law enforcement also engaged in several unnecessarily suggestive identification procedures with multiple witnesses who were vulnerable to influence due to their limited memory for the perpetrator. Further, the ages and gang affiliation status of several witnesses would have made them more susceptible to influence due to threats and coercion.

My opinions are supported by the fact that both Mr. Richmond and Rey Lozada have testified that they did not see the face of the shooter and only selected Mr. Bouto because of external influences. Although Mr. Richmond reported in 2014 that he believed Mr. Bouto is guilty of the murder of Mr. Ruvalcaba, in a 2019 proceeding, Mr. Richmond testified that the primary reason he continued to say Mr. Bouto was the shooter (in 2014) was because he was afraid (of Det. Guevara among other things). He also testified in 2019 and 2021 that he did not know if Mr. Bouto was the shooter because he did not see the shooter's face. (P. 12) Although Mr. Lozada also told investigators in 2014 that Mr. Bouto was the shooter, Mr. Lozada has also recently testified (2020) that he did not see the shooter's face and does not know if Mr. Bouto is the shooter. (Depo P. 45)

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selections of Mr. Bouto as the shooter, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables"). It is critical to understand the impact of both system and estimator variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made.

The distinction between estimator and system variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading international expert in eyewitness identification research. Over the past 40+ years, a substantial amount of research on both estimator and system variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[4] In 2015, the law in Illinois

[4] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

regarding eyewitness identification procedures was amended and this law is consistent with best practices described in this report.[5]

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Bouto include:

**Estimator Variables:**

1) Effects of Limited Opportunity to Observe at the Time of the Event
    a) Exposure Time & Estimates
    b) Distance
    c) Weapon-focus Effect
    d) Disguise
    e) Prior familiarity
2) Stress/Arousal

**System Variables:**

1) Co-witness Contamination
2) Description "Accuracy"
3) Show-up Bias
4) Lineup Bias
5) Pre-identification Warnings/Instructions
6) Non-blind Lineup Administration
7) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
8) Witness Confidence
9) Post-identification Feedback

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[6] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[7] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer*

[5] IL ST CH 725 § 5/107A-0.1

[6] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[7] Ibid.

*is commonly none the wiser when perception differs from the "ground truth" of the external world— it appears that accurate eyewitness identification may be difficult to achieve.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*, especially when the witness' memory is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impacts of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[8] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[9] The 2020 White Paper[10] maintains the original four best practice recommendations from 1998[11] and adds five new best practice recommendations for the collection and preservation of eyewitness evidence.[12] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently

[8] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

[9] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[10] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[11] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[12] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

numbers as **375.**[13] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[14] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness, such as in this case. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In these exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet can still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[15] In the 2020 White Paper mentioned above, Dr. Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[16] The researchers note that there have been 11 published articles on the subject with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of witnesses who view a photo array or lineup in actual cases choose an innocent filler. Of those who "identify"[17] a person from a photo array or lineup, more than one third (36.8%) choose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 36.8%, as these data do not include erroneous selections of innocent suspects (it only includes filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" are incorrect. While false identifications of innocent fillers almost invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

---

[13] The figure of 375 has not been updated on the Innocence Project website for over one year and therefore this figure is outdated. Visit www.innocenceproject.org for information and statistics on DNA exoneration cases nationally.

[14] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[15] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[16] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[17] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

## VI. Proposed Testimony

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

### Estimator Variables

### 1. Effects of Limited Opportunity to Observe at the Time of the Event

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the amount of time a witness views a perpetrator's face significantly impacts the witness's later ability to identify that person. Generally, when the opportunity to see a person's face is limited (due to short time, presence of a weapon, distance, disguise, etc.), the result will be a weak or poor memory for that individual.

#### a) Exposure Time & Estimates.

According to the police file, neither Margaret Fleming nor Michael Fleming ever saw the shooter's face. They were able to describe his shirt as a dark short-sleeved hooded sweat shirt with the hood pulled up, tight around the shooter's face.

According to the police report, prior to the shooting, Mr. Richmond and Rey Lozada were walking towards the victim when they turned around and allegedly saw the shooter pull out a gun and shoot toward them and the victim. They hit the ground and saw the victim get shot and fall to the ground.

Mr. Richmond testified at a proceeding in 2019 that he glanced up, saw the shooter and then started ducking and running away. (P. 8) Mr. Richmond also testified in 2019 that he did not see the shooter's face and that he told Det. Guevara this information at the police station before the lineup.[18] (P. 19) In his 2021 deposition, Rey Lozada could not say whether the shooter was Mr. Bouto because he never saw the shooter's face. (Depo P. 45).

In research on the effects of exposure duration – the amount of time one has to view or encode something - on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[19] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an

---

[18] Mr. Richmond also testified in 2019 that Det. Guevara told him that he was going to get involved in the investigation even though Mr. Richmond didn't see the shooter's face and did not want to get involved. (P. 19)

[19] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

updated meta-analysis[20] and other research[21] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

For example, in one study by Memon, Hope and Bull, mock witnesses viewed a video of a realistic crime that lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s).[22] Witnesses were then tested with a perpetrator-present or perpetrator-absent photo array 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in perpetrator-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in perpetrator-absent arrays remained relatively high regardless of the exposure time.)

*Performance of Young Adults (ages 17-25) in the 12s and 45s Exposure Conditions with Perpetrator-Present and Perpetrator-Absent Photo Arrays (**Errors** are bolded)*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | Non-Choice | Hits | False Alarm | Non-Choice |
| Perp-Present Array | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Perp-Absent Array | NA | **90%** | 10% | NA | **41%** | 59% |

The results of the Memon et al. study above show that in circumstances where witnesses viewed the perpetrator's face for 45 seconds, 41% of witness made a mistake and misidentified an innocent person from a photo array in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Given the descriptions of the shooting provided by witnesses in this case, it seems unlikely that their ability to see the face of the shooter was even 12 seconds.

