**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BOUTO, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 19 CV 2441 |
| | ) | |
| v. | ) | Hon. John Kness |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT L.R. 56.1 STATEMENT OF FACTS**

Plaintiff Robert Bouto hereby responds to Defendants' Joint Local Rule 56.1 Statement of facts, as follows:

## JURISDICTION AND VENUE

1. This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331 over Bouto's asserted 42 U.S.C. § 1983 federal claims and supplemental jurisdiction over Bouto's state law claims under 28 U.S.C. § 1367. (Dkt. 434, Officer Defs.' Ans. and Affirmative Defs. to Pl.'s Second Am. Compl. ("Answer") ¶¶ 10–11.)

**RESPONSE:** Admitted.

2. Venue is proper in this district court under 28 U.S.C. § 1391(b)(2). (*Id.* ¶ 12.)

**RESPONSE:** Admitted.

## PARTIES

3. In May 1993, Defendant Movants Richard Maher and Ernest Halvorsen (with JoAnn Halvorsen acting as Special Representative for Ernest Halvorsen who is deceased) were Area 5 violent crimes detectives. (Ex. 1, Maher Dep. at 23:7–24:6, 29:10–14.)

**RESPONSE:** Admitted.

4. In May 1993, Defendant Movants Alan Pergande, Kenneth Pang, and Louis Marron, were tactical officers; and Defendant Movant Edward Mingey was a Sergeant at the Area 5 violent crimes unit. (Ex. 2, Mingey Dep. at 36:17–37:1; Ex. 1, Maher Dep. at 59:15–17; Ex. 3, Pang Dep. at 44:24–45:2; Ex. 4, Pergande Dep. at 23:25–25:3.)

**RESPONSE:** Admitted.

5. All Defendants were employed by the Chicago Police Department and acting under color of law and within the scope of their employment for the City of Chicago during the Ruvalcaba homicide investigation. (Dkt. 434, Answer ¶¶ 15–17.)

**RESPONSE:** Admitted.

**THE RUVALCABA MURDER**

6. On May 14, 1993, at approximately 3:05 PM, fifteen-year-old Salvador Ruvalcaba was shot and killed at 3415 West Sunnyside Avenue near the mouth of the alley between Kimball Ave. and Bernard St. (Ex. 5, 5-14-1993 General Offense Case Report at RFC-Bouto 54-55; Ex. 6, Shier Aff.; Ex. 4, Pergande 7-31-1996 Trial Trans. at 180:24–182:16; Ex. 7, Rey Lozada 7-31-1996 Trial Trans. at 32:1-6.)

**RESPONSE:** Admitted.

7. Shortly before the shooting, near Roosevelt High School at the intersection of Kimball and Wilson, Ruvalcaba met with his friends Frank Escobar and brothers Rey and Jacobo Lozada, who were members of the Spanish Cobras street gang. (Ex. 7, Rey Lozada Dep. at 11:5–12:3, 12:7–14:16, 19:13–16, 34:9–20; Ex. 8, Richmond Dep. at 11:18-24.)

**RESPONSE:** Admitted.

8. Around the same time, at approximately 2:45 PM, Bouto went to Roosevelt High School to pick up his girlfriend. (Ex. 9, Bouto Dep. at 232:9–233:1; Ex. 10, 5-14-1993, Felony Review Folder at CCSAO-Serr/Mont_019291.)

**RESPONSE:** Admitted.

9. After Ruvalcaba met up with Rey, Jacobo, and Escobar, they proceeded to walk south on the Spanish Cobra side of Kimball, where they encountered their friend Carl Richmond—another member of the Spanish Cobras—and then headed west down Sunnyside away from Kimball. (Ex. 11, Lozada 7-31-1996 Trial Trans. at 25:16–26:21, 27:7–28:6; Ex. 11, Richmond 7-31-1996 Trial Trans. at 93:2–20, 95:5–8; Ex. 7, Lozada Dep. at 30:14–23, 223:16–23; Ex. 8, Richmond Dep. at 12:3-5; Ex. 9, Bouto Dep. at 165:14-24, 45:14-46:6.)

**RESPONSE:** Admitted, except for clarify that the "Spanish Cobra side of Kimball," which was the west side of Kimball, was also the territory of several other street gangs. PSOF 1.

10. Rey, Escobar, and Jacobo then observed a member of the P.R. Stones with a gun firing in their direction. (Ex. 7, Rey Lozada Dep. at 26:20–29:15, 139:23–140:10; Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 76–77; Ex. 10, 5-14-1993 Felony Review Folder at CCSAO-Serr/Mont_019291.)

**RESPONSE:** Admitted that an unknown person fired a gun in the direction of Rey, Escobar, and Jacobo. The rest is disputed: none of Defendants' citations, including their citations to Rey Lozada's deposition testimony or a page from the felony review folder, support that Rey, Escobar, and Jacobo observed a member of the *P.R. Stones*, specifically, shooting at them. Regardless, that fact is disputed. PSOF 20, 1, 2. The shooter was wearing a hood, the eyewitnesses could not see the shooter's face, and the eyewitnesses were too far from the shooter to discern who he was and what gang he was from. PSOF 14, 16-19. Rey Lozada testified that he had been in

several confrontations with the Familia Stones immediately prior to the shooting (PSOF 2-3), and that he could not tell whether Ruvalcaba's shooter was a member of the Familia Stones, the P.R. Stones, or some other opposing gang or group (Dkt. 446-6, Lozada Dep. at 14:11-15:8, 22:13-24:1, 106:18-107:18), of which there were many in the area (PSOF 1), including many that were rivals with the Spanish Cobras (PSOF 1, 2). Defendants' citation to Defendants' Exh. 12 (Dkt. 446-11 at RFC-Bouto 76–77) does not support that Rey, Escobar, and Jacobo observed a member of the P.R. Stones, specifically, shooting at them; the summaries for each do not mention the P.R. Stones. As for the summary in that report attributed to Carl Richmond, Richmond clarified repeatedly that he did not see the shooter's face, he did not know whether or not the shooter was a P.R. Stone, and he previously so testified only because Guevara told him to make his inculpation of Bouto "convincing." Dkt. 446-7, Richmond Dep., at 160:11-163:11, 82:3-82:23, 87:5-87:13, 105:12-105:20; PSOF 20, 44-54.

11. Richmond heard shots and saw Ruvalcaba, who was "15 to 20 feet in front of me," get shot in the back, right near the alley. (Ex. 8, Richmond Dep. at 20:20–21:18.)

**RESPONSE:** Admitted that Richmond heard shots and saw Ruvalcaba, who was in front of Richmond, get shot in the back, right near the alley. Disputed that Ruvalcaba was 15-20 feet from Richmond when this occurred; Richmond was only about 10-15 feet east of Ruvalcaba. Dkt. 446-7, Richmond Dep., at 20:22-21:3 ("about 10 feet or so behind"); Exh. 12, 6/1/93 Grand Jury Trans., at 5:9-10 (ten to fifteen feet); Dkt. 446-10, July 31, 1996 Trial Trans. at 118:19-118:23 ("He was maybe ten to fifteen feet in front of me…").

## POLICE INVESTIGATION OF RUVALCABA'S MURDER

### A. Officers respond to the scene and initiate an investigation.

12. At 3:25 PM, CPD Patrol Officers Sheri Shier and Coletta Baumann responded to the scene of the shooting, where they observed Ruvalcaba's body and spoke "to witness #1 [Melissa]

Melendez" at the scene—the only witness they reported interviewing—who informed them that she saw the "offender run [westbound] on Sunnyside toward victim fired several shots at victim striking him in the back," before the offender "fled [eastbound] on Sunnyside." (Ex. 5, 5-14-1993 General Offense Case Report at RFC-Bouto 54-55; Ex. 6, Shier Aff.).

**RESPONSE:** Admitted, except to clarify that Melendez also provided a description of the shooter. PSOF 11.

13. Melendez reportedly described the offender as a male white Hispanic, who was approximately 16 years old, 5 feet and 5 inches tall, weighed about 120 pounds, had black hair with ponytail, shaved, and was wearing a black shirt and black three-quarter length baggy pants with white high-top shoes. (Ex. 5 , 5-14-1993 General Offense Case Report at RFC-Bouto 54–55; Ex. 6, Shier Aff.)

**RESPONSE:** Admitted, except as to characterization of the shirt and hair. With respect to the offender's shirt, Melendez reported a "bl[ac]k t-shirt," specifically. With respect to the offender's hair, Melendez reported: "BL[AC]K, SHAVED W/PONYTAIL." PSOF 11; Pl.'s Exh. 10, General Offense Case Report, at 1.

14. 17th District tactical unit officers Defendants Pergande, Pang, and King arrived at the scene at approximately 3:25 PM, where Defendant Pergande spoke with witnesses Richmond, Rey, Jacobo, and Escobar and obtained the following information about the offender: (1) he was a member of the P.R. Stones; (2) he was approximately 16 or 17 years old; (3) he was approximately five foot and seven inches, 140 pounds; (4) he was wearing a "blue hoody with long black shorts,"; (5) he had shaved hair on the sides with a small ponytail; and (6) that the shooter fled to the northeast. (Ex. 11, Pergande 7-31-1996 Trial Trans. at 180:24–181:11; Ex. 13, Pergande 5-3-1995 Mot. to Quash Arrest Trans. at 5:19–6:13, 8:11–10:13; Ex. 4, Pergande Dep. at 157:23–158:1; Ex. 7, Lozada Dep. at 43:14-45:5; Ex. 8, Richmond Dep. at 26:12-27:5, 120:16-121:18.)

**RESPONSE:** Admitted that 17th District tactical unit officers Defendants Pergande, Pang, and King arrived at the scene at approximately 3:25 PM, where Defendant Pergande spoke with witnesses Richmond, Rey, Jacobo, and Escobar. Dispute that Pergande obtained the information claimed. The only information that Pergande recorded from those interviews was in a report created a year and a half after the interviews, which he claimed to have done without any notes. PSOF 39; Dkt. 446-17, Sept. 1994 Show-Up Report; Dkt. 446-4, Pergande Dep., at 123:25-124:3, 126:9-126:16, 195:9-195:17. Pergande's report claimed that he received a description only from Frank Escobar, who had died nearly a year prior to creation of the report. Dkt. 446-17, Sept. 27, 1994 Show-Up Supp. Report, at PageID#13261; DSOF 84. The description from Escobar was that "a M/4/16-17, [5'7"], 140lbs wearing a blue hoodie, black long shorts, shaved hair on sides w/ pony tail had shot the victim." Dkt. 446-17, Sept. 27, 1994 Show-Up Supp. Report, at PageID#13261. There is no documentation in the investigative file that the other three witnesses provided any such information to Pergande.

Moreover, there is no documentation that Escobar had said a *short* ponytail. As Pergande has admitted, he previously gave sworn testimony stating that none of the Spanish Cobra Witnesses had said anything about the shooter's ponytail's length, nor does his own report indicate anything about the ponytail's length. Dkt. 446-4, Pergande Dep., at 229:15-234:5; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report. That was a lie by Pergande created after-the-fact to try to explain away the photographic evidence that Mr. Bouto had no ponytail at the time of his arrest and thus did not match descriptions of the shooter in response to Pergande's lies that he saw a ponytail on Bouto on May 14, 1993 when he arrested Bouto. PSOF 23, 11, 15; Dkt. 446-12, Mtn. to Quash Hrg. Tr., at 6:17-6:22.

Additionally, it is disputed that any of the Spanish Cobra Witnesses identified the shooter as a P.R. Stone, specifically. PSOF 20, 1, 2. The shooter was wearing a hood, the eyewitnesses could

not see the shooter's face, and the eyewitnesses were too far from the shooter to discern who he was and what gang he was from. PSOF 14, 16-19. Rey Lozada testified that he had been in several confrontations with the Familia Stones immediately prior to the shooting (PSOF 2-3), and that he could not tell whether Ruvalcaba's shooter was a member of the Familia Stones, the P.R. Stones, or some other opposing gang or group (Dkt. 446-6, Lozada Dep. at 14:11-15:8, 22:13-24:1, 106:18-107:18), of which there were many in the area (PSOF 1), including many that were rivals with the Spanish Cobras (PSOF 1, 2). Richmond clarified repeatedly that he did not see the shooter's face, he did not know whether or not the shooter was a P.R. Stone, and he previously so testified only because Guevara told him to make his inculpation of Bouto "convincing." Dkt. 446-7, Richmond Dep., at 160:11-163:11, 82:3-82:23, 87:5-87:13, 105:12-105:20; PSOF 20, 44-54.

15. An officer at the scene also relayed to Pergande that a different witness advised that the offender was wearing a black T-shirt, black three-quarter length baggie pants, with white shoes, and black hair that was shaved on the sides with a ponytail on top. (Ex. 13, Pergande 5-3-1995 Mot. to Quash Arrest Trans. at 10:14–11:16.)

**RESPONSE:** Admitted in part and denied in part. This description Pergande testified to tracks the description given by witness Melissa Melendez, who provided most of that information but said white *high tops*, and described the shooter's hair as: "BLK, SHAVED W/PONYTAIL" (PSOF 11), without anything about the ponytail being "on top" and so there is a dispute of fact regarding whether Pergande received the modified description presented here, as he claims, or received the actual description documented in the General Offense Case Report (PSOF 11). Otherwise admitted.

