**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BOUTO, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 19 CV 2441 |
| | ) | |
| v. | ) | Hon. John Kness |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................................iii

INTRODUCTION ...............................................................................................................................1

LEGAL STANDARD ..........................................................................................................................3

ARGUMENT......................................................................................................................................4

I.      The Jury Must Resolve Plaintiff's Due Process Fabrication Claim Against Defendants ..........4

      A.  Defendants Fabricated Carl Richmond's Identifications of Plaintiffs..................................5

      B.  Defendants' Invocations of the Fifth Amendment Permit Adverse Evidentiary Inferences Against Them. .......................................................................................................13

      C.  Defendants Fabricated Escobar's Identifications of Mr. Bouto. ...................................... 15

            1.  Escobar's scene showup..........................................................................................16

            2.  Escobar's live lineup.................................................................................................19

            3.  Escobar's fabricated identifications deprived Mr. Bouto of liberty ............................ 21

      D.  Defendants' Fabrication of a Supposed "Confession" Heard by Maldonado and Vicente Deprived Mr. Bouto of Liberty ....................................................................................25

      E.  Defendants Fabricated Rey Lozado's Live Lineup Identification of Mr. Bouto ...............27

      F.  Defendants Fabricated the Clothing Identifications of Mr. Bouto....................................29

      G.  Defendants' Expansive Reading of *Moran* and *Patrick* In Order to Obtain Qualified Immunity Fails As A Matter of Law.....................................................................................31

II.     A Trial is Required on Plaintiff's Malicious Prosecution Claim .................................................32

      A.  A Reasonable Jury Could Find That Defendants Lacked Probable Cause.........................32

            1.  Defendants cannot rely on their own fabrications for probable cause ........................35

            2.  Once the fabricated evidence is stripped away, the remaining evidence does not amount to probable cause ......................................................................................37

                 i.  Mr. Bouto's appearance did not give Defendants probable cause ........................37

                 ii.  Rey Lozado did not give the Defendants probable cause .....................................39

B.  Defendants Did Not Have Arguable Probable Cause and Are Not Entitled To Qualified Immunity ................................................................................................................43

C.  Plaintiff's Federal Malicious Prosecution Claim Must Proceed to Trial ............................46

III.  Plaintiff's Due Process Claim Does Not Require a Finding that the Identification Was Unduly Suggestive ................................................................................................................50

IV.  A Trial is Required on Plaintiff's Suppression of Evidence Claim ............................................51

A.  Defendants' Suppression of Their Manipulative and Coercive Tactics Used on Key Prosecution Witnesses Violates Due Process ........................................................52

B.  Defendants' Qualified Immunity Defense As To *Brady* Fails................................................58

V.  A Trial is Required on Mr. Bouto's Conspiracy Claims ................................................................59

VI.  Plaintiff's Failure to Intervene Claim Must Proceed To A Trial................................................64

VII.  Plaintiff's IIED, *Respondeat Superior*, and Indemnification Claims Should Not Be Dismissed. ................................................................................................................64

## TABLE OF AUTHORITIES

### CASES

*Abbott v. Sangamon County,* 705 F.3d 706 (7th Cir. 2013)................................................................33

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) .........................................................27

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) ................................................36, 40, 45

*Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016) ...........................................................................49

*Amundsen v. Chicago Park Dist.*, 218 F.3d 712 (7th Cir. 2000) ............................................. 60, 62

*Anderer v. Jones,* 342 F. Supp. 2d 799 (E.D. Wis. 2002), *aff'd,* 385 F.3d 1043
(7th Cir. 2004)*, amended on denial of reh'g,* 412 F.3d 794 (7th Cir. 2005).......................34, 36, 42

*Andersen v. City of Chicago,* 454 F. Supp. 3d 808 (N.D. Ill. 2020)......................................... 17, 42

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) ......................................................*passim*

*Anderson v. Creighton*, 483 U.S. 635 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) ................................48

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................4

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) .....................................................23, 32, 48, 59

*Aska v. Yingling*, No. 3:23-CV-50004, 2026 WL 179545 (N.D. Ill. Jan. 23, 2026)................................59

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir.).......................................................*passim*

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) .................................................................................13

*Beck v. Ohio*, 379 U.S. 89 (1964)..................................................................................................40

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) .................................................................13

*Behrens v. Pelletier*, 516 U.S. 299 S. Ct. 834, 133 L. Ed. 2d 773 (1996) ..................................48

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) .................................................60, 63, 64

*BeVier v. Hucal,* 806 F.2d 123 (7th Cir. 1986)..............................................................................40

*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016) ......................................................................47

*Blackmon v. City of Chicago,* 700 F. Supp. 3d 617 (N.D. Ill. 2023) ...............................................8

*Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) .............................................................8, 50, 51

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001) ............................................................................54

*Brady v. Maryland*, 373 U.S. 83(1963)..........................................................................*passim*

*Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) .................................................................22

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)...............................................................................64

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019) ..................................................................... 15, 34

*Camreta v. Greene*, 563 U.S. 692 (2011).................................................................................47

*Cartwright v. Chicago*, 450 Fed. App'x 539 (7th Cir. 2011) ........................................................44

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...........................................................................3

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) ............................................................... 44, 46

*Coleman v. City of Peoria, Illinois*, 925 F.3d 336 (7th Cir. 2019)..................................................12

*Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408 (N.D. Ill. Aug. 26, 2015) ...........................26

*Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015) ..........................................................................23

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) .....................................................................13

*Devereaux v. Abbey,* 263 F.3d 1070 (9th Cir. 2001).....................................................................7

*District of Columbia v. Wesby*, 583 U.S. 48 S.Ct. 577 L.Ed.2d 453 (2018) … ............................................32

*Dominguez v. Hendley,* 545 F.3d 585 (7th Cir.2008)..........................................................4, 5, 7, 58

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013) ..................................................................... 57, 58

*Estate of Loury v. City of Chi.*, 2019 U.S. Dist. LEXIS 38029 (N.D. Ill. Mar. 11, 2019)...........................13

*Evans v. Matson*, 2022 WL 912031 (E.D.Wis. Mar. 29, 2022), aff'd, No. 23-2954, 2024 WL 2206638 (7th Cir. May 16, 2024)..............................................................................................45, 46

*FDIC v. O'Neil*, 809 F.2d 350 (7th Cir. 1987) ...........................................................................55

*Fields v. Wharrie (Fields I)*, 672 F.3d 505 (7th Cir. 2012).........................................................53

*Fields v. Wharrie (Fields II)*, 740 F.3d 1107 (7th Cir. 2014)................................................*passim*

*Flanagan v. Office of Chief Judge of Circuit Court of Cook Cnty., Illinois*, 893 F.3d 372 (7th Cir. 2018)............................................................................................................18

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ............................................................. 40, 43

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................................40

*Fulton v. Bartik*, No. 20 C 3118, 2024 WL 1242637 (N.D. Ill. Mar. 22, 2024) ................................ 45, 46

*Gauger v. Hendle,* 349 F. 3d 354 (7th Cir. 2003)..........................................................55

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012)..................................... 8, 36, 55

*Giglio v. United States*, 405 U.S. 150 (1972) .............................................................51

*Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190
(N.D. Ill. Oct. 30, 2019) ...........................................................................13

*Goudy v. Basinger ("Goudy I")*, 604 F.3d 394 (7th Cir. 2010) ...........................................52

*Goudy v. Cummings ("Goudy II")*, 922 F.3d 834, 2019 WL 1930509
(7th Cir. May 1, 2019)...........................................................15, 25, 51, 58

*Gray v. City of Chicago*, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022)........................5, 12, 19, 34

*Griffin v. City of Chicago*, 497 F. Supp. 3d 307 (N.D. Ill. 2020)......................................11

*Grundhoefer v. Sorin,* 20 N.E.3d 775 (1st Dist. 2014) ..................................................35

*Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743
(N.D. Ill. July 13, 2017) ...........................................................................29

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979)............................................... 60, 61

*Harlow v. Fitzgerald*, 457 U.S. 800 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) ........................... 32, 48

*Harris v. City of Chicago*, 266 F.3d 750 (7th Cir. 2001)........................................ 13, 14

*Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 11887797 (N.D. Ill. Aug. 22, 2017) .......................10

*Harris v. Kuba,* 486 F. 3d 1010 (7th Cir. 1987).........................................................55

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015) ................................................... 33, 37

*Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 L.Ed.2d 383 (1994) ......................................49

*Hernandez v. Avery*, 137 S. Ct. 2249, 198 L. Ed. 2d 680 (2017) ..........................................52

*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009)........................... 62, 63

*Hope v. Pelzer*, 122 S.Ct. 2508 (2002)................................................................59

v

*Howard v. Firmand,* 378 Ill. App. 3d 147 (1st Dist. 2007) ........................................................35

*Humphrey v. City of Anderson,* No. 119 C 00764, 2020 WL 3060363
(S.D. Ind. June 8, 2020) .................................................................................................. 26, 50

*Hunter v. Bryant,* 502 U.S. 224 (1991) .......................................................................................44

*Hurt v. Wise,* 880 F.3d 831 (7th Cir. 2018) ...........................................................8, 21, 43, 46

*In re Watts Coordinated Pretrial Proc.,* No. 19-CV-1717, 2022 WL 9468206
(N.D. Ill. Oct. 14, 2022) ...........................................................................................................24

*Jimenez v. City of Chicago,* 830 F.Supp.2d 432 (N.D. Ill. 2011) ............................................ 29, 42

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ....................................................*passim*

*Kluppelberg v. Burge,* No. 13 C 03963, 2017 WL 3142757 (N.D. Ill. July 25, 2017) ......................... 14, 20

*Kohler v. Leslie Hindman, Inc.,* 80 F.3d 1181 (7th Cir. 1996) .............................................................10

*Kuri v. City of Chicago,* No. 13 C 1653, 2017 WL 4882338 (N.D. Ill. Oct. 30, 2017) ........................ 36, 54

*Kyles v. Whitley,* 514 U.S. 419 (1995) ..............................................................21, 32, 52, 54

*LaPorta v. City of Chi.,* 277 F. Supp. 3d 969 (N.D. Ill. 2017) .........................................................13

*LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir. 1995) ...............................................14

*Lawson v. Veruchi,* 637 F.3d 699 (7th Cir. 2011) ...........................................................36, 40, 45

*Lewis v. City of Chicago,* 914 F.3d 472 (7th Cir. 2019) ................................................................53

*Liggins v. City of Chicago,* No. 1:20-CV-04085, 2021 WL 2894167
(N.D. Ill. July 9, 2021) ............................................................................................... 63, 64

*Logan v. City of Chicago,* 891 F. Supp. 2d 897 (N.D. Ill. 2012) ..............................................14, 15

*Lopez v. Dart,* No. 06 C 4836, 2008 WL 4889088 (N.D. Ill. July 17, 2008) ...........................................16

*MacDonald v. General Motors Corp.,* 110 F.3d 337 (6th Cir. 1997) ...............................................10

*Mack v. City of Chicago,* 151 F.4th 887 (7th Cir. 2025) .............................................................47

*Malley v. Briggs,* 475 U.S. 335 (1986) ........................................................................... 43, 49

*Manning v. Miller,* 355 F.3d 1028 (7th Cir. 2004) ....................................................................58

*Manuel v. City of Joliet,* 137 S. Ct. 911 (2017) .......................................................................53

*Maxwell v. Indianapolis*, 998 F.2d 431 (7th Cir. 1993) ........................................................34, 35, 43

*McComas* v. *Brickley*, 673 F.3d 722 (7th Cir. 2012) ...........................................................43

*Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450
(N.D. Ill. April 8, 2024) ................................................................................................. 24, 31

*Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590 (N.D. Ill. 2013) .........................................15

*Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000) ......................................................................9

*Mitchell v. Forsyth*, 472 U.S. 511 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) ..........................................48

*Mitsui Sumitomo Ins. Co., Ltd. v. Moore Transp., Inc.*, 500 F. Supp. 2d 942
(N.D. Ill. 2007) ..............................................................................................................44

*Moorer v. Platt,* No. 18 CV 3796, 2020 WL 814924 (N.D. Ill. Feb. 19, 2020) ....................................42

*Moran v. Calumet City,* 54 F.4th 483 (7th Cir. 2022) ........................................... 23, 24, 25, 26, 31

*Mullenix v. Luna*, 577 U.S. 7 (2015) ...................................................................................50

*Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022) ........................................................64

*Napue v. Illinois*, 360 U.S. 264 (1959) ...............................................................................51

*Neil v. Bigger*, 409 U.S. 188 (1972) ..................................................................................40

*Nelson v. Vill. of Lisle, Ill.*, 437 F. App'x 490 (7th Cir. 2011) ................................................37

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) ............................................................ 53, 55

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) ............................................................. 53, 56

*Norris v. Bain*, 2006 WL 753131 (S.D. Ind. Mar. 21, 2006) ........................................................49

*Olson v. Tyler,* 771 F.2d 277 (7th Cir. 1985) ........................................................................49

*Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503 (D. Md. Oct. 23, 2015),
aff'd, 679 Fed. App'x. 234 (4th Cir. 2017) ..............................................................................8

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ....................................20, 28, 31

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) .................................................... 22, 23

*Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328 (N.D. Ill. Oct. 31, 2012) ......................... 12, 27

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) .......................................................................29

*Pearson v. Callahan*, 555 U.S. 223 S. Ct. 808, 172 L. Ed. 2d 565 (2009)....................................................48

*Pennington v. Hobson*, 719 F.Supp. 760 (S.D.Ind. 1989)...................................................................... 49

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014)...................................................................4

*Phillips v. City of Chicago, No. 14 C 9372*, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018)......................... 22

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002)............................................................................60

*Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019) …………….………….................................... 32, 43

*Reitz*, v. Creighton, No. 15-CV-01854, 2015 WL 5081485 (N.D. Ill. Aug. 26, 2015)..........................63

*Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir. 1981) ................................................60

*Richardson v. Vill. of Dolton*, No. 20 C 4254, 2022 WL 4606063 (N.D. Ill. Sept. 30, 2022) ...................46

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018).........................................................................................29

*Robinson v. Gerritson*, 210 F. Supp. 2d 1004 (N.D. Ill. 2002) .......................................................47

*Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861 (7th Cir. 2010) .......................................10

*Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011).............................................................................50

*Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir. 2019) ......................................................15

*Russell v. Board of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336 (7th Cir. 2001)...................5

*Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097
(N.D. Ill. May 17, 2016) .................................................................................................60

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)..................................................................55

*Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020) ..................................28

*Simmons v. City of Chicago*, Case No. 14 C 9087, 2017 WL 497755
(N.D. Ill. Feb. 7, 2017).................................................................................................37

*Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591 (7th Cir. 1985)....................................................12

*Smith v. Cain*, 565 U.S. 73 (2012)...............................................................................52, 53

*Smith v. City of Chicago*, 913 F.2d 469 (7th Cir. 1990)..............................................................49

*Smith v. City of Chicago*, No. 21-CV-890, 2026 WL 113675 (N.D. Ill. Jan. 15, 2026)............................10

*Smith v. Springer,* 859 F.2d 31 (7th Cir.1988) ................................................................ 49

*Smith v. Burge*, 222 F. Supp. 3d 669, (N.D. Ill. 2016) ....................................................60

*Sornberger v. City of Knoxville,* 434 F. 3d 1006, (7th Cir. 2006) ....................................55

*Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015) ..............................................................3

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ...............................................................48

*Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34 (2d Cir. 2005) ................................. 13, 14

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2017) ..................................................... 8, 19, 22

*Stovall v. Denno*, 388 U.S. 293 (1967) ...........................................................................41

*Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021) .................................................... 48, 59

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013) ..................................... 20, 21

*Thompson v. City of Chicago*, No. 07 C 1130, 2009 WL 674353 (N.D. Ill. Mar. 12, 2009) ........................14

*Thomspon v. Clark*, 596 U.S. 36 (2022).........................................................................47

*Titran v. Ackman,* 893 F.2d 145 (7th Cir. 1990) ...........................................................25

*Tolan v. Cotton*, 572 U.S. 650 (2014) ........................................................................... 59

*Treece v. City of Naperville,* 1998 WL 142391 (N.D.Ill. March 25, 1998)......................49

*Tully v. Del Re*, No. 00 CV 2829, 2002 WL 31175983 (N.D. Ill. Oct. 1, 2002) ...................60

*U.S. v. Preston*, 751 F.3d 1008 (9th Cir. 2014).......................................................... 20, 28

*United States v. Alahmedalabdaloklah,* 76 F.4th 1183 (9th Cir. 2023) ............................25

*United States v. Caliendo*, 910 F.2d 429 (7th Cir. 1990) ...............................................60

*United States v. Carpenter*, 342 F.3d 812 (7th Cir. 2003)................................................38

*United States v. Glaser* 14 F.3d 1213 (7th Cir. 1994).................................................... 47

*United States v. Harris*, 914 F.2d 927 (7th Cir.1990) ...................................................13

*United States v. Johnson*, 457 U.S. 537 (1982) ..............................................................41

*United States v. Kozinski*, 16 F.3d 795 (7th Cir. 1994) .................................................. 12

*United States v. Sasson*, 62 F.3d 874 (7th Cir. 1995)..................................................................60

*United States v. Timms*, 74 Fed. Appx. 647 (7th Cir. 2003) ...................................................... *38*

*Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231
(N.D. Ill. Sept. 30, 2023)............................................................................................ *25*

*Venture Holdings, LLC v. Moca Fin., Inc.,* 116 F.4th 651 (7th Cir. 2024)....................................15

*Wallace v. City of Chicago,* 440 F. 3d 421, (7th Cir. 2006) ..........................................................55

*Washington v. Boudreau,* 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022)........................... 9, 16, 24

*Wearry v. Cain*, 136 S.Ct. 1002 (2016) ....................................................................................... 52

*Wearry v. Cain*, 577 U.S. 385 (2016) ................................................................................... 51, 57

*Weston v. City of Chicago*, No. 20 C 6189, 2026 WL 821237 (N.D. Ill. Mar. 25, 2026) ........................ 58

*White v. Smith,* 696 F.3d 740 (8th Cir. 2012).......................................................................... 7, 28

*Whitlock v. Brueggmann*, 682 F.3d 567 (7th Cir. 2012) ...........................................................*passim*

*Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770 (N.D. Ill. 2020)........................................... 11, 28

*Williams v. Chrans*, 50 F.3d 1356 (7th Cir. 1995) ......................................................................23

*Williams v. City of Chicago*, 315 F. Supp. 3d 1060 (N.D. Ill. 2018) ............................................26

*Williams v. City of Chicago,* 733 F.3d 749 (7th Cir.2013) ..........................................................35

*Wilson v. Schomig*, 863 F.Supp. 789 (N.D.Ill. 1994) .................................................................19

*Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000)...............................................34, 36, 42

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994)........................................................................... 64

*Yash Venture Holdings, LLC v. Moca Fin. Inc,* No. 4:19-CV-04176-SLD-JEH,
2022 WL 3574319 (C.D. Ill. Mar. 31, 2022)...............................................................................15

## RULES

Federal Rule of Evidence 803(8)(A)(iii).........................................................................................13

Federal Rule of Evidence 803(8)(A).............................................................................................13

Federal Rule of Civil Procedure 801(d)(2)(D) ........................................................................................13

## INTRODUCTION

Defendants present a sanitized version of the record and then ask this Court to bless their actions and grant them summary judgment. That is the opposite of the Rule 56 process.