**Time Estimation.** In his 2021 deposition, Rey Lozada could not say whether the shooter was Mr. Bouto because he never saw the shooter's face. (Depo P. 45). He indicated that he took a few steps when the shooting started, hit the ground and stayed looking down until the gun shots stopped. When he looked back toward the shooter, the shooter was running and he could only see the back of his head. (Depo P. 31). At trial, however, Mr. Lozada testified that it took about a minute for the shooter to "run up and shoot the gun and turn around and run away". (TT P. 38) He later added that he looked down for about 10 seconds and looked at the shooter for about 50 seconds. (TT P. 67)

---

[20] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[21] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[22] Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354.

Although no eyewitness expert can determine which of the versions provided by Mr. Lozada is accurate or closer to the truth, given the descriptions of the shooting by other witnesses, it seems unlikely that the shooting took one minute to complete.

Researchers have investigated people's retrospective estimates of the amount of time that an interaction or event took place. The general findings show that estimates often differ from the actual amount of time, with the error often in the direction of overestimating.[23] Sometimes the estimate of time is profoundly exaggerated. In one study, participants saw a 30-second simulated bank robbery on videotape.[24] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152 seconds – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30 seconds. Although it was rare, some people produced inordinately long estimates of over 900 seconds. In other words, these individuals remembered a 30-second bank robbery tape as having lasted over 15 minutes. Thus, it is possible that witness testimony about the duration of their observations will be skewed such that triers of fact hear testimony that the witness had a longer opportunity to view the perpetrator than is in fact true.

**b) Distance.**

There was trial testimony from Mr. David Press, an investigator who took measurements at the crime scene from various locations described by various witnesses in this case. From these measurements, the distance between 3353 W. Sunnyside Avenue - where the shooter was standing according to Margaret and Michael Fleming and where the shell casings were found - and 3415 W. Sunnyside Avenue - where the victim's body was located and near where witnesses Carl Richmond, Frank Escobar, Rey Lozada, and Jacobo Lozada were prior to the shooting - is 245 feet.

At trial, Rey Lozada testified that he was 15-20 feet from the shooter when the shooting started. (TT. 37) However, in a 2014 interview with investigators, Mr. Lozada said that he was 30-40 yards from the shooter. Regardless of the exact distance, based on the overall description of the events from various witnesses, it appears that distance is a relevant estimator variable.

Research conducted on this topic has shown that distance can significantly impact a person's ability to view the details of another person's face.[25] In his "distance-as-filtering hypothesis", Dr. Geoff Loftus explains that as a face is viewed at further and further distances, there is less ability to detect the details of the face because facial details become coarser and coarser. As way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (6.7 yards; left) to 100 feet (33.3 yards; right).

---

[23] For example, see: Attard & Bindermann (2014). Establishing the duration of crimes: An individual differences and eye-tracking investigation into time estimation. *Applied Cognitive Psychology, 2,* 215–225; Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1*, 3–13; Yarmey, & Yarmey (1997). Eyewitness recall and duration estimates in field settings. *Journal of Applied Social Psychology, 27,* 330–344.

[24] Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3-13.

[25] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968.




In other research, scientists tested eyewitnesses on their ability to recognize a stranger's face from a range of distances.[26] Participants viewed faces from distances between 10 feet and 131 feet and were then immediately asked to make an identification from a six-person lineup. The results showed that the proportion of correct responses to errors was too great at distances over 49 feet for an identification to be considered probative. Accordingly, the authors recommended a 50 foot distance cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[27] Other researchers,[28] however, have found significant impairments in identification accuracy as distance between witness and the target increases but do not recommend a particular cutoff point, as did Wagenaar and van der Schrier. The implication of the scientific research is that distances over 100 feet, as shown above, make it extremely difficult to encode the details of a person's face, which is required in order to make accurate identification decisions.

**c) Weapon-focus Effect.**

Although there does not seem to be any description of a weapon provided by witnesses in the police file, at trial Rey Lozada (P. 33), Mr. Richmond (P. 100), Margaret Fleming (P. 150), and Michael Fleming (P. 166) all described seeing a black/dark gun held by the shooter. Mr. Lozada also testified that he saw the shooter put the gun back in his pants after the shooting and run in the opposite direction. (P. 35)

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect." As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated an impairment of identification accuracy when a weapon was present during the event/crime. A more recent meta-analysis confirms the findings of the Steblay 1992 report.[29] In summary, although it can certainly be true that a witness pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. In

---

[26] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practival tool for use in the courtroom. *Psychology, Crime & Law, 2,* 321-332.
[27] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.
[28] Lindsay, Semmler, Weber, Brewer, & Lindsay (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law and Human Behavior, 32,* 526-535.
[29] Fawcett, Russell, Peace, & Christie (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law, 19,* 35–66.

addition, viewing a weapon can also cause a witness to become afraid, which also can decrease the quality of a witness' memory (see below).

**d) Disguise.**

Another factor that can reduce a witness' ability to observe is the presence of disguise (e.g., hat, mask, sunglasses) worn by a perpetrator during the commission of a crime.

In this case, Mr. Richmond testified in 2019 that the shooter was wearing a hoodie and the hood was up so he couldn't really see who it was. (P. 10) This testimony is consistent with Rey Lozada's deposition testimony where he indicated that the shooter's hood was pulled tight (P. 27) and the initial reports and trial testimony of Margaret Fleming and Michael Fleming that they could not see the shooter's face because he was wearing a hood.

With respect to "obstructions" limiting a witness' opportunity to see a perpetrator clearly, research indicates that when a perpetrator is merely wearing a hat it can significantly reduce later identification accuracy.[30] Thus, the presence of the hood, pulled tight around the shooter's face, likely had a negative impact on the witnesses' abilities to see the shooter clearly and subsequently make a positive identification of his face.