**B. Bouto is detained and returned to the scene for a show-up.**

16. Police were aware that Kimball Avenue acted as a dividing line between the Spanish Cobras' territory on the westside and the P.R. Stones' territory on the eastside. (Ex. 7, Lozada Dep.

at 106:11–107:18; Ex. 9, Bouto Dep. at 45:14–46:6; Ex. 13, Pergande 5-3-1995 Mot. to Quash Arrest Trans. at 11:14–18; Ex. 12, 5-16-1993 Supp Report at RFC-Bouto 73, 76–77.)

**RESPONSE:** Admitted, but clarify that police were also aware that Kimball Avenue was a dividing line between other gangs as well, and the territory on the west side was not exclusively Spanish Cobra testimony, and the territory on the east side was not exclusively P.R. Stones territory. PSOF 1-4, 20.

17. Pergande and Pang drove three to four blocks northeast—and east of Kimball Avenue—to the area of Eastwood Avenue and Kedzie Avenue because Pergande knew it to be frequented by members of the P.R. Stones street gang. (Ex. 11, Pergande 7-31-1996 Trial Trans. at 182:15–183:2, 185:18–21.)

**RESPONSE:** Admitted that Pergande and Pang drove three to four blocks northwest—and east of Kimball Avenue—to the area of Eastwood Avenue and Kedzie Avenue. Disputed that they did so specifically because Pergande knew that area to be frequented by members of the P.R. Stones street gang, for which he offers only his own testimony that the jury is entitled to disbelieve. Plaintiff's evidence is that there were many gangs operating in that area, including to the east of Kimball. PSOF 1-4, and that Pergande and Pang were simply driving in the general vicinity of the shooter, looking for suspects matching the various physical and clothing descriptions provided by the eyewitnesses (PSOF 8, 22), when they came across Mr. Bouto, who Pergande knew to be a witness in a misconduct case against members of the 17th district tactical team of which he was a part (PSOF 29-33, 92), and Pergande then falsely claimed that Bouto matched the various descriptions provided by the eyewitness, which he did not (PSOF 21-27). There is no contemporaneous documentation in the investigative file made prior to the arrest of Bouto, such as in the General Offense Case Report (Pl.'s Exh. 10), or the single General Progress Report in the case (Dkt. 446-19), that would corroborate Pergande's claim that he had received information that

the shooter was a P.R. Stone prior to encountering Bouto at the location of Eastwood Avenue and Kedzie. In fact, Richmond and Rey Lozada deny any knowledge that the shooter was a P.R. Stone (PSOF 20); the descriptions provided by Michael Fleming and Melissa Melendez do not so state (PSOF 11-12); and the first mention of any eyewitness claiming that the shooter was a P.R. Stone in the investigative file appears to be Guevara's Cleared/Closed Report, which was created after the arrest of Bouto, a known P.R. Stone, had been selected as the police suspect (Dkt. 446-11, at PageID#13026-13027). That reference claims only that Richmond so stated (*id.* at PageID#13030), but Richmond has since revealed that Guevara coerced his statements inculpating Bouto (PSOF 44-54); Richmond does not actually know whether the shooter was a P.R. Stone (PSOF 20); there were many gangs operating in that area to the east of Kimball Avenue, including those in conflict with the Spanish Cobras (PSOF 1-2).

18. Upon arrival at approximately 3:45 PM, Pergande observed Bouto, who he believed "pretty much fit the description" of the shooter because he was "wearing a blue hood sweatshirt, the black baggy three-quarter length shorts," and had "shaved hair on the sides." (Ex. 11, Pergande 7-31-1996 Trial Trans. at 183:6–20.)

**RESPONSE:** Disputed in part. Admitted that at approximately 3:45 PM, Pergande observed Bouto. Disputed that Pergande genuinely believed Bouto "pretty much fit the description of the shooter." Pergande knew that Bouto did not match the description of the shooter (PSOF 22-27), but wanted to falsely frame Bouto for the Ruvalcaba homicide because he had arrested Bouto in the past and had recently found out that Bouto was a witness to a civilian misconduct allegation against 17th district tactical team members. PSOF 29-33.

Moreover, Defendants omit material information from Pergande's statements about how Bouto supposedly matched the description: the ponytail. In language that Defendants omit, Pergande claimed in his July 31, 1996 trial testimony that Bouto "pretty much fit the description" of

the shooter because: "He was wearing a blue hooded sweatshirt, the black baggy three-quarter length shorts. He had the shaved hair on the sides **and a tail in his hair**." Dkt. 446-10, July 31, 1996 Trial Trans., at 182:10-183:2 (emphasis added). Pergande lied under oath, claiming he observed a ponytail on Bouto on May 14, 1993, when Bouto had no ponytail. PSOF 23, 11, 15; Dkt. 446-12, Mtn. to Quash Hrg. Tr., at 6:17-6:22.

Pergande similarly claimed during his motion to quash hearing testimony that the supposed ponytail was part of the reason Bouto "match[ed] the description," and that Mr. Bouto had had a ponytail. Dkt. 446-12, Mtn. to Quash Tr., at 9:2-10:6, 10:14-11:9, 12:4-13:2.

19. Pergande was familiar with Bouto, and knew that Bouto was a member of the P.R. Stones. (Ex. 4, Pergande's 5-3-1995 Mot. to Quash Trans. at 13:3–11; Ex. 9, Bouto Dep. at 40:22–41:4; Ex. 14, Pl.'s 1st Supp. Resp. to Def. Maher's 1st Set of Interogs., No. 4, at 3–4.)

**RESPONSE:** Admitted, and clarify that Pergande also knew Bouto not just as a P.R. Stone but also as the witness in a misconduct complaint against 17th district tactical team C. PSOF 29-32.

20. On May 14, 1993, Bouto was 5'9", about 130 pounds, 17-years-old, and wearing a Karl Kani blue hooded sweatshirt, dark three-quarter length shorts, with the sides of his head shaved. (Ex. 9, Bouto Dep. at 154:16–156:5; Ex. 15, 5-14-1993 Arrest Report at RFC-Bouto 41; Ex. 4, Pergande Dep. at 112:5–114:10.)

**RESPONSE:** Admitted that, on May 14, 1993, Bouto was approximately 5'9" or 5'10" in height (PSOF 24); about 130 pounds, 17-years-old [sic], and wearing a Karl Kani blue hooded sweatshirt, and dark three-quarter length shorts. Dispute that Bouto had only "the *sides* of his head shaved"; rather, his hair was close-shaven all around, and he had no ponytail of any kind (PSOF 23). Further clarify, to the extent Defendants imply otherwise, that no eyewitness provided any documented description to the police of the shooter (or any accomplice or suspect or

participant in the events of that day) as having worn a Karl Kani shirt, let alone prior to the eyewitness having viewed Bouto in the line-up wearing a Karl Kani sweatshirt. Exh. 7, Investigative File; e.g., Exh. 10, General Offense Case Report; Dkt. 446-11, Cleared/Closed Report; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report; Dkt. 446-12, May 3, 1995 Mtn. to Quash Hrg. Tr. at 5:19-6:13. Moreover, Karl Kani shirts were very popular at the time. Dkt. 446-22, Michael Fleming dep., at 130:18-131:5.

21. Bouto is of Assyrian descent from Iraq but was at times confused as being Hispanic as a teenager. (Ex. 9, Bouto Dep. at 42:24–43:5.)

**RESPONSE:** Admit that Bouto is of Assyrian descent from Iraq and was at times confused as being Hispanic as a teenager, but clarify that here, the arresting officers and Spanish Cobra Witnesses knew Bouto, and were familiar with his Middle Eastern heritage. PSOF 27.

22. Pergande called Bouto over to his car, handcuffed him, and placed him and at least two other members of the P.R. Stones in his car. (Ex. 9, Bouto Dep. at 146:17–148:23, 151:11–152:5, 153:7–24, 268:2–6.)

**RESPONSE:** Admitted in part and denied in part. Admitted that Pergande called Bouto over to his car and handcuffed him. Admitted that Pergande had two other teenagers in his car. Disputed to the extent that Defendants imply that the two P.R. Stones were with Bouto at the time; as Defendants' citation explains, the two P.R. Stones had been picked up first. Dkt. 446-8, Bouto Dep., at 153:11-153:13. Further clarify that Mr. Bouto was the primary suspect, and the other teenagers were supposedly "other subjects that were behind the offender at the time of the shooting." Dkt. 446-11, Cleared/Closed Report, at PageID#13031-13032.

23. Pergande drove Bouto and the other P.R. Stones to the scene to perform "a show up to the witnesses that were at the scene." (Ex. 11, Pergande 7-31-1996 Trial Trans. at 184:13–185:17; Ex. 13, Pergande 5-3-1995 Mot. to Quash Trans. at 11:23–14:12.)

**RESPONSE:** Admitted, except to clarify that Pergande did not drive Bouto alone. On the afternoon of May 14, 1993, Defendant Pergande was riding with Defendant Pang and Officer King as Beat 1763B; Dkt. 446-4, Pergande Dep., at 127:2-128:7, 130:1 to 131:24; Dkt. 446-17, Sept. 1994 Show-Up Supp. Report, at PageID #13261 (The beat number that included Pergande on May 14 was 1763B); Dkt. 446-11, Cleared/Closed Report, at PageID#13031-13032 (Beat 1763b transported Mr. Bouto and the supposed "other subjects that were behind the offender at the time of the shooting"); Dkt. 446-10, July 31, 1996 Pergande Trial Test. at 180:2-183; Dkt. 446-3, Pang Dep., at 22:8-22:24; Dkt. 446, at DSOF 17 (Pang was riding with Pergande during this search); Dkt. 446-14, Arrest Report, at PageID#13071 (Pergande and Pang arrested Bouto following this search); Exh. 10, General Offense Case Report, at 1, showing the presence of Beat 1763B at the scene).

24. During the show-up, Plaintiff contends that Richmond identified him as the shooter but that the identification was the product of "suggestive and improper procedure."[1] (Dkt. 434, Answer, ¶¶ 66, 76; Ex. 16, 7-26-2006 Pet. for Exec. Clemency at Bouto_012632, Bouto_012634; Ex. 9, Bouto Dep. at 182:19–183:9; Ex. XX, 1-30-2017 Pet. for Post-Conviction Relief ¶ 22; Ex. 17, Press Dep. at 94:13–23.)

**RESPONSE:** Disputed. As demonstrated in Defendants' citation to Plaintiff's deposition, Plaintiff has repeatedly maintained that he could not hear what was happening outside the car. *See* Dkt. 446-8, Bouto Dep., at 182:19–183:9. Based on the circumstances, Plaintiff assumed that he was identified, but he has no personal knowledge of whether Richmond identified him at the showup because he could not hear what transpired outside his presence. *Id.*; *id.* at 177:22-178:11; 183:10-24; 185:5-7. Defendants' citation to their Answer simply reaffirms Plaintiff's allegations: that

[1] Richmond and Plaintiff have both provided conflicting testimony about what occurred during the show-up. Ultimately, Defendants rely on Plaintiff's judicial admissions and asserted theory in the case that Richmond's identification influenced Rey Lozado's identification in advancing this as an undisputed fact. *See, Moran v. Calumet City,* 54 F.4th 483, 494 (7th Cir. 2022) ("An allegation in a complaint is a judicial admission that can be used against the plaintiff.")

Defendants "Pergande, Pang, and Guevara fabricated identifications by Lozada and Richmond (then just 15 and 19 years old, respectively) of 17-year old Mr. Bouto as the gunman," Dkt. 434 ¶ 66, and that Defendants manipulated Richmond and Lozada into falsely identifying Mr. Bouto as the shooter. Dkt. 434 ¶ 76.

25. Richmond was not pressured by any officer to identify anyone at the scene. (Ex. 8, Richmond Dep. at 123:22–124:7.)

**RESPONSE:** Admitted, but irrelevant because Richmond did not identify anyone at the scene. Dkt. 446-7 at 123:18-21.

26. Jacobo identified Bouto as wearing the same clothing as the shooter. (Ex. 13, Pergande's 5-3-1995 Mot. to Quash Trans. at 14:13–18; Ex. 18, 9-27-1994 Supp. Report at RFC-Bouto 000137.)

**RESPONSE:** Disputed. As Defendants knew, Jacobo was too far from the shooter, who was wearing a hood, to make a reliable identification, PSOF 4, 14, 15, 16-17, 35, 37, and Jacobo Lozada did not make any identification at the scene. Dkt. 446-9, Felony Review Jacket, at PageID #:12749 (explaining that "[ARRESTING OFFICERS] RETURNED [DEFENDANT BOUTO] TO THE SCENE" for identifications and omitting any mention of a scene identification by Jacobo (Witness #3, Dkt. 446-9 at PageID#12755). Pergande and King's report created a year and a half after the show-up claimed that, at the show-up, Jacobo "ID'd the offender's clothing," Dkt. 446-17 at PageID #:13261, but the only recording by the police of what clothing Jacobo himself saw on the shooter that would have allowed such an identification was that the shooter wore a "dark blue pullover sweat shirt," which was entirely generic and common attire at the time, as were ¾ length baggy shorts. Dkt. 446-11 at PageID#13031; Dkt. 446-4, Pergande Dep., at 188:24-188:25; Dkt. 446-7, Richmond Dep., at 112:22-112:24. Moreover, the show-up was conducted with Bouto and several other teenage boys sitting in the back of a police car, and so Jacobo did not have the ability

to fully view the shooter's clothing in order to make an actual legitimate identification by clothing. PSOF 34.