Unstated in Defendants' motions is the fact that the City hired Sidley & Austin to investigate Mr. Bouto's claims. PSOF 95. After conducting a comprehensive investigation, Sidley & Austin determined that Mr. Bouto was likely innocent and his conviction was likely procured by Defendant Guevara's misconduct. PSOF 96. Both Defendants Halvorsen and Guevara have pled the Fifth rather than answer questions about their conduct in this case, including whether they framed Mr. Bouto. PSOF 97-98.

Properly construed, the summary judgment record demonstrates a conspiracy between Defendants Guevara, Halvorsen, Pergande, Pang, and Maher to frame Plaintiff for a murder he did not commit. The plot began when Defendants Pergande and Pang falsely arrested Mr. Bouto shortly after the Ruvalcaba murder, despite the fact that he did not fit the suspect's description – unlike the shooter, he had facial hair and no ponytail, among other discrepancies. PSOF 11, 21-27; *id.* 8-20, 38. These Defendants were motivated to frame Mr. Bouto because he was a witness to police brutality perpetrated by their partner. PSOF 29-32, 92-93.

From there, Defendants Guevara and Halvorsen entered the picture. PSOF 8, 33. They manipulated several teenage gang rival witnesses (the "Spanish Cobra Witnesses," Carl Richmond, Rey Lozada, Jacobo Lozada, and Frank Escobar) to falsely implicate Mr. Bouto. PSOF 1-4, 9-10, 14-20, 34-37, 39-62, DSOF 7. They then also secured improper "clothing identifications" from two neighborhood witnesses, a 15-year-old and his mother (Michael and Margaret Fleming), by manipulating these witnesses to "match" their descriptions with the description supposed provided by other eyewitnesses so that they evolved to fit Mr. Bouto. PSOF 12, 14, 63-72. One gang rival, Carl Richmond, testified that although he told Guevara he did not see the shooter, Guevara told him

"that Bouto was the shooter," before threatening him if he did not identify Bouto, "I'm going to make your life miserable." PSOF 49; *see also* PSOF 9, 16-20, 36-37, 34-35, 39-54. These Defendants worked to ensure the witnesses would falsely identify Bouto, including by telling them he was the culprit and showing him in handcuffs to the witnesses before the lineups. PSOF 47-48.

The lineup identifications were inherently unreliable – most were made by rival gang members, who viewed the shooter from over sixty yards away, and Mr. Bouto did not fit the description. PSOF 16-17, 36-37. Three were supposed "clothing identifications"—disavowed by Chicago Police Department policy—by witnesses whose initial interviews reflect that they were able to provide only extremely limited information about the shooter's clothing, or changed their accounts to fit Bouto after encountering Guevara and Halvorsen. PSOF 60-62, 63-72. Even without knowledge of Defendants' misconduct, felony review prosecutors refused to charge Mr. Bouto and directed Defendants to investigate his alibi and a person of interest seen with the shooter. PSOF 77.

Mr. Bouto's alibi was rock solid – as his girlfriend and her friend have testified to for decades, Mr. Bouto was with them, blocks from the murder scene, when the shots rang out. PSOF 7. But rather than investigate that alibi, Defendants Pang removed the battery from Plaintiff's pager, preventing him from disclosing his girlfriend's number to police; and Defendants falsely claimed that Mr. Bouto did not know his girlfriend's last name or where she lived. DSOF 38-40, PSOF 74.

Instead of investigating Mr. Bouto's alibi, Defendants Guevara, Halvorsen, and Maher conspired to coerce two people in the jail lockup, Francisco Vicente and Edwin Maldonado, to falsely claim that Mr. Bouto confessed. PSOF 79-85. That false, and subsequently recanted, claim, was enough to convince prosecutors to charge Mr. Bouto with murder. PSOF 86. Guevara and Halvorsen went on to claim that in two other murder investigations Vicente also heard supposed confessions from the perpetrator, but Vicente has now come clean, giving a thorough account of the

2

fact-feeding, pressure, coercion, and undisclosed promises he received to implicate Mr. Bouto. PSOF 79-82, 86, 90, 91.

At his subsequent criminal trial, Mr. Bouto was convicted based on the identifications fabricated by Defendants. PSOF 6, 94, 28. His defense was hampered by Defendants withholding the highly coercive means by which they manipulated witnesses into falsely identifying Plaintiff. PSOF 9-10, 14-20, 38, 51.

Accordingly, Plaintiff's due process claim must proceed to trial against Defendants Guevara, Halvorsen, and Maher on his fabrication of evidence theory, and against Defendants Guevara, Halvorsen, Pergande and Pang on his *Brady* theory. Plaintiff's malicious prosecution claims also require a trial to determine Defendants Guevara's and Halvorsen's liability. Finally, Defendants Pang, Pergande, Maher, Guevara, and Halvorsen cannot obtain summary judgment on Plaintiff's conspiracy and failure to intervene claims.

Defendants analyze only the portion of the record they claim sinks Plaintiff's claims. But to do so, they necessarily ignore Guevara and Halvorsen's invocations of the Fifth Amendment (PSOF 97-98) and the numerous witnesses in this case accusing Defendants of misconduct. When the totality of the evidence is examined, including the misconduct substantiated by Plaintiff's evidence against Defendants, their motion must be denied.

## LEGAL STANDARD

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]ith the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Credibility

3

determinations are for the jury, and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

ARGUMENT

**I.      THE JURY MUST RESOLVE PLAINTIFF'S DUE PROCESS FABRICATION CLAIM AGAINST DEFENDANTS.[1]**

Plaintiff alleges that Defendants fabricated several witnesses' "identifications" of him, knowing that those identifications were false, and used that false evidence to deprive him of liberty. This includes all three live lineup identifications Defendants supposedly obtained: from Carl Richmond, Rey Lozado, and Frank Escobar, as well as showup identifications from Richmond and Escobar. Defendant Guevara does not dispute for summary judgment purposes that he fabricated Richmond's identification. All told, Defendants fabricated the evidence they needed to pursue Mr. Bouto for the shooting and ensure his prosecution; without their manufactured evidence, there was simply not enough to make a case. Mr. Bouto, after all, had corroborated alibi, did not match the physical description of the shooter, had no physical link to the crime, and denied all involvement.

To establish a due process fabrication claim, Mr. Bouto must show that Defendants: (1) "'created evidence that they knew to be false,'" and (2) that the evidence was used "'in some way'" to deprive him of liberty. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock*, 682 F.3d at 580; *Petty v. City of Chicago*, 754 F.3d 416, 421-22 (7th Cir. 2014)). The Seventh Circuit has repeatedly recognized a due process violation based on fabricating evidence during an investigation. *Whitlock v. Brueggmann*, 682 F.3d 567, 580 (7th Cir. 2012) (acknowledging its decisions in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) and *Dominguez v. Hendley*, 545 F3d. 585 (7th Cir. 2008)). On that score, the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates the due process clause if the

---

[1] Plaintiff has narrowed his claims at summary judgment and no longer proceeds against Defendants Mingey and Marron.

4

evidence is later used to deprive the defendant of her liberty in some way." *Id.* This concept of fabrication is extremely well-settled, and Defendants' attempted narrowing of the claim by arguing that fabricated evidence is actionable only if it was introduced at trial misrepresents the law, as Plaintiff more fully addresses below. In any case, several pieces of evidence fabricated by the Defendants *were* introduced at trial, such as Carl Richmond's false identifications, so on that basis alone a trial is unavoidable.

Police officers cannot create false evidence, such as statements they falsely attributed to a witness. *See Dominguez,* 545 F.3d at 589 ("There was and is no disputing that such conduct [including fabricating evidence] violates clearly established constitutional rights."). At summary judgment, a plaintiff "need not have a smoking gun or an admission to prove knowledge"; a plaintiff need only offer "sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022).

A reasonable jury could conclude on this record that the Defendants "knew the evidence they were eliciting was false." *See id.* Indeed, the record contains a classic "he said, she said," a genuine factual dispute that precludes summary judgment. *Russell v. Board of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336, 340 (7th Cir. 2001) (summary judgment is a singularly inappropriate time to resolve a "he said, she said" kind of dispute). When framed correctly in this manner, there is no question that Plaintiff is entitled to a trial on his fabrication claim.

### A. Defendants Fabricated Carl Richmond's Identifications of Plaintiffs

Beginning with witness Carl Richmond, the record creates a triable issue as to whether Defendants Guevara and Halvorsen fabricated both of his identifications of Plaintiff, first from the scene showup, and then from the live lineup. PSOF 4, 9, 16-20, 36-37, 34-35, 39-54, 97-98.

Richmond did not see the faraway shooter's face, which was obscured by a hood. PSOF 4, 14, 16-18. Richmond was more than two hundred feet away from the shooter (about three quarters of a football field) and the shooting was over within seconds. 16-17, 4.

Richmond told officers at the scene that he had not seen the shooter's face (8-9, 14-15, 18, 44), but officers nonetheless presented this teenage gang rival (PSOF 36-37) with a "showup" of Mr. Bouto and several other teenagers handcuffed in the back of a police car at the scene. PSOF 34-35, Resp. to DSOF 22. Guevara and Halvorsen were present for the showup identification procedure. PSOF 8, 34. Richmond did not pick anyone out. PSOF 45. Corroborating Richmond's account, Defendant Pergande's report on the showup procedure makes no mention of Richmond making an on-scene identification. PSOF 39. Defendants Guevara and Halvorsen, however, faked the evidence: they told Assistant State's Attorney Hughes ("ASA Hughes") during felony review that Richmond *had* identified Mr. Bouto at the scene, thus justifying their decision to detain Mr. Bouto. PSOF 45, 87-89. Richmond flat-out denies doing this. PSOF 45. Guevara invoked the Fifth Amendment when asked whether he fabricated Richmond's on-scene identification of Mr. Bouto, PSOF 97, permitting an adverse inference against Guevara on this question. *Anderson*, 932 F.3d at 511 ("The Fifth Amendment permits an adverse inference against parties in civil actions when they refuse to testify in response to probative evidence against them.").

Following the scene showup, Guevara and Halvorsen forced Richmond to Area Five and would not let him and the other Spanish Cobra Witnesses leave or use the phone. PSOF 46. At the Area Five detective division, before the live lineup, Richmond and the other detained bystanders (including Escobar and Rey Lozado) were shown Mr. Bouto, handcuffed, inside a room whose door was left ajar, and also provided a Polaroid photo of Mr. Bouto taken that day—sending a clear message that Mr. Bouto was the target and making clear his appearance. PSOF 47, 48, 51. Defendant Guevara proceeded to pull individual witnesses out, one by one, to explicitly manufacture

their identifications. PSOF 59. Richmond testified that when it was his turn to be pulled aside, and even though Richmond kept explaining that he did not actually see the shooter's face, Guevara manipulated, pressured, and coerced Richmond to identify Mr. Bouto. PSOF 44-55. Under duress, Richmond had no choice but to adopt the false identification out of intimidation and fear, which he then parroted at Mr. Bouto's criminal trial. *Id.* Guevara invoked his Fifth Amendment privilege when asked about these events (PSOF 97), including if he fabricated Richmond's identification, thus permitting an adverse inference on this point. *See Anderson*, 932 F.3d at 511.

This record thus presents the rare circumstance where direct evidence from a witness reveals the police fabrication. A jury could readily conclude that Richmond's identifications of Mr. Bouto were fabricated statements—identifications which Defendants claim originated with the witness but were actually scripted by Defendants. "Fabricated testimony is testimony that is made up; it is invariably false." *Fields v. Wharrie (Fields II)*, 740 F.3d 1107, 1110 (7th Cir. 2014). Here, Defendants made up two identifications: Richmond's on-scene identification, when he made no identification at all; and Richmond's live lineup identification, which he was forced to adopt despite Defendants knowing that he was unable to truthfully identify anyone at all. Richmond's fabricated identifications alone are sufficient to create a triable fabrication claim. *Dominguez*, 545 F.3d at 589 ("There was and is no disputing that such conduct [including fabricating evidence] violates clearly established constitutional rights."); *Whitlock*, 682 F.3d at 575 ("Herrington's statement alone precludes summary judgment by supporting plaintiffs' contention that the police defendants violated their right not to have police officers manufacture false evidence."); *White v. Smith,* 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case"); *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) ("Fabrication can also be proven circumstantially, including by evidence showing that … [d]efendants used investigative techniques

7

that were so coercive and abusive that they knew or should have known that those techniques would yield false information"); *Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), aff'd, 679 Fed. App'x. 234 (4th Cir. 2017) (finding that allegations that the defendant exerted pressure on victim that resulted in the fabrication of evidence against plaintiff set forth a fabrication claim particularly where the "contents of the conversations . . . are not disclosed" contrary to what one would expect).

Defendant Guevara attempts to avoid liability by arguing that even though he fabricated Richmond's identifications, the result was immaterial to the trial. But the law is clear: convictions that rest on fabricated evidence violate due process, as false evidence can *never* serve a truth-seeking function. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("Falsified evidence will *never* help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process.") (emphasis in original). The Seventh Circuit has repeatedly rejected Guevara's implicit premise that fabricated evidence actually used to deprive someone of liberty can somehow be harmless error. *See id.*; *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018) (The Due Process Clause "forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence."); *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017); *Whitlock*, 682 F.3d at 582-84; *Fields II*, 740 F.3d at 1112.

Here, Richmond's trial testimony against Mr. Bouto was not marginal or irrelevant to issues of guilt or innocence – the prosecution's case was centered on identification evidence, and no confession or physical evidence tied him to the crime. PSOF 94, 5-6. Richmond's testimony bore squarely on whether Mr. Bouto committed the shooting, and this direct "eyewitness" testimony validated other "eyewitnesses" identifications and contradicted Mr. Bouto's alibi defense. *E.g.*, PSOF 42, 7, 73-75. Accordingly, Richmond's testimony was undeniably material. *See Blackmon v. City of Chicago,* 700 F. Supp. 3d 617, 638 (N.D. Ill. 2023), *rev'd on other grounds, Blackmon v. Jones*, 132 F.4th

8

522 (7th Cir. 2025) (alleged fabrication of one of two eyewitnesses who "formed the core of the case" was "clearly material"). In any event, whether fabricated evidence was material is itself a jury question, so a trial is required. *See Washington*, 2022 WL 4599708, at *21 (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary).

Defendant Halvorsen, for his part, does not contest that Guevara fabricated Richmond's live lineup identification, but claims that he did not participate in fabricating either of Richmond's identifications, nor did he know of their falsity. ECF No. 445 at 17-18. His strategy of ignoring inconvenient facts is untenable at summary judgment. As to the scene showup, Assistant State's Attorney Hughes attributed to *both* Halvorsen and Guevara the false fact that Richmond positively identified Mr. Bouto at the scene. PSOF 45, 98. Throughout the early activities of the investigation, from scene showup through live lineup, Plaintiff's evidence reflects that Halvorsen was present in tandem with Guevara at the locations where the fabrication took place; participated with Guevara in myriad instances of misconduct in this investigation, including with respect to Richmond; purposefully declined to carry out investigation that would have been standard in a legitimate investigation; authored the police report on Richmond's manufactured live lineup identification; and gave false information to ASA Hughes about the evidence in the case. PSOF 8, 12, 22, 28, 34, 37, 39, 41, 43, 45, 46, 52-53, 61, 63, 65, 67, 70, 74, 78, 84-87, 90, 98.