**e) Prior Familiarity.**

Rey Lozada testified at trial that he had never seen Mr. Bouto before and didn't know him. (TT. 61) In his 2021 deposition, however, he testified that he had seen Mr. Bouto before the shooting but had never met him. (P. 41) In is his 2021 testimony, he cannot say whether the shooter was Mr. Bouto because he never saw the shooter's face. (P. 45)

At the scene of the shooting, Mr. Richmond gave the police only a physical description of the shooter and there is no mention in any police report of any prior familiarity between Mr. Richmond and the shooter or that Mr. Richmond had knowledge of the shooter's street name. The same is true of other witnesses at the scene including Rey Lozada and Frank Escobar.

Mr. Richmond has subsequently told investigators (in 2014) and testified in court (2019) that he knew that Mr. Bouto's street name was Sadam and that he and Mr. Bouto had had an altercation at a police station prior to May 14, 1993.[31] On the other side, Mr. Bouto also has given a statement that he was familiar with Mr. Richmond, Rey Lozada and Mr. Escobar before May 14, 1993 because of gang-related activity.

In some cases, an eyewitness will inform police that the perpetrator they viewed was not a stranger. In other words, they have seen them in the past before the crime. Familiarity can range from a single previous observation/encounter to a family member or close friend. Although identification errors of familiar people are less likely to occur, the research on non-stranger or "familiar-other" identifications shows that even these identification circumstances are not without error.[32] For example, there have been multiple field

[30] E.g., Cutler & Penrod (1988). Improving the reliability of eyewitness identification: Lineup construction and presentation. *Journal of Applied Psychology, 73,* 281–290; Mansour, Beaudry, Bertrand, Kalmet, Melsom, & Lindsay (2020). Impact of disguise on identification decisions and confidence with simultaneous and sequential lineups. *Law and Human Behavior, 36,* 513–26.

[31] It should be noted here that in 2019 (and again in 2021), Mr. Richmond testified that he did not see the shooter's face and does not know if Mr. Bouto is the person who shot and killed his friend. (P. 12)

[32] For a review of this research, see Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

studies (with actual witnesses in real cases) examining the rate of suspect and filler identifications in stranger and *non-stranger* cases. On average, the rate of suspect identifications in these studies is 41% in stranger cases and 90% in non-stranger cases. Of particular interest, however, is the rate of misidentification of known-innocent fillers in the identification procedure. If a witness and perpetrator were previously known to each other, one might expect that the eyewitness would not make a mistake and choose and innocent lineup member. However, on average, 5% of non-stranger real-world cases have filler identifications. It is important to note that there is a range of familiarity – from "minimal" to "extensive" – that impacts the likelihood of identification error.

This pattern of results from field studies is consistent with a laboratory study conducted by Dr. Steblay and colleagues[33] where they found that 9% of witnesses in non-stranger situations made a filler identification. In a 2019 summary of the non-stranger literature,[34] Dr. Vallano and colleagues provide the following warning (P.133):

> Yet familiar identifications are not infallible. First, an eyewitness who states that they know who the perpetrator is does not necessarily mean that the familiar person she identified is the perpetrator. Second, familiar identifications are not all created equal. Familiar identifications involving *minimal prior exposure* to the perpetrator may operate similarly to stranger identifications, with similarly high error rates. (emphasis added)

**2. Stress/Arousal**

Mr. Richmond has testified that he was afraid when he heard the shots and ran, as did other witnesses, when the shooting began. (2019 P. 9) Rey Lozada has also testified that he was scared during the shooting (TT P. 58) and in shock that the shooting happened. (Depo P. 33) Mr. Fleming testified in his 2020 deposition the he was also afraid when the shooting started. (P. 88)

In research related to stress and arousal, Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[35] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[36] In summary, high levels of stress and arousal, which the witnesses in this case unquestionably experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

---

[33] Steblay, Dietrich, Ryan, Raczynski & James (2011). Sequential lineup laps and eyewitness accuracy. *Law and Human Behavior, 35,* 262–274.
[34] Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.
[35] Deffenbacher , Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.
[36] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

In summary, with respect to estimator variables, there is evidence that all of the witnesses in this case had only a short period of time to see the face of the shooter if they were able to see the shooter's face at all (due to the raised hoodie). In addition, witnesses testified about being shot at, hearing the gun shots and ducking for their lives. Together, these estimator variables likely created a scenario where it would have been difficult for any witness to have a strong memory for the perpetrator. As will be discussed below, there are significant concerns regarding eyewitness reliability in identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed.

**System Variables Relevant to the Current Case**

The police reports and other documentation in this case reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Bouto as the shooter.

**1. Co-witness Contamination**

Witnesses at the scene of the shooting were not separated by law enforcement. In fact, it appears that witnesses at the scene even viewed a "showup" identification procedure while they were together. According to Rey Lozada, he saw Mr. Richmond become upset at the scene and indicate that the shooter was Mr. Bouto, whom Mr. Richmond knew by the street name of Sadam. (Depo P.40)[37] Mr. Lozada then testified that he went along with whatever Mr. Richmond said. (Depo P. 43)[38] He also testified that "we all jumped in the squad car" and went to Area 5 Precinct. (Depo P. 39) This is consistent with Mr. Richmond's 2019 testimony that he, Mr. Lozada and Mr. Escobar were in the same police car on the way to the precinct. (P. 15) On the way to the precinct, the witnesses talked about the shooting with each other and the police. (Lozada Depo P. 160) When he was asked during his deposition about his memory for providing a witness description, Mr. Lozada said (P. 45):

> *If I did, I just followed whatever my brother and Frank was saying, I guess, because they were right next – when they interviewed, they interviewed us together, so whatever they said, I guess I agreed with.*

According to a 2014 investigator interview with Rey Lozada, he recalled that when police brought Mr. Bouto back to the crime scene in a police car (for the showup) that Mr. Richmond approached the car and said that this is the shooter. Therefore, other witnesses at the scene, including Lozada and Mr. Escobar, were able to hear Mr. Richmond's "identification" of Mr. Bouto as the shooter.