27. After Jacobo identified Bouto, Rey also identified Bouto as the shooter. (Ex. 7, Lozada Dep. at 157:16–22.)

**RESPONSE:** Disputed. Disputed that Jacobo identified Bouto, for the reasons stated above in response to DSOF 26. As for Rey Lozada, dispute that Rey identified Bouto, for the reasons stated below in response to DSOF 28.

28. Rey Lozada now contends that he only identified Bouto because Richmond and Jacobo did, but that he was not pressured by any officer to identify Bouto as the shooter at the scene. (Ex. 7, Lozada Dep. at 94:4–94:14, 157:23–158:7; 221:17–222:10.)

**RESPONSE:** Admit that Lozada contends that he only identified Bouto because Richmond and Jacobo did, but deny that Lozada was motivated by Richmond and Jacobo to identify Bouto, rather than any police officer. Richmond denies that he identified Bouto at the show up, so his identification cannot be the basis for Lozada's identification. Dkt. 446-7, Richmond Dep., at 27:9-28:1, 90:1-90:9, 122:7-122:19, 122:18-122:21. Furthermore, the inference from Defendants' police report is that Jacobo did not make any identification at the show up either. See Dkt. 446-9 at PageID #:12749 (explaining that "[ARRESTING OFFICERS] RETURNED [DEFENDANT BOUTO] TO THE SCENE" for identifications and omitting any mention of a scene identification by Jacobo (Witness #3, Dkt. 446-9 at PageID#12755). The sum total of these facts is that the stated basis for Lozado's identification is untrue; a dispute remains for the jury to decide whether, in light of the fact that Defendants were motivated to frame Plaintiff (see PSOF 29-33), and Defendants did indeed frame Plaintiff by manipulating witnesses to identify him (see PSOF 46-51, 56-59, 63-65), whether Lozado's identification was also manipulated by Defendants.

29. Rey Lozada did not tell officers that he identified Bouto at the scene because Richmond and Jacobo identified him. **(Ex. 7, Lozada Dep. at 94:4–94:14, 157:23–158:7; 221:17–222:10.)**

**RESPONSE:** Admit, but clarify that it is disputed whether Lozada identified at the scene for the reasons stated in response to DSOF 28.

30. Frank Escobar identified Bouto as the shooter. (Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 19291, 19289; Ex. 19, Hughes Dep. at 154:15–157:4, 157:25–158:9.)

**RESPONSE:** Disputed. There is no police report, let alone any contemporaneous police report, corroborating that, at the crime scene, Frank Escobar identified Bouto as the shooter. Dkt. 446-17, Sept. 27, 1994, Supp. Report, at PageID #:13261; Dkt. 446-4, Pergande Dep., at 213:10-214:5, 214:21-215:7; Exh. 7, Investigative file. The only police report regarding the show-up identifications at the crime scene, signed by both Defendant Pergande and Officer King, states otherwise: "[Reporting Officers] interviewed witnesses Escobar, Frank, Lasada, Jacob & Ray….**Wit Lasada, Jacob** ID'd the offender's clothing and **Ray** ID'd the offender's face." Dkt. 446-17, Sept. 27, 1994, Supp. Report, at PageID #:13261 (emphasis added). Pergande admitted at his deposition that he did not record what Escobar said, nor does he remember whether or not Escobar made an identification at the scene. Dkt. 446-4, 162:24-163:23; 216:9-217:21.

Defendants cite to information in Defendant Prosecutor Hughes's felony review jacket, but, as set forth in Plaintiff's response brief, that information constitutes inadmissible double-hearsay. The felony review jacket is not a statement of what Escobar saw or did on scene, but instead, is a highly generic summary of what multiple witnesses collectively did, namely, "gave a description" and "I.D.['d]" Defendant. Dkt. 446-9 at PageID #:12749. The "identification" itself is not described, nor is the physical description, and there is no record of what Escobar actually said by way of any identification. Even if it were a statement that could be attributed to Escobar, which it is not, it is

inadmissible double hearsay. The file note contains, at best, a non-verbatim summary of what Escobar supposedly told the A/Os (arresting officers) during the on-scene show-up, who then told ASA Hughes, who then summarized it for his note.

The felony review jacket account is also unreliable and includes known fabrications. For example, Prosecutor Hughes records at CCSAO-Serr-Mont 19291 (Dkt. 446-9 at PageID #:12749) that he was told that Guevara and Halvorsen conducted a line-up because "r/d's did not know about show-up, so they [Guevara and Halvorsen] conducted a line-up at station," but that is hotly disputed: Guevara and Halvorsen had arrived at the crime scene even before Bouto was picked up by Pergande at 3:45 (PSOF 8), themselves participated in a search for suspects (*id.*), and returned to the scene upon receiving notice that a suspect—Bouto—had been taken into custody (*id.*); Pergande, Guevara, and Halvorsen conducted the show-up together (PSOF 34), and there is even a photograph of Guevara and Halvorsen at the scene of the crime while the body is still there, uncovered. Exh. 11; PSOF 8.

Defendants do not point to any admissible evidence they could present on a scene identification from Escobar from any witness who is alive, has a memory of the incident, and is not on the Fifth.

As for the line-up identification, Guevara and Halvorsen's report claims in hearsay that Frank Escobar identified Bouto as the shooter, but there is no admissible evidence to that effect that Defendants can admit. There is no statement or testimony from Frank Escobar, nor is there any non-hearsay evidence to that effect from a different witness. In fact, Guevara, who was the detective with Frank Escobar at the time of the lineup, pleads the Fifth Amendment when asked about whether he knew Frank Escobar had not seen the shooter or whether Guevara fabricated Escobar's identification. Exh. 5 at 19:2-7; 19:13-17. Escobar's viewing of the live line-up was tainted from the start by Guevara's efforts to fabricate a false identification by Bouto. PSOF 46-51; 56-59. Given that

Escobar's identification of an innocent person – the same innocent person who Richmond and Lozado had also identified – followed this private session with Guevara, the fair inference at summary judgment is that Guevara gave the same orders to Escobar that he gave to Richmond. Guevara invoked his Fifth Amendment privilege when asked if he fabricated Escobar's identification, thus creating an adverse inference on this point. PSOF 97.

31. Pergande and Pang then transported Bouto to the 17th CPD District at 4:30 PM. (Ex. 9, Bouto Dep. at 201:3–18; Ex. 15, 5-14-1993 Arrest Report at RFC-Bouto 41.)

**RESPONSE:** Admitted.

### C. Post-show-up investigation.

32. At approximately 4:20 PM, Defendant Halvorsen arrived on scene and reported that he and Guevara spoke with witnesses. (Ex. 5, 5-14-1993 General Offense Case Report at RFC-Bouto 54-55; Ex. 20, 5-14-1993 General Progress Report; Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 72–78; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2; Ex. 22, Halvorsen 2-6-19 Dep. in *Serrano/Montanez* at 126:18–127:19.)

**RESPONSE:** Disputed. Guevara and Halvorsen had both arrived at the scene of the Ruvalcaba homicide far earlier, as is evident from Halvorsen's own testimony of arriving together with Guevara far earlier, as a photograph of Guevara and Halvorsen standing over the body, uncovered, at the crime scene. PSOF 8; Dkt. 446-21, Feb. 6, 2019 Halvorsen Dep. in Montanez, at 123:13-123:32, 124:14-125:24, 126:18-127:13; Dkt. 446-10, Pergande July 31, 1993 Trial Testimony, at 183:15-185:6 (suspect placed in custody at 3:45pm); Exh. 10, General Offense Case Report, at 2 (documenting that "DET GUEVARA #20861 ARRIVED ON SCENE 1550 HRS."); Dkt. 446-8, Bouto Dep., at 160:15-164:9; Exh. 11, Photo of Guevara and Halvorsen at Crime Scene; Dkt. 446-4, Pergande Dep., at 179:23-181:21.

33. Michael and Margaret Fleming resided at 3338 West Sunnyside, near where the offender was located when he fired the shots. (Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 77; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2; Ex. 23, Michael Fleming Dep. at 66:8–67:7, 189:14–23, Ex. 11, Margaret Fleming 7-31-1996 Trial Trans. at 148:1–13.)

**RESPONSE:** Admitted that Michael and Margaret Fleming resided at 3338 West Sunnyside, but dispute that that location was "near where the offender was located when he fired the shots." The casings from the shooting were found on the grassy parkway at 3353 West Sunnyside. PSOF 16. The distance between the location from which Michael Fleming stated that he observed the shooting (the rear porch window of the residence at 3338 West Sunnyside, (Dkt. 446-22, Fleming Dep., at 67:17-68:7, 77:10-77:14, 79:17-79:24), and the location where the offender was located when he fired the shots (3353 West Sunnyside) was substantial:




Exh. 1, Maps Exhibit, at Bouto 041847, Bouto 041849, Bouto 041855, 041865. As for Margaret Fleming, she was not "near" to the shooting; she was inside her apartment, which was on the second floor of 3338 West Sunnyside, when she heard the shots fired, and she claimed to have somehow run downstairs, which required going down several different staircases, and out the door fast enough

to see the shooter still outside, but no detective documented any questioning of her on the plausibility of her account. PSOF 69.

34. Michael Fleming told police that he saw the offender wearing a hooded pullover shirt, fire four to five shots, cross Sunnyside toward his residence, hand a gun to a girl in an alley, and flee north. (Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 77; Ex. 21, Guevara 8-1-1996, Trial Trans. at 38:24–39:2; Ex. 23, Michael Fleming Dep. at 68:15–69:1, 76:16–23, 116:6–117:22, 184:2–188:7.)

**RESPONSE:** Admitted in part and disputed in part. Admitted that Michael Fleming told police he saw the offender hand a gun to a girl in an alley, and further clarify that he provided a detailed description of this girl to police that was contemporaneously documented. PSOF 12; Exh. 28, Halvorsen GPR, Bouto 015528; Dkt. 446-22, Fleming Dep. at 186:13-187:4.

Admitted that Michael Fleming told police he saw the offender cross Sunnyside toward his residence and flee north, but clarify that his account of the path of the shooter is unreliable and disproved by the physical evidence. The alleyway location from which he claimed the offender was firing (Dkt. 446-22, Fleming Dep., at 109:21-110:11, 67:1-67:3; Exh. 1, Maps, at Bouto 041868, Bouto 041847), before the offender supposedly fled north through that same alley by Fleming's residence at 3338 W. Sunnyside (Dkt. 446-22, Fleming Dep., at 112:8-112:14; Exh. 1, Maps, at Bouto 41858), did not match the forensic evidence because the casings were found far west of there, on the grassy parkway at 3353 West Sunnyside (PSOF 16; Exh. 19, Evidence Property Receipt, RFC-Bouto 51; Dkt. 446-11, Cleared/Closed Report, at PageID #13028; Exh. 1, Maps, at 41847.

Disputed that Michael Fleming's description of the offender was that he was wearing a "hooded pullover shirt"; instead, contemporaneous notes reflect that Michael Fleming told Defendant Halvorsen that he saw the offender wearing a "black hoodie" that was "all black," and also that the offender was "clean shaven." PSOF 12. Guevara and Halvorsen fabricated in their

supplementary cleared/closed report that Michael Fleming had described the offender as wearing a "hooded pullover shirt" to deemphasize the discrepancies between the actual description provided by Michael Fleming and Bouto's appearance because Bouto was neither "clean shaven" nor wearing a "black hoodie" that was "all black." PSOF 25; Dkt. 446-25; Dkt. 446-24; Dkt. 446-22.

Disputed as to whether Michael Fleming told police he saw the offender fire four or five shots. At his deposition, Michael Fleming claimed that he was at two different locations at the time he saw the shooting, Dkt. 446-22, Fleming Dep., at 110:19-111:19 & 46:22-50:9 (stating that he was upstairs on the second floor, looking outside a window on his enclosed back porch when the shooting began); *with* Dkt. 446-22, Fleming Dep., at 79:17-80 (stating that he was outside when he saw the shooting began and immediately ran back inside). The cleared/closed report authored by Guevara and Halvorsen upon which Defendants rely is wholly unreliable and could be disbelieved by the jury. It was inaccurate as to Michael Fleming's description of the shooter, as explained in the previous paragraph, and it was also inaccurate in its description of the shooter's path, as Michael Fleming has testified. *E.g.*, Dkt. 446-22, Fleming Dep., at 184:12-185: 9 (Michael Fleming did not tell police, as claimed by Guevara and Halvorsen in their cleared/closed report, that "[t]he offender was standing on street in front of the apartment building entrance at 3353 W. Sunnyside").