Thus, Halvorsen's effort to take himself out of the equations falls short. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (plaintiff's facts must be credited at summary judgment). While Guevara may have been the loudest voice, that does not absolve Halvorsen of liability.

It is necessary to address Defendants' claim that Plaintiff is judicially estopped from relying on Richmond's testimony that he did not identify Plaintiff at the showup. Dkt. 445 at PageID 10896 n.3. Plaintiff has made no such judicial admission. Defendants do not identify the source of the

9

supposed "judicial admissions," but presumably they are referring to their allegations in DSOF ¶24. As stated in his response, however, Plaintiff had no knowledge of what happened outside the police car in which he was detained. Resp. to DSOF ¶24. He assumed that Richmond identified him, but he did not know. *Id.* Plaintiff's statements on this topic in his Complaint cannot constitute judicial admissions because they are not "deliberate, clear and unambiguous" statements such that a party is bound. *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) ("'in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous.'"), quoting *MacDonald v. General Motors Corp.,* 110 F.3d 337, 340 (6th Cir. 1997). In his Complaint, as reproduced in Defendants' Answer at Dkt. 434, Plaintiff alleges that Defendants fabricated and manipulated Richmond into identifying him, but it is not unambiguously clear that Plaintiff is maintaining that Richmond identified him. Dkt. 434 ¶¶ 66-76. It was not until Richmond's deposition that Plaintiff learned that Richmond did not in fact identify him at the showup.

In situations where the alleged admission is not clear and unambiguous, courts decline to apply the judicial admission doctrine. *See, e.g., Smith v. City of Chicago*, No. 21-CV-890, 2026 WL 113675, at *8 (N.D. Ill. Jan. 15, 2026) ("Based upon the equivocal nature of the statement, the Court declines to find that Plaintiff's identification of Defendant Officer Ramos constitutes a binding judicial admission and denies summary judgment on this ground"); *cf. Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 11887797, at *3 (N.D. Ill. Aug. 22, 2017) (St. Eve., J.) (barring use of judicial admission in party's brief because additional evidence had since come to light, rendering admission one of "very little probative value").

Although Defendants refer to Plaintiff's judicial "admissions," it is unclear to what they are referring apart from the allegation in his Complaint. Defendants cannot use statements in Plaintiff's clemency petition as the basis for a judicial admission, because the judicial admission must have been made in the same lawsuit. *See Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996)

("a statement made in one lawsuit cannot be a judicial admission in another"); *Griffin v. City of Chicago*, 497 F. Supp. 3d 307, 315 (N.D. Ill. 2020) (same). And Plaintiff's statements in his deposition clearly demonstrate that he has no personal knowledge, meaning he made no admission in his testimony, judicial or otherwise. See Resp. to DSOF ¶24.

Practically speaking, at trial Richmond will tell the truth: he did not make an identification at the showup. Will Defendants seek to bar him from testifying on the merits, because Plaintiff made an ambiguous reference in this Complaint to an issue of which he had no personal knowledge (and made before Richmond's deposition testimony)? A trial on the merits is always preferred, Fed. R. Evid. R. 1, and even if this was a judicial admission, this Court is not bound to accept it. *See Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 792 (N.D. Ill. 2020).

As to knowledge of falsity, evidence abounds. Defendants knew that Bouto did not match the description of the shooter (PSOF 22-27) and were motivated to frame him as a witness to police misconduct (PSOF 29-33, 92-93). Richmond testified that he told plainclothes officers at the scene that he did not see the shooter, that he did not make any identification at the scene, nor could he given that he did not see the shooter's face clearly, and when forced to identify Mr. Bouto in the live lineup, he repeatedly warned that he lacked actual knowledge of the shooter's appearance. PSOF 14, 4, 16-18, 44-45, 46-54, 55. Defendants also knew of the impossibility of Richmond's identifications from the casings evidence at the scene revealing that the Spanish Cobra Witnesses were too far away to make a reliable identification, as well as from the evidence that shooter was wearing a hoodie that obscured his face. PSOF 16-17, 14. Whether Defendants may have subjectively believed Mr. Bouto was guilty is irrelevant. What matters is that they knew *Richmond's identification* was false as to its central and most inculpatory contents, i.e., that Richmond was able to positively identify the shooter—no different than when Defendants reported a scene identification that never happened. They deceptively presented it as Richmond's own, falsifying the idea that Richmond observed the

11

shooter sufficiently to be able to implicate the shooter, even though they knew he had not. Richmond's testimony on this score requires a trial. From these facts, a jury could find that Guevara and Halvorsen had the requisite knowledge of falsity. *See Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328, at *4 (N.D. Ill. Oct. 31, 2012) (finding jury had to decide fabrication claim where plaintiff indicated that "he will offer testimony at trial regarding the falsity of the statements made by the arresting officers in their reports, which if believed by the trier of fact would constitute circumstantial evidence" of fabrication). [2] The Defendants' knowledge of whether the statement was false is itself a jury question and can be inferred circumstantially. *See Gray*, 2022 WL 910601, at *10 (a plaintiff "need not have a smoking gun or an admission to prove knowledge.").

The contrast between this case and *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019), is also stark. In *Coleman*, the court reasoned that the mere fact that a police officer defendant led an investigation did not sufficiently raise an inference that he knew the specific time Coleman had entered police custody on arrest for a different crime. *Id.* at 344. Here, Plaintiffs' evidence is that Richmond told Defendants he did not see the shooter, and nevertheless Defendants falsely reported that he independently identified Plaintiff twice, because they were motivated to frame him. PSOF 29-33, 97. Defendants have not met their burden at summary judgment, and this claim must proceed to trial. [3]

---

[2] For purposes of summary judgment, Plaintiff is not advancing his claim that Pergande and Pang fabricated Richmond's on-scene identification.

[3] In 2013, the City hired Sidley & Austin to investigate Guevara's misconduct on its behalf. PSOF 95-96. An exhaustive investigation, led by Scott Lassar, the former U.S. Attorney for the Northern District of Illinois, found that Defendant Guevara and Halvorsen contributed to the wrongful conviction of Roberto Bouto and had physically abused several other criminal suspects.

Plaintiff anticipates that Defendants will object to his citation of party-admissions, the report's findings, and other notations in the investigation materials, but resolution of admissibility questions is premature prior to trial. The Lassar investigation, the findings and conclusions from the investigation, and the reports documenting those findings and conclusions, could be used and admitted at trial in several ways. Plaintiffs could use the Lassar investigation as impeachment by contradiction for certain defense witnesses including the City's Rule 30(b)(6) witnesses, the City's expert witnesses, and the prosecutor witnesses, depending on what they testify to at trial. *United States v. Kozinski*, 16 F.3d 795, 805 (7th Cir. 1994) ("Impeachment by contradiction is a valid method of impeachment and 'simply involves presenting evidence that part or all of a witness' testimony is incorrect.'") (quoting *Simmons, Inc. v. Pinkerton's, Inc.*, 762

**B. Defendants' Invocations of the Fifth Amendment Permit Adverse Evidentiary Inferences Against Them.**

Additional direct evidence that Defendants Guevara and Halvorsen knowingly fabricated false evidence arises from their invocations of the Fifth Amendment—a privilege available only where truthful answers could subject the privilege-holder to criminal liability. PSOF 97-98. The Fifth Amendment permits an adverse inference against parties in civil actions when they refuse to testify. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Anderson*, 932 F.3d at 511. *See also Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir. 2001) (abuse of discretion to exclude evidence of defendants' prior invocations of the Fifth Amendment at trial based on FRE 403).

Whether to draw an adverse inference from invocation of the Fifth Amendment is a factual question that must be resolved by a jury. *See id.*; *Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005). But if a jury draws that adverse inference, Defendants cannot avoid liability. Accordingly, Defendants' invocations of the Fifth Amendment render summary judgment necessarily unavailable. *Stich ting Ter Behartiging*, 407 F.3d at 55 (noting that although "a jury might

---

F.2d 591, 604 (7th Cir. 1985)). Furthermore, the reports would not be considered hearsay if they are not offered for the truth of the matter asserted but instead are offered to show their effect on the decisions made by certain witnesses including in relation to Plaintiffs' post-conviction and COI petitions. Additionally, Lassar's role as the City's attorney for purposes of its investigation into Guevara makes him an agent of the City for purposes of Rule 801(d)(2)(D). *See, e.g., United States v. Harris*, 914 F.2d 927, 931 (7th Cir. 1990) (affirming district court's admission of a statement attributed to defendant's attorney acting in his investigative capacity under Rule 801(d)(2)(D)). Further, Courts in this district have found similar reports to be admissible under Fed. R. Evid. 801(d)(2)(D). *See LaPorta v. City of Chi.*, 277 F. Supp. 3d 969, 989 (N.D. Ill. 2017) (considering the Police Accountability Task Force (PATF) report on summary judgment and explaining that "the contents of the City-commissioned PATF report constitute admissions of a party opponent under Fed. R. Evid. 801(d)(2)(D)"); *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *4 (N.D. Ill. Oct. 30, 2019) (considering PATF report on summary judgment based, inter alia, on Rule 801(d)(2)(D), citing LaPorta.)

Finally, the Lassar reports are also admissible as factual findings from a legally authorized investigation under Federal Rule of Evidence 803(8)(A) (providing exception to the rule against hearsay for "[a] record or statement of a public office if it sets out … in a civil case … factual findings from a legally authorized investigation," so long as "neither the source of information nor other circumstances indicate a lack of trustworthiness"). Such reports are presumed to be trustworthy and admissible. *See Daniel v. Cook Cty.*, 833 F.3d 728, 740 (7th Cir. 2016); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). Courts in this district have found similar reports to be admissible under Rule 803(8). *See Estate of Loury v. City of Chi.*, 2019 U.S. Dist. LEXIS 38029, at *4-6 (N.D. Ill. Mar. 11, 2019) ("the PATF Report is admissible under Rule 803(8)(A)(iii), as the report includes factual findings made by a public office resulting from a legally authorized investigation."); *LaPorta v. City of Chi.*, 277 F. Supp. 3d 969, 989 (N.D. Ill. 2017) ("hearsay contents of the PATF and DOJ reports are admissible as 'factual findings from a legally authorized investigation.' Fed. R. Evid. 803(8)(A)(iii)"); Godinez, 2019 WL 5592721, at *11 (same).

13

draw" an adverse inference from the privilege assertion, "we [the court] are required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *4 (N.D. Ill. July 25, 2017) (where defendant invoked Fifth Amendment, court held that "[t]o prevent the case from going to the jury undermines the jury's ability to draw adverse inferences that could establish the elements of the claim").

Moreover, Plaintiff need only present "some evidence to support his claims," that, when coupled with the adverse inferences arising from the Fifth Amendment invocation, demonstrates genuine disputes of fact. *E.g.*, *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 904 (N.D. Ill. 2012) (even if extrinsic evidence of a material element may not be itself sufficient, "when taken with the adverse inferences from [the invoker's] silence, it does create a genuine issue of fact"); *Thompson v. City of Chicago*, No. 07 C 1130, 2009 WL 674353, at *3-*6 (N.D. Ill. Mar. 12, 2009) (insufficient evidence that "defendants violated plaintiff's due process rights," when "coupled with the adverse inferences" arising from defendants' invocation of the Fifth Amendment, "does create a genuine issue of fact"); *Kluppelberg*, 2017 WL 3142757, at *4.

The jury's prerogative to draw an adverse inference necessarily defeats Guevara and Halvorsen's summary judgment motions. *See Harris*, 266 F.3d at 753. Guevara has refused to testify in response to questions such as, for example, whether he fabricated evidence, including the eyewitnesses' identifications, and whether he purposefully framed Plaintiff. PSOF 97. Similarly, Defendant Halvorsen invoked the Fifth Amendment in a prior litigation regarding the Ruvalcaba investigation, whether he participated in the coercion and manipulation of witnesses, whether he failed to intervene in Guevara's misconduct, and whether he purposely framed Plaintiff. PSOF 98. Of course, the law permits Defendants to avoid self-incrimination and does not allow their invocation, alone, to warrant summary judgment in Mr. Bouto's favor. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). However, Defendants cannot parlay the privilege into

14

summary judgment. *See Stichting Ter Behartiging*, 407 F.3d at 55. Were it otherwise, defendants could routinely hide behind their silence, effectively blocking legitimate discovery, and then obtain summary judgment. *See Logan*, 891 F. Supp. 2d at 903.

At summary judgment, this Court must infer guilt from Guevara and Halvorsen's invocation of the Fifth Amendment, because the Seventh Circuit has recognized, "[t]he only valid reason to invoke the Fifth Amendment is a reasonable fear that truthful answers may incriminate the witness." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019). To be privileged, a truthful answer must be "*incriminating*" and "have some tendency to subject [the privilege-holder] to criminal liability." *Id.* (quotations omitted) (emphasis in original). Holding at the summary judgment stage that no inferences can be drawn from this invocation ignores the requirements of the privilege.[4]

### C. Defendants Fabricated Escobar's Identifications of Mr. Bouto.

Defendants have siloed each piece of evidence and analyzed it separately, as if in a vacuum, but the Seventh Circuit has held that this Court need not analyze every due process theory advanced in a wrongful conviction case to deny summary judgment. *Goudy v. Cummings*, 922 F.3d 834, 838-44 (7th Cir. 2019) (suppressed or fabricated evidence is assessed cumulatively, not piece-by-piece, and a court need not evaluate every piece of such evidence to decide genuine disputes require a trial); *Camm v. Faith*, 937 F.3d 1096, 1108-09 (7th Cir. 2019). A factual dispute on any of Plaintiff's due process theories requires a trial. In short, Defendants are far from discharging their burden to

---

[4] Guevara's attempt to "incorporate by reference" various subparts of the other Defendants' motion was confusing at best, making it difficult for Plaintiff to respond. For instance, Guevara's motion cross-references subsections of Defendants Halvorsen *et al.*'s motion that do not exist, or where letters and numbers are mislabeled. *Compare* ECF No. 443 at 2 (referencing Section III.a.) *with* ECF No. 445 at ii (no Section III); ECF No. 443 at 2 (mislabeling subsections in I and II). Moreover, Guevara sometimes incorporated only certain subsections or even halves of subsections, which imposed additional burden on Plaintiff trying to track which arguments required responses. "Such are the perils of incorporation by reference, which for good reason is generally disfavored." *Yash Venture Holdings, LLC v. Moca Fin. Inc*, No. 4:19-CV-04176-SLD-JEH, 2022 WL 3574319, at *3 (C.D. Ill. Mar. 31, 2022), *aff'd sub nom. Yash Venture Holdings, LLC v. Moca Fin., Inc., 116* F.4th 651 (7th Cir. 2024), citing *Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592 (N.D. Ill. 2013) ("Adopting by reference arguments in documents other than in the brief dealing with the particular point under consideration not only provide[s] an effective means of circumventing the page limitations on briefs ... [but] unnecessarily complicate[s] the task of [the] ... judge." (alterations in original) (quotation marks omitted)).

show summary judgment is warranted on the fair trial claims, and this Court need not parse every theory—particularly those not addressed by Defendants—to deny their motion.

Having demonstrated that Plaintiff is entitled to a trial based on Defendants' fabrication of Richmond's identifications, this Court need not consider any of Defendants' remaining fabrication arguments. Nonetheless, Plaintiff discusses the evidence supporting each due process theory.

A jury must decide whether Defendants fabricated Escobar's supposed identifications of Mr. Bouto, which they claim Escobar made twice—first at the scene and then during the Area 5 live lineup. Escobar was never deposed in this case because he died in September 1993. DSOF 84. Defendants' only argument on this score is that Escobar never recanted in the short period of time before his death, so their claims about him must be true, or, alternatively, that his false statements originated with someone other than the police officer defendants. But Escobar's lack of recantation proves nothing, as the Defendants' narrative is entirely contradicted by the record, and those genuine disputes cannot be resolved by the Court. *See Washington v. Boudreau,* 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (denying summary judgment on fabrication claim where witness did not reveal fabrication but record evidence created disputes of fact). Based on the evidence, a reasonable jury could easily conclude that Escobar's first identification never happened, and that his second identification was manufactured by Guevara and Halvorsen, who had chosen their suspect (Mr. Bouto) and forced Escobar into identifying him. Defendants' strategy of disputing these facts in order to achieve summary judgment is untenable. *See Miller*, 220 F.3d at 495 (plaintiff's facts must be credited at summary judgment); *Lopez v. Dart,* No. 06 C 4836, 2008 WL 4889088, at *2 (N.D. Ill. July 17, 2008) (plaintiff's testimony must be taken as true at summary judgment).