Rey Lozada testified in his 2021 deposition that he and others were interviewed together about the shooter's description saying, "he didn't ask me. He just asked the group. It was us three and then they said what they said, and I just agreed." (P. 149)

Other examples of co-witness contamination were described in separate 2014 interviews given by Rey Lozada and Mr. Richmond. Specifically, although there was no documentation in the police file of any photo identification procedures being conducted with witnesses in this case, Mr. Lozada provided investigators with information related to photo identification procedures that were conducted at the police station with four witnesses together in a room. The photographs were passed around between Rey Lozada,

[37] In Mr. Richmond's 2021 deposition testimony, he testified that he only learned Mr. Bouto's street name (Sadam) from people in the neighborhood after Mr. Bouto had been arrested. (P. 25)

[38] At trial, Mr. Richmond testified that the witnesses at the scene were separated and were asked one at a time if they recognized any of the guys in the showup procedure. (P. 105) This testimony is inconsistent with Mr. Lozada's testimony that he was able to hear what other witnesses were saying.

Jacobo Lozada, Mr. Richmond and Mr. Escobar. According to Mr. Richmond in 2014, the witnesses were together listening to what the police were saying rather than being interviewed separately about the shooting.

It also appears that Margaret and Michael Fleming also were interviewed together. In the 5/16/93 Supplementary Report, there is a combined summary of their statements followed by additional detailed statements made by Michael Fleming regarding the actions of the shooter and a young female in the alley (which Margaret Fleming did not see).

If the witnesses had been separated at the scene, in the police car and at the police station it would not have been possible for Rey Lozada to simply follow what Mr. Richmond or other witnesses were saying with respect to Mr. Bouto being the shooter.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[39] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses, law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Zajac and Henderson[40] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In many actual cases, the full scope and impact of post-event contamination is unknown which is why obtaining a detailed, recorded interview with a witness is so important. In this case, the extent of the contamination is unclear but the record indicates there were multiple opportunities for all of the witnesses to have learned information about the perpetrators from others.

**2. Description "Accuracy"**

***Ponytail***. At the Motion to Quash Arrest hearing (P. 5-6), Det. Pergande testified that he approached Mr. Bouto on the street because he matched the description that he had been given by witnesses on the scene:

> *Male White Hispanic, about 16-17 years old, 5'7", 140 lbs, wearing a blue hoody with black ¾ length shorts, black hair with shaved sides and the hair on top pulled back into a tail, small ponytail.*

---

[39] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[40] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17,* 266-278.

Melissa Melendez was a witness to the shooting and was interviewed on 5/14/93 at the scene. She described the shooter as a Hispanic male, 16 years old, 5'5", 120 lbs, wearing a black t-shirt, black ¾ baggy pants, white high tops, hair shaved with a ponytail. Other witnesses also described a ponytail.[41]

The reason this feature is particularly important is because Mr. Bouto did not have a ponytail on 5/14/93. Mr. Bouto's hairdresser, Mr. Arafat Issa, testified at trial that Mr. Bouto never had a ponytail during the time around the shooting. (Bouto 006951) Mr. Bouto did not have a ponytail in the photograph of the live lineup but a ponytail is visible on some of the lineup fillers. Further, there is no description of Mr. Bouto having a ponytail in the arrest report or Supplementary Report (5/16/93) which described his hair as "hair black worn short". [42] Yet Det. Pergande testified at the Motion to Quash Arrest hearing that Mr. Bouto did have a "small tail". (P. 6)

***Facial hair.*** According to Det. Halvorsen's notes, on 5/14/93 Michael Fleming described the offender as "clean shaven". Later, he would testify that he never saw the face of the shooter and did not know if he had facial hair. When he was arrested withing an hour of the shooting, Mr. Bouto had a mustache and "soul patch" below his bottom lip.

With respect to research on witness description accuracy, in Professor Garrett's (2011)[43] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[44]

The lack of detail in the various witness' descriptions of the shooter should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore would not likely be reliable eyewitnesses in the investigation.

### 3. Showup

There is no contemporaneous documentation in the police file about a showup identification procedure being conducted at the scene in this case.[45] The first and only reference of a showup in the police file appears to be a 9/27/94 Supplemental Report (Bouto 021022):

> *R/O's toured area and located the offender. Wit Lasada, Jacob ID'd the offender's clothing and Ray ID's the offender's face.*

---

[41] Rey Lozada testified at trial that he did not see a ponytail. (TT. 61)

[42] In addition, the two jailhouse informants involved in this case (Vicente and Maldonado) described the P.R. Stone (Bouto) as having no ponytail.

[43] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[44] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[45] It also is possible that a police station showup occurred in this case. According to an affidavit and 2021 testimony of Rey Lozada, while he and his friends "were standing by the desks in the open area, we could see Bouto sitting in a room with the door open. The door was not fully open, but it was cracked enough where we could see him" (Depo P.36)

In the state's opening remarks at trial, however, the witnesses who viewed the showup identification procedure and its outcome were described differently than in the Supplemental Report. According to the prosecutor's opening statement (P. 16):

*And a few minutes later they found Robert Bouto and brought him back to the scene with some other people. And individually at the scene within thirty to forty five minutes after the shooting they showed the Defendant and he was identified by Rey Lozada and* ***Carl Richmond*** *(emphasis added) as the shooter.*[46]

However, in Bouto's arrest report prepared by Det. Pergande, the following is noted:

*History and Investigation: Above subject [Mr. Bouto] taken into custody at address of arrest in that he fit the description of the wanted person in connection with the homicide that occurred at 3415 W. Sunnyside. Subject transported into A5/VC where he was positively IDs by several witnesses via a line-up as being the person who shot Ruvalcaba, Salvador (fatally).*

In other words, Det. Pergande failed to mention or document the on the scene showup procedure. Despite the lack of documentation pertaining to the showup procedure in the police file, there was mention of an identification procedure conducted at the crime scene in the prosecutor's arguments at the Motion to Quash Arrest hearing (P. 22):

*The officer [Pergande] exercised good police action in detaining this individual and bringing him back to the scene for purposes of either excluding him or for purposes of continuing to search for the person that was responsible for the death of Salvador Ruvalcaba.*

The prosecutor's statement appears to be describing an identification procedure that was conducted at the scene, similar to what various witnesses have now described.