35. Margaret told police that she observed the offender standing across from their building fire four to five shots and observed that he was wearing a hooded pullover shirt. (Ex. 12, 5-16-1993, Supp. Report at RFC-Bouto 77; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2; Ex. 11, Margaret Fleming 7-31-1996 Trial Trans. at 150:13–151:17, 163:10–15.)

**RESPONSE:** Disputed. First, disputed to the extent Defendants rely on hearsay within their police report to establish any facts for summary judgment purposes. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial), or on Defendant Guevara's testimony at trial, given

that there is no indication that his trial testimony would be repeated or admissible at trial by him due to his wholesale invocation of the Fifth (PSOF 97), including at every trial in which he has been called as a witness in the past 15 years.

Second, disputed that Margaret Fleming's description of the offender was that he was wearing a "hooded pullover shirt" as claimed in Guevara and Halvorsen's cleared/closed supplementary report at Dkt. 446-11. Rather, the General Offense Case Report reflects an initial description by witnesses including Margaret Fleming that the offender was wearing a "black t-shirt" and "white high tops." Dkt. 446-5, at PageID 11822. There is no contemporaneous description of the offender provided solely by Margaret Fleming, contrary to expected police practice. Dkt. 446-11, Cleared/Closed Report, at PageID#13031; Exh. 6, Allio Report, at 11 ("I would expect detectives, at a minimum, to ask Margaret Fleming to describe the offender prior to viewing a lineup, and to document her response. I see no evidence that this basic investigatory step was taken.").

A jury could disbelieve Margaret's trial testimony because, although Guevara and Halvorsen claimed in their cleared/closed report that Michael Fleming had described the offender as wearing a "hooded pullover shirt," contemporaneous notes reflect that Michael Fleming *instead* told Halvorsen that he saw the offender wearing a "black hoodie" that was "all black," and that the offender was "clean shaven." PSOF 12. Guevara and Halvorsen fabricated in their supplementary cleared/closed report that Michael Fleming had described the offender as wearing a "hooded pullover shirt" to deemphasize the discrepancies between the actual description provided by this witness and Bouto's appearance because Bouto was neither "clean shaven" nor wearing a "black hoodie" that was "all black" (PSOF 25; Dkt. 446-25, Lineup Photo; Dkt. 446-24, Lineup Photo; Dkt. 446-22, Fleming Dep., at 130:2-130:22). Indeed, Defendants manipulated 15-year-old Michael by telling him that they needed to "match" the various eyewitness descriptions. PSOF 63-65.

As to whether Margaret Fleming told police that she observed the offender standing across from their building fire four to five shots, that is disputed because Margaret testified that she was inside her apartment, which was on the second floor of 3338 West Sunnyside, and only then, when she had heard the shots fired, did she run down the various staircases required to get out the front door; a jury could disbelieve that she told police an account that is internally contradictory. PSOF 69. For his part, Guevara has pleaded the Fifth Amendment in response to all questions about the investigation, his interactions with witnesses including the Flemings, and the documentation in his reports. PSOF 97.

36. Frank Escobar told Halvorsen and Guevara that he saw a person known to him as "Mario" hand a gun to the offender and the offender shoot toward them. (Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 77; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2; Ex. 19, Hughes Dep. at 103:15–104:9; Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 19291, 19288.)

**RESPONSE:** Admitted.

37. Jacobo Lozada told Halvorsen and Guevara that he saw a male wearing a dark blue pullover sweatshirt firing a gun toward them, and that he did not get a good look at the offender's face, but he saw the offender's clothing. (Ex. 12, 7-16-1993 Supp. Report at RFC-Bouto 77; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2.)

**RESPONSE:** Disputed because the stated fact is unsupported by any admissible evidence. Defendants cannot rely on hearsay within their police report to establish any facts for summary judgment purposes. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial). Further, Defendants cannot rely on Guevara's testimony at trial without some indication that his trial testimony would be repeated or admissible at trial. Given Guevara's wholesale invocation of the

Fifth (PSOF 97), including at every trial in which he has been called as a witness in the past 15 years, Defendants cannot establish that Guevera's trial testimony would be admissible at trial in this case.

**D. Bouto's interactions with police at the 17th District.**

38. Bouto testified that he was at the 17th District for about an hour and was interviewed by Pang, with Pergande coming in-and-out of the interview room, but Bouto does not recall any conversation with Pergande. (Ex. 9, Bouto Dep. at 203:13–205:22, 276:7–9.)

**RESPONSE:** Admitted, except as to the following: (1) in the first passage identified by Defendants, Mr. Bouto clarified that he did not recall the exact length of the interrogation; and (2) Mr. Bouto also specifically testified to conversation with both Pergande and Pang, including that he told both Pergande and Pang about his alibi during this interrogation (e.g., Dkt. 446-8, Bouto Dep., at 205:3-205:22).

39. During the interview with Pang, Bouto contends that he advised Pang that he was with his girlfriend Tania at the time of the shooting, and that although he did not know her phone number, Pang could try to contact her using the last number from which she paged him. (Ex. 9, Bouto Dep. at 203:13–205:22.)

**RESPONSE:** Admitted.

40. Bouto stated that Pang then removed the batteries from Bouto's pager, and as a result, Bouto lost the number from which Tania paged him. (Ex. 9, Bouto Dep. at 276:10–277:3.)

**RESPONSE:** Admitted.

41. Bouto, however, did not know the last number Tania paged him because she would page him from various numbers, such as from a pay phone or friend's house. (Ex. 9, Bouto Dep. at 99:9–100:6.)

**RESPONSE:** Admitted, and clarify that was due to Tania's strict parents, who did not allow dating, as she has testified. PSOF 75.

42. Pergande and Pang then took Bouto to Area 5 and Pergande filled out the arrest report for Bouto, after which Bouto did not have further interactions with Pergande or Pang. (Ex. 9, Bouto Dep. at 206:6–14, 207:15–208:9, 285:12–20, 286:7–21; Ex. 4, Pergande Dep. at 201:6–202:20.)

**RESPONSE:** Admitted that Pergande and Pang then took Bouto to Area 5 and Pergande filled out the arrest report for Bouto. Admitted that Bouto did not have further personal interactions with Pang and Pergande at the close of the police investigation in May 1993, but clarify that Pergande continued to work on the case (e.g., Dkt. 446-17, Sept. 1994 Show-Up Scene Report authored by Pergande), and testified against Mr. Bouto in legal proceedings (e.g., Dkt. 446-12, May 3, 1995 Mtn. to Quash Hrg. Tr., at 3; Dkt. 446-10, July 31, 1996 Trial Trans., at 178).

43. Pang was relieved of duty shortly thereafter and did not have any further role in the Ruvalcaba homicide investigation; specifically, he did not participate in Bouto's booking process, interview any witnesses, conduct or assist with the lineup, or speak with any prosecutor. (Ex. 3, Pang Dep. at 82:9–83:7, 103:4–17, 117:8–19, 118:20–120:21, 123:17–124:7, 134:8–21, 159:1–5.)

**RESPONSE:** Admitted.

44. Pergande's participation in any decision making in the Ruvalcaba homicide investigation ended after he brought Bouto to Area Five. (Ex. 4, Pergande Dep. at 106:22–107:1, 199:24–200:8; Ex. 9, Bouto Dep. 286:22–287:4.)

**RESPONSE:** Disputed; Pergande's continued involvement in the case is evidenced by a September 1994 show-up scene report authored by Pergande (Dkt. 446-17), and his repeated testimony against Mr. Bouto in legal proceedings (e.g., Dkt. 446-12, May 3, 1995 Mtn. to Quash Hrg. Tr., at 3; Dkt. 446-10, July 31, 1996 Trial Trans., at 178).

**E. Lineup and continuing investigation at Area 5.**

45. Guevara took custody of Bouto and placed him in a bathroom and, later on, when Guevara was escorting Richmond, Rey, Jacobo, and Escobar into Area 5, "Detective Guevara opened up the door [to the bathroom] with Carl Richmond, the Lozada brothers, and Frank, and [Guevara] said, 'Is that the shooter?' And everybody was like, 'Yeah, that's him, that's him, that's him.'" (Ex. 9, Bouto Dep. at 208:17–209:9, 216:22–217:21, 219:8–16; Ex. 8, Richmond Dep. at 31:5–32:6; Ex. 7, Lozada Dep. at 36:16–37:1; 48:18–49:24.)

**RESPONSE:** Admitted, except for as to two matters. First, the exact location of this event is immaterial for summary judgment purposes, but a dispute of fact exists between the witnesses' recollections as to in which room it occurred, and certain evidence on this issue has been excluded from the case due to Defendants' untimely disclosure. Dkts 312, 385. Second, when Guevara opened the door, he said, "that's the guy that did it right, that's the guy," and he showed Bouto to the witnesses purposefully to further his plan to fabricate lineup evidence against Bouto. Exh. 2, COI Hrg. Tr., at 111:12-112:18; PSOF 97; e.g., Exh. 5, Guevara Dep. in Bouto, at 33:17-34:11.

46. At some point, Guevara allegedly took Richmond away and brought him to a separate location within Area 5 where Guevara "showed [him] a Polaroid picture of Robert Bouto," and told Richmond that Bouto was the shooter. (Ex. 8, Richmond Dep. at 31:15–19, 33:21–34:7; 130:1–9.)

**RESPONSE:** Admitted.

47. Richmond allegedly told Guevara that he did not see the shooter's face but rather "saw what he was wearing," but Guevara "kept telling [him], yes, [he] did," and "in so many words, he told me that he could make my life very miserable if I don't play ball," so Richmond eventually told Guevara that "if I do this, man, you leave me alone," and Guevara responded, he would if

Richmond would "just follow through and point him out." (Ex. 8, Richmond Dep. at 34:8–16; 35:21–40:7.)

**RESPONSE:** Admitted.

48. After Richmond's interaction with Guevara, Guevara "took [Richmond] out of the room and put [him] in the room back with Rey, Jacobo, and Frank" where Richmond did not tell Rey, Jacobo, or Frank about his conversation with Guevara. (Ex. 8, Richmond Dep. at 41:8–19.)

**RESPONSE:** Admitted that after an interaction by Richmond with Guevara, Guevara "took [Richmond] out of the room and put [him] in the room back with Rey, Jacobo, and Frank." Whether Richmond told Rey, Jacobo, or Frank about his conversation with Guevara is disputed; Richmond's testimony was specifically that he did not recall talking about the "Rey Guevara issue" (Dkt. 446-7, Richmond Dep., at 41:8-41:19), which is ambiguous, and Rey Lozada says that Richmond told him who to identify prior to the lineup (e.g., Dkt. 446-6, Lozada Dep., at 37:2-37:7, 55:11-57:1); given these disputing accounts, and that Guevara has pleaded the Fifth Amendment barring Plaintiff from information about his memory of these events (PSOF 97), the evidence will have to come out at trial about this fact.

49. At some point while idling at Area 5, Rey, Jacobo, and Richmond started looking through a folder with several photos in it, which no officer gave them, but rather, it was sitting on a desk, and Richmond and Jacobo pointed out Bouto's photo saying amongst themselves, "all right. That's him." (Ex. 7, Lozada Dep. at 36:16–37:1 48:18–50:10, 161:16–163:17.)

**RESPONSE:** Admitted that Rey, Jacobo, and Richmond had access a photo of Mr. Bouto at the police station laid on a desk. Disputed in that Richmond and Lozada's testimony makes clear that Mr. Bouto's photograph was laid out purposefully for them that they would view it, and that the viewing was visible to the nearby detectives and included a Polaroid specifically of Mr. Bouto taken that day, which was also presented to the witnesses individually. PSOF 48; Dkt. 446-6,

Lozada Dep., at 76:20-78:13, 234:11-235:9; Dkt. 446-7, Richmond Dep., at 31:16-41:24, 249:8-250:15, 249:8-250:15, 253:15-254:4; Exh. 5, Guevara Dep. in Bouto, at 30:1-32:7, 33:11-33:16, 18:4-19:7.

Whether Richmond and Jacobo pointed out Bouto's photo saying amongst themselves, "all right. That's him," is disputed; while Rey Lozada says they did, Carl Richmond denies doing so (*e.g.*, PSOF 44-50, 54) and Guevara has plead the Fifth Amendment barring Plaintiff from information about Guevara's memory of these events (PSOF 97), and so the evidence will have to come out at trial about these facts.

50. At approximately 7:00 PM, witnesses Richmond, Escobar, Rey, Jacobo, and Michael and Margaret Fleming each viewed an eight-person lineup that included Bouto. (Ex. 24, 5-16-1993 Lineup Report at RFC-Bouto 000081–83; Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 78; Ex. 21, Guevara 8-1-1996 Trial Trans. at 38:24–39:2.)

**RESPONSE:** Admitted.

51. According to Bouto, Halvorsen took him from the bathroom to the lineup room where Halvorsen remained with Bouto and the lineup fillers to instruct them to "look forward, look to the left, look to the right." (Ex. 9, Bouto Dep. at 223:14–226:9, 284:3–14.)