1. **Escobar's scene showup**

Defendants claim that Escobar identified Mr. Bouto as the shooter at the scene of the shooting, when Defendants conducted a "showup" that included Mr. Bouto. The problem for

Defendants is that there is no credible evidence this identification ever happened. PSOF 39; Resp. to DSOF 30, 14. This alone defeats Defendants' motion.

Evidence that Escobar supposedly identified Mr. Bouto as the shooter is all but non-existent. Escobar never testified to what he saw on the day of the shooting—not at the grand jury, nor at trial, nor in a civil deposition. DSOF 84, 100; Dkts. 446-32, 446-34, 446-35. Nor did Escobar provide any kind of written statement identifying the shooter. PSOF 39; Exh. 7, Investigative File. There is no affidavit, no police statement, not even signed or handwritten notes, from Escobar. *Id.* Escobar passed away before Mr. Bouto's criminal trial and has never adopted the identification Defendants claim he gave.

Defendants' own police reports contradict their assertion that Escobar identified Mr. Bouto, or anyone else for that matter, as the shooter. PSOF 39; Pl.'s Resp. to DSOF 30, 14. The only report in the police file documenting the showup is a supplementary report prepared by Defendant Pergande. The report lists identifications by other witnesses at the showup but omits any mention of Escobar supposedly identifying Mr. Bouto. PSOF 39. Pergande admitted at his deposition that he did not record any identification from Escobar, nor does he remember what if any identification Escobar provided. Pl.'s Resp. to DSOF 30, 14. That omission supports the inference that Escobar never made any on-scene identification—which the jury could certainly conclude. *See Andersen v. City of Chicago,* 454 F. Supp. 3d 808, 816 (N.D. Ill. 2020) (officers' failure to document Andersen's alleged spontaneous confession was relevant to proving plaintiff's theory that Andersen did not spontaneously confess); *see also Jones*, 856 F.2d at 991 (denying summary judgment on fabrication claim where serologist's report allegedly omitted that the plaintiff was excluded as a source of the semen and blood found on the victim, and of the hairs found on pantyhose left at the scene).

Pergande's report thus tending to *disprove* that Escobar made an on-scene ID, Defendants instead point to Assistant State's Attorney ("ASA") Hughes' felony review file jacket, but on closer

17

examination, that document also fails them. *See* ECF No. 446 at ¶30. The file jacket briefly recounts a summary of information supposedly provided by certain witnesses to the arresting officers, as recounted by those officers to the ASA. Dkt. 446-9. The problems with using this as evidence are several-fold. First, the document is not a statement of what Escobar saw or did on scene, but instead, is a highly generalized summary of what multiple witnesses collectively did, namely, "gave a description" and "I.D.['d]" Defendant. Dkt. 446-9 at PageID #:12749. The "identification" itself is not described, nor is the physical description, and there is no record of what Escobar actually said by way of identification.

Second, even if it were a statement that could be attributed to Escobar, which it is not, it is inadmissible double hearsay. The file note contains, at best for Defendants, a non-verbatim summary of what Escobar supposedly told the A/Os (arresting officers) who then told ASA Hughes, who then summarized it for his note. The A/Os were Guevara and Halvorsen. Resp. to DSOF ¶67. Double hearsay of this kind cannot be used at summary judgment to establish what Escobar told the Defendant officers. *See Flanagan v. Office of Chief Judge of Circuit Court of Cook Cnty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018) (Flanagan's testimony about what Anderson said Vaughn and Loizon had said was double hearsay and properly ignored at summary judgment). It is particularly untenable for Defendants to rely on their own assertions of what the witnesses said, given Plaintiff's allegation that the Defendants fabricated those witness identifications. ASA Hughes made clear that these notes were *not* a summary of what the witnesses told him, because it was not his practice to document what witnesses said. Resp. to DSOF ¶¶66-67. Guevara, for his part, refused to answer and asserted his Fifth Amendment right. PSOF 97. Halvorsen is likewise unavailable. DSOF 3. In short, Defendants' hearsay statements to the ASA cannot be used to prove the truth of the matter.

This felony review note is the only evidence Defendants have put forward as to Escobar's on-scene identification. For the reasons described above, it falls far short of satisfying Defendants' initial burden of production. *See Wilson v. Schomig*, 863 F.Supp. 789, 793 (N.D.Ill. 1994) (summary judgment "standard places the initial burden on the moving party to identify 'those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact.'"). This presents a classic dispute of fact. Defendants claim Escobar identified Plaintiff; but their own police report contradicts that claim, and the felony review notes do nothing but muddle the matter. Only the jury can resolve these factual disputes and decide whether, as Plaintiff alleges, the Defendants falsely claimed he did.

### 2. Escobar's live lineup

Defendants also rely heavily on a supposed "second" identification from Escobar, this time at a live lineup identification procedure inside Area 5. Escobar's viewing of the live lineup was tainted from the start, however, and a jury could conclude from the record that Defendants falsely scripted Escobar's ensuing "identification" of Mr. Bouto. PSOF 14-19, 38, 59.

Proof of a defendant's intent to fabricate evidence "rarely" exists in the form of direct evidence; "knowledge and intent must often by proven by circumstantial evidence." *See, e.g., Stinson*, 868 F.3d at 527 (quotation omitted); *Anderson*, 932 F.3d at 511 ("admissions of wrongdoing" are "not an everyday occurrence"). Bearing in mind the summary judgment standard, Mr. Bouto need only present sufficient evidence from which a reasonable inference can be drawn that a defendant had knowledge of the falsity of the evidence. *Stinson*, 868 F.3d at 527. *See also Gray*, 2022 WL 910601, at *10 ("smoking gun" or "admission" not required to prove knowledge).

Here, that evidence is presented in abundance. Escobar, who was too far to see the shooter, whose hood obscured his face (PSOF 4, 14, 16-17), and Mr. Bouto does not match the description

19

purportedly provided by Escobar (PSOF 15, 23-27). After viewing a show-up with Mr. Bouto (PSOF 34), Escobar, together with Carl Richmond and Rey Lozado, were brought to Area Five to view a second identification procedure, contrary to practice, and not permitted to leave. PSOF 42, 46. It was made clear to them in myriad ways that the detectives had singled out Mr. Bouto as their suspect. PSOF 47-48. Just as Guevara had done with Richmond, he pulled Escobar out privately, before the lineup procedure. PSOF 59. And as detailed above, when Guevara pulled Richmond aside, he showed him Mr. Bouto's photograph and threatened and coerced him to identify Mr. Bouto as the perpetrator. PSOF 49-50, 54. Given that Escobar's identification of an innocent person (PSOF 5-7) – the same innocent person who Richmond and Rey had also identified and indeed who six out of six persons who viewed the lineup purportedly indicated (PSOF 41)– followed this private session with Guevara, a fair inference is that Guevara put his thumb on the scale with Escobar just as he had with Richmond. *See Thompson v. City of Chicago*, 722 F.3d 963, 974 (7th Cir. 2013) (evidence of officer's similar misconduct was "powerful circumstantial evidence" of misconduct toward the plaintiff). Guevara invoked his Fifth Amendment privilege when asked if he fabricated Escobar's identification, thus entitling Plaintiff to an adverse inference at summary judgment, based on the wealth of circumstantial evidence demonstrating Guevara's motive and misconduct. *See Stich ting Ter Behartiging*, 407 F.3d at 55; *Kluppelberg*, No. 13 C 03963, 2017 WL 3142757, at *4. Moreover, for Defendants' story to be credited, Escobar (and his friends) all identified Mr. Bouto in the lineup despite that he did not fit their description, they viewed the shooter from more than 60 yards away, and Mr. Bouto is innocent.

Taken together, the evidence is sufficient for a jury to conclude that Escobar's identification was fabricated in the same manner as Richmond's. *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1058 (N.D. Ill. 2016) (explaining that "the only way to get eight people to confess (separately) to witnessing an impossible event" would be through a conspiracy with the police). *Cf. U.S. v. Preston*,

20

751 F.3d 1008, 1025 (9th Cir. 2014) (noting that "adopting as true answers that were demonstrably false" was "particularly strong evidence" of involuntariness under the totality of the circumstances test). Evidence of bad faith and knowing misconduct by an actor in one aspect of a homicide investigation—here, Defendants' fabrication of Richmond's identifications—can give rise to a reasonable inference of that actor's bad faith and knowing misconduct in other areas of the investigation—their fabrication of Escobar's identification. *See Thompson*, 722 F.3d at; *Kyles v. Whitley,* 514 U.S. 419, 447-49 (1995) (withheld evidence of police misconduct in one part of the investigation could be extrapolated to attack the police investigation in the remainder of the case).

### 3. Escobar's fabricated identifications deprived Mr. Bouto of liberty

Finally, Defendants argue that even if they fabricated Escobar's identifications, there can be no liability because those identifications were not introduced at Mr. Bouto's trial. That argument misconstrues the law and ignores long-standing jurisprudence from this Circuit and elsewhere on fabricated evidence. *See Hurt*, 880 F.3d at 843 (The Due Process Clause "forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence."); *Fields II*, 740 F.3d at 1112 ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him.").

To start, the Seventh Circuit does not require that fabricated evidence be used at trial for a due process violation to occur. The Seventh Circuit pattern jury instruction offers that fabricated evidence can violate due process if "introduced against Plaintiff" either "at his criminal trial" or "in his criminal case." Seventh Circuit Civil Pattern Inst. 7.14. Indeed, the Seventh Circuit has consistently held that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is used to deprive the defendant of her liberty in *some way*." *Whitlock*, 682 F.3d at 580 (emphasis added). This is true whatever form the initial fabricated evidence takes (e.g., a false report, a manufactured statement, a fabricated identification, invented physical

21

evidence, or planned testimony, etc.), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (e.g., issuance of a warrant, filing of charges, an indictment, a conviction, etc.), and however the evidence comes to impact the criminal proceedings (e.g., introduced as an exhibit, offered as testimony, or used to preclude other evidence from being used in the criminal case). The question is simply whether the fabrication caused a deprivation of liberty.

Consistently with *Whitlock*, the Seventh Circuit's decisions unanimously hold that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. *See, e.g., Patrick v. City of Chicago,* 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Anderson,* 932 F.3d 494 (summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery v. City of Milwaukee,* 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson,* 868 F.3d at 528 (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *25 (N.D. Ill. Mar. 13, 2018) ("there is a plausible argument that the confessions of Plaintiffs' co-defendants caused Plaintiffs' convictions, even though none of those confessions was introduced at either Plaintiff's trial."); *Taylor,* 2019 WL 4597383, at *15 ("But a due process claim need not be based on fabricated evidence that was introduced at trial.") (collecting authority).

Of course, if the fabricated evidence is merely placed "in a drawer," no due process violation occurs. *Id.* at 582 (emphasis added) (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)); *see*

22

*also Armstrong v. Daily*, 786 F.3d 529, 553 (7th Cir. 2015) (reciting drawer example). But if the evidence is used in some way in the prosecution, the remainder of the inquiry depends on principles of causation, which is a question of fact for the jury. *See, e.g., Conley v. Birch*, 796 F.3d 742, 749 (7th Cir. 2015).

Fabricated evidence thus violates due process when it used to affect the outcome of the criminal case (including by preventing the criminal defendant from calling a witness at trial), or where it "furthered the prosecution" in any other way. *See Hurt*, 880 F.3d at 844. Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was introduced at trial in its original form. Defendants cite *Patrick*, 974 F.3d 824 and *Moran v. Calumet City,* 54 F.4th 483, 499–500 (7th Cir. 2022), for this proposition, and go so far as to argue that *Patrick* and *Moran* reversed circuit precedent and brought a change to fabrication law. ECF No. 445 at 18-19. Those decisions did no such thing. Instead, without any mention of *Whitlock*, *Avery* or *Anderson*, *Patrick* held that the jury instruction in *Patrick* was incomplete (but ultimately harmless error) because it did not include a requirement that the fabricated evidence be material and be introduced in the criminal trial. *Patrick*, 974 F.3d at 835. The sole citation *Patrick* offered for that ruling was Seventh Circuit Pattern Instruction 7.14, which, as noted above, does not require evidence to be introduced at trial; rather, it can also be introduced "in a criminal case." Seventh Circuit Civil Pattern Jury Inst. 7.14.

Indeed, *Patrick* could not have overturned the precedent established in *Whitlock*, *Avery* and *Anderson* because one panel of the Seventh Circuit cannot overrule another panel, let alone three such panels. *See Williams v. Chrans*, 50 F.3d 1356, 1368 (7th Cir. 1995). Rather, "[o]verruling requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)." *Brooks*, 279 F.3d at 522. *Patrick* did not propose to overrule any decision, and the *Patrick* panel did not circulate its opinion to the full court before release. *Id.* So *Whitlock*, *Avery* and *Anderson* remain

23

the law of this Circuit—and they are incompatible with Defendants' claim that fabricated evidence must be introduced in the criminal trial to be actionable. Stated differently, "[a] fair reading of Seventh Circuit jurisprudence, from *Whitlock* to *Moran*, reveals that the 'the due process violation occurs once the material fabricated evidence is introduced in some way . . . that results in the criminal defendant's conviction and ultimately deprives him of his liberty." *Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450, at *3 (N.D. Ill. April 8, 2024) (quoting *In re Watts Coordinated Pretrial Proc.*, No. 19-CV-1717, 2022 WL 9468206, at *6-7 (N.D. Ill. Oct. 14, 2022)). Requiring that the fabricated evidence contribute to the plaintiff's criminal prosecution, which results in conviction and "ultimately deprives him of his liberty," squares with the reasoning of *Whitlock* and progeny as well as the more recent, brief discussions in *Patrick* and *Moran*.

Once the correct question is posed, namely, whether the fabrication of Escobar's identifications deprived Mr. Bouto of liberty, the answer is resoundingly yes. Indeed, Defendants do not even argue that Escobar's identifications were immaterial to the prosecution; they argue only that they were not introduced at trial, relying on their improper expansion of *Moran*. But there is no dispute that Defendants used Escobar's claimed identifications to support murder charges against Plaintiff, a position they continue to take at summary judgment. ECF No. 445 at 18 (arguing that Escobar's identification gave Defendants probable cause at time of Mr. Bouto's indictment). Mr. Bouto was detained, brought to the station, and then charged in part based on Escobar's fabricated lineup identification. The record reflects that the decision to charge Mr. Bouto rested on the eyewitness identifications, which at the time ASA Hughes was told included Escobar's. DSOF ¶¶68-69.

Ultimately, whether fabricated evidence was material is itself a jury question, so a trial is required. *See Washington*, 2022 WL 4599708, at *21 (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary).

24

And the materiality analysis must be conducted cumulatively, considering the impact of all the fabricated evidence on Mr. Bouto's constitutionally protected due process rights. *See Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *10 (N.D. Ill. Sept. 30, 2023), citing *Goudy*, 922 F.3d at 843. *See also United States v. Alahmedalabdaloklah,* 76 F.4th 1183, 1231–32 (9th Cir. 2023) ("Our materiality inquiry examines the 'cumulative effect' of all false and misleading evidence and testimony presented at trial") (internal citations omitted).

### D. Defendants' Fabrication of a Supposed "Confession" Heard by Maldonado and Vicente Deprived Mr. Bouto of Liberty

After ASA Bray declined to charge Plaintiff despite the lineup identifications, Defendants fabricated an account by Maldonado and Vicente, including a signed statement by Vicente and eventual grand jury testimony, falsely claiming that Mr. Bouto confessed while detained in the Area Five lockup. PSOF 76-82, 90. Plaintiff's evidence reflects that Vicente and Maldonado were fed facts about the Ruvalcaba murder by Guevara and Halvorsen and then were coerced to adopt and recite those narratives through physical abuse and threats, coupled with undisclosed benefits and promises. PSOF 79-82, 90. Defendants Guevara and Halvorsen were both directly involved in Vicente and Maldonado's interrogations, which resulted in Vicente's false signed statement and their grand jury testimony against Mr. Bouto. *Id.* Defendant Maher joined the conspiracy with Guevara to fabricate evidence, after Guevara assigned him to investigate the robberies committed by Vicente. Maher, Guevara, and Halvorsen fabricated that Vicente purportedly told Maher that another inmate had confessed; this set in motion Vicente's meeting with Guevara and Halvorsen. PSOF ¶¶83-85.

To be clear, Defendants do not deny that Maldonado's and Vicente's statements were fabricated. Instead, they argue only that because those statements were not introduced at trial, there can be no liability, relying again on their flawed misconstruction of *Moran*.[5] As argued in Section

---

[5] Accordingly, this is the only argument Plaintiff addresses, and it is too late for Defendants to make new arguments in reply. *Titran v. Ackman,* 893 F.2d 145, 148 (7th Cir. 1990).