At trial, Rey Lozada testified that he "looked at five people standing in front of a car, the police car." (TT. 39) and this is when he made his identification of the shooter. But in 2021, he described that he was not alone when the showup took place and that other witnesses were next to him. He was next to Mr. Richmond when Mr. Richmond said "that was him", and Mr. Lozada just adopted what Mr. Richmond was saying. (Depo P. 153)

In a 2014 interview, Mr. Richmond told investigators that Det. Guevara did not make the showup identification procedure at the scene fair to Mr. Bouto because the police were bringing random guys which did not have mustaches and did not look like him. Rey Lozado also told the same investigators about the showup and recalled that another suspect in the procedure was an overweight white boy that did not look anything like Mr. Bouto.

In summary, it appears that a multiple-suspect showup procedure occurred at the scene within an hour of the shooting. There is no contemporaneous police documentation regarding the procedure and it is therefore unclear which witnesses viewed the showup, how/where it was conducted, what instructions were given to witnesses before the procedure, and which individuals (suspects) were shown in the procedure. What is

[46] In his 2021 deposition, Mr. Richmond testified about the showup procedure and indicated that other witnesses also were shown the (6 or 7) individuals. It appears that none of those witnesses were brought to the precinct for the lineup. (P. 27) It is unclear to me who these other witnesses were due to a lack of documentation in the police file regarding the showup procedure. Mr. Richmond testified in 2021 that he did not point anyone out in the showup procedure although this testimony is inconsistent with other evidence in this case.

known is that three other individuals who allegedly were near Mr. Bouto when he was detained were brought to the precinct for interviews and to stand in the lineup: William Lupo, Luis Oquendo, and Cesar Matias. There is no documentation regarding any identification of these individuals from the lineup or showup.

In addition, there is some evidence that a second highly suggestive showup identification procedure may have occurred at the police station prior to the live lineup. According to Rey Lozada, Mr. Bouto was handcuffed in a room close to where he and his friends were gathered and the door was ajar so that the witnesses could see him. (Depo P. 49) This is consistent with Mr. Richmond's 2019 testimony that he passed by a room at the police station before the lineup and saw Mr. Bouto handcuffed, sitting in a chair. (P. 19) According to Mr. Richmond in 2019, Det. Guevara showed him a single Polaroid of Mr. Bouto at the precinct prior to the lineup and he told Mr. Richmond "that's who I was going to point out" or Det. Guevara would make things difficult for him.[47] (P. 18-19)

Showup identification procedures are suggestive by their nature and are dangerous because there is no particular way for law enforcement to know when an eyewitness has made an error and identified an innocent person from a show-up because, unlike lineups, there are no known-innocent fillers.[48] A meta-analysis comparing witness performance in show-ups to six-person photo arrays indicates that mistaken identifications are significantly more likely with show-ups.[49]

In addition, the Revised 2020 AP-LS White Paper recommends that showups be avoided altogether unless deemed absolutely necessary. This recommendation is consistent with the 1992 IACP model policy on eyewitness identification which states that showups should be avoided whenever possible.[50]

When showups are used, safeguards should be used to reduce suggestion, such as eliminating inferences of police custody.[51] Showups that occur with a suspect in handcuffs or in the back of a police cruiser may lead to an increased rate of identification not because of recognition, but because of witness deduction ("Gee, this must be the perpetrator if the police have him in custody.").

---

[47] Mr. Richmond also testified in 2019 that it looked like the Polaroid photograph of Mr. Bouto had been taken in the room where he saw him handcuffed. (P. 19)

[48] As stated elsewhere in this report, this is why it is critical to have only one suspect per lineup so that law enforcement can better ascertain whether a witness has a reliable memory.

[49] Steblay, Dysart, Fulero, & Lindsay (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

[50] This 1992 model policy also recommends that only one witness at a time view the showup, that words uttered by police suggesting that the suspect is the perpetrator be "scrupulously avoided", that a suspect is only presented to a witness one time for the purposes of identification, that the suspect is not made to wear clothing similar to that described by the witnesses, and that the suspect not be handcuffed during the showup. From my review of materials in this case, it appears that all of the procedures listed above were utilized in this investigation. IACP (1992). *Model Policy: Showups, photographic identifications and lineups.* Another publication from IACP in 1993, "Showups, Lineups and Photographic Identification: Concepts and Issues Paper", was designed to accompany the 1992 model policy. The 1993 paper underscored the concerns with using showup identification procedures and informed readers that they should be avoided when possible due to their inherent suggestiveness.

[51] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

In summary, the showup procedure described by witnesses in this case substantially increased the likelihood that they would make an identification error, especially given the clothing bias involved in the showup procedure.

***Clothing Bias at Showup (and Lineup).*** In 2012, Rey Lozada testified that he felt certain about his selection of Mr. Bouto from the lineup "because of the hoodie. He still had the hoodie on." (Depo P. 166) In fact, Mr. Lozada had, only a few hours earlier, selected Mr. Bouto from the showup where he was wearing the same hoodie.[52]

The data with regard to clothing bias and show-up identifications is clear (Dysart, Lindsay, & Dupuis, 2004; Yarmey et al., 1996). When an innocent suspect who looks similar to the perpetrator is presented to a witness wearing clothing that matches with witness' description, there is a significant increase in false identifications of that innocent suspect. For example, Dysart et al. (2004) presented witnesses with suspects in various clothing biased showups. When an innocent (similar looking) suspect was presented wearing similar clothing to that worn by the target (perpetrator), he was falsely identified by 37% of witnesses. When the same innocent suspect was presented in clothes that were completely different from that worn by the target, he was falsely identified by 0% of witnesses. In the current case, the clothing worn by Mr. Bouto in the showup (and lineup) was consistent with the witness descriptions and he was the only person in these procedures wearing similar clothing to that worn by the shooter. The result is a set of suggestive or biased identification procedures that made Mr. Bouto stand out.