**RESPONSE:** Admitted, except to note that the exact location from where Halvorsen took Bouto is immaterial for summary judgment purposes, but a dispute of fact exists between the witnesses' recollections as to in which room it occurred, and certain evidence on this issue has been excluded from the case due to Defendants' untimely disclosure. Dkts 312, 385.

52. Below is a photo of the eight-person lineup viewed by Richmond, Escobar, Rey, Jacobo, and Michael and Margaret Fleming. (*See* Ex. 11, 7-31-1996 Trial Trans. at 155:20–157:14, 173:19–174:20; Ex. 24, 5-16-1993 Lineup Report at RFC-Bouto 000081–83; Ex. 25, Lineup Photo, at RFC-Bouto 000179.)

**RESPONSE:** Admitted.

53. According to Richmond, Guevara took him to view the lineup in a room with a two-way mirror with just him, Guevara, and an unknown ASA, and although Guevara did not say anything at that time, Richmond "was already under the impression that [Guevara] made himself clear," so "I pointed out the person that [Guevara] told me shot" Ruvalcaba. (Ex. 8, Richmond Dep. at 46:4–47:5, 248:22–249:3.)

**RESPONSE:** Admitted.

54. At no point did Halvorsen pressure Richmond to identify Bouto as Richmond has testified that "it was all Guevara." (Ex. 8, Richmond Dep. at 67:23–68:3.)

**RESPONSE:** Disputed. PSOF 52-53.

55. According to Rey Lozada, Guevara brought him to view the lineup where he identified Bouto as the shooter. (Ex. 7, Lozada Dep. at 165:14–16; 166:7–18.)

**RESPONSE:** Admitted.

56. No police officer pressured Rey Lozada to pick Bouto out of the lineup, and Rey did not inform any officer that his lineup identification of Bouto as the shooter was incorrect. (Ex. 7, Lozada Dep. at 94:8–14; 167:17–20.)

**RESPONSE:** Disputed, in that Plaintiff's evidence demonstrates that officers used myriad improper tactics to pressure and manipulate 15-year-old gang rival Rey Lozada to make a false identification of an innocent person as the shooter, even though he did not see the shooter well enough to make any identification. PSOF 9, 14, 15, 17, 19, 34-38, 41, 42, 46-49, 54, 57; Exh. 16, Rey Lozada Affidavit, at 7-8 ¶¶6-9. Lozada also testified that he received *explicit* pressure from officers including a Hispanic officer to get him to testify at trial to his false identification of Plaintiff, including through threat of perjury charges. PSOF 58; Dkt. 446-6, Lozada Dep., at 94:8-96:6.

57. It was reported that Richmond, Escobar, and Rey identified Bouto as the person "he saw shoot and kill Ruvalcaba," and Jacobo, Michael, and Margaret identified Bouto "as the person wearing the same clothing as the shooter." (Ex. 24, 5-16-1993 Lineup Report at RFC-Bouto 000081–83; Ex. 10, Felony Review Folder at CCSAO-Serr-Mont_00019291, 00019288; Ex. 19, Hughes Dep. at 154:15–157:4, 157:25–158:9.)

**RESPONSE:** Admitted that Guevara and Halvorsen so reported in their Lineup Report, claiming that 6 out of 6 persons who viewed the lineup selected an innocent man (PSOF 5-7), and that they communicated that information to ASA Hughes for the felony review jacket, but disputed that these identifications happened as claimed. PSOF 9-72. Dispute, of course, Defendants' ability to rely on the cited hearsay to establish that these facts actually occurred. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial),

58. Michael Fleming confirmed his identification in his deposition and confirmed that he was not (1) pressured by any police officer; (2) told by anybody at CPD to pick someone out during the line up; or (3) told to testify in any specific way. (Ex. 23, Michael Fleming Dep. at 121:8-122:2, 123:7-124:4, 126:13-127:16, 196:22–197:12.)

**RESPONSE:** Disputed; Plaintiff's evidence, including from Michael Fleming's deposition, reflects abundant evidence that the then-15-year-old was pressured and manipulated to make a purported unreliable clothing identification of an innocent person as the shooter, even though Michael's own initial description conflicted with the clothing Mr. Bouto wore on May 14, 1993 (PSOF 12, 14, 60, 63-67, 97), including that Guevara and Halvorsen fabricated his identification by manipulating him to "match" his clothing description to some description that purportedly had come from other eyewitnesses, and that it evolved over time to match the clothing Mr. Bouto wore. Dkt. 446-22, Fleming Dep., at 82:14-83:5 ("Q. Do you remember why you were

there at the police station? A. Yeah, they wanted to make sure that the description actually matched everybody else's description, and then they showed us a line-up. I don't know, there was six or seven people in a line-up. Q. When you say 'they wanted to make sure the description matched,' what do you mean? A. From my description to the other witnesses' description. Q. So they wanted to make sure that the description that you had of the perpetrator matched the description that the other eye witnesses had for the perpetrator? A. Correct."); Exh. 5, Guevara Dep., at 38:6-39:2. As for his trial testimony, he indicated that he made an identification of Bouto at the 1996 trial based on recalling his face from the line-up; he had not seen the shooter's face during the shooting and thus was not able to identify Bouto at trial based on any memory of witnessing the shooting. Dkt. 446-22, Fleming Dep., at 139:17-140:16; Dkt. 446-10, July 31, 1996 Trial Tr. at 154:10-154:16.

59. After the lineup, Halvorsen took the below mugshot of Bouto and allegedly returned him to the bathroom, which concluded Halvorsen's interactions with Bouto. (Ex. 9, Bouto Dep. at 284:3–285:12; Ex. 24, 5-16-1993 Lineup Report at RFC-Bouto 000081; Ex. 26, Photo of Bouto, at RFC-Bouto 000182.)




RFC-Bouto 000182

**RESPONSE:** Admitted, except to note that the exact location of this event is immaterial for summary judgment purposes, but a dispute of fact exists between the witnesses' recollections as to in which room it occurred, and certain evidence on this issue has been excluded from the case due to Defendants' untimely disclosure. Dkts 312, 385.

60. Defendant Mingey was not assigned to the Ruvalcaba investigation and he did not (1) respond to the scene; (2) supervise or participate in its investigation; (3) have any interactions with any of the witnesses, including Richmond, Rey and Jacobo Lozada, Frank Escobar, Michael or Margaret Fleming, Michael Summerfelt, Tania Astefan, William Lupo, Luis Oquendo, Cesar Matias, or ASA Matt Cognhaln; or (4) have any "knowledge of this case at all." (Ex. 2, Mingey Dep. at 43:1–4, 121:9-11, 123:14–125:3.

**RESPONSE:** Admitted.

61. The only reference to Defendant Mingey from the Ruvalacaba murder investigation is on a crime scene processing report that contains Defendant Mingey's typed name as approving supervisor and a signature of his name. (Ex. 2, Mingey Dep. at 63:10-17, 115:1–116:20, 119:24–120:14; Ex. 27, 5-14-1993 Crime Scene Processing Report at Bouto 17666.)

**RESPONSE:** Admitted.

62. Defendant Mingey did not sign his name to the crime scene processing report and does not know who did, but he would have permitted someone to sign off using his name given that the report "had to go down to the crime lab right away." (Ex. 2, Mingey Dep. at 51:11-53:2, 61:10-62:19, 116:10-15.).

**RESPONSE:** Admitted, but clarify that Mingey would only allow someone to sign his name to a report if he was informed of the report and approved. Dkt. 446-2 at 62:1-19.

63. At some point on May 14, 1993, police ran a criminal history check on Bouto that detailed arrests for mob action on March 6 and April 12, 1993, and unlawful use of a weapon on March 15, 1993. (Ex. 28, Bouto Criminal History at RFC- Bouto 000045.)

**RESPONSE:** Admitted, but immaterial.

64. Police also obtained the arrest report for the April 1993 unlawful use of a weapon that indicated that Bouto was in possession of a .38 caliber revolver that he bought on the street for protection. (Ex. 29, 3-15-1993 Arrest Report at RFC- Bouto 000043.)

**RESPONSE:** Admitted, but clarify that there is no record whether that arrest report was obtained before or after Bouto was charged with murder, so it cannot be used to support any probable cause finding.

**F. Felony review is contacted.**

65. At approximately 8:45 PM, Felony Review Assistant State's Attorney Kevin Hughes arrived at Area 5 to review the Ruvalacaba murder investigation. (Ex. 19, Hughes Dep. at 103:21–104:9; Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485–86.)

**RESPONSE:** Admitted.

66. It was ASA Hughes' practice to corroborate what witnesses told police, any lineup identifications they made, and to review whether the lineup was unduly suggestive. (Ex. 19, Hughes Dep. at 75:11–77:1; 109:4–17, 111:23–112:6; Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485–92.)

**RESPONSE:** Disputed. ASA Hughes testified that he would corroborate "the date" that witnesses made the identification. Dkt. 446-18, Hughes Dep. at 76:2-5. Further answering, ASA Hughes did not testify that it was his practice to corroborate what witnesses said in every case or that he actually did so in this case. Further answer that ASA Hughes testified that he expected the lineup procedures Guevara and Halvorsen used would not be unduly suggestive and that he does

not recall if he verified in the Ruvalcaba matter whether the lineups were unduly suggestive. (*Id.* at 76:6-77:7). Hughes does not recall which witnesses he interviewed or the content of any communications with any witnesses (*id.* at 19:1-19:18); he claimed based on his felony review folder that he interviewed witnesses like Melissa Melendez that were not even taken to the police station (*id.* at 111:7-113:10); Dkt. 446-11, Cleared/Closed Report, at PageID 13028-29; he admits he did not see any indication that he had interviewed Carl Richmond in his felony review file (*id.* at 109:4-110:15); admits he has no independent memory whatsoever of his work on the case, and thus he does not recall which witnesses he interviewed or the content of any communications with any witnesses (Dkt. 446-18, Hughes Dep., at 18:14-18:25, 19:1-19:18, 112:20-113:10); he also claimed it was his practice to document any concerns about credibility for any witnesses in his felony review file, but did not do so here despite a wealth of information by which to question the eyewitness identification accounts, including that Bouto did not match their initial descriptions (PSOF 23-25); he admits that he received unknown information about the witnesses and identifications from Guevara and Halvorsen (Dkt. 446-18, Hughes Dep., at 19:25-20:9); his felony review notes include known fabrications by Guevara and Halvorsen (PSOF 45, 61); and at the time of this deposition, and prior to settlement, Hughes was a defendant in this case, himself accused of misconduct. Dkt. 446-18, Hughes Dep., at PageID 13265 (documenting that Hughes was a Defendant at the time of his deposition).

67. ASA Hughes documented in the Felony Review Folder that Richmond, Rey, Jacobo, and Escobar gave a description of the offender to officers at the scene who then toured the area, found Bouto, and returned him to the scene. (Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485; Ex. 19, Hughes Dep. at 103:4–104:6, 110:22–111:6, 113:12–23, 154:15–157:4, 157:25–158:9.)

**RESPONSE:** Admitted as to what ASA Hughes documented based on what Guevara and Halvorsen, the "arresting officers," told him, and clarify that the document refers to

the four witnesses collectively. Further answering, Hughes made clear that the felony review notes were not a summary of what the witnesses told him, because it was not his practice to document what witnesses said, and he does not now recall which information on his felony review jacket came from witnesses, or, alternatively, came from Guevara and Halvorsen. (Dkt. 446-18, Hughes Dep., at 112:7-19, 134:19-136:2, 136:3-136:21).

68. ASA Hughes documented in the Felony Review Folder that at the scene, Richmond (W1), Escobar (W2), and Rey (W4) identified Bouto. (Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485, 18486–18490; Ex. 19, Hughes Dep. at 154:15–157:4, 157:25–159:4.)

**RESPONSE:** Admitted ("Defendant was I.D.'d by W1, W2, & W4.").

69. ASA Hughes further documented in the Felony Review Folder that in a lineup at Area 5, Richmond (W1), Escobar (W2), and Rey (W4) identified Bouto as the shooter, and Jacobo (W3) and Margaret Fleming (W6) identified Bouto's clothing worn by the shooter. (Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485–18491; Ex. 19, Hughes Dep. at 154:15–157:4, 157:25–158:9.)

**RESPONSE:** Admitted.

70. At approximately10:00 PM, ASA Hughes interviewed Bouto who told ASA Hughes that at the time of the shooting, he was with his girlfriend, Tania, and although he "didn't know [her] apartment number" he "told him exactly where she lived," but Bouto was unable to provide ASA Hughes with Tania's number because "it was on my pager, and the detectives had removed the battery out of my pager, so I lost the number." (Ex. 19, Hughes Dep. at 106:18–108:3; Ex. 9, Bouto Dep. at 229:7–233:8; Ex. 10, Felony Review Folder at CCSAO-Serr-Mont 18485–86.)