25

I.C.3, however, *Moran* did not add legal requirements to fabrication nor upend years of Seventh Circuit precedent firmly establishing that fabricated evidence has no place in any part of the criminal process. Maldonado and Vicente's gave false statements and grand jury testimony, which were used to indict Mr. Bouto and deprive him of liberty. PSOF 91. *See Fields II*, 740 F.3d at 1112 ("[T]he fabrication of evidence of evidence harmed the defendant before and not just during the trial, because it was used to help indict him"); *see also see also Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1075 (N.D. Ill. 2018) ("If [the plaintiff] has pled that the fabricated evidence . . . furthered the prosecution, he has done enough"); *Humphrey v. City of Anderson*, No. 119 C 00764, 2020 WL 3060363, at *7-8 (S.D. Ind. June 8, 2020) ("'[T][he fabrication of evidence can cause harm to a defendant before trial."); *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (permitting fabrication claim where plaintiff alleged that fabricated evidence was used to secure his arrest and indictment).

Vicente's false statements, and the suggestion that Maldonado would soon corroborate them, were also used to prosecute Mr. Bouto in the first place. PSOF 76-78, 86. Specifically, ASA Bray declined to prosecute Mr. Bouto based solely on the initial identifications Defendants offered up from Richmond and others; instead, Bray directed Defendants Guevara and Halvorsen to investigate Mr. Bouto's alibi and a person known to Escobar as "Mario," who was seen providing the murder weapon to the shooter. *Id.* Rather than carry out that investigation, Defendants Guevara and Halvorsen instead fabricated Vicente and Maldonado's statements.  The only evidence collected between Bray's initial refusal to approve charges and her subsequent approval of charges was Vicente's statement and the expectation that Maldonado would soon confirm Vicente's inculpation of Mr. Bouto; this timing creates a reasonable inference that Vincente and Maldonado made the difference. PSOF 86.

**E. Defendants Fabricated Rey Lozado's Live Lineup Identification of Mr. Bouto**

A jury must also decide whether Rey Lozado's live lineup identification was fabricated. The starting premise at summary judgment is Mr. Bouto's innocence of the crime. PSOF 1-4. So the question becomes not whether Rey's identification was false, but how Rey came to identify the innocent police suspect who did not fit the shooter's description—did the false identification come from Rey himself through the influence of fellow gang members, or Defendants? At summary judgment, where there are competing inferences, the tie goes to the plaintiff. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). That is particularly appropriate here given the circumstantial evidence of fabrication. *See Patterson*, 2012 WL 5381328, at \*4 (finding jury had to decide fabrication claim where plaintiff indicated that "he will offer testimony at trial regarding the falsity of the statements made by the arresting officers in their reports, which if believed by the trier of fact would constitute circumstantial evidence" of fabrication).

Rey has recanted his identification, testified that he lacked the requisite personal knowledge to identify anyone at all based on his limited view of the shooter, and felt heavily influenced by his environment to implicate Mr. Bouto. PSOF 4, 14, 19, 16-17, 20, 38, 46-48, 59, 57-58. Defendants downplay the extent to which they orchestrated the outcome of the live lineup, but the record tells a different story: Guevara deliberately showed witnesses that Plaintiff was chained up inside Area Five and said words to the effect of, "That's the guy"; Plaintiff was exclusively singled out to Rey through pre-lineup displays of a Polaroid photo and having Plaintiff viewed through a one-way mirror; (PSOF 47-48) and despite that fact that Rey could not have gotten a good look at the shooter, Rey was taken to Area Five to make an identification. PSOF 14, 16-17, 19.

Rey's circumstances alone create a genuine dispute on fabrication, but the scale tips fully once the rest of the so-called identifications are considered. If Defendants did not fabricate Rey's identification, then how did six different people come to identify the same innocent person (who

27

failed to match the shooter's description), either by face or by clothing? PSOF 41. It is no retort to point out gang influence, because there is no suggestion whatsoever that Michael and Margaret Fleming had any gang affiliation. And while they did not identify Mr. Bouto by face, their clothing descriptions continued to shift and morph during the police investigation to match what Mr. Bouto was wearing. PSOF 63-65, 70-72. A reasonable jury could easily find fabrication, not simply an unfortunate coincidence, from these facts. *See Patrick*, 213 F. Supp. 3d at 1058 (explaining that "the only way to get eight people to confess (separately) to witnessing an impossible event" would be through a conspiracy with the police). *Cf. U.S. v. Preston*, 751 F.3d 1008, 1025 (9th Cir. 2014) (noting that "adopting as true answers that were demonstrably false" was "particularly strong evidence" of involuntariness under the totality of the circumstances test.). For the same reasons that Defendants Guevara and Halvorsen would have understood Escobar's fabricated identifications to be false, so, too, could a jury readily conclude that they knew Rey's "identification" was false as well—that Rey was dutifully parroting the message Defendants were broadcasting in no uncertain terms, *not* that it represented Rey's truthful identification of the shooter, an identification they knew he was simply too far away to make. *See* Section I.C. (discussing Escobar's identification).

Summary judgment is not proper under these circumstances. *See, e.g., Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *15 (N.D. Ill. June 4, 2020) (in denying summary judgment on a fabricated evidence claim, the court reasoned, "[a]lthough Wilda was not forced to pick a particular car, plaintiffs have some evidence that the detectives used suggestive techniques to obtain Wilda's identification of Montanez's car"); *see also White,* 696 F.3d at 757 (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case").

The fact that Rey has not admitted the extent of the police misconduct that is otherwise borne out by the record is not probative of whether his statement was fabricated, contrary to

28

Defendants' suggestion. A jury could easily conclude that Rey is afraid of speaking out against the police and of choosing the "safer" alternative of blaming peer pressure. *See Jimenez v. City of Chicago*, 830 F.Supp.2d 432, 444-45 (N.D. Ill. 2011) ("Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense."); *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

Only a jury can appropriately weigh these considerations. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1046 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018) ("But in situations like the one the summary judgment record requires this court to find, where a witness has fabricated an identification with police, the witness might well view the consequences of revealing the truth to be dire"). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (court may not "make credibility determinations, weigh the evidence or decide which inferences to draw from the facts").

### F. Defendants Fabricated the Clothing Identifications of Mr. Bouto

At trial, two of the four main prosecution witnesses "identified" Mr. Bouto not by appearance but by clothing. Michael and Margaret Fleming both testified at trial that they recognized Mr. Bouto as the shooter based on his clothing. Margaret passed away after the trial, but Michael testified in this civil suit that his description was the direct result of Guevara and Halvorsen's purposeful fabrication. Michael testified that the Defendants told him they "wanted to make sure that the description actually matched everybody else's description, and then they showed us a lineup." PSOF 63-65. Put another way, Guevara "wanted to make sure that the description that [Michael] had of the perpetrator matched the description that the other eyewitnesses had for the

29

perpetrator." PSOF 63-65, 70-73, 66-67. Michael testified that during the live lineup, he and Margaret selected the person that fit the description that he had been provided by police as purportedly having come from the other eyewitnesses, collectively. *Id.* A jury could conclude from this testimony that Michael and Margaret's identifications were molded to fit the other identifications Guevara had secured.

The evolution of Michael's descriptions supports this account. Michael's descriptions of the shooter's clothing evolved over time to more closely match the attire he saw on Mr. Bouto at the lineup, from the initial description provided to Halvorsen (a "black hoodie" that was "all black" on a "clean-shaven" shooter), which *exculpated* Bouto (PSOF 25; Dkt. 446-25) to Guevara and Halvorsen's supplementary Cleared/Closed report (a "hooded pullover shirt" with no color reference), to his 1996 trial description that changed color (a blue hoodie) and added "a three-quarter length black shorts, white socks, and black shoes." PSOF 63-65. Guevara and Halvorsen also attempted the coercion with regard to his description of the shooter's path, attempting to confirm his observations to the conflicting evidence, as Michael has since revealed. PSOF 66-67. The same is true of Margaret's descriptions (PSOF 70-71), as she revealed in a City investigation (PSOF 72, 95-96).

Moreover, the circumstances of the clothing lineup suggest that Defendants were not merely following the evidence, but rather, trying to ensure that Plaintiff would be picked by the witnesses. Contrary to accepted practices, Defendants Guevara and Halvorsen devised a lineup in which only Bouto wore clothing resembling the clothing worn by the shooter. PSOF 60-62.

Defendants Pergande, Guevara, and Halvorsen also fabricated the purported clothing lineup identification of Jacobo Lozada. Resp. to DSOF 26; PSOF 4, 14, 16-17, 61, 59. As Defendants knew, Jacobo was too far from the shooter, who was wearing a hood, to make a reliable identification, PSOF 4, 14, 15, 16-17, 35, 37, and Jacobo did not make any identification at the

30

scene. Resp. to DSOF 26; Dkt. 446-9, Felony Review Jacket, at PageID #:12749. Guevara and Halvorsen then went on to claim that he made a clothing identification at the lineup (Dkt. 446-23, Lineup Report), but the only recording by the police of what clothing Jacobo himself saw on the shooter that would have allowed such an identification was that the shooter wore a "dark blue pullover sweat shirt," which was entirely generic and common attire at the time, as were ¾ length baggy shorts. Resp. to DSOF 26. As they knew, the lineup procedures used to obtain the gang rival identifications were full of pernicious tactics used to signal the police suspect. PSOF 41-44, 46-48, 60, 62, 63-67, 71. Given Jacobo's initial inability to describe the shooter (PSOF 61), Guevara and Halvorsen's use of an unsanctioned and wholly improper "clothing identification" procedure (PSOF 60, 62), a jury could find Plaintiff's evidence sufficient to create a jury question as to whether 17-year-old Jacobo's lineup identification was fabricated by these Defendants, particularly given the evidence of manipulation of other witnesses such as Carl Richmond and Michael Fleming. *See also* PSOF 97, 98.

**G. Defendants' Expansive Reading of *Moran* and *Patrick* In Order to Obtain Qualified Immunity Fails As A Matter of Law**

Defendants' argument that *Moran* and *Patrick* injected new requirements into the fabrication claim is the height of overreach. Those decisions did not do so. *See* Section I.C.3., above. In 1993 and today, police officers were prohibited from falsifying evidence that was used to deprive criminal defendants of liberty. *See Whitlock*, 682 F.3d at 585 (clearly established by 1984 that police cannot engage in the "deliberate manufacture of false evidence"). What is relevant to the qualified immunity analysis is whether the *conduct* was clearly prohibited by 1993, and the answer is yes.

As to their argument that recent caselaw has injected uncertainty such that officers now deserve qualified immunity, that argument is illogical and has no legal support. For starters, Plaintiff rejects the premise that *Moran* and *Patrick* have "injected uncertainty." *See Mendoza*, 2024 WL 1521450, at *3 (discussing continuity in fabrication caselaw from *Whitlock* to *Moran*). But even if it

31

had, that at most would impact the viability of the legal claim post-*Moran*, as opposed to whether a reasonable officer would have understood that the *act* of concealing exculpatory or impeachment evidence was prohibited. *See Armstrong*, 786 F.3d at 538 ("*Harlow* purged qualified immunity doctrine of its subjective components, meaning that the defendants' actual state of mind or knowledge of the law is irrelevant to whether the asserted conduct would have been legally reasonable."). Defendants can hardly argue that their conduct in 1993 was not clearly established based on decisions that injected uncertainty into the legal claim thirty-five years later.

## II.   A TRIAL IS REQUIRED ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM

### A.   A Reasonable Jury Could Find That Defendants Lacked Probable Cause

Defendants have failed to marshal enough evidence to obtain summary judgment on Plaintiff's malicious prosecution claim. Far from it, the record they have presented, with all inferences taken in Plaintiff's favor, exposes the Defendants' plot to frame Mr. Bouto. All of the evidence directly inculpating Mr. Bouto was manufactured or materially tainted by the Defendants. *See* Section I, *supra*. Defendants did not reveal to the ASA their hand in fabricating these "witness identifications." PSOF 87-89. Doing so would have discredited the entire investigation, including other evidence they gathered which they claim was unrelated to these fabricated identifications. *See Kyles*, 115 S. Ct. at 1571 (defense could have used suppressed evidence "to throw the reliability of the investigation into doubt and to sully the credibility of [the detective]" and to attack the thoroughness and good faith of the investigation). They had, after all, no untainted evidence whatsoever connecting Mr. Bouto to the shooting. PSOF 6, 28, 5.

Any singular piece of evidence Defendants cite for probable cause must be viewed in the context of Defendants' broader effort to frame Mr. Bouto. *See Rainsberger v. Benner*, 913 F.3d 640, 648 (7th Cir. 2019), citing *District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577, 588, 199 L.Ed.2d 453 (2018) (probable cause inquiry "does not take each fact in isolation; it depends on the totality of the

circumstances"). Defendants' strategy is to isolate various pieces of evidence—such as a purported clothing match—that they believe are favorable, while excising the unfavorable evidence of their own misconduct from the record. To do so, they argue that this Court need not consider testimony from Richmond, Vicente, or Maldonado – all of whom revealed the Defendants' efforts to manufacture a phony case against Mr. Bouto – since they had a "surplus" of probable cause without those individuals.

But this Court must consider the "totality of the facts and circumstances," which includes the fact that the detectives who obtained the identifications were also trying to frame Plaintiff. E.g., PSOF 29-32, 92-93, 97-98. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (citing *Abbott v. Sangamon County,* 705 F.3d 706, 714 (7th Cir. 2013)). Defendant Guevara ignored Richmond's protestations that he did not see the shooter and explicitly threatened him to either falsely identify Plaintiff or face bogus charges himself. Guevara and Halvorsen, in an act that grossly deviated from accepted practices, displayed Mr. Bouto in handcuffs to the witnesses before the lineup, telling them words to the effect of "that's the guy who did it." Similarly, Guevara and Halvorsen brought the witnesses to a desk where photos of Mr. Bouto were present, also before the lineup. When felony review prosecutors directed Guevara and Halvorsen to track down Plaintiff's alibi and find the man known as Mario who provided the murder weapon to the shooter, these Defendants instead beat and coerced false statements from Vicente and Maldanado claiming that Mr. Bouto confessed.

Moreover, the officers who arrested Plaintiff knew that he was a witness in a police brutality complaint against their fellow officers. These officers were willing to lie to bring false charges against Mr. Bouto. Defendant Pergande falsely reported that Mr. Bouto had a ponytail, despite conclusive photographic evidence to the contrary (not to mention testimony from his barber who had just cut his hair the day before). Defendants Pang and Pergande tried to torpedo Plaintiff's alibi, by

33

removing the battery to his pager (thus destroying any hope of obtaining his girlfriend's phone number) and falsely claiming that Bouto did not know his girlfriend's last name or where she lived.

Even if none of the show up or line up identifications were fabricated, therefore, on this record probable cause would still be a question for the jury. Although felony review prosecutors were informed that six out of six witnesses had identified Plaintiff (and knew nothing about the Defendants' misconduct in obtaining those identifications), prosecutors still refused to charge Plaintiff with murder. Certainly, there were reasons to doubt the identifications. The Spanish Cobra gang members were all enemies of Mr. Bouto; they all observed the shooter from more 60 yards away, too far to make out an accurate facial identification; they identified Plaintiff despite him not having the ponytail described by all accounts. The clothing identifications were procured from a lineup in which Mr. Bouto was the only person wearing clothing that resembled the shooter.

Properly construed, Defendants have no basis to demonstrate probable cause on these facts. The detectives who obtained the identifications were simultaneously trying to frame Plaintiff. Mr. Bouto did not match the shooter's description in several important respects. Moreover, Defendants' attempt at summary judgment rests entirely on hotly disputed facts, which Rule 56 does not permit. *See also Gray*, 2022 WL 910601, at *9 (denying summary judgment where "the Individual Defendants' probable cause argument rests almost entirely on disputed facts" and once they are stripped away, "whether those [remaining] facts are sufficient to constitute probable cause is a question better left to a jury"), citing *Camm v. Faith*, 937 F.3d 1096, 1106 (7th Cir. 2019). Perhaps the jury, having heard the full record at trial, will agree with Defendants. But this Court cannot determine as a matter of law that no reasonable jury could determine there was no probable cause. *Maxwell*, 998 F.2d at 434.

In summary, when viewed through the lens of the entire corrupt police investigation, and once the fabricated evidence is stripped, none of the evidence Defendants cite—the clothing and physical "matches" and Rey Lozado's so-called identification—would have amounted to probable cause. *See*

34

*Anderer,* 342 F. Supp. 2d at 802 ("[T]he statement of one witness or victim is a sufficient basis for probable cause only where that witness is credible or the information is trustworthy."), *quoting Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("[A] report from a single, *credible* victim or eyewitness can provide the basis for probable cause.") (emphasis in original citation). Each is discussed in turn.

### 1. Defendants cannot rely on their own fabrications for probable cause

Defendants hang their hat primarily on Frank Escobar, arguing that his two identifications gave them probable cause notwithstanding all of the above. However, as explained in Section I.C, *supra*, there is no competent evidence that Escobar made any identification at the scene and the issue is easily disputed, so that is a fiction on which Defendants may not rely to obtain summary judgment. There is also a genuine dispute about whether Escobar's live lineup identification was fabricated, so here, too, a jury must decide whether that constituted probable cause to believe Mr. Bouto committed a crime notwithstanding the remaining exculpatory evidence known to police. *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *Williams v. City of Chicago*, 773 F.3d 749, 757 (7th Cir. 2013). After all "a conclusion that probable cause existed as a matter of law is appropriate *only* when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434 (emphasis added); *Howard v. Firmand,* 378 Ill. App. 3d 147, 150 (1st Dist. 2007) ("where the circumstances giving rise to an alleged malicious prosecution are in dispute, the appropriate venue to resolve that dispute is before a jury and not by a court as a matter of law"); *Grundhoefer v. Sorin,* 20 N.E.3d 775, 781 (1st Dist. 2014) (jury must resolve factual disputes regarding probable cause, "especially if the dispute involves a question of credibility"). At summary judgment, this Court should "give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Id.* (citing *Williams v. City of Chicago,* 733 F.3d 749, 756 (7th Cir.2013)).