**4. Lineup Bias**

In my opinion, the live lineup shown to the six witnesses within 4 hours of the shooting was biased against Mr. Bouto. Foremost, Mr. Bouto the only lineup member wearing clothing that matches the description of the shooter's clothing. This is extremely important for all of the witnesses but two witnesses in particular. Margaret Fleming and Michael Fleming allegedly only selected Mr. Bouto from the lineup because his clothing matched the clothing worn by the shooter. Neither witness saw the shooter's face.

When it comes to filler selection, there are many choices law enforcement need to make when deciding who to put in a lineup including how many fillers should be used, and how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[53] In this case, the lineup fails on this principle because Mr. Bouto is the only lineup member wearing clothing similar to that described by the various witnesses. It is important to keep in mind that, if clothing was part of the witness' original description, either all or none of the lineup members should match this aspect of the description otherwise the lineup will be biased toward the suspect.[54]

---

[52] Two other witnesses, Margaret Fleming and Michael Fleming, allegedly only selected Mr. Bouto from the lineup because of his clothing, as neither witness saw the face of the shooter.

[53] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs; Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[54] E.g., Lindsay, Wallbridge, & Drennan (1987). Do the clothes make the man? An exploration of the effect of lineup attire on eyewitness identification. *Canadian Journal of Behavioural Science, 19,* 463-478.

**Multiple suspect lineup:** From the police report dated May 14, 1993:

> *"They also had other subjects that were behind the offender at the time of the shooting. R/d then asked tactical unit beat 1763b to bring all suspects into Area Five Violent Crimes for further investigation and a line-up."* Then,

> *"R/Dets. Interviewed William Lupo, Luis Oquendo and Cesar Matias. R/Dets. Informed them that they were identified by witnesses, as standing behind the offender at the time of the shooting. All three denied being there."*

With respect to the selection of lineup fillers, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime. From the materials I reviewed, I did not see any lineup documentation that, in my experience, is typically created when a lineup is conducted. Therefore, it is unclear which witnesses allegedly identified Mr. Lupo, Mr. Oquendo and Mr. Matias as being behind the shooter, or when they did so. (Bouto 021016) It also is unclear how many individuals the various witnesses selected from the lineup. For example, did any single witness identify 4 out of 8 lineup members? It is also unclear if any of these individuals were identified as the individual who handed the shooter the gun (named Mario).

**Filler similarity.** When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[55] (e.g., gender, age, height, weight, etc.) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones.[56] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. In this case, it is not clear what criteria were used to select the lineup fillers. What is clear from viewing the lineup is that most fillers do not match the overall description provided by the witnesses in this case. Some of the lineup members appear much taller or shorter than Mr. Bouto's height (and the height described by witnesses). The build of several of the fillers is different than that described by the witnesses and also Mr. Bouto's build. Although the arrest report indicates that Mr. Bouto has a "dark" complexion, several of the fillers are light complected.

**Photo array procedure:** According to a 2014 interview with investigators and his 2021 deposition, Rey Lozada recalled viewing photos with other witnesses at the police station prior to viewing the live lineup containing Mr. Bouto. The photographs included a Polaroid of Mr. Bouto and approximately 6 other photos.

According to Mr. Lozada, prior to viewing the lineup, various police officers saw these witnesses looking at photographs on a desk and did nothing to stop these witnesses from looking at photographs. (Rey Lozada Depo P. 48-50)

From the materials I reviewed, there is no documentation regarding this alleged photo procedure. However, if this procedure occurred, as Mr. Lozada has described, it would be considered a highly suggestive identification procedure. First, several witnesses were together, viewing photographs and making

---

[55] For example, see Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[56] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

comments regarding the individuals including Mr. Bouto. Second, these witnesses had already allegedly selected Mr. Bouto from the showup procedure. Third, they were at the police station waiting to view a live lineup. Therefore, at that point in the investigation, there would have been no reason related to eyewitness reliability for witnesses to be viewing photographs that included a photograph of Mr. Bouto.

In summary, with respect to the lineup in this case, if the procedures happened the way that some witnesses have testified - in addition to the suggestive construction of the lineup itself - there was a very strong likelihood that the witnesses would select Mr. Bouto from the procedure. After being selected from an unnecessarily suggestive procedure (here, a showup), the results from any subsequent procedure are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy.

**5. Pre-identification Warnings/Instructions**

For the showup identification procedure, there is no documentation at all in the police file prior to a September 27, 1994 memo regarding the procedure. At trial, Rey Lozada testified that he was asked "if I can identify someone" from the shooting. He looked at five people standing in front of the police car and said he recognized the shooter. (TT. 34) It appears that he was not specifically informed that the shooter may or may not be present. In fact, in 2019, Mr. Richmond testified that he was told by police on the scene that "they had three guys in a car and they believed that the shooter was one of them. And I was – that's who I was told to point out, basically". (P. 13) Mr. Richmond went on to describe the *pre-lineup* instruction bias provided by Det. Guevara (P. 25-26):

> *Rey Guevara pulled me out of the room, showed me a picture of Mr. Bouto handcuffed in an empty room and told me that that's who I was going – that that's who he is. He had the shooter. He was like coaching us saying that it's him. And I told him – I saw – you know, I was stressing to him I didn't want to get involved. And he just abundantly made it clear to me, before he brought me back in the room with the other two witnesses, that I was gonna point out Mr. Bouto or he was gonna make life miserable for me.*[57]

With respect to the lineup identification procedure, Mr. Richmond provided information to investigators in 2014 (and in an affidavit in 2008) that Det. Guevara told him, Rey Lozada and Mr. Escobar that they had the shooter and that Mr. Bouto would be standing in position 3 in the lineup. In 2019, Mr. Richmond recalled that Det. Guevara told him who to point out. (P. 21) However, in 2014, Rey Lozada told investigators that Mr. Guevara did not tell them which person to select. Therefore, there are conflicting accounts on this issue.