**RESPONSE:** Admitted.

71. At this point in the investigation, ASA Hughes concluded that "there was more than enough evidence" to approve charges but his supervisor, ASA Bray, informed him to classify the

Ruvalcaba murder investigation as a "continuing investigation until May 15," so detectives could interview Bouto's alibi witness, Tania, and to locate an individual known as Mario who may have handed the gun to the shooter just prior to Ruvalcaba being shot. (Ex. 19, Hughes Dep. at 115:24–116:21, 117:8–118:7, 141:4–20; Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 000078.

**RESPONSE:** Admitted in part and disputed in part. Disputed and immaterial as to Hughes's personal conclusions. Plaintiff's evidence is that ASA Hughes was not the decisionmaker, and so his personal opinion is irrelevant, and it is also inadmissible. PSOF 76. Defendants initially sought the deposition of the actual decision-maker, ASA Sally Bray, but withdrew her as a witness when she invoked privilege. PSOF 76. ASA Hughes testified that he specifically did not recall whether he made a recommendation to Bray or thought charges should be approved at this stage. Dkt. 446-18, Hughes Dep., at 116:9-117:17.

Second, even if Hughes's personal opinion were as Defendants' claim and was relevant and admissible (which it is not), the following would have influenced Hughes's personal opinion on whether probable cause existed to charge and prosecute Bouto had it been made known to him: improper and suggestive lineup tactics (Dkt. 446-18, Hughes Dep., at 125:18-126:19); Bouto's status as a witness in a misconduct complaint against officers who arrested him (*id.* at 126:20-129:17); intentional fabrication by police of Vicente's statement, including through force, feeding facts, and undisclosed offers of leniency (*id.* at 121:5-123:25); information that Vicente claimed to have heard confessions in multiple murder cases (*id.* at 119:24-120:18, 145:14-146:11); and information that called into question the integrity of the police investigation (*id.* at 123:1-123:19, 124:25-125:11).

Third, ASA Bray declined to approve charges because she affirmatively "wanted the R/Dets. to try and locate the offenders alleged girlfriend, Tanya, and the individual known only as Mario who handed Robert BOUTO the gun." Dkt. 446-11, Cleared/Closed Report, at PageID #:13032; PSOF 77.

The evidence in the case would allow a fact-finder to find the evidence at that point in the investigation *insufficient* to support charges. Such evidence includes Bray's documented refusal to approve charges and instruction to carry out additional investigatory tasks first (PSOF 77); the nature of the shooting (e.g., PSOF 1-4); Mr. Bouto's deviation from the descriptions of the eyewitnesses, as well as their statements that they did not see the shooter (e.g., PSOF 8-27); the distance between the identifying witnesses and the casings from the shooting (PSOF 16-17); the lack of physical evidence against Mr. Bouto (PSOF 6, 28); the unreliability of the identifications of Bouto from gang rivals (e.g. PSOF 34-62); the unreliability of supposed clothing identifications by Michael and Margaret Fleming (PSOF 60, 63-70); and the undisclosed conflict of interest of the arresting officers including Pergande (PSOF 29-33); and Guevara and Halvorsen's invocations of the Fifth Amendment about the investigation, from which adverse inferences may be drawn (PSOF 97-98).

72. Bouto was then held overnight in a cell at the District 25 lockup at Grand and Central. (Ex. 9, Bouto Dep. at 247:24–248:13, Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 78.)

**RESPONSE:** Admitted.

### G. Vicente's involvement in the investigation.

73. Next to Bouto's cell was Francisco Vicente, who was placed in the District 25 lockup after being arrested on the afternoon of May 14, 1993 at approximately 1:45 p.m. by tactical officers, Defendants Louis Marron and Jose Pena, pursuant to an arrest warrant for several armed robberies. (Ex. 30, 11-19-18 Vicente Dep. at 15:4–16:16; Ex. 31, 2022-03-01 Vicente Dep. at 25:19–23, 31:19–34:3; Ex. 32, 5-14-93 Vicente Arrest Report at RFC-Bouto 00041.)

**RESPONSE:** Disputed in part. First, Bouto and Vicente were not in the lockup together on the afternoon or evening of May 14, 1993, because Bouto was not signed into the lockup until May 15, 1993 at 01:40 a.m. (Exh. 31, Bouto arrest report), and Vicente was signed out at 5:30pm

(17:30) by Defendant Maher and only returned at 10:50pm (22:50). Dkt. 446-1, Maher Dep., at 169:10-169:14; Exh. 29, Vicente Arrest Report, at 2 (CCSAO-Serr-Mont_ 00018878).

Second, Francisco Vicente's cell was not "next to Bouto's cell." At the pertinent time that Bouto supposedly confessed to Vicente, which was at approximately 10:00am-10:30am on the morning of May 15, 1993, Vicente was in holding cell 7-2, James Houston was in holding cell 7-3, Edwin Maldonado was in holding cell 7-4, Anthony Jones was in holding cell 7-5, and Bouto was in holding cell 7-6. PSOF 82; *see also* Dkt. 446-33, Vicente Statement, at PageID#15209-15210 ("Francisco Vicente states that on May 15, 1993 at approximately 10:00 a.m., he was talking to his friend Edwin Maldonado who he calls 'Lobo' in the cell next to his cell. Francisco Vicente states that he [and] Lobo were talking to a guy in the cell next to Lobo's.").

Admitted that Francisco Vicente was placed in the District 25 lockup after being arrested on the afternoon of May 14, 1993 at approximately 1:45 p.m. by tactical officers, Defendants Louis Marron and Jose Pena, pursuant to an arrest warrant for several armed robberies.

74. Also, in lockup a few cells away from Bouto and Vicente, was Edwin Maldonado, who was placed in the District 25 lockup after being arrested for a robbery. (Ex. 33, Maldonado 5-19-1993 Grand Jury Testimony at 24–25.)

**RESPONSE:** Admitted, except timeline and placement information is ambiguous and misleading. First, Bouto, Vicente, and Maldonado were not in the lockup together on the afternoon or evening of May 14, 1993, because Vicente and Maldonado were taken out at 5:30pm and not returned until 10:50pm. Dkt. 446-1, Maher Dep., at 169:10-169:14; Exh. 29, Vicente Arrest Report, at 2 (CCSAO-Serr-Mont_ 00018878); Exh. 30, Maldonado Arrest Report

Second, Maldonado's cell was not "a few cells away from Bouto and Vicente." At the pertinent time that Bouto supposedly confessed to Vicente, which was at approximately 10:00am-10:30am on the morning of May 15, 1993, Vicente was in holding cell 7-2, James Houston was in

holding cell 7-3, Edwin Maldonado was in holding cell 7-4, Anthony Jones was in holding cell 7-5, and Bouto was in holding cell 7-6. PSOF 82; *see also* Dkt. 446-33, Vicente Statement, at PageID#15209-15210 ("Francisco Vicente states that on May 15, 1993 at approximately 10:00 a.m., he was talking to his friend Edwin Maldonado who he calls 'Lobo' in the cell next to his cell. Francisco Vicente states that he [and] Lobo were talking to a guy in the cell next to Lobo's.").

Admitted that Edwin Maldonado was placed in the District 25 lockup after being arrested for a robbery.

75. The following day—on May 15, 1993— Defendant Maher was investigating armed robberies involving Vicente, and at 4:00 PM, Maher removed Vicente from lock-up and brought him to an interview room. (Ex. 1, Maher Dep. at 99:8–18, 104:19–23, 105:8–108:22, 117:12–15.)

**RESPONSE:** Admitted, except clarify that it was Guevara, specifically, who assigned Maher to the Vicente robberies (PSOF 83) and that 4:00p.m. was not the time of removal, but rather the time that first Maher signed Vicente out at the front desk of the lockup, after which he walked back to the lockup and requested that Vicente be brought to him, and so it could have taken anywhere from 5-15 minutes for Maher to actually remove Vicente from the lock-up to bring him to an interview room. Dkt. 446-1, Maher Dep., at 49:14-51:9, 170:4-170:18.

76. Maher was aware that a shooting occurred near Roosevelt High School, but he was not assigned to or otherwise involved in the Ruvalcaba homicide investigation. (Ex. 1, Maher Dep. at 107:23–108:25, 111:9–112:4.)

**RESPONSE:** Disputed. Plaintiff's evidence is that he joined the conspiracy with Guevara to fabricate evidence against Mr. Bouto in the Ruvalcaba homicide investigation at around 3:00pm on May 15, 1993, when Maher arrived at work; it was then that Guevara communicated with Maher about the Ruvalcaba homicide and Guevara specifically assigned Defendant Maher to investigate the robberies committed by Vicente. PSOF 83. Maher, Guevara, and Halvorsen

fabricated that Vicente supposedly informed Maher that another prisoner in the lockup had confessed to Vicente about committing a murder while Maher transported Vicente from the lockup, which was false. PSOF 84-85.

77. Vicente does not know who Maher is and has not accused him of coercion. (Ex. 30, 11-19-18 Vicente Dep. at 44:9–45:7, 294:21–22, Ex. 31, 2022-03-01 Vicente Dep. at 47:11–13.)

**RESPONSE:** Admitted.

78. According to Vicente, he was removed from the lockup by an unknown officer and taken to an interview room in the booking division of District 25 where he was interviewed by Guevara and Halvorsen, who wanted Vicente "to coerce[] a story on Robert Bouto," specifically "that while in lockup, [Bouto] confessed to me" about the Ruvalcaba murder, which Vicente eventually agreed to do after Guevara physical abused and threatened him. (Ex. 30, 11-19-18 Vicente Dep. at 21:3–22:3, 28:12–31:8, 180:11–183:3; Ex. 31, 2022-03-01 Vicente Dep. at 42:18–46:4, 46:5–48:1.)

**RESPONSE:** Admitted.

79. At approximately 6:35 PM—after meeting with Guevara and Halvorsen six or seven more times "to get [him] to fabricate the story" and "memorize what they were trying to tell [him] to say,"—Vicente signed a statement written by ASA Hughes that stated that while Bouto and Vicente were conversing in lock-up, Bouto confessed to Vicente that he shot Ruvalcaba. (Ex. 30, 11-19-18 Vicente Dep. at 44:9–48:4; Ex. 31, 2022-03-01 Vicente Dep. at 57:23–59:1; Ex. 34, 5-15-93 Vicente Stmt. at RFC-Bouto 00029-33.)

**RESPONSE:** Admitted.

80. From the moment Vicente was booked for the robbery charges by Pena and Marron until he signed the May 15, 1993, statement, Vicente only spoke with Halvorsen, Guevara, and ASA

Hughes about the details of his conversations with Bouto. (Ex. 30, 11-19-18 Vicente Dep. at 188:18–189:20.)

**RESPONSE:** Admitted.

81. Vicente now contends that his statement is false. (Ex. 30, 11-19-18 Vicente Dep. at 44:9–48:4; Ex. 31, 2022-03-01 Vicente Dep. at 57:23–59:1; Ex. 34, 5-15-93 Vicente Stmt.)

**RESPONSE:** Admitted.

82. Later in the evening of May 15, 1993, ASA Hughes approved charging Bouto for Ruvalcaba's murder. (Ex. 19, Hughes Dep. at 119:1–119:8.)

**RESPONSE:** Disputed. ASA Sally Bray was the decision maker, as Hughes repeatedly made clear; he lacked authority to approve charges: PSOF 76. Bray invoked privilege as to her decision-making process and moved to quash Defendants' subpoena for her deposition until Defendants withdrew it and removed her name from their disclosures. Dkts. 363, 366, 367.

## Criminal Proceedings

### A. Grand Jury

83. Bouto was indicted for the first-degree murder of Ruvalcaba on June 4, 1993 after the testimony of Richmond, Maldonado, Vicente, and Halvorsen. (Ex. 33, 5-19-93 Grand Jury Hearing; Ex. 35, 6-1-93 Grand Jury Hearing; Ex. 36, 6-4-93 Grand Jury Hearing; Ex. 37, Grand Jury Indictment.)

**RESPONSE:** Admitted.

84. On September 17, 1993, prior to any pretrial hearings and trial, Frank Esocbar died. (Ex. 38, 7-23-1996, Mot. in Limine re Deceased Witnesses; Ex. 39, Chicago Trib., *Man Fatally Shot Near High School*, Sept. 17, 1993.)

**RESPONSE:** Admitted.

85. On July 1, 1994, prior to any pretrial hearings and trial, Jacobo Lozada died. (Ex. 38, 7-23-1996, Mot. in Limine re Deceased Witnesses; Ex. 40, *People v. Georgakapoulos*, 303 Ill.App.3d 1001, 1004 (Ill. App. Ct. 1999).)

**RESPONSE:** Admitted.

86. On September 7, 1994, Bouto moved to quash his arrest and suppress the evidence obtained as a result of his arrest, claiming that he was arrested without a warrant or probable cause. (Ex. 41, 9-7-1994 Mtn. to Quash Arrest and Suppress Evid. at CCSAO-Serr-Mont_00018759.)

**RESPONSE:** Admitted, but immaterial; Bouto did not then have the evidence he now has amassed of Defendants' misconduct.

87. On May 3, 1995, following a hearing on Bouto's Motion to Quash Arrest and Suppress Evidence, the court denied Bouto's motion and held that "probable cause existed due to the facts and circumstances" known to Pergande. (*See* Ex. 13, 5-3-1995, Mot. to Quash Arrest Hearing at 1–2, 24:22–25:1; Ex. 41, 9-7-1994 Mtn. to Quash Arrest and Suppress Evid.)