35

If the jury determines that Escobar's identifications were fabricated, such a finding would undo Defendants' probable cause. Evidence that has been manufactured by a police officer cannot by its very terms support an "honest and sound suspicion" that the accused committed the crime. The law is well-settled, therefore, that "civil defendants cannot rely on evidence that they or their co-conspirators manufactured for probable cause." *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by the affiant cannot support a finding of probable cause"); *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (analyzing whether probable cause existed by setting aside purportedly fabricated or manipulated evidence); *Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) ("Defendants cannot manufacture their own probable cause by fabricating evidence.") (collecting cases).

As explained in Section I.C, Escobar's identification was wholly implausible and unreliable. The evidence shows that Guevara told Escobar who to identify, Escobar was exposed to multiple viewings of Mr. Bouto marked as the suspect before making the identification, the Defendants would have known he was too far to make an actual identification, and Mr. Bouto's appearance differed from his initial description of the shooter.

Probable cause "is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Gauger*, 352 Ill. Dec. 447, 954 N.E.2d at 329-30 (internal quotation marks, citation, and emphasis omitted). *See also Anderer,* 342 F. Supp. 2d at 802 ("[T]he statement of one witness or victim is a sufficient basis for probable cause only where that witness is credible or the information is trustworthy."), *quoting Woods*, 234 F.3d at 996 ("[A] report from a single, *credible* victim or eyewitness can provide the basis for probable cause.") (emphasis in original citation). The foregoing facts reveal an identification that no person of ordinary care would have considered to be reliable evidence of guilt.

36

**2. Once the fabricated evidence is stripped away, the remaining evidence does not amount to probable cause**

By their own terms, Defendants' malicious prosecution argument rises and falls with Escobar. They suggest, however, that "other evidence" bolstered their case and added to probable cause. Under closer examination, that evidence is nothing more than highly generic, commonplace similarities of clothing and gender, akin to saying that the shooter and Mr. Bouto were both "males wearing clothes." There was no probable cause to arrest and prosecute Mr. Bouto, and summary judgment should be denied.

**i. Mr. Bouto's appearance did not give Defendants probable cause**

While numerous bystanders gave descriptions of the shooter, some of which differed from each other, most descriptions coalesced around: a white Hispanic male, with a ponytail, clean-shaven, a height of 5'5-5'7," wearing white hightop sneakers. PSOF 11-15, 18-19. Mr. Bouto differed visibly in every way: he was darker-complexioned and Middle Eastern, not a White Hispanic, which Defendants (and the Spanish Cobra witnesses knew); he had short, closely cropped hair and *no* ponytail; he was not clean-shaven but instead wore a prominent mustache, a soul patch, and dark stubble; he was taller than the shooter at 5'9"-5'10,'" and he was black, not white, hightops. PSOF 23-27. Each of these differences, when taken together and viewed collectively as the probable cause framework requires, eviscerates probable cause. *See Hart*, 798 F.3d at 587 (probable cause is evaluated upon the totality of the facts and circumstances known to the officers at the time). *See also Nelson v. Vill. of Lisle, Ill.*, 437 F. App'x 490, 494 (7th Cir. 2011) (police may not ignore "clearly exculpatory facts").

The shooter's ponytail was observed by numerous witnesses, which means Mr. Bouto's lack of a ponytail was necessarily exculpatory. Defendants simply ignore the missing ponytail, a strategy that is untenable for summary judgment. As to height, Mr. Bouto and the shooter differed by as many as five inches, a difference which courts in this district have found significant. PSOF 24; *see*

*Simmons v. City of Chicago*, Case No. 14 C 9087, 2017 WL 497755, at *12-*13 (N.D. Ill. Feb. 7, 2017) (describing as "significant" the three- to six-inch height difference between plaintiff and the target of the warrant, and finding this mismatch "a bridge too far" for probable cause). Other descriptions failed to match as well. The shooter was "clean shaven," but as Mr. Bouto's photo indicates, Mr. Bouto was not. PSOF 25. Facial hair differences also cannot be ignored.

Finally, Mr. Bouto did not have on white high-top shoes, nor was he wearing orange shorts as described by the 911 caller. PSOF 26, 13, 11. Defendants argue that Mr. Bouto's clothing at the time of the crime—a dark hoodie and long, baggy shorts—somehow provide probable cause for his arrest. But the outfits in question were hardly unique; a dark-hooded sweatshirt and long dark shorts were one of the most popular types of outfits of the day. Resp. to DSOF 26. Defendants make much of the fact that Mr. Bouto was wearing Karl Kani brand clothing, but *no* witness described seeing the shooter in Karl Kani until *long after* Mr. Bouto was arrested. Resp. to DSOF 20. So that "match" was a straw man accepting Plaintiff's facts. Even if both Mr. Bouto and the shooter wore Karl Kani, Defendants' reliance on *United States v. Timms* to suggest that Mr. Bouto's matching brand of clothing gave them probable cause is a non-starter—the clothing worn in *Timms* was highly unique, a white leather designer jacket bearing the embroidered label "Karl Kani" and Tiger-embellished jeans. *See United States v. Timms*, 74 Fed. Appx. 647, 749 (7th Cir. 2003). White leather and tiger prints are a far cry from the ubiquitous sweatshirt and shorts Mr. Ruvalcaba's shooter was wearing, which, Plaintiff's evidence establishes as common attire during the time. Resp. to DSOF 20. What was significant in *Timms* was the eccentric nature of the clothing. The Seventh Circuit noted exactly that, observing that Timms' outfit was "unusual" and "distinctive," and even then, finding that "[i]n these circumstances, Timms's clothing alone *might* have established probable cause for his arrest." *See United States v. Carpenter*, 342 F.3d 812, 814 (7th Cir. 2003) (discussing co-defendant Timms' outfit) (emphasis added). *United States v. Carpenter*, which Defendants also cite,

turned on the same facts as *Timms* and involved a unique white leather jacket. *Id.* at 813-15. Defendants have not cited anything to suggest that Mr. Bouto's clothing was somehow unique, either in color, size, shape, or embellishment.

Simply put, Defendants' argument fails multiple ways. Plaintiff is not arguing that, as a matter of law, no probable cause existed. Rather, Plaintiff is simply stating that reasonable jurors could disagree about whether these facts establish probable cause. There is a material factual dispute about whether Mr. Bouto and the shooters' clothing actually matched. And even if they did, that match would be legally inconsequential given that items in question were commonplace and Mr. Bouto had discrepancies in every other characteristic. None of Defendants' cited legal authorities suggest otherwise.

### ii. Rey Lozado did not give the Defendants probable cause

Finally, Defendants make a passing reference to 15-year-old Spanish Cobra Rey Lozado's "identification" of Mr. Bouto on the scene and in the live lineup as part of their probable cause. ECF No. 445 at 10. Defendants' treatment of Rey is skittish – they acknowledge that Rey has recanted his identification of Mr. Bouto and do not appear to rely on him heavily, trying instead to use their own documentation about Escobar (who is deceased and never gave any testimony or signed statements). Their half-hearted reliance on Rey is understandable: the circumstances of Rey's identifications clearly violated accepted police procedures, and it was obvious that his identification of Mr. Bouto was totally unreliable. As argued above, moreover, the facts support a jury determination that Rey's live lineup identification was fabricated, which if found cannot form the basis for probable cause. *See* Section I., supra. Defendants cannot rely on their own fabrications to prosecute someone.

Even setting aside the fabrication claim, Rey's live lineup identification could not form probable cause because it was utterly implausible, and no trained officer would have relied on it

knowing the true circumstances of its genesis. For example, where a defendant had obvious reasons to doubt the accuracy of the information reported or failed to inform the courts and prosecutors of facts that they knew would negate probable cause, probable cause will not save a flawed indictment. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Alexander*, 721 F.3d at 423; *Lawson*, 637 F.3d at 704-05; *Fox v. Hayes*, 600 F.3d 819, 833-35 (7th Cir. 2010); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). While officers are allowed "some margin of error" in assessing probable cause, "a police officer evaluating a situation for probable cause must utilize the means at hand to minimize the risk of error." *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir. 1986).

Defendants knew that Rey was extremely vulnerable to police influence, because they were aware that: Rey was a child, merely 15 years old; he was in the Spanish Cobras gang and taken to Area Five with "elder" notorious gang members; he could not have seen the shooter close enough to identify him or her. PSOF 9, 50, 4, 14, 16-17. Rey told officers at the scene he could not see the shooter (PSOF 14), and the only description he was able to give at the murder scene was that the shooter was wearing a blue hoodie—nothing more. PSOF 19. Such an incomplete description is unsurprising given that Rey was a good 200 feet away from the shooter, like the other Spanish Cobra Witnesses he was with, and had only the briefest opportunity to observe the shooter from a distance. PSOF 4, 14, 16-17. *See Neil v. Bigger*, 409 U.S. 188, 199–200 (1972) (opportunity of the witness to view the criminal at the time of the crime and the accuracy of the witness's description of the criminal affect reliability of identification). By all accounts, moreover, the shooter had a hoodie drawn tight over his face, obscuring his features. PSOF 14.

As Rey revealed at his deposition, moreover, Defendants Guevara and Halvorsen openly signaled their interest in framing Mr. Bouto. PSOF 47-48. Guevara purposely allowed Rey to see Mr. Bouto handcuffed and isolated at Area Five and went so far as to say words to the effect of, "that's

the guy that did it." PSOF 47. Rey looked at a photograph of Mr. Bouto that Detectives had made available to the Spanish Cobra Witnesses, which was highly improper. *Id.* "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982). In a stark departure from acceptable police procedure, the Detectives sat the Spanish Cobra Witnesses, including Rey, together in a room to discuss the crime; they showed Mr. Bouto's photo to them; and also showed Mr. Bouto himself displayed through a one-way mirror—sending an unmistakable message that Mr. Bouto was the correct and only person to identify. *Id.* After testifying at trial under duress (PSOF 58), unsurprisingly, Rey has recanted his false identification (PSOF 14; Exh. 16, Lozada Affidavit, at ¶¶6-9), and he will testify at trial to the tactics and influence that caused him to identify Mr. Bouto.

In short, experienced detectives Guevara and Halvorsen knew that Rey was vulnerable to police and gang pressure, that he could not have seen the shooter's face sufficient to make an independent identification, and that he was informed in no uncertain terms *prior to the identification procedure* that the Defendants wanted Mr. Bouto pinned for the shooting. Moreover, Rey's live lineup identification followed the scene showup, where Rey again saw Mr. Bouto marked as a suspect. Experienced detectives would have understood that it is contrary to accepted police practice and training to show a witness the same suspect in repeated eyewitness identification procedures, as doing so decreases each subsequent identification's reliability. PSOF 42. In fact, Guevara and Halvorsen revealed their understanding that multiple showings of the same suspect violated accepted police procedure, because to justify their lineup at the station, they falsely reported to the felony review prosecutor that they did not realize a showup had been done. Based on the summary judgment record, that was a lie; Guevara and Halvorsen were present at the scene showup. PSOF 8, 34; Resp. to DSOF 32.

41

Rey's "identification" thus falls utterly short of the credible eyewitness identifications which the Seventh Circuit has found to support probable cause, and the Defendants offer no authority to the contrary. *See Anderer v. Jones,* 342 F. Supp. 2d 799, 802 (E.D. Wis. 2002), *aff'd,* 385 F.3d 1043 (7th Cir. 2004), *amended on denial of reh'g, 4*12 F.3d 794 (7th Cir. 2005) ("[T]he statement of one witness or victim is a sufficient basis for probable cause only where that witness is credible or the information is trustworthy."), *quoting Woods,* 234 F.3d at 996 ("[A] report from a single, *credible* victim or eyewitness can provide the basis for probable cause.") (emphasis in original citation). Courts recognize that not all witnesses are reliable, and thus, the law prohibits Defendants from basing their probable cause on an identification they know to be unreliable. *See Moorer v. Platt,* No. 18 CV 3796, 2020 WL 814924, at *3 (N.D. Ill. Feb. 19, 2020) (knowing an identification is unreliable would negate it as a basis for probable cause).

The fact that Rey may have identified Mr. Bouto in a scene showup does not change the analysis. First, there is a factual dispute about whether he made any on-scene identification; Pergande's post-dated report claimed he did, but Rey does not recall identifying anyone at the scene. PSOF 56. And the police did not create any contemporaneous record of Rey's supposed on-scene identification, which they should have done had there actually been an identification. PSOF 39-40. The deviation from well-established police practices creates an inference against the Defendants. *See Andersen,* 454 F. Supp. at 816; *Jimenez,* 732 F.3d at 721-22. The jury must make this factual determination.

Second, Defendants Guevara, Halvorsen, Pergande, and Pang were well aware that the suspects in the showup, including Mr. Bouto, were crammed into the back of a police car and did not even step out, obscuring observation of, for example, Mr. Bouto's height, his shorts, his shoes, likely the back of his head (to observe his hairstyle), and other salient characteristics. PSOF 34. Third, as with the live lineup, the showup was conducted in a group setting, akin to the officers

42

crowd-sourcing the identity of the shooter. Rey heard what others were saying, which influenced his own statement, and he was not interviewed separately as he should have been. Resp. to DSOF 38. Scene showups are notoriously less reliable and have a higher rate of mistaken identification than lineups because there are no known-innocent fillers to reduce the risk of false identification; when they occur without an admonition that the perpetrator may not be present and a suspect in handcuffs or in the back of a police cruiser is presented to the witnesses, there is a further risk of an identification not because of recognition, but because of witness deduction (e.g., "gee, this must be the perpetrator if the police have him in custody."). PSOF 35.

*    *    *

A review of the evidence known to Defendants Guevara, Halvorsen, Pergande and Pang reveals no genuine support for their first-degree murder charge against Mr. Bouto. The totality of these circumstances supports not even bare suspicion, but of course "probable cause requires more than that." *Rainsberger*, 913 F.3d at 649.

### B. Defendants Did Not Have Arguable Probable Cause And Are Not Entitled To Qualified Immunity

Defendants also argue that even if there was no probable cause, there was "arguable" probable cause such that they should have qualified immunity. "Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." *McComas* v. *Brickley*, 673 F.3d 722, 725 (7th Cir. 2012) (emphasis in original). In evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell*, 998 F.2d at 435-36. *Malley v. Briggs* held unambiguously that an officer has no such immunity when a reasonable official in his position would have known the facts did not establish probable cause. 475 U.S. 335, 345 (1986). The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox*, 600 F.3d at 833.

43

The jury must resolve a probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008). The Seventh Circuit has reversed summary judgment grants where defendants did not establish conclusively an absence of a fact dispute on probable cause. *Cartwright v. Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011). Qualified immunity also does not protect officers "who knowingly violate the law"; here, the evidence shows that Guevara, Halvorsen, and Pergdande acted knowingly. *Supra* at 2-7; *Hunter v. Bryant,* 502 U.S. 224, 229 (1991). Immunity is unavailable now.

In support of arguable probable cause, Defendants claim they were reasonable in relying on Mr. Bouto's gang affiliation and that he "was identified as the murderer by an eyewitness, found near the scene in the direction the shooter fled, and closely matched the clothing and physical appearance descriptions provided by multiple witnesses." ECF No. 445 at 12. As explained above, however, each of those factors except for Mr. Bouto's alleged gang affiliation (disputed) and the fact that he was present—along with dozens of other people—near the scene, was either fabricated or patently unreliable. *See* Section II.A, supra.

When the fabricated and implausible evidence is stripped from the analysis, as it must be, all that is left is proximity to a busy crime scene and affiliation with a gang that may or may not have been involved. Those highly general facts could be true of so many people as to be meaningless. As to "gang affiliation," Defendants failed to develop this argument, so it is unclear if they mean gang affiliation alone supports probable cause or if they would argue that Mr. Bouto's alleged affiliation to a particular gang created the reasonable suspicion, and if so, how. Either way, their passing reference to "gang affiliation" leaves Plaintiff no opportunity to respond meaningfully and amounts to waiver. *Mitsui Sumitomo Ins. Co., Ltd. v. Moore Transp., Inc.*, 500 F. Supp. 2d 942, 951 (N.D. Ill. 2007) (perfunctory arguments are waived and court has no obligation to consider arguments merely raised

44

but not developed). Moreover, the facts are heavily disputed on this front; none of the four Spanish Cobra Witnesses observed whether Ruvalcaba's shooter was a member of the P.R. Stones as opposed to a member of the Familia Stones or some other opposing gang member. PSOF 20, 1-4.