Simply failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array or lineup and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[58]

---

[57] In his 2021 deposition, Rey Lozada testified that Det. Guevara told him "We got the motherfucker" or "We're going to get him". (P. 56)

[58] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased

Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[59] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2015 Illinois law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

In summary, based on the testimony of Mr. Lozada and Mr. Richmond, there is evidence of strong pre-identification bias in this case. If the suggestive procedures occurred the way in which both witnesses have recounted, it would have significantly increased the likelihood that the witnesses would have chosen Mr. Bouto from the lineup. This is especially true given the poor encoding conditions and other estimator variable factors described above. The extended period of time that Mr. Richmond took to make his selection of Mr. Bouto from the live lineup further supports the above conclusion.

**6. Non-blind Lineup Administration**

All of the identification procedures reportedly conducted in this case were done by Defendant detectives who developed Mr. Bouto as a shooting suspect and therefore were aware that Mr. Bouto was a suspect in the procedures. In fact, Mr. Richmond testified in a 2019 proceeding about why he selected Plaintiff from the lineup (P. 26):

> Q. And why did you point out Robert Bouto at that lineup?
> A. I was pointing – I was told to by Rey Guevara.

In this case, none of the identification procedures were audio or video recorded. If they had been recorded, it would have allowed observers or listeners to evaluate the interactions to determine whether any suggestion - explicit or subtle - had been given during the arrays or lineup.

Contemporary police guidelines (e.g., IACP, 2006) and the law in approximately half of the United States for conducting identification procedures,[60] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is

---

lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[59] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

[60] The 2015 eyewitness identification bill passed in Illinois requires double-blind or blinded administration of identification procedures.

the suspect can lead them to say things that focus the eyewitness on the suspect.[61] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[62] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[63] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether they administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The researchers also asked administrators if they had influenced the witness during the lineup procedure. The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the line of administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

---

[61] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[62] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[63] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

In summary, though double-blind administration was not the norm in the United States in 1993, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Bouto from the showup and lineup. In cases, such as this one, where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

**7. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

Mr. Bouto was presented to witnesses in this case for the purposes of identification at least 3 but perhaps as many as 4 times: showup, photos at police station, lineup, and trial. It should be noted that the police record in 1993 did not document the showup procedure nor the photo procedure that was described by Rey Lozada in his 2016 affidavit and again in his 2021 deposition.

Given the repeated identification procedures in this case, the concepts of unconscious transference and commitment are relevant to this case. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[64]

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[65] this is known as "commitment."[66] Thus, it is quite possible that Mr. Bouto was selected by Mr. Lozada and Mr. Richmond at the live lineup merely because they had previously viewed and selected him from the showup (and possibly photos). Rey Lozada has testified that he and other witnesses viewed photographs - including a photograph of Mr. Bouto – together at the police station after the showup and prior to the lineup (while Mr. Bouto was in custody). If this photo procedure did occur, it is not clear from the record why it was conducted. There is no scientific explanation related to witness reliability that can explain why photographs of Mr. Bouto would have been displayed to witnesses at that point in the

[64] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[65] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[66] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

investigation. In my professional experience, I have never before encountered a case where law enforcement conducted a showup and received a "positive identification" and then conducted a photo array followed by a live lineup. Furthermore, all of these identification procedures were conducted within 4 hours of each other.

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere theater and not actual independent tests of a witness's memory or ability to identify perpetrators.[67] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[68]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific finds and best practice recommendations:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

---

[67] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

[68] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 8, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg

In this case, witnesses were presented with repeated identification procedures with Mr. Bouto as the suspect within several hours of each other. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

**8. Witness Confidence**

In the materials I reviewed, there does not appear to be any contemporaneous recording of the witnesses' levels of confidence in their selection of Mr. Bouto (or his clothing) from the showup or live lineup.

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[69] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[70]

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors. For example, researchers have recently found that the confidence accuracy relationship is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.[71]

Expressions of confidence at trial, however, are relatively meaningless[72] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[73]

**9. Post-identification Feedback**

---

[69] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[70] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[71] The facts of this case suggest that several witnesses viewed the perpetrator from a distance greater than 66 feet. See Lockamyeir, Carlson, Jones, Carlson & Weatherford (2020). The effect of viewing distance on empirical discriminability and the confidence–accuracy relationship for eyewitness identification. *Applied Cognitive Psychology, 34,* 1047-1060.

[72] See footnote 69 (E.g., Leippe, 1980…)

[73] E.g., Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979.

According to a 2014 interview with investigators, Rey Lozada recalled a photo array procedure that he and other witnesses participated in together before viewing the live lineup. During this procedure, a few of the witnesses selected the wrong person and were told that they made the wrong decision (by police or other witnesses). The witnesses then selected someone else.

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[74] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.[75]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect /defendant or that they have been a really good witness.[76] In the first research on the post-identification feedback phenomenon, Gary Wells and Amy Bradfield[77] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[78]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[79] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make

---

[74] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[75] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[76] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[77] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[78] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[79] Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959.

them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[80] In this case, it is remarkable that given the many suggestive elements of the identification procedure that Mr. Melendez continued to assert at trial (and at his deposition) that he did not see the shooter's face and did not (independently) identify Mr. Sierra as the shooter. Mr. Rodriguez, however, selected Mr. Sierra three times from various suggestive procedures. These selections

**VII. Summary of Opinions regarding Detective Guevara Cases**

I have been retained as an expert witness and submitted an eyewitness identification expert report or testified in several other cases where Detective Guevara is/was a Defendant. These include:

*Jacques Rivera v. Reynaldo Guevara, et al.,* Case No. 1:12 CV 04428 (April 25, 2017 deposition)
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020 deposition)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020 deposition)
*Thomas Sierra v. Reynaldo Guevara, et al.*, Case No. 1:18-cv-03029 (September 16, 2022 report)

For the current report, I was asked to comment on any similarities between Mr. Bouto's case and the other Det. Guevara cases (above) with respect to estimator and system variables.