**RESPONSE:** Admitted, but immaterial, because 1) Pergande misrepresented to the court that Mr. Bouto had a ponytail (*see* Dkt. 446-12 at PageID 13041:20-22, *id.* at PageID 13047:23-48:2); 2) Pergande misrepresented that a PR Stone committed the shooting (see *id.* at PageID 13045:7-13, *id.* at PageID 13048:9-16); 3) Pergande misrepresented that Jacob Lozado and Carl Richmond identified Mr. Bouto at the showup (*see id.* at PageID 13049:13-18 and 13049:23-50:2); 4) Plaintiff does not have a false arrest claim, so any decision about the evidence to seize Plaintiff before charges were approved is irrelevant; and 5) Plaintiff's conviction has been vacated, so any pre-trial ruling has also been vacated. *See Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir. 2006). PSOF 23 (Bouto did not have a ponytail); PSOF 20 (no evidence that a P.R. stone committed the shooting); PSOF 45, 14, 16-17, 61 (Carl Richmond did not identify Plaintiff at the show up, and Jacobo could not have made an identification).

88. On January 12, 1996, Bouto moved to suppress the identifications made by Richmond, Jacobo, Rey, and Escobar, arguing that the identifications were "unnecessarily suggestive and conducive to irreparable mistaken identification." (Ex. 42, 1-12-1996, Mot. to Suppress.)

**RESPONSE:** Admitted, but immaterial, since at that time, Bouto did not have access to all of the information since revealed about Defendants' misconduct in procuring those identifications. PSOF 44-75.

89. On June 12, 1996, the criminal court held a hearing pursuant to Bouto's Motion to Suppress Identification, and having heard testimony from Pergande, Rey Lozada, and Carl Richmond, the Court denied the motion. (*See* Ex. 43, 6-12-1996 Mot. to Suppress Identifications Hearing at 1–2, 45.)

**RESPONSE:** Admitted, but immaterial, since at that time, Bouto and the criminal court did not have access to all of the information since revealed about Defendants' misconduct in procuring those identifications. PSOF 44-75.

90. On April 30, 1995, Maldonado provided an affidavit to Bouto's defense attorney recanting his May 16, 1993, grand jury testimony, now claiming that (1) he never heard Robert Bouto confess; (2) he falsely implicated Bouto under pressure from Francisco Vincente, who he feared and (3) his signed statement was based on "what the states attorney told [him] that Francisco Vicente had earlier said to them and police." (Ex. 44, Maldonado 4-30-1995 Aff. ¶¶ 6–11, 14, 19 [sic]).)

**RESPONSE:** Admitted that the affidavit so stated *in part*, but clarify that Defendants' characterization and passive voice removes the implication in Vicente's statement that the ASA (former Defendant Hughes) was recounting the information so that Vicente could copy it. As to (3), the affidavit stated in full:

> A short time later I met with an assistant state's attorney who told me what Francisco Vincente had stated to them. I then repeated to them the same thing that the assistant state's

> attorney told me. I made a statement and signed my signature on that statement at the urging of the assistant state's attorney and the Chicago Police Department. The contents of the statement was what the states attorney told me that Francisco Vincente had earlier said to them and the police. If they did not tell me what Francisco Vincente had told them, I would not have been able to corroborate Francisco Vincente's statements. **I made the statement according to what they told me.**

Dkt. 446-43, Maldonado Affidavit, at ¶10 (emphasis added); Dkt. 446-30, Vicente Dep., at 51:11-16, 285:7-24.

91. On July 23, 1996, a few days before Bouto's trial, Bouto's criminal defense attorneys filed a motion in limine to bar the State from introducing any evidence procured from Frank and Jacobo and prohibit any reference to these two witnesses being murdered, stating in the motion the defense sought "to prohibit the State from introducing any evidence procured from any deceased witness and from inflaming the jury by implication, that they, Frank Escobar and Jacob [sic] Lozada, were murdered to prevent them from testifying." (Ex. 38, 7-23-1996, Mot. in Limine re Deceased Witnesses; Ex. 45, 7-29-1996 Trial Trans. 30:5–32:2.)

**RESPONSE:** Admitted, but clarify:

(1) during argument, prior to the ruling, the State clarified its position that it did not intend to use the statements of Lozado or Escobar at trial or imply that Bouto was somehow responsible for their murder. Dkt. 446-44, July 29, 1996 Trial Trans., at PageID #:15354-55.

(2) to the extent Defendants raise the portion of the motion in limine regarding "inflaming the jury," which is immaterial to summary judgment, to cast aspersion on Bouto before this Court, there is absolutely no evidence whatsoever that Bouto had any involvement in the murders of Frank Escobar or Jacobo Lozada. Not only was he behind bars at the time due to Defendants' framing him for the Ruvalcaba murder, but Defendants present no evidence from the investigation of their murders that would support such a claim nor does any such evidence exist; Rey Lozada, for example, has testified that his brother Jacobo's death was unrelated. Dkt. 446-6, Rey Lozada Dep., at 57:13-63:8, 173:1-173:23; Dkt. 446-44, July 29, 1996 Trial Trans., at Bouto006403 (court's ruling that

"the state is prohibited from implying that the defendant had any connection to the absence of these witnesses.").

92. Bouto's criminal defense attorneys also filed motions in limine "to bar the State from introducing evidence of other pending cases," specifically Bouto's then-present charges for "Possession of a Controlled Substance in case number 93 CR 116368, Mob action case number 93 CR 271224 and UUW case number 93 CR 207667 in the County of Cook," and that "the State be ordered to instruct its witnesses, who might be aware of the Defendant's previous arrests for possession of a controlled substance, Mob Action, UUW, that they are, under no circumstances, to mention those pending cases." (Ex. 46, Mot. in Limine to Prevent State's Witnesses from Mentioned Def.'s Prior Arrest; Ex. 47, 7-23-1996, Mot. in Limine to Bar Evid. of Other Pending Cases.)

**RESPONSE:** Admitted but immaterial.

93. The court granted these three motions in limine on July 29, 1996. (Ex. 45, 7-29-1996 Trial Trans. at 28:19–32:24)

**RESPONSE:** Admitted.

94. From July 31 to August 1, 1996, Bouto was tried before a jury for the Ruvalacaba murder. (Ex. 11, 7-31-1996 Trial Trans. at 1; Dkt. 446-20, 8-1-1996, Trial Trans. at 1.) The victim's mother Maria Ruvalcaba, Rey Lozada, Medical Examiner Dr. Kirschner, Richmond, Maragret and Michael Fleming, Defendant Pergande, and CPD Evidence Technician Reynolds testified for the State. (*Id.*)

**RESPONSE:** Admitted.

95. Rey Lozada testified at Bouto's trial that that he identified Bouto as the shooter at the scene and at the lineup. (Ex. 11, Lozada 7-31-1996 Trial Trans. at 34:13–36:11, 37:6–39:19.)

**RESPONSE:** Admitted.

96. Richmond testified at Bouto's trial, identified Buoto [sic] in open court as the person he saw shooting, and testified that he identified Bouto as the shooter at the scene and at the lineup. (Ex. 11, Richmond 7-31-1996 Trial Trans. at 95:5–96:17, 99:8–102:13.)

**RESPONSE:** Admitted.

97. Michael Fleming testified at Bouto's trial that he identified Bouto in the lineup as wearing similar clothing and being the same height and weight as the shooter. (Ex. 11, Michael Fleming 7-31-1996 Trial Trans. at 171:19–173:17, 176:8–13.)

**RESPONSE:** Admitted that he answered "yes" to the prosecutor's question about whether the person he identified matched in height and weight (as opposed to him affirmatively offering those facts) three years after the lineup at the 1996 trial; disputed that is what actually occurred.

98. Margaret Fleming testified at Bouto's trial that she identified Bouto in the lineup as wearing the same clothing as the shooter. (Ex. 11, Margaret Fleming 7-31-1996 Trial Trans. at 153:11–155:18.)

**RESPONSE:** Admitted that Margaret Fleming answered "yes" to the leading question whether the Bouto was wearing the same clothing as the shooter. Dkt. 446-10 at 154:17-20.

99. There is no evidence from her trial testimony that Margaret was pressured by any police officer or told by anybody at CPD to pick someone out during the line up, and Margaret passed away prior to being deposed in this litigation. (Ex. 11, Maragret [sic] Fleming 7-31-1996 Trial Trans. at 147:20–163:24; Ex. 23, Michael Fleming Dep. at 31:11–17.)

**RESPONSE:** Disputed. PSOF 14, 63-72, 97. Although she did not directly so testify, circumstantial evidence of manipulation, pressure, and coercion includes, but is not limited to, that Margaret's generic description of the shooter's clothing evolved over time to be closer and closer to Bouto's clothing at the lineup; that Michael Fleming testified that his description of the

shooter's clothing was manipulated to match that of everyone else's (PSOF 63), and his descriptions of the shooter evolved in a similar way as Margaret's (PSOF 65); that Margaret identified an innocent man as the shooter (PSOF 5); that Guevara claimed that all six eyewitnesses who viewed the lineup he orchestrated identified Mr. Bouto, an innocent man (PSOF 41); that Margaret's lineup was conducted by Guevara, who has an extensive history of misconduct, and is now pleading the Fifth because truthful answers about this investigation could incriminate him; that Guevara answered "the Fifth" when asked if he framed Plaintiff (PSOF 97); and that other eyewitnesses have revealed investigatory misconduct in this case to frame Plaintiff (PSOF 45-74).

100. The identifications of Jacobo and Escobar were not introduced at trial. (Ex. 45, 7-29-1996 Trial Trans. at 28:19–32:24.)

**RESPONSE:** Admitted.

101. Defendant Pergande testified that when he located Bouto on the day of the shooting, "[h]e had the shaved hair on the sides and a tail in his hair." (Ex. 11, Pergande 7-31-1996 Trial Trans. at 183:6-185:5.)

**RESPONSE:** Admitted that he so testified; denied that it was true; indeed in Bouto's arrest report prepared by Pergande, Pergande himself described Bouto's hair as only "short." Dkt. 446-14,, Arrest Report, at PageID#13071; Dkt. 446-4, Pergande Dep., at 111:7-111:13, 112:8-112:16, 114:7-114:10; PSOF 23.

102. During the trial, Bouto's criminal defense attorney indicated that they wanted to call the 911 dispatcher to impeach Michael Fleming's testimony about his description of the shooter wearing black pants because the 911 dispatcher's notes, which were disclosed to Bouto's defense attorneys, indicated that the caller said the offender was wearing "orange shorts." (Ex. 11, 7-31-1996, Trial Trans. at 142:24–143:17, 145:22–146:20.)

**RESPONSE:** Admitted that Bouto's criminal defense attorney so indicated, but clarify that the confusion arose because the prosecutor was unaware of the 911 call notes, which had been omitted from the police investigative file (Dkt. 446-10, July 31, 1996 Trial Tr., at 146:17-146:15; Exh. 4, Lassar Report, at 6 n.5); and the defense attorney was "asking for assistance or additional time to obtain a witness that they have just learned about[,] a dispatcher from the Chicago Police Department who took the 911 call," Dkt. 446-10, July 31, 1996 Trial Tr. at 143:3-143:17, and mistakenly believed at the time that the "Michael" who made the 911 call was Michael Fleming (DSOF 103; Exh. 4, Lassar Report, at 6 n.5; Exh. 14, 911 Call Dispatch Notes).

103. The court did not permit this impeachment because Michael Fleming testified that he did not call 911. (Ex. 11, 7-31-1996, Trial Trans. at 176:18–23.)

**RESPONSE:** Admitted.

104. According to Bouto's investigator, Michael Summerfelt was the 911 caller. (Ex. 48, J.C. Frycek & Associates Notes at CCSAO-Serr-Mont_00018361.)

**RESPONSE:** Admitted.

105. The defense called Bouto's barber Arafat Issa, Defendant Pergande, Defendant Guevara, defense investigators Frycek and Press, and alibi witnesses Tania Astefan and Helen Kandah. (Ex. 21, 8-1-1996, Trial Trans. at 2.)

**RESPONSE:** Admitted.

106. Tania Astefan testified that on the day of the murder, she was with Bouto, who was her boyfriend, after school beginning at approximately 2:50 p.m., and that they were together at 3:04 p.m. (when she heard gunshots) up through approximately 3:10 p.m., when he dropped her off at home. **(Ex. 21, 8-1-1996, Trial Trans. at 82:6-83:16, 84:13-15, 87:4-19, 92:19-24.)**

**RESPONSE:** Admitted.

107. The Ruvalcaba investigative file contains only one two-page General Progress Report—prepared by Halvorsen on May 14, 1993—documenting a description of the shooter and contact information of scene witnesses, including Michael Fleming, and the Investigative File Inventory form confirms it is the only such General Progress Report in the file. (Ex. 20, GPR at RFC-Bouto 000057–58; Ex. 49, Investigative File Inventory at RFC-Bouto 000002.)