Defendants certainly have not presented any caselaw that found arguable probable cause on gang affiliation and proximity alone. *Cf. Fulton*, 2024 WL 1242637, at \*13 ("At the threshold, duct tape and gas cans, like red and black jackets, are so commonplace that a suspect's possession of them, without more, does very little to establish probable cause."). The cases Defendants cite all depend on more specific identifiers, such as closely matching physical descriptions, which as explained above are not present here. In *Evans*, for example, the court found that probable existed to arrest plaintiff because he matched the suspect's height, race, gender, clothing, and was last seen on the street where the suspect fled. *Evans v. Matson*, 2022 WL 912031, at \*1 (E.D.Wis. Mar. 29, 2022), aff'd, No. 23-2954, 2024 WL 2206638 (7th Cir. May 16, 2024). And none of the cases on which Defendants rely, including *Timms, Carpenter,* and *Evans*, involved a contention that the police fabricated the evidence supplying the purported probable cause, unlike the record here, which implicates a fact dispute for the jury requiring rejection of this defense. ECF No. 445 at 21. It is firmly established that knowingly false statements cannot support arguable probable cause, because intentionally creating false evidence by definition cannot form a mistaken belief. *See Fulton v. Bartik,* No. 20 C 3118, 2024 WL 1242637, at \*10 (N.D. Ill. Mar., 22, 2024), citing *Alexander*, 721 F.3d at 423. "[O]fficers who knowingly, or with reckless disregard for the truth, rely on such false statements 'cannot be said to have acted in an objectively reasonable manner' unless there is also 'accurate information sufficient to constitute probable cause [that] attended the false statements.'" *Id.*, citing *Lawson*, 637 F.3d at 704.

Here, there is at least a genuine factual dispute as to whether Mr. Bouto matched the suspect, since he had facial hair, did not have a ponytail, was taller by several inches, wore different

45

clothing, and was of a different race. PSOF 22-27. Unlike in *Evans*, moreover, where "officers reported seeing no one else who matched the description," Mr. Bouto was one of several young men at the scene, and the Defendants adduced no evidence that he was the only person who matched the description. *See id.* at *4. Indeed, the description itself changed materially to fit the suspect, as the Flemings changed their tune on height and clothing *after* Mr. Bouto was detained—and Michael's initial description *exculpated* Mr. Bouto. PSOF 12, 14, 63-72.

Defendants cannot invoke qualified immunity by claiming a "mistaken belief" formed largely based on evidence they themselves falsified. The meager evidence that remains does not add up to arguable probable cause. *See Fulton*, 2024 WL 124637, at *16 ("While these facts *might* add up to reasonable articulable suspicion, they do not establish probable cause, or even arguable probable cause, as a matter of law."); *Hurt*, 880 F.3d 841 (because a jury could resolve factual disputes underlying defendants' actions in plaintiff's favor, the case for even arguable probable cause "falls apart"); *Richardson v. Vill. of Dolton*, No. 20 C 4254, 2022 WL 4606063, at *6 (N.D. Ill. Sept. 30, 2022) (where jury could resolve disputed facts and infer that it was unreasonable to arrest plaintiff, "qualified immunity would not shield Carr with arguable probable cause, because his probable-cause determination was either unreasonable or fabricated").

Furthermore, "[b]ecause of the numerous genuine disputes of material fact surrounding the Police Officer Defendants' purported basis for probable cause, they are not entitled to qualified immunity on Counts III and IX at this stage of the litigation." *Fulton v. Bartik*, No. 20 C 3118, 2024 WL 1242637, at *17 (N.D. Ill. Mar. 22, 2024), citing *Chelios*, 520 F.3d at 686. Summary judgment must be denied.

### C. Plaintiff's Federal Malicious Prosecution Claim Must Proceed to Trial

As to the federal malicious prosecution claim only, Defendants make a final argument: that they are qualifiedly immune because this federal claim was not recognized by the Supreme Court

until *Thomspon v. Clark* was issued in 2022. *See* 596 U.S. 36 (2022). (This argument does not concern Plaintiff's state law claim, for which of course there can be no qualified immunity. *Robinson v. Gerritson*, 210 F. Supp. 2d 1004, 1013 (N.D. Ill. 2002)).

Defendants have not cited a single case from this Circuit applying qualified immunity to federal malicious prosecution claims on grounds that the officers' misconduct pre-dated *Thomas.* The handful of decisions Defendants cite all come from within the Fifth Circuit, which are not binding on this court. *See United States v. Glaser* 14 F.3d 1213, 1216 (7th Cir. 1994) ("A district court in Wisconsin must follow [Seventh Circuit] decisions, but it owes no more than respectful consideration to the views of other circuits."); *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). While the Seventh Circuit does not appear to have addressed this precise question, it did recognize a federal malicious prosecution claim just last year, stemming from officers' 2012 police investigation and ensuing criminal prosecution. *See Mack v. City of Chicago*, 151 F.4th 887, 894 (7th Cir. 2025). Although the Court granted the officers qualified immunity, it was *not* because the misconduct predated *Thompson* but rather because the officers had probable cause to detain the plaintiff and thus there was no constitutional violation. *Id.* at 897.

*Bianchi*, which Defendants cite, is no help to them. *Bianchi* was decided in 2016, six years before *Thompson*, and there the Court considered whether a federal malicious prosecution claim existed. *See Bianchi v. McQueen*, 818 F.3d 309, 323 (7th Cir. 2016). The law was unsettled on that issue until *Thompson*. *Bianchi* did <u>not</u> hold that officers can claim qualified immunity for wrongful conduct simply because the conduct occurred before *Thompson*, nor did it hold more generally that tortious conduct is immunized when it occurs before a specific legal claim is developed by the courts. *Id.* Defendants offer no other cite for such a proposition.

47

Defendants' position fundamentally misunderstands the Seventh Circuit's long-held view that the qualified immunity doctrine considers the *conduct*, not the claim, at issue. *See Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) ("clearly established" prong satisfied by showing "an analogous case establishing the right to be *free from the conduct at issue*") (emphasis added). The Seventh Circuit explained this in *Taylor v. Ways*, in which the defendants to an employment discrimination claim invoked qualified immunity by arguing that "it was not clearly established that a *subordinate employee could be held liable* for unlawful efforts to cause the termination of another employee." *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021) (emphasis in original). The Court held that even though plaintiffs had not identified a specific case clearly establishing the subordinate employee's liability, qualified immunity was unavailable because the misconduct at issue had long been prohibited. The Seventh Circuit's rejection of defendants' logic is instructive:

> Ernst's argument asks the wrong question about qualified immunity. The question is not whether *rules of individual liability* for the conduct were clearly established at the time. The question is whether *the wrongfulness of the defendant's conduct* was clearly established. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (in deciding immunity, "the focus is on his conduct, not on whether that conduct gave rise to a tort in a particular case"). The Supreme Court has repeatedly described the defense of qualified immunity in terms of whether the defendant official's "actions" or "conduct" violated clearly established law, not in terms of whether a defendant should have realized he would be held civilly liable for his actions or conduct. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ("conduct"); *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996) (("conduct"); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) ("actions"); *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) ("actions"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (("conduct").

*Id.*

Applying that framework to these facts, it is clear that qualified immunity is unavailable; the misconduct at issue had been clearly prohibited long before the 1993 Ruvalcaba investigation. It was clearly established, as discussed already, that the fabrication and suppression of evidence was unconstitutional in 1993. *Supra* I, IV.C. Moreover, it was established long before the Ruvalcaba

48

investigation that officers who submit false evidence to secure charges violate the Fourth

Amendment and are not entitled to immunity. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). In *Jones v.*

*City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988), for example, the Seventh Circuit confirmed that

police officers could be liable "for concealing information from, and making material

representations to, local prosecutors, leading to the wrongful arrest and prosecution of a defendant."

*Norris v. Bain*, 2006 WL 753131, at *12 (S.D. Ind. Mar. 21, 2006). "*Jones* made clear that providing

false information against a suspect as part of a criminal investigation subjects an official to liability

under § 1983." *Norris*, 2006 WL 753131, at *12. Numerous other pre-*Thompson* decisions recognized

that officers could be liable for falsifying evidence that led to criminal charges. *See, e.g., Pennington v.*

*Hobson*, 719 F.Supp. 760, 767 (S.D.Ind. 1989) ("[A] police officer who knowingly or recklessly

submits an affidavit containing false statements concerning an arrestee violates the arrestee's clearly

established Fourth Amendment rights"), citing *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985). *See*

*also Smith v. Springer,* 859 F.2d 31, 34 (7th Cir.1988) (a plaintiff "can prevail on his § 1983 claim if he

shows that the defendants fabricated evidence leading to his false arrest and subsequent

unreasonable seizure"); *Smith v. City of Chicago,* 913 F.2d 469, 472 (7th Cir. 1990) (same), both

abrogated on other grounds by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383

(1994). *Cf. Treece v. City of Naperville,* 1998 WL 142391, *11 (N.D.Ill. March 25, 1998) (officer did not

have qualified immunity from suit because "a reasonable officer could have understood that

falsifying police reports and fabricating charges violated [plaintiff's] rights under the Fourth

Amendment").

     If Plaintiff's facts are credited, a reasonable jury could find that Defendants manufactured

false evidence, suppressed the true circumstances of the unreliable witnesses "identifications," and

knowingly misled prosecutors into charging Mr. Bouto when the untainted evidence did not justify

doing so. *See Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016) (improper to grant qualified

49

immunity if there are disputes of material facts surrounding the alleged unlawful conduct). If so, Defendants should not be shielded from liability simply because the Supreme Court clarified a Fourth Amendment pathway to malicious prosecution claims in 2002. *See Humphrey*, 2020 WL 3060363, at \*11 ("They err, however, in relying on the state of the law applicable to Section 1983 malicious prosecution claims instead of focusing on Defendants' alleged conduct"), citing *Fields*, 740 F.3d at 1114.

The specific types of misconduct in which the Defendants engaged have long been prohibited, and Defendants' suggestion that they were not "on notice" of these prohibitions until 2002 borders on frivolous. *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known."); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (cleaned up) ("the official must have [had] fair warning that his conduct [was] unconstitutional").

Qualified immunity is unavailable, and summary judgment should be denied.

## III. PLAINTIFF'S DUE PROCESS CLAIM DOES NOT REQUIRE A FINDING THAT THE IDENTIFICATION WAS UNDULY SUGGESTIVE

Defendants argue that Plaintiff fails to present evidence of a viable suggestive identification claim and that Defendants are entitled to qualified immunity on such a theory. This Court need not reach these issues because Plaintiff proceeds on fabrication and *Brady* theories to challenge the identifications evidence and does not rely on any standalone suggestive identification theory.

Should the Court consider the issue, *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025), is a narrow decision that does not impact Plaintiff's pending due process claim for fabrication and suppression of evidence. The Court explained that the "appeal is limited to Blackmon's contention that an unduly suggestive photo array or lineup *by itself* entitles an accused to damages. And our answer—that it does not—is limited to that issue." *Id.* at 526. Simultaneously, the Court reaffirmed

that due process is violated, and qualified immunity is unavailable, when police officers fabricate evidence or suppress *Brady* material, such as when officers coach a witness to identify a suspect and deceive a prosecutor about what they did, hide the true nature of identification procedures they conducted, coerce a witness to testify falsely, or manufacture identifications. *Id.* at 525-26. (noting that it had long been established that such allegations "could justify awards of damages against the police"), citing *Jones*, 856 F.2d 985. Thus, it remains the law—and *Blackmon* reaffirms—that an officer is liable and lacks immunity when, as here, he fabricates an identification or suppresses the true nature of his identification procedures. Mr. Bouto's claims fall squarely in the permissible category.

Based on *Blackmon's* narrow holding, Plaintiff is not advancing his claim based solely on the unduly suggestive identification. However, Plaintiff preserves the claim in the event the law changes.

## IV. A TRIAL IS REQUIRED ON PLAINTIFF'S SUPPRESSION OF EVIDENCE CLAIM

To prove a *Brady* violation, a plaintiff must demonstrate (1) that the evidence in question was favorable to his defense, either because it had exculpatory or impeachment value; (2) that the police "suppressed" the favorable evidence; and (3) prejudice ensued, which occurs if the evidence was material. *See Goudy v. Cummings ("Goudy II")*, 922 F.3d 834, 2019 WL 1930509, at *3 (7th Cir. May 1, 2019).

The Supreme Court holds that "[e]vidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to

51

'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain,* 132 S. Ct. 627,629-31 (2012)); *see also Kyles*, 514 U.S. at 434.

The Seventh Circuit has repeatedly admonished, moreover, that the materiality of suppressed evidence must be evaluated collectively, not parsed out in siloed strands as Defendants have done. *See Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) ("materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation."); *Goudy v. Basinger ("Goudy I")*, 604 F.3d 394, 400 (7th Cir. 2010) (evaluating each piece of suppressed evidence in isolate "suggest[s] that cumulative materiality is not the touchstone," when it is). *Id.* Only by considering the suppressed evidence as a whole can the "full exculpatory value of this evidence" be assessed. *Id.* at 401.

Here, Defendants suppressed the coercive and highly improper tactics they used to make prosecution witnesses out of non-witnesses. By doing so, they suppressed the exculpatory and impeachment evidence that would have wholly undercut the State's case. Mr. Bouto's criminal trial contained no physical evidence of guilt, no confession, and Mr. Bouto had strong alibi evidence. Against this backdrop, the suppressed evidence, especially when viewed cumulatively, was reasonably likely to have affected the criminal jury's judgment.

## A. Defendants' Suppression of Their Manipulative and Coercive Tactics Used on Key Witnesses Violates Due Process

Defendants acknowledge Plaintiff's claim that they failed to disclose the coercive tactics they used to obtain Rey's and Richmond's identifications but take the position that no *Brady* claim can exist where, as here, those identifications also give rise to fabrication claims. Defendants' argument flies in the face of well-settled Seventh Circuit law.

First, it is firmly established that evidence that would impeach a key eyewitness's identification – such as evidence that the ID was tainted or given only after the use of coercive tactics – is material. *See, e.g., Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir.), *cert. denied sub nom. Hernandez v. Avery*, 137 S. Ct. 2249, 198 L. Ed. 2d 680 (2017) (*Brady* violation can exist where

52

police fail "to disclose facts about the coercive tactics used to obtain" a false witness statement) (quoting *Fields II*, 740 F.3d at 1123 (Sykes, J., concurring in part and dissenting in part); *Fields II*, 740 F.3d at 1123 ("[I]f the police officers ... withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of Brady."). *See also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie* (*Fields I*), 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other [pieces of] information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

Courts have consistently recognized the affront to due process when a police officer manipulates a witness to falsely identify a criminal defendant and then fails to disclose the manipulation. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001), abrogated on other grounds by *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017). *See also Anderson*, 932 F.3d at 506-07 (concluding *Brady* violation occurred when misconduct used to fabricate statement was not disclosed); *Avery*, 847 F.3d at 439 (when witness tampering is used to deprive a criminal defendant of liberty, the failure to disclose the tactics amounts to a "violation of the *Brady* duty to disclose facts about the coercive tactics").

Unsurprisingly, therefore, the Seventh Circuit has held, time and again, that suppressing evidence of witness fabrication gives rise to an independent *Brady* claim when it causes a deprivation of liberty. *See, e.g., Lewis v. Chicago*, 914 F.3d 472, 479-80 (7th Cir. 2019) (emphasis added) ("[M]isconduct [involving fabricated evidence] that results in a conviction might also violate the

53

accused's right to due process under the rubric of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles*, 514 U.S. 419, if government officials suppressed evidence of the fabrication."); *Avery*, 847 F.3d at 443-44; *Kuri*, 2017 WL 4882338, at *7 (there is no indication from the record that Kuri knew that the Police Defendants used "pressure tactics and inducements" to obtain these false statements) (quoting *Avery*, 847 F.3d at 443).

Here, Defendants suppressed the true circumstances of Richmond and Escobars's lineup identification. Evidence is suppressed for *Brady* purposes if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). It is undisputed at summary judgment that Defendants Guevara and Halvorsen did not disclose any of the following facts: (1) they singled out Mr. Bouto and signaled to Richmond and Escobar that he was their suspect, where he was clearly seen chained up at Area 5 and standing on the other side of the one-way mirror; (2) they showed the witnesses a lone Polaroid photograph of Mr. Bouto, in the clothing he would be wearing during the live lineup, just before the lineup; and (3) they forced the witnesses to identify Mr. Bouto, and threatened and pressured him with terrifying criminal consequences for noncompliance. PSOF 44-54.

Beyond suppressing the outright threats and fact-feeding they used on Richmond and Escobar, Defendants Guevara and Halvorsen also suppressed the coercive and highly suggestive methods they used on Richmond, Escobar, and Rey Lozado. That they showed the witnesses a singled-out Polaroid photograph of Mr. Bouto, as well as the existence of the Polaroid and the photograph itself, were kept hidden from the prosecution. PSOF 51. Rather than deny the allegations that he improperly targeted Mr. Bouto using the Polaroid, Defendant Guevara asserted his right against self-incrimination. PSOF 97. So, too, for Halvorsen, who participated in these

54

coercive interrogations alongside Guevara. *See* PSOF 8, 12, 22, 28, 34, 37, 39, 41, 43, 45, 46, 52-53, 61, 63, 65, 67, 70, 74, 78, 84-87, 90, 98 (summarizing Halvorsen's involvement in scene showup, providing false information to Felony Review ASA, fabricating false identifications during live lineup, and failed to disclose coercion and improper influence of witnesses).