With respect to estimator variables, all of the cases had a series of uncontrollable factors that tend to reduce the strength of a witness' memory and consequently their ability to be an accurate witness.

It seems that a common theme in the Guevara cases I have reviewed to date is to manipulate witnesses who had poor opportunities to view the perpetrator, often telling witnesses that the perpetrator has been caught before conducting the lineup. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in both cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator.

With respect to system variables or the choices made by law enforcement during the collection of eyewitness evidence, there is a great deal of consistency between the five cases:

1) Viewing of photographs (which include the suspect) before a lineup
2) Filler bias and use of multiple suspects in the same array
3) Pre-identification instruction bias
4) Use of non-blind rather than a double-blind lineup;
5) Post-identification feedback and its effects on bolstering witness confidence, etc.
6) Repeated identification procedures, unconscious transference and commitment

In summary, a comparison of the five cases reveals many similarities in the facts of each case, now revealed in post-conviction litigation discovery.

[80] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

**VIII. Summary of Opinions in This Case**

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. Several of the witnesses were shot at and ducked for cover. They were afraid. Other witnesses heard shots and saw the shooter but did not see his face. The initial descriptions of the shooter were vague and did not include any description of the facial features. Mr. Lozada has testified about looking at suggestive photos with other witnesses prior to the lineup. In these photos, the suspect (Mr. Bouto) was the only person wearing clothing similar to the description provided by the witnesses. Further, witnesses were told by police that they had the shooter before the showup and lineup. Given these factors, it is not difficult to arrive at a reasonable explanation as to how several witnesses came to select Mr. Bouto or his clothing from the lineup.. The combination of a weak memory for the shooter coupled with suggestive identification procedures easily accounts for the selections of Mr. Bouto who has been granted a Certificate of Innocence in this matter.

**IX. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 7, 2022.

Jennifer Dysart

Jennifer Dysart, PhD

## Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of October 6, 2022)**

**California:**
*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)
*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw,* Case No. 12-cv-1892 EDL (December 21, 2020)
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)

**Illinois:**
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al., Case No. 2:18-cv-02545-KHV-KGG* (September 23, 2021)

**Louisiana:**
*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (September 14, 2021)

**Massachusetts**
*Angel Echavarria v. J. Michael Roach, et al.,* Case No. 1:16-cv-11118 (August 5, 2020)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)

**Ohio:**
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019)

## Appendix B

## Academic Curriculum Vitae of Jennifer E. Dysart

# JENNIFER E. DYSART

## Curriculum Vitae

---


University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY 10019

*Email:* jdysart@jjay.cuny.edu
*Phone:* 212.484.1160


## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology)<br>*Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

**Peer-Reviewed Journal Publications**

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

## Books

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

## Book Chapters

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.,

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San

Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at

the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, March). Assessing Credibility and Reliability: Perception, Memory and Eyewitnesses Identification. Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts

Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor/Conviction Review Presentations

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited Presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

**Invited Defense Attorney Presentations**

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking

a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited speaker at the Florida State Attorney's Office (Conviction Review). Meeting via Zoom.

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public

Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

## Supervision of Doctoral Students at John Jay College of Criminal Justice

2010 — John DeCarlo (Criminal Justice Doctoral Student)
Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011 — Victoria Lawson (Forensic Psychology Doctoral Student)
Topic: Eyewitness Identification

2006-2009 — Anna Rainey (Forensic Psychology Doctoral Student)
Topics: Showups; Cross-race identification

2006-2009 Brian Wallace (Forensic Psychology Doctoral Student)
Topics: Alibi believability; Mug shot searching.

**Supervision of Masters Theses at John Jay College of Criminal Justice**

2018 – 2020 Elena Christofi
Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019 Samantha Kosziollek
Topic: 911 Dispatchers

2016 – 2018 Marisa Jaross
Topic: Composite sketches

2016 – 2017 Brittany Kassis
Topic: 911 Dispatchers

2011 – 2012 Tamara Andrade
Topic: Composite creation in cross-race identifications

2010 – 2011 Jennifer Savion
Topic: Composite creation in cross-race identifications

2009 – 2010 Lindsey Butera
Topic: Eye-tracking and lineup accuracy with biased lineups
Yinglee Wong
Topic: Cross-race description accuracy of hair/hairstyles
Nancy Yang
Topic: Eye-tracking and weapon focus effect

2008 – 2009 Alexander Buijsrogge
Topic: Cross-race composite creation of famous faces
Kristin Chong
Topic: Stranger alibis and identification accuracy
Victoria Lawson
Topic: Cross-race showup and lineup accuracy
Jessica Owens
Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008 Sarah Kopelovich
Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005 Lisbeth Fugal
Topic: Post-identification feedback
Anna Rainey
Topic: Cross-race identification and "contact" with other groups

2004 Sandra Soucie
Topic: CSI Effect

## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005 Daniel Csuka
Topic: Multiple Independent Identification Accuracy

## Awards and Scholarships

2017 PSC CUNY research grant ($3,500)

2008 John Jay College Research Assistance Program Grant ($1,000)

2005 Connecticut State University Research Grant ($4,400)

2005 Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005)

2003-2005 Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002 American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002 American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003 Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually)

2000-2001 Ontario Graduate Scholarship ($15,000)

1999-2000 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900)

1998-1999 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300)

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**

- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**

- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**

- Introduction to Psychology (undergraduate course)

## University Committee Service

| | |
|---|---|
| 2016 – 2019 | Graduate Studies Council, John Jay College of Criminal Justice |
| 2013 – 2016 | College Council Member, John Jay College of Criminal Justice |
| 2013 – 2016 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2013 – 2014 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |

| | |
|---|---|
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2006 – present | Consultant, eyewitness identification expert |

| | |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

## Reviewing (past and current)

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

**Professional Affiliations**

American Psychology–Law Society
Society for Applied Research in Memory and Cognition