**RESPONSE:** Admitted that is what the investigative file produced in discovery contains. Exh. 7, Investigative File.

108. At trial, Bouto's criminal defense attorney stated on the record that he had these "handwritten notes done by Officer Halverson," which contained a description of the shooter and information from Michael Fleming. (Ex. 11, 7-31-1996 Trial Trans. at 237:8–241:2.)

**RESPONSE:** Admitted.

109. Guevara and Halvorsen's May 16, 1993, supplementary and lineup reports were never introduced by the prosecution at Bouto's criminal trial and were not introduced by either party as exhibits, but Bouto's defense attorney used the May 16, 1993, supplementary report one time to refresh Guevara's memory about the time of day during which Ruvalcaba was murdered. (*See* Ex. 21, Guevara's 8-1-1996 Trial Trans. at 38:21–39:16; Ex. XX, 5-16-1993 Lineup Report at RFC-Bouto 000081–83; Ex. 12, 5-16-1993 Supp. Report at RFC-Bouto 77.)

**RESPONSE:** Admitted, but immaterial.

110. Pergande and King's September 27, 1994 supplementary report containing information from the May 14, 1993 show up at the crime scene was not introduced by either party at trial. (Ex. 18, 9-27-1994 Supp. Report at RFC-Bouto 000137; Ex. 11, Pergande 7-31-1996 Trial Trans. at 178:15–202:6.)

**RESPONSE:** Admitted, but immaterial.

111. Neither Vicente nor Maldonado testified at trial, and neither of their statements were introduced at trial. (*See generally* Ex. 11, 7-31-1996 Trial Trans.; Ex. 21, 8-1-1996 Trial Trans. at 2:1–22.)

**RESPONSE:** Admitted.

112. On August 1, 1996, the jury convicted Bouto of first-degree murder. (Ex. 21, 8-1-1996 Trial Testimony at 228:21–24; Dkt. 434, Answer ¶¶ 1, 224.)

**RESPONSE:** Admitted.

**B. Bouto's sentencing and prior arrest for mob action.**

113. Prior to the Ruvalcaba murder, when Bouto was arrested on April 12, 1993 for Mob action, his co-arrestee Daniel George's mother filed a complaint with CPD's Office of Professional Standards unit against tactical officers Day, Dembowski, and King alleging that they physically abused Daniel George after his arrest. (Ex. 50, 4-20-1993 C.R. at RFC-Bouto 012458-012459; Ex. 9, Bouto Dep. at 302:14–305:1.)

**RESPONSE:** Disputed in that the complaint was filed by Daniel George's *sister*, who reported that she witnessed police push one brother and then observed a second brother, Daniel George, with a bruise to his eye and a bloody nose and was informed by him that a plainclothes police officer had hit him. Exh. 15, George CR File, at RFC-Bouto 012454, RFC-Bouto 012460. The remainder is admitted.

114. Prior to Bouto's arrest for the Ruvalacaba murder, he was aware that he was identified as a witness to the alleged abuse of Daniel George. (Ex. 51, 5-3-1993 OPS Letter at RFC-Bouto 12468; Ex. 9, Bouto Dep. at 305:20–306:4.)

**RESPONSE**: Disputed. The cited evidence does not establish that Plaintiff knew he had been listed as a witness. The deposition testimony merely establishes that the officers had animus toward Mr. George and knew Mr. Bouto was acquainted with Mr. George. Defendants'

citation to their exhibit 51 requires the Court to infer that Mr. Bouto received the letter and read it before his arrest on May 14, which this Court cannot do, particularly given the lack of a certified mail receipt demonstrating that the letter was delivered before May 14, 1993.

115. At Bouto's September 11, 1996, sentencing hearing, tactical officer Day testified about Bouto's April 12, 1993 arrest for mob action, and Bouto's defense attorney cross-examined him about George's abuse complaint filed against Day. (Ex. 52, 9-11-1996 Day's Sentencing Hearing Trans. at 52:18–54:24, 55:9–59:3.)

**RESPONSE:** Admitted.

116. Bouto was sentenced to 45 years, and the conviction was affirmed on appeal on November 25, 1998. (Dkt. 434, Answer ¶ 224; Ex. 53, *People v. Bouto*, No. 1-97-0343, at Bouto 017904 (Ill. App. Ct. Nov. 25, 1998).)

**RESPONSE:** Admitted.

**POST CONVICTION PROCEEDINGS**

117. In January 2017, Bouto filed a post-conviction petition arguing actual innocence based on tainted identifications and misconduct by Defendant Guevara. (Ex. 54, Pet. for Post-Conviction Relief at Bouto 000263–000291.)

**RESPONSE:** Admitted.

118. In April 2018, the Circuit Court of Cook County vacated Bouto's conviction for first-degree murder per an agreed motion with the Cook County State's Attorney's Office, and in June 2018, the murder charges were dismissed. (Ex. 55, Order Vacating Conviction at Bouto 003159; Answer ¶ 8.)

**RESPONSE:** Admitted.

**BOUTO'S CONTENTIONS**

119. In response to interrogatories, Bouto contends that Defendant Pergande, Pang, Guevara, and Halvorsen suppressed General Progress Reports that documented interviews with "Carl Richmond, Rey Lozada, Frank Escovar, Jacobo Lozada, William Lupo, Luis Oquendo, and Cesar Matias." (Ex. 56, Pl. Resp. to Def. Pang's Second Set of Interoggs., No. 11, at *1–2; Dkt. 434, Answer ¶ 90.)

**RESPONSE:** Admitted.

120. In response to interrogatories, Bouto contends that "a witness to the Ruvalcaba shooting made a 911 call in which he provided a description of the shooter which did not match Plaintiff," and "the record of this 911 call was not provided to Plaintiff or his criminal defense attorney." (Ex. 56, Pl. Resp. to Def. Pang's Second Set of Interoggs., No. 12, at *3.)

**RESPONSE:** Admitted.

121. Bouto contends Guevara and, on some occasions, Halvorsen, suppressed the tactics used to obtain identifications from Carl Richmond, Rey Lozada, Frank Escobar, Jacobo Lozada, specifically that Guevara showed "Bouto to many of the witnesses and instructed them that he was the shooter and that they should select him," and that before viewing the lineup, Guevara and Halvorsen showed Carl Richmond, Rey Lozada, Frank Escobar, Jacobo Lozada photographs of Bouto. (Dkt. 434, Answer ¶¶ 72–73; *see also* Ex. 56, Pl. Resp. to Def. Pang's Second Set of Interoggs., No. 13, at *4–5.)

**RESPONSE:** Admitted.

122. In response to interrogatories requesting Bouto to identify "what conduct" he attributes to Defendants Halvorsen, Maher, Marron, Mingey, Pang, and Pergande, "which you claim led to your arrest, prosecution, and conviction for the murder of Sal Ruvalcaba," Bouto referred to his Complaint and said that he "cannot possibly know at this early stage of litigation all conduct by

Defendant that led to Plaintiff's arrest, prosecution, and conviction, because this information is in Defendants' hands, Defendants have conspired to continue to suppress and destroy it, and discovery has only just begun." (Ex. 57, Pl.'s Resp. to Def. Halvorsen's First Set of Interrogs., No. 1, at 3; Ex. 58, Pl.'s Resp. to Def. Maher's First Set of Interrogs., No. 1, at 3; Ex. 59, Pl.'s Resp. to Def. Marron's First Set of Interrogs., No. 1, at 3; Ex. 60, Pl.'s Resp. to Def. Mingey's First Set of Interrogs., No. 1, at 3; Ex. 61, Pl.'s Resp. to Def. Pangs's First Set of Interrogs., No. 1, at 3; Ex. 62, Pl.'s Resp. to Def. Pergande's First Set of Interrogs., No. 1, at 3.)

**RESPONSE:** Disputed. If Defendants are suggesting that they were not on notice of Plaintiff's claims against them, Plaintiff's Third Amended Complaint provides a comprehensive explanation of the misconduct alleged against each of these Defendants. According to the Third Amended Complaint, Defendants Pergande and Pang claimed they arrested Mr. Bouto because he matched the shooter's description, but he did not match that description at all. Dkt. 256 ¶¶ 36-47, 55. Defendants Pang and Pergande arrested Plaintiff because they knew he was a witness to an excessive force complaint against Officers Day, Dembrowski, and King. *Id.* ¶ 49. Defendants Pang and Pergande arrested Plaintiff despite knowing he was not the perpetrator of the homicide. *Id.* ¶ 56. Defendants Pang, Pergande, and Halvorsen conducted and/or participated in the show-up, and used suggestive and coercive methods to manipulate eyewitnesses into identifying Plaintiff. *Id.* ¶¶ 57, 60-65. Defendants Pergande and Halvorsen prepared false and incomplete police reports, intentionally omitting their manipulative conduct and the statements of the witnesses who viewed the lineup, hiding this evidence to ensure that Mr. Bouto would not be able to access the information. *Id.* ¶¶ 67, 69. Defendants Pergande and Halvorsen purposely declined to photograph the other participants in the show-up. *Id.* ¶ 68. Defendant Halvorsen allowed witnesses to view photos of Mr. Bouto at Area 5 before the lineup, and constructed the lineup so that Mr. Bouto was the only one who remotely resembled the witnesses' descriptions. *Id.* ¶¶ 73-75, 77. Defendants Pergande and Halvorsen created

false and misleading police reports to document the lineup, which omitted their actions to influence the identifications, as well as the actual responses provided by eyewitnesses who viewed the lineups. *Id.* ¶ 86. Defendant Pergande withheld documentation regarding the fact that Bouto was a witness in the excessive force complaint against his fellow officers at the time of Bouto's arrest. *Id.* ¶ 91. Defendant Pang was present when Plaintiff's battery was removed from his pager, and then that incident was omitted from reports. *Id.* ¶¶ 92-94. Defendant Halvorsen knew he was directed to follow up on Plaintiff's alibi, as well as to identify "Mario", but instead he took no steps to do so. *Id.* ¶¶ 115-119. Defendant Halvorsen coerced Vicente to falsely implicate Mr. Bouto of murder, by feeding him details of the crime, telling him to implicate Mr. Bouto, promising him help with his pending charges in exchange for his assistance, and using force and threats to get him to comply. *Id.* ¶¶ 129-132. Defendant Halvorsen concealed his misconduct regarding Vicente from prosecutors and from the official police reports, and instead fabricated a false account stating that Vicente had legitimately heard Bouto confess to murder. *Id.* ¶¶ 140, 145-46. Halvorsen claimed that Vicente had told Maher that Bouto had confessed before he had any contact with Vicente, which was false, as explained in the preceding paragraphs. *Id.* ¶¶ 146-48. For his part, Defendant Maher backed the false claim that Vicente had told him first that Bouto confessed, and he and Halvorsen created a false story that Vicente had told Maher that Bouto confessed before Halvorsen arrived to work at 4 p.m. on 5/5/93. *Id.* ¶¶ 152-54. Maher's participation emboldened Halvorsen to carry out the plan to coerce Vicente, and Maher participated in fabricating Vicente's false inculpation of Bouto. *Id.* ¶¶ 155-56. Defendants Halvorsen and Maher knew Vicente's and Maldanado's statements were false. *Id.* ¶ 167. Defendants Pang, Pergande, Maher, and Halvorsen manipulated and solicited false statements from Lozado, Richmond, Michael and Margaret Fleming, Vicente, and Maldanado, falsified police reports, used suggestive identification procedures to falsify evidence, and failed to correct the fabricated evidence known to them to be false when it was used against Plaintiff at his

criminal trial. *Id.* ¶ 377. They also withheld their misconduct from prosecutors and Mr. Bouto's defense. *Id.* ¶ 383. Further, Plaintiff objected to these interrogatories on grounds that each interrogatory was "overly broad and unduly burdensome in its request for 'specificity.'" *See, e.g.*, Dkt. 446-56 at 3. Despite the objection, Defendants never sought any additional information from Plaintiff regarding these discovery responses, claimed that his responses were deficient in any way, or asserted that they were ignorant as to what misconduct they were alleged to have committed.

123. In response to interrogatories requesting Bouto to state with particularity (a) "the exculpatory evidence the Defendant Officers" withheld or suppressed, (b) "what testimony the Defendant Officer fabricated during the investigation of, or during any of the underlying criminal proceedings relating to the Sal Ruvalcaba homicide," (c) "identify which reports you allege were falsified and identify the information you allege was falsified," and (d) "describe the opportunity" each Defendant "had to intervene," Bouto referred to his Complaint and said that he "cannot possibly know at this early stage of litigation all of the opportunities that the Defendant Officers had to intervene to prevent him from being subjected to wrongful prosecution and imprisonment for a murder that he did not commit, because this information is in Defendants' hands, Defendants have conspired to continue to suppress and destroy it, and discovery has only just begun." (Ex. 61, Pl.'s Resp. to Def. Pangs's First Set of Interrogs., Nos. 3, 6, 8, 10 at 4–5, 7–11.)

**RESPONSE:** Disputed. See response to DSOF 122.

RESPECTFULLY SUBMITTED,

By: /s/Ruth Brown
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
russell@loevy.com