Notwithstanding the mountain of law identifying these collective circumstances as coercive and requiring them to be disclosed under the *Brady* line of cases, summarized above, Defendants nevertheless rely on *Saunders-El* to argue that they are not obligated to record their own misconduct, and if they do not document their coercion, they do not have to disclose it. That is not the law. Unlike here, *Saunders-El* considered a *Brady* claim that was only a repurposed fabrication claim. There, Plaintiff alleged that when defendants "kept quiet" about the fact that they planted blood evidence, they also violated *Brady*. The court rejected this legal theory and observed that the State is not required to create exculpatory evidence or accurately disclose the circumstances of its investigation. *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015).[6]

Stretching the bounds of this decision well beyond its factual context, Defendants argue that they had no obligation to "create" exculpatory evidence. *Cf. FDIC v. O'Neil*, 809 F.2d 350, 354 (7th Cir. 1987) ("general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language"). But there can be no

---

[6] *Saunders-El* based its ruling on a line of cases stating that evidence known to the criminal defendant cannot form the basis of a Brady violation. *See Saunders-El*, 778 F.3d at 562, *citing Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir.2003), *overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 423 (7th Cir.2006); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir.2006). (*Saunders-El* also cites *Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007), but that case also relies on *Gauger* and *Sornberger*.) *Gauger* and *Sornberger* are false confession cases holding that police withholding a truthful account of an interrogation does not offend *Brady*. *See Gauger*, 349 F.3d at 360; *Sornberger*, 434 F.3d at 1029. These cases have nothing to say about *Newsome*'s holding that "a due process claim in the original sense of that phrase" exists where police withhold the means they "used to influence the identification." *Newsome*, 256 F.3d at 752.

straight-faced dispute that the jury was entitled to know that the prosecution's "eyewitnesses" gave their identifications only after being subjected to coercion and intimidation. *Newsome*, 319 F.3d at 304 (failure to disclose "the details of how they induced the witnesses to finger Newsome" forms the basis for a *Brady* violation). Whether or not Defendants wrote down the coercive tactics they used is irrelevant; they were required to disclose the *information* itself. Indeed, police officers rarely document their coercion of witnesses in their own police reports, but the Seventh Circuit has repeatedly admonished that it must be disclosed—and to withhold it may violate *Brady. See, e.g.,* *Avery*, 847 F.3d at 439 (*Brady* violation can exist where police fail "to disclose facts about the coercive tactics used to obtain" a false witness statement); *id.* at 439 (quoting *Fields II*, 740 F.3d at 1123 (Sykes, J., concurring in part and dissenting in part) ("[I]f the police officers ... withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of Brady."). Defendants' argument turns *Brady* on its head—they propose a rule that police officers can easily avoid complying with *Brady* by not writing down the exculpatory/impeachment information that they possess. *Saunders-El* creates no such loophole, nor does any other case.

In sum, Defendants' argument that facts giving rise to a due process fabrication claim cannot also give rise to a due process suppression claim is a made-up rule. The Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory

56

because, although the plaintiff "knew that the informants' statements were false, . . . he did not know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him prove that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a Bivens claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013).

Once this legal fiction is rejected, Mr. Bouto's *Brady* theory based on the suppressed coercive tactics must proceed to trial. Defendants do not contest the materiality of the coercion. Nor can they—the prosecution's case rose and fell with the witness identifications. Mr. Bouto, on the other hand, had to challenge those accounts with only his alibi evidence, as there was no physical evidence that could exclude (or include) him such as DNA. Anything that would have allowed him to attack the witnesses' accuracy or independence was thus highly material. *See Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"). If Defendants had disclosed this information, Mr. Bouto could have presented evidence that Rey and Richmond implicated him only because Defendants had coerced them to do so. *See Anderson,* 932 F.3d at 507 ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication").

In the case of Frank Escobar, had he not been linked with a false identification of Mr. Bouto, moreover, he could have been used to impeach the prosecution's witnesses. After all, Escobar was walking with Richmond, just a few feet behind the victim, when the fatal shots were fired. Standing some 200 feet from the shooter, Escobar would not have been able to make out the shooter's face. His testimony would have revealed the implausibility of Richmond's and Rey's claims, but Mr. Bouto could not risk calling him because Defendants had tarnished Escobar as a

57

defense witness by forcing him, too, to adopt a phony identification. These facts make out a *Brady*

claim. *See Anderson*, 932 F.3d at 507 (denying summary judgment on *Brady* claim where defendant

police officer forced witness to sign false evidence adverse to plaintiffs in order "to neutralize" the

witness such that plaintiffs could not call witness at trial, "without the plaintiffs ever knowing that

[witness's] about-face was the fruit of police misconduct").

### B. Defendants' Qualified Immunity Defense as to *Brady* Fails

Defendants make a one-sentence argument that it was not clearly established in 1993 that

police officers could be held liable for failing to disclose their improper tactics. ECF No. 445 at 26.

This argument deserves little consideration, as it flies in the face of sixty years of *Brady*

jurisprudence. *Dominguez*, 545 F.3d at 589 (clearly established by 1989 that withholding material

information, in this case use of a showup with eyewitness, was unconstitutional). *See also Weston v.*

*City of Chicago*, No. 20 C 6189, 2026 WL 821237, at *19 (N.D. Ill. Mar. 25, 2026). *Weston,* involving a

1990 police investigation, denied qualified immunity because it "was clearly established that police

officers had to disclose exculpatory and impeachment evidence, including evidence of witness

coercion," citing *Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) and *Engel v. Buchan*, 710 F.3d

698, 708-709 (7th Cir. 2013). Indeed, "[i]t was already clearly established as early as 1981 that police

could not withhold exculpatory information from prosecutors." *Goudy*, 922 F.3d at 844 (denying

qualified immunity from *Brady* claim based on suppression of evidence that several witnesses initially

identified different suspect and another suspect initially denied involvement in crime but later

changed his story).

Defendants also attempt qualified immunity by arguing that the requisite *mens rea* for *Brady*

claims is unsettled; specifically, that it remains unsettled whether liability requires bad faith or can be

premised on a lesser showing of recklessness. Defendants argue that this "uncertainty in the law"

means the right cannot be clearly established, so qualified immunity should accord. ECF No. 445 at

58

28. But if Defendants' argument were correct, every defendant in the Seventh Circuit would enjoy qualified immunity on every *Brady* claim, but that is axiomatically not true. More fundamentally, Defendants again miss the mark – the qualified immunity doctrine concerns the wrongfulness of the *conduct*, not the officers' predications about how the contours of the ensuing legal claims would evolve through the courts. *See Taylor*, 999 F.3d at 491 ("The question is not whether *rules of individual liability* for the conduct were clearly established at the time. The question is whether *the wrongfulness of the defendant's conduct* was clearly established.") (emphasis in original), citing *Armstrong*, 786 F.3d at 556. And as the paragraph above lays out, it has long been held that the conduct of suppressing from the prosecution the coercive tactics used on material witnesses is forbidden.

Indeed, in support of their approach to qualified immunity, they cite only one case name, *Aska v. Yingling*, without providing a case citation, and that decision appears to deal with a circuit split surrounding the officer's *factual* understanding when effectuating a search warrant, not the officers' understanding of the *legal contours* of a claim. *Aska v. Yingling*, No. 3:23-CV-50004, 2026 WL 179545, at *13 (N.D. Ill. Jan. 23, 2026). They cite no case suggesting that officers enjoy qualified immunity from *Brady* claims indefinitely while the Seventh Circuit resolves whether recklenessness is sufficient. It is well-settled that the correct inquiry is whether, after crediting the Plaintiff's version of facts, *see Hope v. Pelzer*, 122 S.Ct. 2508, 2513 (2002), Defendants' <u>actions</u> were clearly prohibited by 1993. *See also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."). The answer here is yes.

## V.    A TRIAL IS REQUIRED ON MR. BOUTO'S CONSPIRACY CLAIMS

The jury must also resolve Plaintiff's federal and state law conspiracy claims against Defendants Guevara, Halvorsen, Pergande, Maher, and Pang.

To prove a section 1983 conspiracy, Mr. Bouto must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or

a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. *See also Jones,* 856 F.2d at 992 (conspirators need not have agreed on details or even know who the other conspirators are; sufficient to understand the general objectives). "[I]f the agreement is not overt, 'the alleged acts must be sufficient to raise the inference of mutual understanding' (i.e., the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal citation omitted). This is because the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," but requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) (citation and internal quotation marks omitted). Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002).

A coconspirator need not have directly caused a constitutional violation himself. *See United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990) (mere presence or a single act can be grounds for liability if the act was "intended to advance the ends of the conspiracy") (internal citation omitted). All that is necessary is that the coconspirator agree—explicitly or tacitly—to the objective of the conspiracy and take some overt step in furtherance of that objective. *Jones*, 856 F.2d at 993; *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *11 (N.D. Ill. May 17, 2016). The overt step need not be illegal. *See Smith v. Burge*, 222 F. Supp. 3d 669, 697 (N.D. Ill. 2016). Conspiracies, moreover, are by their nature carried out in secret, and thus direct proof of agreement is rare." *Tully v. Del Re*, No. 00 CV 2829, 2002 WL 31175983, at *7 (N.D. Ill. Oct. 1, 2002) (citing *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995)). Thus, as Defendants concede, "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir.

60

1984). At summary judgment, when inferences are taken in the non-movant's favor, "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds." *Hampton*, 600 F.2d at 621. Applying this law, the jury must resolve Mr. Montanez's conspiracy claims against the Defendants.

The general scope of Defendants' conspiracy against Mr. Bouto was to secure his conviction for a crime he did not commit. That is, the "agreement" at issue involved manufacturing evidence of guilt, and suppressing evidence that tended to undercut guilt, such that Mr. Bouto would be charged and tried for the Ruvalcaba murder, even though they knew there was no legitimate reason to suspect him of the crime. Defendants Pergande, Pang, and Halvorsen argue that there is no evidence of such an agreement, but the record demonstrates otherwise.

Construing the record in Mr. Bouto's favor and affording him all reasonable inferences, the Ruvalcaba investigation reveals a coordinated effort by the Defendants to fabricate evidence against Mr. Bouto. Plaintiff's evidence establishes that he was innocent (PSOF 5-7); that just shortly before his arrest, Defendant Pergande had learned Mr. Bouto was a witness in a police brutality complaint against Defendant Pergande and Pang's regular partners on the 17th District tactical team, including some of Mr. Bouto's arresting officers, and Pergande had just made a statement on their behalf (PSOF 29-32, 92-93); that Area Five Detectives like Guevara, Halvorsen, and Maher also worked closely with the tactical team and were motivated to support them in their sceme (DSOF 3, PSOF 33); that shortly after this complaint was filed, Defendants seized an opportunity to pick Plaintiff up on a shooting case because they found him in the vicinity, despite the fact that he did not fit the suspect's description (PSOF 22-27, 29-32); that Defendants Pergande, Pang, Guevara, and Halvorsen coordinated to obtain on-scene showup "identifications" from a group of teenage gang members and two neighborhood witnesses, the Flemings, who were easily manipulable and lacked

61

actual knowledge of the shooter's identity (*e.g.*, *supra* at PSOF 12, 14, 60, 62, 63-75); that Defendants Guevara and Halvorsen falsely claimed that certain witnesses made showup identifications when they did not (e.g., PSOF 18, 44-45); that in furtherance of the joint venture, Defendant Pergande went along with this fiction by falsely claiming Plaintiff had a ponytail (Resp. to DSOF 18), testifying about the false identifications and by suppressing the coercive tactics used to procedure them; that Defendant Pang removed the battery from Plaintiff's pager to destroy the means to obtain his alibi witness's phone number and make his alibi look suspicious and difficult to investigate (Resp. to DSOF 38-41; PSOF 73-75); that Defendants Guevara and Halvorsen manufactured additional "corroboration" from Vicente and Maldonado to ensure charges were filed (PSOF 79-82, 90); that Defendant Maher, Guevara, and Halvorsen fabricated evidence that Vicente had supposedly confessed first to an unrelated detective, Maher, in order to remove suspicion from his account (PSOF 83-85); and that Plaintiffs' criminal proceedings and eventual conviction were rendered a sham by false evidence and withheld exculpatory evidence. *E.g.*, PSOF 86, 94. Thus, Defendants each played a role in construction a false case implicating Plaintiffs.

This evidence creates a genuine dispute of fact as to whether Defendants reached an agreement by way of a common objective to secure a conviction against Mr. Bouto for a crime he did not commit. *See Xie*, No. 14 CV 6082, 2016 WL 6193981, at *10; *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *9-*10 (N.D. Ill. Jan. 26, 2009). Indeed, it is "unlikely" that they undertook these coordinated steps together, without an agreement. *Amundsen*, 218 F.3d at 718. Because "[t]here is no such thing as accidental or inadvertent participation in a conspiracy," *Jones*, 856 F.2d at 993, an entirely plausible and reasonable inference arising from Pergande, Pang, Guevara, and Halvorsen's coordinated acts is that they agreed to frame Mr. Bouto. Thus, at a bare minimum, the record establishes a factual dispute about whether these Defendants understood "the

62

general objectives of the scheme, accepte[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *Id,* at 992.

Defendants also argue that Plaintiff has not established a predicate constitutional violation to underlie his conspiracy claims. Not so. As Sections I, II, and IV, *supra*, show, Mr. Bouto has significant due process violations that a jury must resolve, including fabrication and *Brady* claims, so the requirement of a predicate constitutional violation is satisfied. *See, e.g., Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *9 (N.D. Ill. Jan. 26, 2009).

As to Defendants' assertion that a Section 1983 conspiracy claim requires a private actor, they misstate the law. The Seventh Circuit has allowed conspiracy claims under section 1983 to go forward against several employees of the same municipality. *E.g., Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (allowing section 1983 conspiracy claim against "several members of the same police unit"); *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit"); *Jones*, 856 F.2d at 992 (affirming jury determination of conspiracy among Chicago police officers); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253–61 (7th Cir. 1984) (upholding damage award for conspiracy among Milwaukee police officers). "And district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, No. 1:20-CV-04085, 2021 WL 2894167, at *5 (N.D. Ill. July 9, 2021). Even if the doctrine were applicable to section 1983 cases generally, it would not fit with the facts of this case. "The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions." *Reitz v. Creighton*, No. 15-CV-01854, 2015 WL 5081485, at *5 (N.D. Ill. Aug. 26, 2015). Defendants' conspiracy to violate Mr. Bouto's civil rights could not have been carried out in pursuit of the City of Chicago's lawful business, and therefore the intracorporate conspiracy doctrine does not operate as a shield.

63

Defendants' qualified immunity assertion is predicated on their belief that conspiracy requires a private actor. It does not, as shown above, so here, too, qualified immunity fails. In fact, the cases cited above show that conspiracy claims against Chicago police officers were affirmed as long ago as 1984 and 1988. *See Jones*, 856 F.2d at 992; *Bell*, 746 F.2d at 1253–61. *See also Liggins*, 2021 WL 2894167, at *6 (qualified immunity defense unavailable on conspiracy claim).

## VI.      Plaintiff's Failure to Intervene Claim Must Proceed To A Trial

Defendants argue that Plaintiff's failure to intervene claim is derivative of underlying constitutional violations, and because they contend that Mr. Bouto has not demonstrated any such violations, this claim fails too. Mr. Bouto has identified several underlying constitutional violations, however, that a reasonable jury could find occurred on this record. This includes numerous due process violations, as well as malicious prosecution. These constitutional violations give rise to a duty to intervene. *See Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (a person can be liable for failing to intervene if that individual had reason to know that a constitutional violation was being committed and a realistic opportunity to prevent the harm from occurring). Moreover, the Defendants worked alongside each other and acted in concert, as Plaintiff has explained throughout, and thus had an opportunity to intervene and prevent Plaintiff's constitutional rights from being violated. The duty to intervene was clearly established, moreover, by 1993. *See Yang*, 37 F.3d at 285 (holding that police officer's 1991 failure to intervene could violate due process clause). Accordingly, Defendants' motion should be denied.

## VII.     Plaintiff's IIED, *Respondeat Superior* and Indemnification Claims Should Not Be Dismissed.

The Defendants argue that Plaintiff's intentional infliction of emotional district, indemnification, and *respondeat superior* claims should be dismissed to the extent that the underlying claims challenged above are dismissed. However, as argued above, Plaintiff has triable federal and

state law claims against each of the remaining Defendants, which support his IIED, *respondeat superior* liability and indemnification. Because the premise of Defendants' only argument against these claims is incorrect, summary judgment on these counts must be denied.

*   *   *

For the foregoing reasons, Plaintiff respectfully asks this Court to deny the Defendants' motions for summary judgment.

RESPECTFULLY SUBMITTED,

By:    /s/Ruth Brown
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
russell@loevy.com